## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THERESA LEE,                                          :
parent and next friend of A.L., a minor              :
722 Grand Street, NW                                 :
Washington, D.C. 20001                               :
                 **Plaintiffs**          :
                                        :
                                        :

                **v.**                                    :
DISTRICT OF COLUMBIA                                  :
A Municipal Corporation                              :
One Judiciary Square                                 :
441 Fourth Street, N. W.                             :
Washington, D.C. 20001                               :
                                        :
serve:                                               :
                                        :     **Civil Action No:**
ADRIAN FENTY, Mayor                                  :
District of Columbia                                 :
1350 Pennsylvania Avenue, N. W., 5th Fl.  :
Washington, D.C. 20002                               :
                                        :
LINDA SINGER                                         :
Attorney General                                     :
1350 Pennsylvania Avenue, N. W.,                     :
Ste. 409                                             :
Washington, D.C. 20004                               :
                **and**                                   :
                                        :
MICHELLE RHEE (officially)                           :
Chancellor, D.C. Public Schools                      :
825 North Capitol St., N. E., Suite 9026             :
Washington, D.C. 20002                               :
                                        :
**Defendants**                                       :

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE AND OTHER RELIEF

Comes now the Plaintiffs, by and through their attorneys Domiento C.R. Hill, Roxanne D. Neloms, and the Law Offices of James E. Brown & Associates, P.L.L.C, and respectfully unto this Honorable Court as follows that:

**JURISDICTION**

1.  This Court has jurisdiction pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C Sections 1400-1461; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. Sections 794; 42 U.S.C. Section 1983; 28 U.S.C. Section 1331 and 1343 and 5 D.C. Municipal Regs. Sections 3000.1 et seq.

2.  Declaratory relief is authorized by 28 U.S.C Sections 2201; 2202.

3.  Venue is proper in this Court pursuant to 28 U.S.C. Section 1391.

**PARTIES**

4.  Theresa Lee initiates this cause of action on behalf of her minor child Antonio Lee, herein after referred to as A.L.

5.  A.L.'s birth year is 1995 and at all times relevant to the filing of this suit, resides in the District of Columbia.

6.  Defendant, the District of Columbia Government is a municipal corporation that receives federal funds pursuant to the Individuals with Disabilities Act ("IDEA"), to ensure access to a free and appropriate education ("FAPE") and is obligated to comply with the applicable federal regulations and statutes including but not limited to the IDEA.

7.  Defendant, Michelle Rhee, being sued in her capacity as the Chancellor of the

2

District of Columbia Public School System ("DCPS") which is the State Educational

Agency ("SEA"), charged with responsibility of ensuring that all disabled children

in the District of Columbia receive access to a free and appropriate public education

"FAPE" and to ensure them equal protection and due process of law.

## RELEVANT BACKGROUND

8.  That A.L. attended Bruce Monroe Elementary for the 2004-2005 school year, during

which time the MDT team developed an individualized education plan (IEP). *See*

*Exhibit 2*

9.  That the May 2005 IEP identified A.L. as a student specific learning disabilities and

provided him with 5 hours of specialized instruction per week. *Id*

10. That the May 2005 IEP also provided for ten (10) hours of Extended School Years

Services ("ESY") per week for the summer 2005 and further developed a compensatory

education plan with 17 hours and 15 minutes of compensatory education services. *Id.*

11. That DCPS failed to implement the compensatory education plan and extended school

year services as agreed upon at the May 26, 2005 IEP meeting.

12. That due to DCPS' failure to implement the ESY and compensatory education plans, the

parent sought legal assistance and so on April 9, 2007, the parent, by and through

counsel, filed an administrative due process complaint against DCPS.

13. That among other things, the complaint alleged the following:

1.  DCPS denied the student a free and appropriate public education by failing

to conduct an annual review of the student's IEP;

2.  DCPS failed to provide the student with the agreed upon compensatory

3

services, specifically seventeen hours and 15 minutes of compensatory

education services as agreed on the compensatory education plan; and

3.     DCPS failed to provide the student with Extended School Year Services

("ESY") for the summer of 2005.

14. That as relief, *inter alia*, the parent sought:

1.     Independent funding of the seventeen (17) hours and fifteen (15) minutes of

compensatory educations services agreed to in the May 2005 Compensatory

Education Plan; and

2.     Independent funding of the one hundred and twenty (120) hours of missed

ESY services.

15. That on June 11, 2007, an administrative due process hearing was held for A.L. before

Hearing Officer Frederick Woods.

16. That at the hearing, the parent withdrew the first issue of the expired IEP and prepared

move forward on the two remaining issues regarding DCPS' failure to implement A.L.'s

2005 ESY and compensatory education plans.

17. That the Hearing Officer Woods insisted that because counsel for the parent withdrew

the issue regarding the May 2005 IEP, she could not move forward on the two remaining

issues.

18. That parent's counsel vehemently informed Hearing Officer Woods that her claims of

ESY and compensatory education were viable claims, notwithstanding, the hearing

officer crafted the issue as "Did DCPS violate the Individuals with Disabilities Education

Improvement Act (IDEIA) at 20 U.S.C. [section] 1400 et.seq. and deny A.L. a Free

4

Appropriate Education Public Education (FAPE) by failing to implement his 5/26/05 Compensatory Education Plan?"

19. That during the hearing, DCPS' counsel and Hearing Officer Woods erroneously informed the parent that students who attended religious private school were not entitled to special education services.

20. That Hearing Officer Woods further informed the parent that he did not have the authority to enforce a compensatory education plan designed by A.L.'s MDT team, claiming that compensatory education was not a right, but a remedy. *See TR.at*

21. That he then, speaking directly to the parent, told her that he could not remedy her situation because of the context in which the issue were presented. *See TR.at 81.*

22. That he commented on the parent's counsel lack of understanding of the burden of persuasion and that he "wondered" if the case could some how be resolved prior to him reaching a determination. *See TR.at 82-84.*

23. That based on that prompting, DCPS counsel stated that she would be willing to settle if prevailing party status and the parent's request for attorney fees were withdrawn *See TR.at 85-87.*

24. That even after counsel for the parent reiterated her claims and the relief sought, Hearing Officer Woods questioned whether counsel understood what she was being offered by DCPS' counsel. *See TR.at 88.*

25. That Ms. Lee soon became irate with the discussions between the hearing officer and DCPS counsel and stated that she was fed up with not receiving help with her son's situation. *See TR.at 88-89.*

5

26. That at the conclusion of the hearing, Hearing Officer Woods granted DCPS' counsel request for a directed verdict. *See TR.at 94-95.*

27. That in the June 2007 Hearing Officer's Decision, Mr. Woods determined that the parent failed to meet the *Reid* test for Compensatory Education relief; and further found that even if there was a procedural violation of the IDEIA there was no evidence presented at the due process hearing that the procedural violation resulted in a denial of FAPE. *See Exhibit 1.*

28. Based on the gravity of error committed by Hearing Officer Wood's, parent's counsel submitted a timely motion for reconsideration outlining points of error and included issues regarding lack of impartiality and lack of knowledge on special education law. *See Exhibit 10.*

29. That attached to that motion were the sworn affidavits of Ms. Lee and the special education advocate, whereby both stated that they believed the hearing officer had been biased. *See Exhibit 11.*

30. That Hearing Officer Woods failed to address the motion, so in accordance with Standard Operation Procedural Manual parent's counsel considered her motion for reconsideration denied. *Id.*

## COUNT I

## HEARING OFFICER WOODS COMMITTED ERROR WHEN HE FAILED TO ADDRESS THE ISSUES ALLEGED IN THE APRIL 2007 ADMINISTRATIVE DUE PROCESS COMPLAINT.

31. That the parent re-alleges paragraphs 1-30.

6

32. That the April 2007 administrative due process hearing complaint alleged that failed DCPS to conduct an annual review of the student's IEP; failed to provide A.L. with seventeen hours and 15 minutes of compensatory services; and failed to provide A.L. with Extended School Year Services ("ESY") for the summer of 2005. *See Exhibit 13.*

33. That instead of deciding the issues alleged in the administrative due process hearing request, he decided the issue of "[whether] DCPS violated the Individuals with Disabilities Education Improvement Act (IDEIA) at 20 U.S.C. [section] 100 et seq. and deny A.L. a Free Appropriate Public Education by failing to implement his **05/26/06???** Compensatory Education Plan? *See Exhibit 1.*

34. That he found that DCPS had not denied A.L. access to FAPE because "1) the parent did not meet the *Reid* test for compensatory education relief; and 2) even if there were a procedural violation of the IDEIA there was no evidence presented at the due process hearing the procedural violation resulted in the denial of FAPE."

35. That Hearing Officer Woods committed error when he failed to address the issues raised in April 9, 2007 Administrative Due Process Hearing Request and the further re-drafting of the issues presented established a burden of proof the parent could not defend. *Id.*

36. That a hearing officer decision should be based on substantive and procedural grounds that affect whether a child received a free and appropriate public education. *See* 20 U.S.C. 1415 (E).

37. That Hearing Officer Woods' interfered with the parent's right to due process when he failed to allow the parent the ability to litigate on those issues presented in her due process complaint.

7

## COUNT II

### HEARING OFFICER WOODS ERRED WHEN HE FAILED TO ENFORCE THE MAY 2005 COMPENSATORY EDUCATION PLAN.

38. That parent's counsel re-alleges paragraphs 1-37.

39. That Hearing Officer Woods erred when he failed to enforce the May 2005 Compensatory Education Plan and found that standards set forth in *Reid* applied to awards of compensatory education determined by MDT teams. *See Exhibit 3;4.*

40. That Members of the MDT team in 2005 awarded A.L. seventeen hours of compensatory education to redress the services they failed to provide for him during the 2004-2005 school year. *Id.*

41. That in the administrative due process hearing request, parent's counsel alleged that DCPS denied A.L. access to a free and appropriate education when it failed to implement the compensatory education plan it developed. *Id*

42. That Hearing Officer Woods erroneously redrafted the parent's issue regarding compensatory education and further erroneously concluded that he could not enforce the May 2005 Compensatory Education Plan because it was designed by a MDT team. *Id.*

43. That he found that the parent had not met her burden as established in *Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. 2005) and opined that only a hearing officer had the discretion to grant awards of compensatory education. *See Exhibit 1.*

## COUNT III

### HEARING OFFICER WOODS ERRED WHEN HE GRANTED DCPS' MOTION FOR A DIRECTED VERDICT.

8

44. That the parent re-alleges paragraphs 1-43.

45. That during the conclusion of parent's counsel case in chief, DCPS' counsel requested that a motion for a directed verdict be granted.

46. That Hearing Officer Woods erred in granting that motion, as the evidence of record demonstrated that parent's counsel set forth legally sufficient evidence to support her prima facie case.

47. That motions for a directed verdict are to be granted in matters where a party, with the burden of proof, has failed to present prime facie case and one would not legally find for that party on that matter. See Fed.Civ.P 50 (a)(2007).

48. That the party requesting the motion for directed verdict has the burden of establishing what, if any evidence, the plaintiff failed to set forth or that only one reasonable conclusion could be inferred form the evidence set forth by the plaintiff. *Id*

49. That parent's Counsel submitted documentary evidence and testimony to support the issues raised in the administrative due process complaint. *Id.*

50. That the parent testified that while A.L. had been granted ESY and compensatory education services, DCPS failed to implement the compensatory education plan or E.S.Y. *See Exhibit 2;3;4.*

51. That DCPS' counsel failed to rebut the evidence set forth by parent's counsel and never called witnesses to rebut the parent's position that A.L.'s E.S.Y or compensatory education plan had been implemented. *Id*

9

## COUNT IV

### HEARING OFFICER WOODS ERRED WHEN HE FAILED TO GRANT THE PARENT'S MOTION FOR DEFAULT JUDGMENT

52. That the parent re-alleges paragraphs 1-51.

53. That if a local educational agency has not sent a prior written notice to the parent relating to the information contained in the parent's due process complaint, the local education agency is required to send a response within ten days of receipt. See 20 U.S.C. 1415 (B)(1).

54. That the parent filed an administrative due process complaint on April 9, 2007 complaint to which she received no response. *See Exhibit 13.*

55. That parent's counsel informed Hearing Officer Woods that per the IDEIA and Standard Operating Manual, DCPS' had an obligation to file a response to the parent's complaint. *See Tr. at 8*. See Massey, et al v. District of Columbia et al, Civil Action No. 05-2033 (Nov, 2005); *see also Schaffer et al v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed. 2d 387, 74 USLW 4009, 203 Ed. Law Rep. 29, 2005 Daily D.A.R. 13, 287, 19 Fla. L. Weekly Fed. 51, (" . . .the Petitioners argued that "school districts have a 'natural advantage' in information and expertise, but Congress addressed this when it obliged schools to safeguard the procedural rights of parents...Congress added provisions requiring school districts to *answer the subject matter of a complaint in writing*, and to provide parents with the reasoning behind the disputed action...IDEA, in fact, requires state authorities to organize hearings in a way that guarantees parents and children the

10

procedural protections of the Act…These protections ensure that the school bears no unique informational advantage." *Id.*

56. That Hearing Officer Woods failed to rule on the motion for default judgment on the record or address it in his June 2007 Hearing Officer's Decision.

## COUNT V
## HEARING OFFICER WOODS ACTIONS DURING AND SUBSEQUENT TO THE JUNE 2007 HEARING INDICATES THAT HE LACKED IMPARTIALITY.

57. That the parent re-alleges paragraphs 1-56.

58. That the parent further alleges that Hearing Officer Woods lacked the ability to remain impartial throughout the hearing subsequently thereto.

59. That according to 34 C.F.R. §300. 511, among other things, a hearing officer: ". . . i) must possess knowledge of, and the ability to understand, the provisions, of the Act, Federal and State regulations pertaining to the Act, and legal interpretations of the Act by Federal and State courts; (iii) Must possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and (iv) must possess the knowledge and ability to render and write decisions in accordance with appropriate legal practice."

60. That first, DCPS failed to file a response and/or a prior written notice as required by statute, to which, Hearing Officer Woods failed to rule on parent's counsel Motion for Default Judgment.

61. That however, he granted DCPS' counsel motion for a directed verdict, even after he limited the scope upon which the parent could reasonably litigate.

11

62. That DCPS offered no witness testimony, nor documentary evidence to rebut DCPS' failure to provide A.L. with ESY in 2005 nor of its failure to implement A.L.'s May 2005 compensatory education plan. *See Tr.at 1-100.*

63. That second, Hearing Officer Woods erroneously informed the parent and allowed DCPS' counsel to argue that students who attended religious private school were not entitled to special education services. *See Tr. at Id.*

64. That this argument is in straight contradiction with 20 USC 1412 (a)(10),which states that students who attend religious and private schools are entitled to receive specialized instruction and related services. See 20 USC 1412(a)(10).

65. That third, he interfered with the attorney client relationship when he began to suggest to the parent that her counsel lacked the requisite competence to provide adequate legal representation. *See Exhibit 1; 11; 12.*

66. That he intimated that counsel did not understand the burden of persuasion and therefore he wished there was something he could do to help the parent. *Id*

67. That fourth, he re-drafted the issues presented in the hearing request and then found in favor of DCPS stating that the parent had not put forth a prima facie case. *See Exhibit 1; 13.*

68. That he then erroneously found that April 2007 administrative due process complaint has been filed frivolously, all the while discounting his actions on the record. *See Exhibit 14*.

12

69.    That the June 2007 HOD is peppered with examples of Hearing Officer Woods

misstating the events that occurred in the hearing and further support his bias

towards the parent and partiality towards DCPS.  ***See Exhibit 1.***

**Wherefore**, the plaintiff prays that this Court:

1.    Reverse the June 2007 Hearing Officer's Decision and find that the

parent's due process rights were violated;

2.    Enforce the May 2005 Compensatory education plan and order DCPS to

fund independent services;

3.    Remand on the issue of ESY and allow the parent to litigate to

demonstrate harm;

4.    Award Plaintiff's attorney fees and costs of this action;

5.    Award any other relief that the Court deems just and proper.


Respectfully submitted,


Domiento C.R. Hill No. MD 14793
Roxanne D. Neloms  No. 478157
James E. Brown & Associates, PLLC
1220 L. Street, NW, Suite 700
Washington, DC 20005
(202)742-2000 (Tele.)
***Counsels for Plaintiffs***

# Exhibit 1

# District of Columbia Public Schools
## State Enforcement & Investigation Division
## Confidential

**FREDERICK E. WOODS**, Esq., Due Process Hearing Officer
Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
Facsimile: (202) 698-3825

| | | |
|---|---|---|
| **In the Matter of** | ) | **IMPARTIAL** |
| | ) | **DUE PROCESS HEARING** |
| **Antonio Lee** | ) | |
| **Date of Birth**: 06/03/95 | ) | |
| Petitioner, | ) | **DECISION AND ORDER** |
| | ) | |
| vs. | ) | Hearing Request: April 9, 2007 |
| | ) | **Hearing Date: June 11, 2007** |
| **The District of Columbia Public Schools,** | ) | Held at: Van Ness Elementary School |
| **Home School: Bruce Monroe Elementary** | ) | 1150 5th Street, S.E., 1st Floor |
| **Attending: Nativity Catholic Academy** | ) | Washington, D.C. 20003 |
| | ) | |
| Respondent. | ) | |
| | ) | |

| | |
|---|---|
| **Parent:** | **Theresa Lee, Mother** |
| | **722 Grand Street, N.W.** |
| | **Washington, D.C. 20001** |
| **Counsel for the Parent/Student:** | **Jani Tillery, Esq.** |
| | **James E. Brown & Associates, PLLC** |
| | **Attorneys at Law** |
| | **1220 L Street N.W., Suite 700** |
| | **Washington, D.C. 20005** |
| **District of Columbia Public Schools:** | **Tiffany S. Puckett, Esq.** |
| | **Attorney Advisor** |
| | **Office of the General Counsel, DCPS** |
| | **825 North Capitol Street, N.E., 9th Floor** |
| | **Washington, D.C. 20002** |

1

## I.    JURISDICTION

The Due Process Hearing was convened and this Order written pursuant to Public Law 108-446, the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400 et seq.; 34 C.F.R. §§ 300 et seq.; 5 D.C.M.R. §§ 3000 et seq.; and Section 143 of the D.C. Appropriations Act, effective October 21, 1998.

## II.    DUE PROCESS RIGHTS

The parent through counsel waived a formal reading of the due process rights.

## III.    FIVE-DAY DISCLOSURES

Petitioner:    Admitted, without objection, a disclosure letter filed on 06/04/07 that list four witnesses and attached fifteen exhibits sequentially labeled and tabbed AL-01 through AL-15. Two witnesses were present: the student's mother; and Diane Crews-Pinkney, education advocate.

Respondent:    Admitted, without objection a disclosure letter filed on 06/04/07 that list six witnesses. No exhibits were offered into evidence. No witnesses were present or called to testify because DCPS' Motion for Directed Decision was granted after the parent rested their case.

## IV.    STATEMENT OF THE CASE

A.L., born 06/03/95, age 11, is a 4th grade, 16% out-of-general education, Specific Learning Disabled (SLD) student attending Nativity Catholic Academy in the District of Columbia. (R. at AL-01, 05)

Parent's counsel Jani Tillery alleged in the student's 04/09/07 Due Process Hearing Request that DCPS violated the IDEIA and denied A.L. a Free Appropriate Public Education (FAPE) by failing to implement his 05/26/05 Compensatory Education Plan. (R. at AL-01, 04) Each and every other claim raised in A.L.'s 04/09/07 due process hearing request was dismissed, with prejudice at the due process hearing.

The DCPS Student Hearing Office scheduled the Due Process Hearing for 9:00 a.m., Monday, June 11, 2007 at Van Ness Elementary School, 1150 5th Street, S.E., 1st Floor, Washington, D.C. 20003. The hearing convened as scheduled.

Attorney Advisor Tiffany S. Puckett appeared in-person for DCPS. Attorney Jani Tillery appeared in-person representing A.L. who was not present; and his mother who was present. After the testimony of the parent's two witnesses the parent rested; and DCPS' Motion for Directed Decision was granted. Here are the reasons why.

2

## V.    SUMMARY OF THE EVIDENCE

The testimony of these two (2-listed witnesses and these three (3)-listed admitted exhibits are relied upon in reaching the decision.

### Witnesses:

(1) A.L.'s mother; and

(2) Diane Crews-Pinkney, Education Advocate.

### Exhibits:

| 1. | AL-01 | The 04/09/07 Parent's Due Process Hearing Request |
| 2. | AL-04 | The 05/26/05 Compensatory Education Plan |
| 3. | AL-05 | The 01/26/06 IEP and MDT Meeting Notes |

### Issue

Did DCPS violate the Individuals with Disabilities Education Improvement Act (IDEIA) at 20 U.S.C. §§ 1400 et seq. and deny A.L. a Free Appropriate Public Education (FAPE) by failing to implement his 05/26/06 Compensatory Education Plan?

### Answer

No because: (1) the parent did not meet the Reid test for Compensatory Education relief; and (2) even if there was a procedural violation of the IDEIA there was no evidence presented at the due process hearing that the procedural violation resulted in a denial of FAPE.

## VI.    FINDINGS OF FACT:

1.    A.L., born 06/03/95, age 11, is a 4th grade, 16% out-of-general education, Specific Learning Disabled (SLD) student attending Nativity Catholic Academy in the District of Columbia. (R. at AL-01, 05)

2.    A.L.'s 01/26/06 IEP calls for him to receive this special education service to accommodate his SLD disability—

   a.  Specialized Instruction    5-hours/week.
   (R. at AL-05)

3

3.    On 05/26/05, over two (2)-years ago, DCPS developed a Compensatory Education Plan awarding A.L., "17-hours 15-minutes of Specialized Instruction." (R. at AL-04)

4.    According to the credited testimony of the mother, who expressed her frustration by raising her voice because her concerns about A.L. were not raised in the hearing request therefore not being addressed—

    a.   A.L.'s 05/26/05 Compensatory Education Plan had not been implemented.

    b.   A.L. was, however, to enroll at Bruce Monroe ES for the summer 2006 to receive his Compensatory Education award but the school was not open that summer.

    c.   A.L. had been enrolled in a private, general education school for the entire 2005-06 school year; and she neither sought nor received any special education services for him at that school.

    d.   Suddenly, although her body language evinced a build-up of frustration with the issue being litigated, the mother said in a loud voice, "I do not care about any prior services but want services for my son from this day forward."

    e.   **Side bar:** Sadly, however, even after granting parent's counsel two recesses to consult with her client and DCPS counsel, parent's counsel incredulously continued to litigate the Compensatory Ed claim each time the hearing reconvened.

5.    Finally, as the parent's last witness, the student's education advocate testified but offered no probative evidence about the 05/26/05 Compensatory Education Plan. That's because the advocate did not even know A.L. until May 2007—one (1)-month after A.L.'s 04/09/07 due process hearing request was filed.

6.    There is no record evidence about how failing to implement the Compensatory Education Plan did or would impact A.L.'s special education program—particularly since the Plan is two (2)-years old and A.L. no longer receives special education services.

7.    And there is no record evidence that A.L. was denied a FAPE as required by the IDEIA when the parent alleges an IDEIA procedural violation.

8.    So based on the record evidence the hearing request is dismissed, with prejudice. And the hearing request was frivolous when filed, and it became patently frivolous based upon the evidence presented at the due process hearing yet parent's counsel continued to litigate.

## VII.  DISCUSSION and CONCLUSIONS OF LAW:

### I

**DCPS is required to make a FAPE available to all children with disabilities within the jurisdiction of the District of Columbia.**

The IDEIA at 20 U.S.C. § 1400 et seq. and 5 D.C.M.R. § 3000.1 (2003) requires DCPS to fully evaluate every child suspected of having a disability within the jurisdiction of the District of Columbia, ages 3 through 22, determine their eligibility for special education and related services and, if eligible, provide special education and related services through an appropriate IEP and Placement.

There was no IDEIA violation at the time the hearing request was filed because the parent alleged an IDEIA procedural violation but proffered no evidence whatsoever that the alleged procedural violation resulted in a denial of a FAPE to the student. Here is why.

1. Pursuant to 5 D.C.M.R. § 3002.1, LEA Responsibility, "[t]he services provided to the child must address all of the child's identified special education and related services needs and must be based on the child's unique needs and not on the child's disability."

2. Pursuant to 5 D.C.M.R. § 3013.1(e), Placement, "[t]he LEA shall ensure that the educational placement decision for a child with a disability is …based on the child's IEP."

3. Pursuant to 5 D.C.M.R. § 3025, Procedural Safeguards—Prior Written Notice, DCPS shall provide written notice to the parent of a child with a disability before it proposes…an educational placement of the child.

4. Pursuant to the IDEIA at 20 U.S.C. § 1414 (d) (A), (B) Requirement that Program be in Effect—

    1. At the beginning of each school year, each local educational agency … shall have in effect for each child with a disability in the agency's jurisdiction an IEP.

5. DCPS complied with these cited IDEIA obligations based on the parents 04/09/07 hearing request because A.L. had an IEP for the 2005-06 school year and a placement to implement it. But that year his mother enrolled him

5

in a private, general education school where he did not receive any special education services. (R. at AL-01, 05)

6. The parent's only claim is that A.L. did not receive his 05/26/05 Compensatory Education award of 17-hours 15-minutes of Specialized Instruction—albeit he has not received special education services since the 2004-05 school year.

7. Since Compensatory Education is relief that a hearing officer can award for missed services, the parent, however, is required to meet the Reid test for the hearing officer to award Compensatory Education. The parent did not meet that burden. So DCPS' Motion for Directed Decision was granted.

8. That's because the parent's requested relief, Comp. Ed in the form of 17-hours 15-minutes of Specialized Instruction, was not supported by any credible evidence that complies with the standards established in Reid v. District of Columbia, 401 F.3d 516, 523-24 (D.C. 2005), that held, "Compensatory Education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a period of time to provide a FAPE to a student."

9. Pursuant to Reid v. District of Columbia, 401 F.3d 516, 522 (D.C. 2005), "Under the theory of 'compensatory education' courts and hearing officers may award educational services ... to be provided prospectively to compensate for a past deficient program."

10. "The ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." Reid, 401 F.3d at 524.

11. Joining sister circuits, the District of Columbia Circuit Court held that "Compensatory Education awards fit comfortably within the 'broad discretion' of courts fashioning and enforcing IDEA remedies, see Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16 (1993)." Reid, 401 F.3d at 523.

12. In sum, the Reid decision expressly states that courts and hearing officers may award Compensatory Education. Reid, 401 F.3d at 522. However, a BLMDT, as required under the IDEIA, includes LEA and SEA representatives who are employees of the state, who, under the IDEIA, cannot conduct due process hearings. So if a hearing officer ordered a BLMDT to decide the parent's Compensatory Education claim, that team is being ordered to engage in a function reserved to courts and hearing officers. And, according to Reid, "under the statute [IDEIA] a hearing

officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." <u>Reid</u>, 401 F.3d at 526.

13. Consequently, in the absence of an agreement between the parties that a certain type, form and amount of Compensatory Educations services are warranted, Compensatory Education is not an appropriate subject of discussion for a BLMDT/IEPT pursuant to a hearing officer's decision. Therefore, a BLMDT/IEPT is not being ordered to decide Compensatory Education services.

14. The parent, therefore, must meet the <u>Reid</u> test to receive a Comp Ed award. And in this matter, the parent did not meet that burden.

15. That is because the parent provided no evidence about how the requested 17-hours 15-minutes of Specialized Instruction was "reasonably calculated to provide educational benefits that likely would have accrued from special education services the school should have supplied in the first place." <u>Reid</u>, 401 F.3d at 524.

16. Instead, the parent's sole position was that the missed 17-hours 15-minutes of Specialized Instruction during the 2004-05 school year should be compensated by giving the student Comp. Ed in the amount 17-hours 15-minutes of Specialized Instruction for each hour of missed services. This hour-for-hour formula was expressly rejected by the Court in <u>Reid</u>." <u>Reid</u>, 401 F.3d at 523-24.

17. In Reid, the parent's advocated for a one-for-one formula. The Court held that, "[a]s to the Reids, we [the Court] reject the one-for-one formula they advocate. Rather, designing [the student's] remedy will require a fact-specific exercise of discretion by either the district court or a hearing officer." <u>Reid</u>, 401 F.3d at 523-24.

18. Ergo, the parent's one-for-one formula in this case suffers the same fate as the parent's in the <u>Reid</u> case where that formula was expressly rejected by the Court. So this hearing officer employs the holding in <u>Reid</u> and rejects the one-for-one formula advocated by the parent in this case.

19. So there is no procedural violation of the IDEIA. But even if there was, that procedural violation did not result in DCPS denying A.L. a FAPE. Here is why.

20. Pursuant to the IDEIA at 20 U.S.C. § 1414 (E) (ii), and 34 C.F.R. § 300.513 (a) Decision of hearing officer on procedural issues, states that, "[i]n matters alleging a procedural violation, a hearing officer may find that a child did

not receive a free appropriate public education [FAPE] only if the procedural inadequacies—

    (I)    impeded the child's right to a free appropriate public education;

    (II)    significantly impeded the parent's opportunity to participate in the decision making process regarding the provisions of a FAPE to the parent's child; or

    (III)    caused a deprivation of educational benefits."

21. And pursuant to 34 C.F.R. § 300.513 (3) Hearing Decisions, "[n]othing in paragraph (a) of this section shall be construed to preclude a hearing officer from ordering an LEA to comply with procedural requirements."

22. A.L. was not denied a FAPE because the alleged procedural inadequacy did not impede his right to a FAPE nor deprive him of educational benefit since he remains at his current placement selected by his parent—a private general education school. And since A.L.'s mother participated in the 05/26/05 BLMDT/IEPT/Comp Ed Meeting where the 05/26/05 Comp Ed Plan was developed, the parent's right to participate in the decision making process regarding the provisions of a FAPE was not impeded.

23. Moreover, according to the testimony of two witnesses who testified in this case the student's mother, and the student's education advocate, they did not even state, let alone prove that the missed services either impeded A.L.'s right to a FAPE or deprived him of educational benefit.

24. Equally troubling is once the parent's case-in-chief was completed, it was patently obvious there was no record evidence about why the requested hours of Specialized Instruction was necessary in compliance with Reid. But parent's counsel continued to litigate. Even after the hearing officer recessed the case to allow counsel to reflect on the record evidence before deciding DCPS' Motion for Directed Decision.

25. Consequently, pursuant to the IDEIA at 34 C.F.R. § 300.517 (a)(ii) Attorney's Fees, "the court, [not a hearing officer] may award reasonable attorney's fees as part of the costs to—to the prevailing party who is an SEA or LEA against the parent or attorney of a parent who files a complaint ...that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after litigation clearly became frivolous, unreasonable, or without foundation."

26. Based on this credited testimony of the mother—particularly when she said "I do not care about any prior missed services;" the student's education advocate; and the student's two (2)-year old Compensatory Ed Plan, the litigation was patently frivolous yet parent's counsel continued to litigate.

27. But counsel proffered no evidence about how the missed services and unimplemented 05/26/05 Compensatory Education Plan has, is or would impact A.L.'s special education program progress. And that abyss made the claim patently frivolous.

28. So based on this hearing record, there exists no evidence supporting the parent's claim that A.L. was denied a FAPE.

29. And there was no evidence presented at the due process hearing that complied with Reid that held, "an ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." Reid, 401 F.3d at 524. So Compensatory Education is denied.

30. Pursuant to 5 D.C.M.R. § 3030.3, "The burden of proof shall be the responsibility of the party seeking relief; either the parent/guardian of the child or the LEA. Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student a Free Appropriate Public Education (FAPE)."

31. The parent, who filed the hearing request, had and did not meet their burden of proof in this case because the parent:

    a.  failed to meet the Reid test for the hearing officer to award Compensatory Education.

Therefore, in consideration of the record evidence, the hearing officer finds that DCPS did not deny A.L. a FAPE, and issues this:

# ORDER

1. The parent's 04/09/07 Due Process Hearing Request is dismissed, with prejudice.

2. There is no finding that A.L. was denied a FAPE.

3. This Order resolves all issues raised in the student's 04/09/07 Due Process Hearing Request that is dismissed, with prejudice; and the hearing officer made no additional findings.

This is the **FINAL ADMINISTRATIVE DECISION.**  An Appeal can be made to a court of competent jurisdiction within ninety (90)-days of this Order's issue date pursuant to 20 U.S.C. § 1415 (i)(1)(A), (i)(2)(B).

_____          6/21/07
Frederick E. Woods                                   _____
Hearing Officer                                              Date

Issued: _____6/22/07_____
DCPS Student Hearing Office

10

# District of Columbia Public Schools

### *State Enforcement & Investigation Division*

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| A.L. | ) | |
| Petitioner, | ) | **IMPARTIAL** |
| vs. | ) | **DUE PROCESS HEARING** |
| | ) | |
| The District of Columbia Public Schools, | ) | |
| Bruce Monroe Elementary School | ) | |
| Respondent. | ) | |

The Individuals with Disabilities Education Improvement Act (IDEIA) 20 U.S.C.
§§ 1400 et seq.

Case Information:     Hearing Request Date: April 9, 2007
**Hearing Date: June 11, 2007**
Held at:   Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
SETS Case Number: _____
Student's Birth Date: June 3, 1995
Attending School: Nativity Catholic Academy
Managing School: Bruce Monroe Elementary School

## **CERTIFICATION OF RECORD**

I, Frederick E. Woods, Impartial Due Process Hearing Officer in this matter, do

hereby certify that the attached Record of Proceedings and Index of Exhibits itemizes

the entire record in the above captioned matter as of this date, consisting of all letters,

pleadings, orders, exhibits, depositions, and tapes.

I further certify that the materials placed in the SHO file for this student are

either the original or true copy of the original documents submitted in this matter.

Executed this 21st day of June , 2007.

Due Process Hearing Officer

11

Re:  MATTER OF
A.L. v. DCPS, BRUCE MONROE ELEMENTARY SCHOOL

# RECORD OF PROCEEDINGS

## DATE:            DESCRIPTION:

04/09/07        Due Process Hearing Request Filed By Parent

05/30/07        Notice of Due Process Hearing Date Sent to Parties

06/11/07        Due Process Hearing Convened; Completed; and
                Recorded in HR-7A, Start Time 9:00 a.m. and End
                Time 12:15 p.m.

06/21/07        Hearing Officer's Decision Filed with the SHO

06/21/07        Hearing Officer's Decision Issued by the SHO

_____                    6/21/07
Frederick E. Woods                                 Date
Due Process Hearing Officer

# Exhibit 2

**EXHIBIT**

ALL-STATE LEGAL

**AL-2**

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS · IEP

Additional Com___

## I. IDENTIFICATION INFORMATION

Student Name: Last **Lee**  First **Antonio**  MI

Student ID **9078616**  Soc. Sec No **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** Age **9.11**  Grade **3**

Gender ☒M ☐F  Date of Birth **6.05.95**  Ethnic Group **Afro-American**

Address **722 Girard Street, N.W.**

**Washington**  **D.C.**

☐ Non-attending

Attending School **Bruce Monroe**  Home School **Bruce Monroe**

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS I

Parent **Mr. & Mrs. Lee**

Address of (if different from student):  ☐ Parent ☐ Guardian ☐ Surrogate

Telephone: Home **202-327-4128 Cell**  Work

## II. CURRENT INFORMATION

Date of IEP Meeting: **5.26.05**

Date of Last IEP Meeting:

Date of Most Recent Eligibility Decision:

Purpose of IEP Conference:

☒ Initial IEP  ☐ Review of IEP

☐ Requested Eval.  ☐ 3yr ReEval.

Indicate Level of Standardized Assessment

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | TRANSPORTATION |
|---|---|
| ESY | TRANSITION |

## III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | English | Native Language |
| Parent | English | English | English | Native Language |
| Home | English | English | English | Native Language |

To be completed by Office of Bilingual Education
English and Math Proficiency Assessment

Oral

Rdg / Written

Instrument

Date

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | | | FREQUENCY Hr / Min D/W/M | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks/mos |
|---|---|---|---|---|---|---|---|
| Specialized Instruction | | 5 | 5 | H W | Sp. Ed. Teacher | 5.27.05  5.26.05 | 10 MOS |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL | Specific Hours Per Week | | | 5 hrs per wk. | | | |

## V. Disability(ies)

**Specific Learning Disabled**

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%  ☐ 21-60%  ☐ 61-100%

Percent of time NOT in a Regular Education Setting **16%**

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

**Terrance Beason (School Psychologist)**  [signature]

**Viola Wu (General Ed. Teacher)**  [signature]

**Mary Battle Sp. Ed. Teacher**  [signature]

**Neane Williee, UCW**  [signature]

**Senoria L. Hurtado**  [signature] Connelli

**Barbara Bailey  Sp. Ed. Spec**  **Sheree Lee (mom)**

I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of services in this IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education. ☒ **Sheree Lee**

Parent/Guardian Signature  Date **5.26.05**

**PARENT AGREES WITH THE IMPLEMENTATION OF IEP BUT NOT ALL CONTENTS**

Student Name _Antonio Lee_   Managing School _Bruce Monroe_   DCPS - IEP
Student ID Number _907 86 16_   DOB _6-03-95_   Attending School _Bruce Monroe_   Page 2 of 4

**VII. Present Educational Performance Levels in Areas Affected by the Disability**   Additional Comments: ☐

**Academic Areas: (Evaluator)** _Terrance Benson (Reviewer)_   Score(s) When Available

Math Strengths:
Based on Antonio's performance on the Woodcock-Johnson (WJ) he possesses grade level difficulties in arithmetic.

Math Cal | 104 | 10-1
Math Rea | 90 | 8-4

Impact of disability on educational performance in general education curriculum:
Academically Antonio's skills aren't expected to impact his classwork.

See goal page
Date: 3-3-05
Rdg. Com | 79 | 7-3

Reading Strengths:
Based on his performance on the (WJ) Antonio's reading & written language skills are

Rdg. Basic | 76 | 7-6
Written Ex. | 71 | 7-4

Impact of disability on educational performance in general education curriculum: a found to strength
His deficits in reading are expected to impact him academically.

See goal page
Date: 3-3-05

**Communication (Speech & Language) (Evaluator)**   Score(s) When Available
Strengths:

Exp.Lang.
Rec. Lang.
Artic.
Voice
Fluency
Exp. Voc.
Rec. Voc.

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Motor/Health (Evaluator)**   Score(s) /Results When Available
Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Social Emotional Behavioral Areas: (Evaluator)**   Score(s) When Available
Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Cognitive/Adaptive Behavior: (Evaluator)** _Terrance Benson (Reviewer)_   Score(s) When Available
Strengths:
Based on the WASI, Antonio demonstrated more developed abilities verbally than non-verbally.

Verbal IQ = 86
Performance IQ = 76
Full Scale IQ = 78

Impact of disability on educational performance in general education curriculum:
Antonio is expected to experience difficulties academically in light of his cognitive functioning.

See goal page:
Date: 3-3-05

**Prevocational Skills: (Evaluator)**   Score(s) When Available
Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

Student Name _Antonio Lee_  Managing School _Bruce Monroe_  DCPS - IEP
Student ID Number _9678616_  DOB _6.03.95_  Attending School _Bruce Monroe_  Page 3 of 4

☐ MIL. SPECIALIZED SERVICES  Additional Comments: ☐  Goal Number: ☐

Area addressed by goal: _Academic: Reading_
_Reading Skills_

ANNUAL GOAL: (including mastery criteria.)

_Improve Antonio's Reading Skills for an approximate growth of Ten (school) months or to the greatest extent possible as evidenced by 80% or better accuracy_

Provider(s): _Special Education Teacher_

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Antonio will classify objects by categories as evidenced by 80% (or better) accuracy | | Quarterly |
| Antonio will classify pictures by categories as evidenced by 80% (or better) accuracy | | Quarterly |
| Antonio will drill practice with teacher step-by-step assistance to learn the vowels and consonants sounds given varies combinations as evidenced by 80% ... | | Quarterly |
| Antonio will match the vowels and the consonants to make blends of specific sounds as evidenced by 80-100% accuracy | | Quarterly |
| Antonio will construct a mixture of letters and sounds to make words, phrases and sentences to read as evidenced by 80-100% accuracy | | Quarterly |
| Antonio will sequence the consonant Hers and sounds in the order they should mastered P, B, M, W, h, T, D N, C K, N G, Y, F V, Th (voiced) (unvoiced) L, Sz, WH Zh, Sh, ch, J, K as evidenced by 80% accuracy. | | Quarterly |

### EVALUATION PROCEDURE(S)

Portfolio ☐  Log ☐  Chart ☐  Test ☐  Documented Observation ☐  Report ☐  Other ☐

Name _Antonio Free_____ Managing School _Bruce Monroe_ EXP. IEP
ID Number _9078616_ DOB _6-03-95_ Attending School _Bruce Monroe_ Page 3 of 4

**SPECIALIZED SERVICES**   Additional Comments:                Goal Number: [  ]

Area addressed by goal: _Academic Reading: Critical_
_Comprehension_

L GOAL: (including mastery criteria)

_Improve Reading Skills for an approximate_
_ould of Ten months or better or to the extent_
_ossible as evidenced by 80% accuracy_

(s): _Special Education Teacher_

r audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks.) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Antonio will be able to find & identify the main idea in story or text as evidenced by 80% accuracy | | Quarterly |
| Antonio will be able to iden-tify the supporting details as evidenced by 80% accuracy | | Quarterly |
| Antonio will be able to pre-dict what will happen after Reading portion of a story as evidenced by 80% acc111 | | Quarterly |
| Antonio will be able to dis-tinguish fantasy from reality as evidenced by 80% accuracy | | Quarterly |
| Antonio will be able to decipher fact from opinion as evidenced by 80% performance using examples. | | Quarterly |
| Antonio will be able to discuss characteristics of an antagonist in vs a protagonist as evidenced by 80% accuracy. | | Quarterly |
| Antonio will be able to analyze stories and text and draw his own conclusions ... 80% accuracy | | Q... |

**EVALUATION PROCEDURE(S)**

Obs   Log   Chart   Test   Documented Observation   Report   Other

Student Name: _Antonio Lee_     Managing School _Br. & Monroe CS_     DCPS - IEP
Student ID Number: _907 8616_     DOB _6.03.95_     Attending School _Bruce Monroe_     Page 3 of 4

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |

Area addressed by goal: _Academic: Written Expression_

ANNUAL GOAL (including mastery criteria.)

_Improve Written Expression skills for an approximate growth of ten months or to the extent possible as evidenced by 80% accuracy_

Provider(s): _Special Education Teacher_

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| — Antonio will be able to write a grammatically correct sentence by using the correct subject and verb agreement as evidenced by 80-100% accuracy | | Quarterly |
| — Antonio will be able to write capital letters at the beginning of a word which begins a sentence in 80% accuracy | | Quarterly |
| — Antonio will be able to write a simple sentence of subject-verb-object (svo) as evidenced by 80% accuracy. | | Quarterly |
| — Antonio will be able to write a compound sentence connected by an "and" conjunction as evidenced by 80%... | | Quarterly |
| — Antonio will be able to write complex sentences using subjunctions to connect the sentences as evidenced by 80% accuracy | | Quarterly |
| — Antonio will learn and practice/write the proper//facial syntax (placement of works in written text) as evidenced by 80-100% accuracy | | Quarterly |

**EVALUATION PROCEDURE(S)**

☑ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☐ Documented Observation  ☐ Report  ☐ Other _____

Student Name: _Antonio Jr._   Managing School: _D.C. Manual_   **DCPS - IEP**
Student ID Number: _907 8616_   DOB: _6-03-95_   Attending School: _Bruce Manual_   **Page 3 of 4**

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | | Goal Number: ☐ |

Area addressed by goal: _Academic; Written Expression_

ANNUAL GOAL (including mastery criteria.)

_Antonio will improve Written Expres-
sion for an approximate growth of
ten months or better - or to the extent possible
as evidenced by 80% performance._

Provider(s): _Special Education Teacher_

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| • Antonio will write declarative (telling) sentences to make statements about the world around him ... 80% ... | | Quarterly |
| • Antonio will write interrogative (asking) sentences from statements as evidenced by 80% accuracy | | Quarterly |
| • Antonio will be able to write imperative (command/order) sentences to show distress and or a directive to do ...80% ... | | Quarterly |
| • Antonio will be able to write exclamatory sentences depicting urgency or excitement as evidenced by 80% accuracy | | Quarterly |
| • Antonio will be able to write a descriptive paragraph where he describes who, what, when, where and how ... by 80% ... | | Quarterly |
| • Antonio will write to the higher-order thinking spectrum by responding to; Examples: Antonio, what do you think about a 12 month school year? as evidenced by 80% accuracy of Subject-verb agreement, capitalization, syntax, and end marks punctuation. | | Mastery |

**EVALUATION PROCEDURE(S)**

☑ Portfolio ☐ Log ☐ Chart ☐ Test ☐ Documented Observation ☐ Report ☐ Other _____

Student Name _Antonio Rice_  Managing School _Bruce Monroe_  14 Pg of P
Student ID Number _7078616_  DOB _6-03-93_  Attending School _Bruce Monroe_  Page 4 of 4

Additional Comments [ ]

## LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION/SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used in a LRE setting in general education? [ ] Yes [✓] No

Explanation for removal out of regular education classroom:

_Antonio's needs in reference to written Language and Reading will be addressed in a Special Education setting with the Special education teacher._

## Supplementary Aids and Services

| Classroom Needs (not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr / Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing: [ ] None needed

Timing/Scheduling _Flexible Scheduling_
Setting _Small group_
Presentation _Repetition of clear directions_
Response _Immediate_
Equipment ___

## STATE AND DISTRICT ASSESSMENTS:

[ ] Level I  Tested with non-disabled peers under standard conditions without accommodations
[✓] Level III  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations
[ ] Level V  Portfolio:

[ ] Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.
[ ] Level IV  (Describe the alternative assessment)

## Areas Requiring Specialized Instruction and Related Services:

[✓] Reading
[✓] Mathematics
[✓] Written Expression
[ ] Other:
[ ] None  Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

[ ] Physical/Sensory
[ ] Social Emotional
[ ] Physical Development

[ ] Transition
[ ] Vocational
[ ] Independent Living
[ ] Speech/Language

Modifications:
[ ] Language Arts/English
[ ] Social Sciences
[ ] Biological & Physical Sciences
[ ] Fine Arts

## PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| _General + Special Education Combined_ | _accepted_ | _Voided via Specialized instruction and little time lost @ Non dis-abled peers_ |

Modification(s)/Accommodation(s) to address the harmful effects:

_Specialized instruction in the resource center 16% of each school day to address Reading and writing skills_

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT _Antonio Lee_    SCHOOL _Bruce_    DATE _5.26.05_

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| _(signature)_ | _Mother_ | |
| _Kevin A. Washington_ | _Father_ | |
| _Mark Battle_ | _Mark Battle_ | Sp. Ed. |
| _Heather Wu_ | _(signature)_ | Social Worker |
| VIOLA WU | _Viola Wu_ | General Ed. Teacher |
| _Marta Palacios_ | _Marta Palacios_ | Principal |
| _Terrance Benson_ | _(signature)_ | School Psychologist |
| _Jeannie L. Hurtado_ | _Jeannie Hurtado_ | Counselor |

After reviewing all of the documents, the MDT determined that the student is eligible for special education as a _Learning Disabled Student_

Specialized instruction is required in the following academic areas: _Reading, and Written Expression, and ....._

The total number of hours for specialized instruction is _5 hours per week_

Related services are required in the following areas:

The following accommodations and /or modifications will ~~be~~ _be_ made: _IEP Addendum for ESY Services along with a compensatory Educational plan for 17HRS and 15 minutes beginning 5.27.05 2Hrs in Resource special Education center 2hrs daily; last day June 9, 2005 - 9 15 mn_

Placement Discussion: The IEP can be implemented at the neighborhood school which is _Bruce Monroe Elementary School. 3012 Georgia Avenue Washington, D.C. 20001_

# Exhibit 3

EXHIBIT

*AL-3*

District of Columbia Public Schools
Division of Special Education

## IEP ADDENDUM FOR ESY SERVICES

Student Name: *Antonio Lee*   Initial *✓*   Date of Birth: *6.03.95*

Gender: ☑ Male  ☐ Female                Grade *3*

School: *Bruce Monroe Elementary*  Date IEP Written *5.26.05*

**Checklist:**

|  |  | Yes | No |
|---|---|---|---|
| 1. | IEP is appropriate and reasonable for student | ☑ | ☐ |
| 2. | All or most IEP goals and objective are being achieved | ☐ | ☐ |
| 3. | Severity of student's disability requires individualized programming in areas of: *Reading and Written Expression* | ☑ | ☐ |
|  | • Self sufficiency and independence from caretaker or<br>• *Reading and Written Expression* | | |
| 4. | Student record shows serious regression following interruptions in the school program. | ☑ | ☐ |
| 5. | Student record shows inability to recoup skills a reasonable time following regression. | ☐ | ☐ |
| 6. | Student has critical need for continuity in programming to facilitate achieving educational benefit from her or his education program. | ☑ | ☐ |
| 7. | Transportation services needed | ☐ | ☐ |

**Determination**

After review the IEP team **RECOMMENDS** the provision of an
extended school year program for the above student.          ☑   ☐

**Reason**

*Antonio has demonstrated emerging skills breakthrough in critical skill, which will be lost without ESY Services which will most likely prevent him from acquiring the full benefit from the educational program during the regular school year. Also, he needs ESY to keep his current level of information, skills, and behavior in areas necessary for self-sufficiency.*

IEP Attachment - D
ESY Services
Page 2 of 2

## Special Education Goal and Objective for ESY

Goals and objectives from the IEP which are to be specifically addressed during ESY are:

| Annual Goal(s) | Skills Area(s) |
|---|---|
| • Comprehend direct meanings of words sentences or passages; judge reality or fantasy; and Fact/opinion | Reading Skills |
| • Identify main ideas and Supporting details Recall sequence; predict outcomes. | |
| • Demonstrate syntax fluency; correct use of grammar, mechanics. | Written Expression |
| • Connect Verbs to agree with the Subjects | |
| • Write the four (4) Types of Sentences | |

| Special Education Services for ESY | | RELATED SERVICES | | | | |
|---|---|---|---|---|---|---|
| Skills Area(s) | * Setting | Time to be Provided | | | Projected Date of Initiation | Number of Weeks |
| | | Amount | Unit ( Hours/ Mins ) | Period ( D/ W/ M ) | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

\* **Setting : A -** Full Time General Education ; **B -** Combo. General Education / Resources Classroom ; **C -** Out of Regular Education

### ESY Least Restrictive Environment (LRE)

[x] Placement as in regular school year

[ ] Placement different from regular school year

Hours/Week
*10 Hrs*

**Placement**

Specify placement (setting and alternate) of ESY service:
*General and Special Education combination*

Explain why options selected above are the most appropriate and the least restrictive.
*The combination of general education setting and a Special Ed le- source center provides a balance of a least restrictive environment for Antonio which serves to address needs adequately*

Describe any other options considered, and provide reasons those options rejected.

| Parent Name | Date | Signature |
|---|---|---|
| | | |

# Exhibit 4

## COMPENSATORY EDUCATIONAL PLAN*

Comp-ED Serv
Page 1 of 2

**Section I:**

Student Name: _Antonio Lee_    DOB _6.03.95_ Sex _M_    Grade _3_

Age _9.11_   Date of IEP _5.26.05_   Date of Proposal _5.26.05_   Home School _Bruce Monroe_

Attending School: _Bruce Monroe E.S._    Disability _Specific Learning Disability_

Language _English_    Address _722 Girard Street NW_

Parent Name: _Theresa Lee_    Phone (H):    (W):

Instructional/Related Services Missed: _Reading and Written Expression Skills_

Time Period in which service Delay/Disruption occurred: _February 19, 2005 - May 26, 2005_

Description of Compensatory Education due to __✓__ HOD**  ___ SA**  ___ MA**  ___ Other

*(Describe the requirements for DCPS' Comp. ED services based on the HOD/SA/MA document checked above.)*

_Minus Holidays, Record Keeping days, and a student's Absences, DCPS reimbursed the time Antonio missed to compensate the delay or disruption of the service process._

**Section II:** Compensatory Education Services to be provided:

| Skill Areas | Provider | Beginning Date | Duration/Total Hours |
|---|---|---|---|
| Reading Written Expression | Classroom/Sp.Ed. Teacher | 5.27.05 | 17 Hrs. 15 Min |

**Special Education Goals and Objectives for Compensatory Education Services**

**Goals and objectives from the current IEP which are to be implemented for Compensatory Education.**

| Annual Goals (s) and Objective (s) | Skills Area (s) |
|---|---|
| Annual Goal: Comprehend the direct meaning of words, sentences, or passages—(Literal Comprehension) Objective: Recognize main ideas, comparisons; recall supporting details; recall Sequence; predict outcomes; judgment of reality or fantasy—fact/opinion and worth | Reading Skills: · Sight Word Recognition · phonic skills · Decoding · oral Paragraph Reading |
| Annual Goal: Demonstrate Fluency in Syntax, grammar and Mechanics of Written Expression. Objective: Make grammatically correct Subject/Verb agreement; use capital letters for proper Nouns and first word of a Sentence; indent 1st line of a paragraph | Written Expression Skills: Sentences: declarative; interrogate; imperative; exclamatory |
| Annual Goal: Objective: | |
| Annual Goal: Objective: | |

Parent Signature:    Principal Signature: _Marilyn Palacios_

IEP Members: _TERRANCE BEASON_ psychol Position: _Psychologist_ _Venance BP_

_Heather Williams_ _Social_worker_    _Social the tutor_ _Denin St Hube_

_VIOLA WU_ _General Ed. Teacher_

_Barbara Bailey_ _Sp.Ed. Spec._

_M. Battle_ _Special Education_

Section III:  Signatures for Services Rendered:

| Provider | Service | Total Hours Received | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Principal Signature: _____   Date:_____

Section IV:  If the services on the plan are not completed by the end of the school year, or if the student transfers before the services are concluded, the IEP/MDT completes the bottom portion of this proposal, attaches the proposal, lesson objectives, and progress report to the new or current IEP and files the IEP in the student's special education folder.  For the transferring student, the special education records, inclusive of the IEP and compensatory education documents are forwarded to the receiving school.  Copies of documents must be forwarded to the designated office.

| Services | Frequency | | Setting | Total Hours of Comp. ED services to be provided. |
|---|---|---|---|---|
|  | Hr/Min | Wk/Mo. | Sp Ed |  |
| Reading ritten expression | 10 Hrs | WK | Sp Ed. Resource | 17 HRS · 15 M |
|  |  |  |  |  |
|  |  |  |  |  |

Complete a MDT/IEP Meeting Note Page and attach meeting page and Compensatory Education Plan to P.  Copy of the plan must be forwarded to the designated office in the Office of Special Education within e (5) school days.  **HOD/SA/MA must be attached.

# Exhibit 5

**EXHIBIT**

AL-5

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS -

Additional Comments: ☐

### I. IDENTIFICATION INFORMATION

Student Name: Last Lee          First Antonio          Mi

Student ID 9078516     Soc. Sec. No. 577 27 8440     Age: 10     Grade 4

Gender ☒ M ☐ F    Date of Birth 6/3/95    Ethnic Group African American

Address 722 Girard St. NW
_House No.      Street Name                    Quadrant      Apartment #_
Washington, DC
_City      State      Zip Code_

☐ Non-attending

Attending School Nativity          Home School Bruce Monroe

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent Mr and Mrs. Lee

Address of (if different from student): ☒ Parent ☐ Guardian ☐ Surrogate

_House No.    Street Name          Quad    Apt. No.    City          State    Zip Code_
Telephone: Home 202 527-4128 cell          Work

### II. CURRENT INFORMATION

Date of IEP Meeting: 1/26/06

Date of Last IEP Meeting: 5/26/2005

Date of Most Recent Eligibility Decision: 1/26/2006

Purpose of IEP Conference:
☒ Initial IEP          ☐ Review of IEP
☐ Requested Eval.      ☐ 3yr ReEval.

Indicate Level of Standardized Assessment: III

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | TRANSPORTATION |
|----------|----------------|
| ESY | TRANSITION |

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | n/a | native language | Oral |
| Parent | English | n/a | English | native language | Rdg./Written |
| Home | English | n/a | n/a | native language | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | | | FREQUENCY Hrs/Min  D/W/M. | | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | | 5 | 5 | hour | week | Special Education Teacher | 1/27/2006 | 10 months |
| Specialized Instruction | | 5 | 5 | H | W | Sp. Ed. teacher | 1/27/2006 | 10 moths |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | | 5 | | Hours Per Week | | | | |

### V. Disability(ies)

SLD

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%    ☐ 21-60%    ☐ 61-100%

Percent of time NOT in a Regular Education Setting 16%

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

THERESA Lee

Nicole Poitier-Lewis

Janet Dunne m. J.

Lydia Jenkins

LESLIE J. CHARLES, MS, SLP, DCPS

Nicole Champagne

Natalie Howard

Theresa Lee

Nicole Poitier

Anthony Johnson

Lydia Jenkins

Leslie Charles

Nicole Champagne

✓ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature  Theresa Lee          Date 2/14/06

| Student Name | Antonio Lee | | Managing School | CARE Center/Bruce Monroe | | DCPS - IEP |
| Student ID Number | 9078616 | DOB  6/3/95 | Attending School | Nativity | | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** Janet Burns

Score(s) When Available

Math Strengths:
Able to solve addition, subtraction and multiplication facts within a 3 minute time frame.

Math Cal.    GE    3.5

Math Res. _____ _____

Impact of disability on educational performance in general education curriculum:
Difficulty completing division problems impacts computation skills.

See goal page: _____

Date:  1/13/06

Reading Strengths:
Able to read a short story.

Rdg. Com    GE    1.8

Rdg. Basic    GE    2.7

Written Ex. _____ _____

Impact of disability on educational performance in general education curriculum:
Difficulty with decoding words impacts reading skills.

See goal page: _____

Date:  1/13/06

---

**Communication (Speech & Language) (Evaluator)**

Score(s) When Available

Strengths:

Exp. Lang. _____ _____
Rec. Lang. _____ _____
Artic _____ _____
Voice _____ _____

Impact of disability on educational performance in general education curriculum:

Fluency _____ _____
Exp. Voc. _____ _____
Rec. Voc. _____ _____
See goal page: _____
Date: _____

---

**Motor/Health (Evaluator)**

Score(s) /Results When Available

Strengths:

_____ _____
_____ _____

Impact of disability on educational performance in general education curriculum:

_____ _____

See goal page: _____

Date: _____

---

**Social Emotional Behavioral Areas: (Evaluator)**

Score(s) When Available

Strengths:

_____ _____
_____ _____

Impact of disability on educational performance in general education curriculum:

_____ _____

See goal page: _____

Date: _____

---

**Cognitive/Adaptive Behavior: (Evaluator)**

Score(s) When Available

Strengths:

_____ _____
_____ _____

Impact of disability on educational performance in general education curriculum:

_____ _____

See goal page: _____

Date: _____

---

**Prevocational Skills: (Evaluator)**

Score(s) When Available

Strengths:

_____ _____
_____ _____

Impact of disability on educational performance in general education curriculum:

_____ _____

See goal page: _____

Date: _____

| Student Name  Antonio Lee | Managing School  CARE Center/Bruce Monroe | DCPS - IEP |
|---|---|---|
| Student ID Number  9078616    DOB  6/3/95 | Attending School  Nativity | Page 3 of 4 |

VIII. SPECIALIZED SERVICES    Additional Comments: ☐          Goal Number: ☐

Area addressed by goal:   Academics

ANNUAL GOAL: (including mastery criteria.)

Antonio will demostrate measurable growth in the area of reading with 80% accuracy.

Provider(s):  Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Antonio will  recognize words with multiple meanings (e.g., sentence, hard, school) and be able to determine which meaning is intended from the context of the sentence  with 80% accuracy. | | monthly |
| Antonio will determine meanings of words and alternate word choices using intermediate level dictionaries and/ or thesauri  with 80% accuracy. | | montly |
| Antonio will identify the meaning of common prefixes and sufixes (e.g., un,-re,in,dis,ful,ly,less) with 80% accuracy. | | monthly |
| Antonio will  identify playful uses of language ( e.g., tongue twisters, riddles) with 80% accuracy. | | monthly |
| Antonio will identify roots of words ( e.g., "graph" is a common root...autograph, photograph, biography) with 80% accuracy. | | monthly |
| Antonio will retell and paraphrase information shared orally by others  with 80% accuracy. | | monthly |

EVALUATION PROCEDURE(S)

☐ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☒ Documented Observation   ☐ Report   ☐ Other _____

| Student Name | Antonio Lee | Managing School | CARE Center/Bruce Monroe | DCPS - IEP |
| Student ID Number | 9078416 | DOB 6/3/95 | Attending School Nativity | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | | Goal Number: ☐ |

Area addressed by goal:  Academics

ANNUAL GOAL: (including mastery criteria.)

Antonio will demonstrate measurable growth in the area of reading with 80% accuracy.

Provider(s):  Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (Include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Antonio will apply knowledge of basic syllabication rules when reading four or five written words (e.g. information, multiplication, pepperoni) with 80% accuracy. | | monthly |
| Antonio will apply knowledge of the following common spelling patterns:<br>1.that drop the final e and add endings such as -ing,-ed, or-able<br>2. that require changing the final y to i (e.g., baby to babies)<br>3. that include common prefixes, suffixes and root words  with 80% accuracy. | | monthly |
| Antonio will summarize main ideas and supporting details in text with 80% accuracy. | | monthly |
| Antonio will distinguish fact from opinion with 80% accuracy. | | monthly |
| Antonio will identify cause and effect relationships with 80% accuracy. | | monthly |
| Antonio will decode words using a phonetic approach with 80% accuracy. | | monthly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☑ Test  ☑ Documented Observation  ☐ Report  ☐ Other _____

| Student Name | Antonio Lee | Managing School | CARE Center | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9078616 | DOB 6-3-95 | Attending School | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**     Additional Comments:     Goal Number: [ ]

Area addressed by goal: _Academic: Written Expression_

**ANNUAL GOAL:** (including mastery criteria.)

Antonio will demonstrate growth in the area of written expression as evidenced by mastery of short-term objectives with 80% accuracy.

Provider(s): _Special Education Teacher_

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Antonio will write a grammatically correct sentence using correct subject-verb agreement with 80% accuracy. | | Monthly |
| Antonio will write capital letters at the beginning of a sentence with 80% accuracy. | | Monthly |
| Antonio will write a compound sentence using connector words such as "and", "because" or "if" with 80% accuracy. | | Monthly |
| Antonio will write declarative sentences to make a statement with 80% accuracy. | | Monthly |
| Antonio will write interrogative sentences with 80% accuracy. | | Monthly |
| Antonio will write exclamatory sentences with 80% accuracy. | | Monthly |

**EVALUATION PROCEDURE(S)**

Portfolio     Log     Chart     ✓Test     ✓Documented Observation     Report     Other _____

District of Columbia Public Schools     07-02-2001     Division of Special Education     Appendix - A     IEP Page 3 of 4

Student Name _Antonio Lee_                Managing School _CARE center_                DCPS - IEP
Student ID Number _9078616_    DOB _6-3-95_    Attending School _____    Page 3 of 4

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ☐
Area addressed by goal: _Academic ; Written Expression_
_Communication_
_Written Expr_

ANNUAL GOAL: (including mastery criteria.)

_Antonio will demonstrate improved written language
skills as evidenced by mastery of short-term
objectives with 80% accuracy._

Provider(s): _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| _Antonio will write exclamatory sentences depicting urgency or excitement with 80% accuracy._ | | Monthly |
| _Antonio will be able to write a descriptive paragraph with 80% accuracy._ | | Monthly |
| | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**
☐ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

| Student Name | Antonio Lee | | Managing School | CARE Center | | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9078616 | DOB 6/3/95 | Attending School | Nativity | | Page 4 of 4 |

Additional Comments: ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education? ☒ Yes ☐ No

Explanation for removal out of regular education classroom.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr / Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing: ☐ None needed

Timing/Scheduling: Extended time repeated direction

Setting: small group

Presentation: frequent breaks,

Response:

Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I Tested with non-disabled peers under standard conditions without accommodations.

☒ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permission accommodations.

☐ Level V Portfolio:

☐ Level II (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:

☒ Reading          ☐ Physical/Sensory     ☐ Transition
☐ Mathematics      ☐ Social Emotional     ☐ Vocational
☒ Written Expression ☐ Physical Development ☐ Independent Living
☐ Other.                                  ☐ Speech/Language
☐ None    Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

Modifications:
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education | accepted | Continued School Failure |
| Combination General Ed/Special Ed | rejected | Impact on Self Esteem |
| Out of General Education | rejected | Time away from nondisabled peers |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

Scheduling for minimal specialized services In ~~Ation~~ Inclusion (general education)

Location for Services  Bruce-Monroe ES

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT

MDT REFERRAL DATE _____

STUDENT: Antoine Lee                SCHOOL: Nativity                DATE: 1/26/2006

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Theresa Lee | Thu | mother |
| Gloria Everett | | Social Worker |
| Janet Burns | | Psychologist |
| Kevin Washington | Kevin Washington | Father |
| Lydia Jenkins | Lydia Jenkins | Librarian |
| Anthony Johnson | Anthony Johnson | Teacher |
| LESLIE CHARLES | Leslie Charles | Speech-lang. Pathologist |
| NICOLE CHAMPAGNE | Nicole Champagne | School Counselor NCA |
| N. car Pelther - lewis | Neal Pelt Lewis | principal |

The purpose of today's meeting to to review the evaluation completed by Janet Burns dated 1/13/2006 and determine Anotino's eligibility for Special Education Services. If found eligible DCPS will update his IEP.

Introductions were made by the MDT.

According to parents she requested that student repeat 1st grade at Bruce Monroe. The mother was concerned that her son was not working at grade level since 1st grade. She had requested testing & only received services in the 3rd grade; but no services (IEP was not implemented). In 3rd grade he was to receive ESY services for 17.5 hours in specialized instruction. Her son did not attend summer because Bruce Monroe was under renovation. The parents were not informed where he could get the services that summer. The mother sought outside help in getting her son tested. For 4th grade, mother transferred her son to Nativity School were he received no sp. ed. services.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE _____

**MULTIDISCIPLINARY TEAM (MDT)**
**CONTINUATION MEETING NOTES**
MEETING TYPE: _____ Eligibility

___ of ____

STUDENT Antonio Lee  SCHOOL CARE Center DATE 1/26/06

**The Psychologist Reports:**

Antonio is a ten-year youngster who
is attending Nativity Catholic School, Findings
from the educational re-evaluation along with
Review of previous assessments, reflects
continued weakness in the area of Reading and
written language. His handicapping condition
of "Learning Disabled" remains.

Garet R. M
Psychologist

DISTRICT OF COLUMBIA PUBLIC SCHOOL
WASHINGTON, DC

MDT REFERRAL DATE: _____    MULTIDISCIPLINARY TEAM (MDT)    Page: _____ of ____
CONTINUATION MEETING NOTES
MEETING TYPE: MDT

STUDENT Antonio Lee    SCHOOL Nativity C.A.    DATE: 1-26-06

Antonio was assessed in the area of speech and language on November 30, 2004 by Yuan-Ju Hsu, MA, CCC-SLP, DCPS speech-language pathologist. Results of the CELF-4 revealed expressive and receptive language skills to be within normal limits.

Antonio demonstrates significant reading deficits. To further explore his deficiencies, the Comprehensive Test of Phonological Processing was administered on December 13, 2005. Antonio achieved the following scores:-

Phonological Awareness — Standard Score - 76 (Poor)
Phonological Memory   — Standard Score - 88 (Below Average)
Rapid Naming          — Standard Score - 79 (Poor)

Subtest Scores:
    Elision - SS = 5 ; Blending Word - SS = 7 ; Memory for Digits - SS = 8
    Rapid Digit Naming - SS = 6 ; Nonword Repetition - SS = 8 ;
    Rapid Naming for Letters - SS = 7.

Results of the CTOPP revealed Antonio's phonological processing skills, specifically deficits in phonological awareness and rapid naming skills, were significantly delayed and could be impacting upon his reading skills. Deficiencies in phonological processing should be addressed by the reading specialist. No speech or language intervention services are recommended.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT Antonio Lee                    SCHOOL Nativity/Bruce Monroe       DATE: 1/26/2006

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Theresa Lee | Theresa Lee | Mother |
| Gloria Everett | Gloria T. Everett | Social Worker |
| Janet Burns | | |
| NICOLE CHAMPAGNE | Nicole Champagne | School Counselor. NCA |
| NICOLE Peltier-Lewis | Nicole Pelt Lewis | Principal NCA |
| Lydia Jenkins | Lydia Jenkins | Librarian. NCA |
| Kevin Washington | Kevin Washington | Mother |
| Natalia Houston | Natalia Houston | IEP Developer |

The student is eligible for special education as a student with _learning disability_

He will receive the following services: _reading + written expression_

Specialized Instruction _5hrs_ per week

The following settings were discussed:

General Education- _accepted_

Combination General Education and Special Education- _rejected_

Out of General Education- _rejected_

Location of services will be: _Bruce Monroe ES_
* The parents will enroll Antonio in summer
school to complete Compensatory education plan completed
on 5/26/05.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    IEP MEETING NOTES

# Exhibit 6

EXHIBIT

AL-4

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## KINDERGARTEN PROGRESS REPORT

(Page 1 of 3)

Student's Name: _____

Teacher: _Mrs. Antonio Lee Thompson_

School: _Barnard_

Year: _2000 2001_

Parents: This report is to inform you of your child's progress so that we may work together in guiding his/her development.

| READING PREPARATION | Sem 1 | Sem 2 |
|---|---|---|
| Names/Recognizes letters of the alphabet | N | N |
| Associates most letters with sounds | | |
| Seeks likeness and differences in objects, in letters, in words | √ | √ |
| Names familiar signs, labels book titles | √ | √ |
| Works from left to right | √ | √ |
| Names/Identifies basic colors | | √ |
| Recognizes name in print | | √ |
| Matches like/same objects | | √ |
| Finds the one that is different | | √ |
| Plays simple board games | | |
| Completes 10 to 12 piece interlocking puzzles | | √ |

| WRITING PREPARATION | Sem 1 | Sem 2 |
|---|---|---|
| Aware of some purposes for writing | N | N |
| Attempts to print to convey own ideas | | √ |
| Writes using invented spelling | | |
| Enjoys/shares own writing | | |

| LISTENING & SPEAKING | Sem 1 | Sem 2 |
|---|---|---|
| Listens attentively | N | P |
| Follows directions | | √ |
| Hears likenesses/differences in sounds of letters | N/A | √ |
| Tells the sounds made by letters | N/A | |
| Retells nursery rhymes, short stories, short poems | | √ |
| Answers questions in sentences | | √ |
| Expresses ideas clearly in keeping with age | | √ |
| Participates in class discussions | | √ |

| LITERATURE | | |
|---|---|---|
| Names picture/story characters | | √ |

| | Sem 1 | Sem 2 |
|---|---|---|
| Has a sight-word vocabulary (up to 40 words) | N | N |
| Identifies main idea | | |
| Connects text with personal experiences | | |
| Enjoys "reading" picture books | N/A | N/A |

| SCIENCE/SOCIAL STUDIES | Sem 1 | Sem 2 |
|---|---|---|
| Participates in care of living things | N | P |
| Recognizes/Describes seasons | | √ |
| Participates in guided experiments | | √ |
| Makes observations and discoveries about the environment/community | | √ |

SPECIAL SERVICES (Please check if applicable)

ESL/Bilingual
Special Education
Speech & Language
Other

| ATTENDANCE | Advisories | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| Days of Instruction | 3 | — | — | T |
| Days Absent | 0 | — | — | 0 |
| Days Tardy | | | | |

SCORING KEY
P = Progressing Satisfactorily
N = Needs Support

FOR INDIVIDUAL OBJECTIVES
+ = Excellent
√ = Satisfactory
— = Unsatisfactory

TEACHER COMMENTS Attached



...BIA PUBLIC SCHOOLS
...PROGRESS REPORT

(Page 2 of 3)

**SCORING KEY**

P = Progressing Satisfactorily
N = Needs Support

FOR INDIVIDUAL OBJECTIVES

+ = Excellent
√ = Satisfactory
— = Unsatisfactory

**...MATICS**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Compares objects by length, weight |  |  |
| Tells use of measuring devices (clock, calendar, ruler, thermometer) |  |  |
| Identifies penny, nickel, dime, quarter |  |  |
| Names hour on analog clock |  |  |
| Uses math terms (less, equal) |  |  |
| Identifies numbers 1 through 12 |  |  |
| Counts by rote to 50 |  |  |
| Names wholes and parts of wholes |  |  |
| Reads/Interprets simple graphs |  |  |
| Orders/Sorts objects by specific characteristics (size, shape) |  |  |
| Identifies sets with ten items |  |  |
| Duplicates patterns |  |  |
| ...atches items one-to-one |  |  |
| Recognizes shapes |  |  |

**ART AND MUSIC**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Identifies and uses line, shape, color, texture, form and direction |  |  |
| Creates images that represent ideas and feelings through symbols |  |  |
| Responds rhythmically and expressively to music |  |  |
| Imitates dance |  |  |
| Sings individually and in groups |  |  |

**PHYSICAL DEVELOPMENT**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Manages fastenings (zips, ties) |  |  |
| Cuts on the line with preschool scissors |  |  |
| Holds and uses pencil with a mature pencil grasp |  |  |
| Prints full name |  |  |
| Copies simple geometric shapes |  |  |

**HEALTH/PHYSICAL EDUCATION**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Walks down stairs alternating feet |  |  |
| Skips and hops |  |  |

**SOCIAL DEVELOPMENT**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Catches, bounces, throws ball |  |  |
| Displays age-appropriate health and safety practices |  |  |
| Tells full name |  |  |
| Tells address/telephone number |  |  |
| Tells age/birthday |  |  |
| Shares and takes turns |  |  |
| Displays self-discipline |  |  |
| Adjusts to new situations |  |  |
| Respects property of others |  |  |
| Names persons who make up family |  |  |
| Tells function of body parts |  |  |
| Completes actions in toileting |  |  |
| Shows responsibility for own things |  |  |
| Follows class rules |  |  |
| Gets along well with peers |  |  |

**WORK HABITS**

|  | Sem 1 | Sem 2 |
|---|---|---|
| Works at task until complete |  |  |
| Seeks help when needed |  |  |
| Takes care of materials |  |  |
| Cleans up after work period |  |  |
| Asks questions |  |  |

**Grade Next Year**

TEACHER COMMENTS Attached



District of Columbia Public Schools Report Card
SY 2000-2001 (Page three of three)
**TEACHER COMMENTS**

Student Name: Lee, Antonio                Grade: Kgn

**First Advisory**

Teacher Signature _____ Date _____

**Second Advisory** Antonio has made very little progress both academically and socially. It is very proud that he can write his name and some numbers. He needs improvement in his social behavior. He continues to disrupt the class on a daily basis. Please discuss these issues with him!

Teacher Signature Thompson    Date 1/31/01

**Third Advisory**

Teacher Signature _____ Date _____

**Fourth Advisory** Antonio needs support in both reading and math. His emotional outbursts has interfered with his progress tremendously. He needs great assistance this summer in all skills. Enjoy your summer.

Teacher Signature Thompson    Date 6/19/01

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## 3RD GRADE REPORT CARD SY _____
(Page one of three)

Student Name: _____

ID#: _____

School: _____

Teacher: _____

- - - - - - - - - - - - - - - - - - - - - - -

| INSTRUCTIONAL LEVEL | above level | on level | below level |
|---|---|---|---|
| **Reading** | | | |
| 1st Advisory | — | — | ✓ |
| 2nd Advisory | — | — | ✓ |
| 3rd Advisory | — | — | ✓ |
| 4th Advisory | — | — | ✓ |
| **Mathematics** | | | |
| 1st Advisory | — | — | ✓ |
| 2nd Advisory | — | — | ✓ |
| 3rd Advisory | — | ✓ | ✓ |
| 4th Advisory | — | — | ✓ |

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **READING** | | | | |
| Uses word attack skills & vocabulary building strategies | ✓ | ✓- | ✓ | ✓- |
| Reads and comprehends 25 books | — | ✓- | ✓- | ✓ |
| Identifies main idea and supporting details | | ✓- | ✓- | ✓- |
| Reads aloud with accuracy and fluency | | ✓- | ✓ | ✓- |
| Determines cause and effect relationships in text | | ✓- | ✓- | ✓- |
| **WRITING** | | | | |
| Writes a personal letter | — | | ✓- | ✓- |
| Writes a personal narrative | — | | ✓- | ✓- |
| Writes a brief report | | ✓- | ✓- | ✓- |
| Uses technology to create, revise and publish work | — | ✓ | NI | |
| Uses correct grammar, capitalization & spelling | | 3 | ✓- | ✓- |
| Uses writing process | — | — | — | — |
| **LISTENING SKILLS** | | 1 | 2 | 2 |
| Exhibits appropriate audience behavior | | ✓ | ✓ | ✓ |
| Comprehends oral presentations | | ✓- | ✓ | ✓ |
| **SPEAKING SKILLS** | | 1 | 2 | 2 |
| Gives & understands oral directions | — | ✓- | ✓- | ✓ |
| Participates in group discussions | | ✓ | ✓ | ✓ |
| Makes oral presentations | | ✓- | ✓- | ✓ |

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **MATHEMATICS** | | 1 | 2 | 2 |
| Adds & subtracts whole numbers with regrouping | — | ✓- | ✓ | ✓- |
| Applies place value concepts | — | ✓- | ✓ | ✓- |
| Models concepts of multiplication and division | — | ✓- | + | + |
| Applies estimation and rounding strategies | | ✓ | + | + |
| Counts money & makes change | | ✓- | ± | ± |
| Classifies three-dimensional shapes | — | ✓ | ✓ | ✓ |
| Identifies geometric figures | | ✓ | ✓ | ✓ |
| Interprets data from charts, graphs and tables | — | ✓ | ✓ | ✓ |
| Models & solves problems | — | — | ✓- | ✓- |

### Reporting Key:
**For overall grade in subject area:**

4 = Exceeds the standard (Advanced)
Student takes initiative to exceed the standard; consistently produces excellent work, applying skills/concepts correctly; shows creativity and insight.

3 = Meets the standard (Proficient)
Student produces work that meets the standard; frequently produces very good work of high quality; applies skills/concepts correctly.

2 = Approaches the standard (Basic)
Student shows a basic working knowledge of skills/concepts; produces satisfactory work; usually applies skills/concepts correctly.

1 = Does not meet the standard (Below Basic)
Student does not show basic working knowledge of skills/concepts; seldom produces work of satisfactory quality.

**For skills/expectations within subject area:**

| + = Excellent | -- = Unsatisfactory |
|---|---|
| ✓ = Satisfactory | NI = Not Introduced |

*Revised 2000-2001*



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**3RD GRADE REPORT CARD** SY _____
(Page two of three)
Student Name: _____

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **SOCIAL STUDIES** | _ | 2 | _ | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Identifies historical landmarks & key geographical features of the nation's capital | _ | ✓ | ✓ | |
| Recognizes significant persons, documents & events shaping Washington, D.C. | _ | ✓ | ✓ | |
| Describes the contributions of diverse groups to Washington, D.C. society | _ | ✓ | ✓ | |
| Demonstrates recognition of names of other large cities & capitals | _ | ✓ | ✓ | |
| Demonstrates map & globe skills | _ | ✓ | ✓ | |

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **SCIENCE** | 1 | 2 | _ | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Uses scientific methods to ask & answer questions about the natural world | _ | ✓ | ✓ | |
| Describes how structures of living things adapt to function | _ | ✓ | ✓ | |
| Describes physical features of local environment | _ | ✓ | ✓ | |
| Describes how vibrating objects produce sound | _ | ✓ | ✓ | |
| Describes how matter changes | _ | ✓ | ✓ | |
| Explains seasonal changes | _ | ✓ | ✓ | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **MUSIC** | _ | 2 | 3 | |
| Identifies music of various cultures and styles | _ | ✓ | ✓ | |
| Interprets music through singing, listening, performing, creating, reading & writing | | ✓ | + | ? |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **ART** | | | | |
| Applies different media, techniques & processes in artworks | | | | |
| Uses symbols & images to convey meaning | | | | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **HEALTH & PHYSICAL EDUCATION** | _ | 3 | 4 | |
| Explains consequences of negative & positive behaviors in conflict | _ | ✓ | + | 2 |
| Scores in acceptable levels for physical fitness; e.g. sit & reach, running | _ | ✓ | + | |
| Displays increased motor skills in individual & team sports | _ | ✓ | + | |

**For the section on WORK HABITS, PERSONAL & SOCIAL SKILLS, the following key is used:**

+ = Excellent
✓ = Satisfactory
-- = Unsatisfactory

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **WORK HABITS** | | | | |
| Follows directions | _ | ✓ | ✓ | ✓ |
| Completes classwork on time | _ | = | ✓ | ✓ |
| Works well with others/cooperates | _ | ✓ | ✓ | ± |
| Uses time wisely | _ | ✓ | ✓ | ✓ |
| Completes and returns homework | _ | ✓ | ✓ | ✓ |
| Participates in class discussions | _ | ✓ | ✓ | ± |
| Makes an effort | _ | ✓ | ✓ | ± |
| **PERSONAL & SOCIAL SKILLS** | | | | |
| Follows classroom rules | _ | ✓ | ✓ | ✓ |
| Follows playground/school rules | _ | ✓ | ✓ | ✓ |
| Respects the rights/property of others | _ | ✓ | ✓ | ± |
| Listens while others speak | _ | ✓ | ✓ | ± |
| Practices self-control | _ | ✓ | ✓ | |

| **ATTENDANCE** | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Days of Instruction | _ | 40 | 47 | |
| Days Absent | _ | 1 | 1 | 2 (E) |
| Days Tardy | _ | 0 | 0 | 0 |

**SUPPORT SERVICES** Check where applicable. Additional comments from support staff attached.

| | | | |
|---|---|---|---|
| Resource: Reading | _ | _ | _ |
| Resource: Mathematics | _ | _ | _ |
| Special Education | _ | _ | _ |
| Bilingual/ESL | _ | _ | _ |

*Revised 2000-2001*

**Grade Next Year** ____ 4

# Exhibit 7

**EXHIBIT**

AL-7

ALL-STATE LEGAL

STANFORD

*ACHIEVEMENT TEST SERIES, NINTH EDITION*
SELECT

**STUDENT REPORT**
PERFORMANCE STANDA
ANTONIO LEE

TEACHER: JOHNSON
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 01
TEST DATE: 04/02

Age: 6 Yrs 10 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 106 | DNA | |
| Word Study Skills | 36 | DNA | |
| Word Reading | 30 | 6 | BELOW BASIC |
| Reading Comp. | 40 | 11 | BELOW BASIC |
| Total Mathematics | 69 | 29 | BASIC |
| Problem Solving | 44 | 22 | BASIC |
| Procedures | 25 | 7 | BELOW BASIC |

Performance Standards are content-referenced scores that reflect what students know and should be able to do in given subject areas. The Stanford Performance Standards were determined by expert panels of educators, who judged each test question on the basis of how students at different levels of achievement should perform. These expert judgments yielded four categories or levels of student performance.

Below Basic indicates little or no mastery of fundamental knowledge and skills.

Basic denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

Proficient represents solid academic performance, indicating that students are prepared for the next grade. At the high school level, that indicates preparedness for democratic citizenship, responsible adulthood, and productive work.

Advanced signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

**NOTES**

STANFORD LEVEL/FORM: Primary 1/T
1995 NORMS: Spring      National

OTHER INFO: 2
Process No. 10292001-1592344-0121-47106-1
Copy 01

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.

# STANFORD

**ACHIEVEMENT TEST SERIES, NINTH EDITION**
SELECT

| STUDENT REPORT |
| :---: |
| FOR |
| ANTONIO LEE |

TEACHER: JOHNSON
SCHOOL:  BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE:  01
TEST DATE: 04/02

Age: 6 Yrs  10 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE | | | NATIONAL GRADE PERCENTILE BANDS |
| :--- | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: |
| | | | | | | | | 1  10  30  50  70  90  99 |
| Total Reading | 106 | DNA | | | | | | |
| Word Study Skills | 36 | DNA | | | | | | |
| Word Reading | 30 | 6 | 436 | 3-1 | 10.4 | | | |
| Reading Comp. | 40 | 11 | 457 | 6-2 | 17.3 | | | |
| Total Mathematics | 69 | 29 | 489 | 12-3 | 25.3 | | | |
| Problem Solving | 44 | 22 | 513 | 18-3 | 30.7 | | | |
| Procedures | 25 | 7 | 448 | 9-2 | 21.8 | | | |

| CONTENT CLUSTERS | RS/ NP/ NA | Below Average | Average | Above Average | | | Below Average | Average | Above Average |
| :--- | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: | :---: |
| Word Study Skills | DNA/ 36/ 0 | | | | | | | | |
| Structural Analysis | DNA/ 12/ 0 | | | | | | | | |
| Phonetic Analysis-Consonants | DNA/ 12/ 0 | | | | | | | | |
| Phonetic Analysis-Vowels | DNA/ 12/ 0 | | | | | | | | |
| | | | | | | | | | |
| Word Reading | 6/ 30/ 27 | ✓ | | | | | | | |
| | | | | | | | | | |
| Reading Comprehension | 11/ 40/ 39 | ✓ | | | | | | | |
| Two-Sentence Stories (Riddles) | 2/ 5/ 5 | ✓ | | | | | | | |
| Short Passages (Cloze) | 3/ 15/ 14 | ✓ | | | | | | | |
| Short Passages w/Questions | 6/ 20/ 20 | | | | | | | | |
| Recreational | 4/ 10/ 10 | | ✓ | | | | | | |
| Textual | 2/ 5/ 5 | | ✓ | | | | | | |
| Functional | 0/ 5/ 5 | ✓ | | | | | | | |
| Initial Understanding | 4/ 9/ 9 | | ✓ | | | | | | |
| Interpretation | 2/ 11/ 11 | ✓ | | | | | | | |
| | | | | | | | | | |
| Mathematics: Problem Solving | 22/ 44/ 43 | ✓ | | | | | | | |
| Concepts/Whole No. Comput. | 3/ 3/ 3 | | | ✓ | | | | | |
| Number Sense and Numeration | 7/ 12/ 12 | | ✓ | | | | | | |
| Geometry and Spatial Sense | 2/ 5/ 5 | ✓ | | | | | | | |
| Measurement | 4/ 8/ 8 | | ✓ | | | | | | |
| Statistics and Probability | 1/ 5/ 5 | ✓ | | | | | | | |
| Fraction and Decimal Concepts | 1/ 3/ 3 | ✓ | | | | | | | |
| Patterns & Relationships | 2/ 5/ 4 | ✓ | | | | | | | |
| Problem-Solving Strategies | 2/ 3/ 3 | | ✓ | | | | | | |
| | | | | | | | | | |
| Mathematics: Procedures | 7/ 25/ 24 | ✓ | | | | | | | |
| Number Facts | 1/ 8/ 8 | ✓ | | | | | | | |
| Computation/Symbolic Notation | 2/ 11/ 10 | ✓ | | | | | | | |
| Computation in Context | 4/ 6/ 6 | | ✓ | | | | | | |

STANFORD LEVEL/FORM: Primary 1/T
1995 NORMS:  Spring     National

OTHER INFO:  2-------                Copy 01
Process No.: 10292001-1592344-0121-47105-1

Scores based on normative data copyright © 1996 by Harcourt, Inc.  All rights reserved.

# STANFORD

**ACHIEVEMENT TEST SERIES, NINTH EDITION**
**SELECT**

**STUDENT REPORT**
**FOR**
**ANTONIO LEE**

TEACHER: PARRY
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 02
TEST DATE: 04/04

Age: 8 Yrs. 11 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE | | | |
|---|---|---|---|---|---|---|---|---|
| Total Reading | 118 | 42 | 522 | 19-4 | 31.0 | | | |
| Word Study Skills | 48 | 24 | 558 | 21-3 | 33.0 | | | |
| Vocabulary | 30 | 7 | 495 | 7-2 | 6.7 | | | |
| Reading Comp. | 40 | 11 | 540 | 15-3 | 28.2 | | | |
| Total Mathematics | 74 | 35 | 532 | 15-3 | 28.2 | | | |
| Problem Solving | 46 | 21 | 541 | 14-3 | 27.2 | | | |
| Procedures | 28 | 14 | 517 | 20-3 | 32.3 | | | |

### NATIONAL GRADE PERCENTILE BANDS



| CONTENT CLUSTERS | RS/ NP/ NA | Below Average | Average | Above Average | | Below Average | Average | Above Average |
|---|---|---|---|---|---|---|---|---|
| Word Study Skills | 24/ 48/ 48 | ✓ | | | | | | |
| Structural Analysis | 9/ 12/ 12 | ✓ | | | | | | |
| Phonetic Analysis-Consonants | 11/ 18/ 18 | ✓ | | | | | | |
| Phonetic Analysis-Vowels | 4/ 18/ 18 | ✓ | | | | | | |
| | | | | | | | | |
| Reading Vocabulary | 7/ 30/ 30 | ✓ | | | | | | |
| Synonyms | 6/ 18/ 18 | ✓ | | | | | | |
| Context | 0/ 6/ 6 | ✓ | | | | | | |
| Multiple Meanings | 1/ 6/ 6 | ✓ | | | | | | |
| | | | | | | | | |
| Reading Comprehension | 11/ 40/ 40 | ✓ | | | | | | |
| Recreational | 6/ 14/ 14 | ✓ | | | | | | |
| Textual | 3/ 13/ 13 | ✓ | | | | | | |
| Functional | 2/ 13/ 13 | ✓ | | | | | | |
| Initial Understanding | 4/ 14/ 14 | ✓ | | | | | | |
| Interpretation | 6/ 20/ 20 | ✓ | | | | | | |
| Critical Analysis | 0/ 3/ 3 | ✓ | | | | | | |
| Process Strategies | 1/ 3/ 3 | | ✓ | | | | | |
| | | | | | | | | |
| Mathematics: Problem Solving | 21/ 46/ 46 | ✓ | | | | | | |
| Concepts/Whole No. Compur. | 1/ 4/ 4 | ✓ | | | | | | |
| Number Sense and Numeration | 3/ 10/ 10 | ✓ | | | | | | |
| Geometry and Spatial Sense | 3/ 5/ 5 | | ✓ | | | | | |
| Measurement | 7/ 10/ 10 | | ✓ | | | | | |
| Statistics and Probability | 2/ 6/ 6 | ✓ | | | | | | |
| Fraction and Decimal Concepts | 3/ 3/ 3 | | | ✓ | | | | |
| Patterns & Relationships | 1/ 5/ 5 | ✓ | | | | | | |
| Problem-Solving Strategies | 1/ 3/ 3 | | ✓ | | | | | |
| | | | | | | | | |
| Mathematics: Procedures | 14/ 28/ 28 | ✓ | | | | | | |
| Number Facts | 3/ 8/ 8 | ✓ | | | | | | |
| Computation/Symbolic Notation | 7/ 12/ 12 | ✓ | | | | | | |
| Computation in Context | 4/ 8/ 8 | ✓ | | | | | | |

STANFORD LEVEL/FORM: Primary 2/T
1995 NORMS: Spring          National

OTHER INFO: 2
Process No: 10492015-1672138-0460-07492-2
Copy 02

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.



**STANFORD** *ACHIEVEMENT TEST SERIES, NINTH EDITION SELECT*

**STUDENT REPORT with PERFORMANCE STANDARDS FOR ANTONIO LEE**

TEACHER: PARRY
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 02
TEST DATE: 04/04

Age: 8 Yrs 11 Mos.
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 118 | 42 | BELOW BASIC |
| Word Study Skills | 48 | 24 | BASIC |
| Vocabulary | 30 | 7 | BELOW BASIC |
| Reading Comp. | 40 | 11 | BELOW BASIC |
| Total Mathematics | 74 | 35 | BELOW BASIC |
| Problem Solving | 46 | 21 | BELOW BASIC |
| Procedures | 28 | 14 | BELOW BASIC |

Performance Standards are content-referenced scores that reflect what students know and should be able to do in given subject areas. The Stanford Performance Standards were determined by expert panels of educators, who judged each test question on the basis of how students at different levels of achievement should perform. These expert judgments yielded four categories or levels of student performance.

Below Basic indicates little or no mastery of fundamental knowledge and skills.

Basic denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

Proficient represents solid academic performance, indicating that students are prepared for the next grade. At the high school level, this indicates preparedness for democratic citizenship, responsible adulthood, and productive work.

Advanced signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

NOTES

STANFORD LEVEL/FORM: Primary 2/T
1995 NORMS: Spring    National

OTHER INFO: 2———    Copy 02
Process No. 10492015-1672138-0460-07493.2

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.



**STANFORD**

ACHIEVEMENT TEST SERIES, NINTH EDITION
SELECT

| STUDENT REPORT |
| FOR |
| ANTONIO LEE |
| Age: 9 Yrs 10 Mos |
| Student No: 9078616 |

TEACHER: VIOLA WU
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 03
TEST DATE: 04/05

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE | | |
|---|---|---|---|---|---|---|---|
| Total Reading | 84 | 23 | 542 | 4-2 | 13-1 | | |
| Vocabulary | 30 | 5 | 496 | 1-1 | 1-0 | | |
| Reading Comp. | 54 | 18 | 564 | 16-4 | 27-2 | | |
| Total Mathematics | 76 | 39 | 572 | 25-4 | 35-8 | | |
| Problem Solving | 46 | 21 | 567 | 17-3 | 29-2 | | |
| Procedures | 30 | 18 | 579 | 45-5 | 47.4 | | |

NATIONAL GRADE PERCENTILE BANDS

1   10   30   50   70   90   99

| CONTENT CLUSTERS | RS/ NP/ NA | Below Average | Average | Above Average | | | Below Average | Average | Above Average |
|---|---|---|---|---|---|---|---|---|---|
| **Reading Vocabulary** | 5/ 30/ 30 | ✓ | | | | | | | |
| Synonyms | 4/ 18/ 18 | ✓ | | | | | | | |
| Context | 1/ 6/ 6 | ✓ | | | | | | | |
| Multiple Meanings | 0/ 6/ 6 | ✓ | | | | | | | |
| | | | | | | | | | |
| **Reading Comprehension** | 18/ 54/ 54 | ✓ | | | | | | | |
| Recreational | 8/ 18/ 18 | ✓ | | | | | | | |
| Textual | 9/ 18/ 18 | ✓ | | | | | | | |
| Functional | 6/ 18/ 18 | ✓ | | | | | | | |
| Initial Understanding | 6/ 14/ 14 | ✓ | | | | | | | |
| Interpretation | 5/ 24/ 24 | ✓ | | | | | | | |
| Critical Analysis | 3/ 8/ 8 | | ✓ | | | | | | |
| Process Strategies | 4/ 8/ 8 | ✓ | | | | | | | |
| | | | | | | | | | |
| **Mathematics: Problem Solving** | 21/ 46/ 46 | ✓ | | | | | | | |
| Concepts/Whole No. Compu. | 3/ 9/ 9 | | ✓ | | | | | | |
| Number Sense and Numeration | 1/ 6/ 6 | ✓ | | | | | | | |
| Geometry and Spatial Sense | 3/ 6/ 6 | ✓ | | | | | | | |
| Measurement | 6/ 10/ 10 | | ✓ | | | | | | |
| Statistics and Probability | 3/ 6/ 6 | | ✓ | | | | | | |
| Fraction and Decimal Concepts | 2/ 4/ 4 | | ✓ | | | | | | |
| Patterns & Relationships | 2/ 3/ 3 | | ✓ | | | | | | |
| Estimation | 1/ 3/ 3 | | ✓ | | | | | | |
| Problem-Solving Strategies | 0/ 4/ 4 | ✓ | | | | | | | |
| **Mathematics: Procedures** | 18/ 30/ 30 | | ✓ | | | | | | |
| Number Facts | 4/ 6/ 6 | | ✓ | | | | | | |
| Computation/Symbolic Notation | 10/ 12/ 12 | | | ✓ | | | | | |
| Computation in Context | 3/ 9/ 9 | | ✓ | | | | | | |
| Rounding | 1/ 3/ 3 | | ✓ | | | | | | |

STANFORD LEVEL/FORM: Primary 3/T
1995 NORMS: Spring    National

OTHER INFO: -------    Copy 01
Process No. 10592001-1601457-1359-29325-1

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.



**ACHIEVEMENT TEST SERIES, NINTH EDITION**
**SELECT**

**STUDENT REPORT** with
**PERFORMANCE STANDARDS FOR**
**ANTONIO LEE**

Age= 9 Yrs 10 Mos
Student No: 9078616.

TEACHER: VIOLA WU
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE:      03
TEST DATE: 04/05

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 84 | 23 | BELOW BASIC |
| Vocabulary | 30 | 5 | BELOW BASIC |
| Reading Comp. | 54 | 18 | BELOW BASIC |
| Total Mathematics | 76 | 39 | BASIC |
| Problem Solving | 46 | 21 | BELOW BASIC |
| Procedures | 30 | 18 | BASIC |

Performance Standards are content-referenced scores that reflect what students know and should be able to do in given subject areas. The Stanford Performance Standards were determined by expert panels of educators, who judged each test question on the basis of how students at different levels of achievement should perform. These expert judgments yielded four categories or levels of student performance.

Below Basic indicates little or no mastery of fundamental knowledge and skills.

Basic denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

Proficient represents solid academic performance, indicating that students are prepared for the next grade. At the high school level, this indicates preparedness for democratic citizenship, responsible adulthood, and productive work.

Advanced signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

**NOTES**

OTHER INFO:  2———————      Copy 01
Process No. 1Q592001-1601457-1359-29326-1

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.

# Exhibit 8

EXHIBIT

AL-8

ALL-STATE LEGAL®

FRANCIS & ASSOCIATES, P.C.
601 PENNSYLVANIA AVENUE, NW
SUITE 900
WASHINGTON, DC 20004

CONFIDENTIAL PSYCHOEDUCATIONAL EVALUATION

**NAME:** ANTONIO LEE
**DOB:** JUNE 3, 1995
**DOE:** FEBRUARY 18, 2005
**GRADE:** THIRD GRADE
**DOR:** MARCH 3, 2005

**REASON FOR REFERRAL:** Antonio Lee, a nine-year-old, African American male, was referred for a Psychoeducational Evaluation to assess his cognitive and academic functioning. The referral information indicated that in the recent past, Antonio experienced academic difficulties. As a result of his prior academic difficulties, previously, Antonio received a Psychoeducational Evaluation. However, the results of the prior Psychoeducational Evaluation appeared somewhat irregular. Consequently, the current Psychoeducational Evaluation was requested. Antonio was accompanied to the evaluation by his mother, Ms. Theresa Lee.

**EVALUATION METHOD**
1.    Woodcock Johnson 3rd Edition, Test of Achievement, (WJ-III)
2.    Wechsler Abbreviated Scale of Intelligence, (WASI)
3.    Bender Visual Motor Gestalt Test (Bender Gestalt)
4.    Clinical Interview with Antonio Lee
5.    Clinical Interview with Antonio Lee and Ms. Theresa Lee

**EVALUATION NOTE**
       During November of 2004, Antonio previously received a Psychoeducational Evaluation. As a part of his previous Psychoeducational Evaluation, Antonio was administered the Wechsler Intelligence Scale for Children-4th Edition, (WISC-IV). Given this current Psychoeducational Evaluation's relatively close proximity to his prior Psychoeducational Evaluation, Antonio could not be readministered the WISC-IV. Consequently, during the current Psychoeducational Evaluation, in an attempt to obtain his cognitive functioning, Antonio was administered the Wechsler Abbreviated Scale of Intelligence.

**BEHAVIORAL OBSERVATIONS AND CLINICAL INTERVIEW**
       Antonio appeared to be average height and average weight. He appeared his stated age. There were no difficulties with his gross motor or fine motor movements. There were no apparent difficulties with his hearing or vision. He understood some of the instructions and directions as presented. When he did not appear to understand the directions, he rarely asked for clarification. He appeared to formulate his thoughts and ideas with some difficulty. In addition, when Antonio appeared to be thinking, he would often tap or scratch his head. Rapport was tentatively established. His hygiene was adequate.

Antonio's cooperation and motivation to complete the evaluation were adequate. As such, he did not engage in any oppositional mannerisms. In contrast, on occasion, before he responded to an evaluation prompt, Antonio displayed some latency and appeared somewhat distracted. In addition, at times, Antonio appeared to be a somewhat limited and guarded reporter.

Throughout the evaluation, as a result of apparently suffering from a cold, Antonio readily displayed some nasal congestion.

During the evaluation, Antonio's speech was limited. As such, typically, he remained quiet. In contrast, during instances when Antonio spoke, at times, he displayed some verbal dysfluency. For instance, he displayed somewhat limited vocabulary skills as well as a somewhat limited ability to pronounce unfamiliar words. In addition to his speech and language limitations, his spelling abilities were also very poor.

Antonio's performance on the verbal tasks varied. For example, at times, when completing reading tasks, Antonio would read the first letter of a word, then think of a word that started with that letter, and then state the word from his memory. For instance, when presented with a word like "doll," Antonio would read the letter "D," and then state, "day." Furthermore, on occasion, if Antonio misread a word while reading a sentence, he would readily restart reading the sentence from the beginning. Additionally, at some points, while Antonio was reading, he would substitute synonyms for the word that was actually written. In particular, while reading a sentence, Antonio substituted the word "hen" for "chicken." Overall, Antonio displayed somewhat limited reading abilities. In particular, at times, Antonio readily skipped words he did not understand. As such, he had a very limited ability to comprehend the context of a sentence.

Antonio's performance on the nonverbal tasks appeared consistent. Typically, while completing the nonverbal tasks, he remained quiet. In addition, his strategies for completing the nonverbal tasks appeared ordered and focused. For example, while completing the nonverbal tasks, Antonio readily utilized concrete aids, such as counting on his fingers. Of note, on arithmetic tasks that included a verbal component, Antonio readily attempted to utilize a pen and paper while completing the tasks. However, he displayed a limited ability to determine what information was important and should be written down as opposed to what information was inconsequential. As such, he frequently wrote down all of the information, which negated the utility of using a pen and paper.

Throughout the evaluation, Antonio occasionally appeared to be monitoring this writer. As such, at times, while completing the evaluation tasks, Antonio readily looked at this writer seemingly in an attempt to ascertain if this writer was observing him.

Antonio indicated that he was born and raised in Washington, DC. Antonio denied being aware of whether or not his parents were married at the time of his birth. In contrast, Antonio mentioned that at the time of his birth, he resided with his father. Overall, Antonio described his prior relationship with his father as appropriate. Antonio described his father's primary form of discipline as "talking to me."

REPORT OF PSYCHOEDUCATIONAL EVAL    ON
ANTONIO LEE
PAGE: 3

According to Antonio, at some point during his childhood, his mother obtained custody of him from his father. Antonio denied being able to provide a rationale explaining the transfer of custody. Antonio indicated that at the time the transfer was enacted, he wanted to remain in the care of his father. In contrast, Antonio mentioned that he most recently saw his father during his birthday party at Chuck E. Cheese. Antonio denied ever spending the night at his father's residence since the custody transfer.

Antonio described his mother as "nice." In particular, Antonio mentioned that his mother typically provides for his needs. Antonio described his mother's primary form of discipline as corporal punishment or coming to his school. He denied having ever been corporally punished for no reason. In addition, he denied having ever felt as if he were abused.

Antonio described his stepfather as "nice." According to Antonio, he and his stepfather maintain an appropriate relationship. Antonio described his stepfather's primary form of discipline as "sometimes he talks to me or I get spankings."

According to Antonio, he has two brothers and one sister. Antonio indicated that he maintained appropriate relationships with his siblings. According to Antonio, at times, he and his siblings may engage in verbal arguments. However, he denied having ever engaged in a physical altercation with his siblings. Antonio mentioned that during the times when he and his siblings are arguing, his mother will "holler or say stuff."

According to Antonio, currently, he is displaying appropriate academic functioning. However, Antonio denied having any knowledge regarding his current grades. In contrast, he denied having ever failed any academic courses. Antonio denied being aware of whether or not he was ever held back from being promoted to his next subsequent grade.

Antonio indicated that currently, he received services from Sylvan Learning Center. In particular, he mentioned that he was receiving services to improve his reading. Antonio also mentioned that he enjoyed working with his current teacher.

According to Antonio, in the past, as a result of engaging in a physical altercation, he was sent to the Principal's office. Antonio mentioned that while at the Principal's office, the principal talked to him. Overall, Antonio attributed the physical altercation to the other student's inappropriateness.

Antonio described himself as having somewhat limited frustration tolerance. In particular, he stated, "When I get hard stuff, I get frustrated, and I don't want to do it." Similarly, Antonio described himself when he becomes angry, and said, "I try to stop myself, but he makes me hit him [the other student in which he engaged in the physical altercation]."

According to Antonio, in the past, when he was emotionally distressed, he attempted to hurt himself. For example, he stated, "I scratched my face because I was getting angry, when my sister kept playing all the time." In contrast, Antonio denied having ever tried to kill himself. Furthermore, he denied having ever experienced suicidal ideation.

According to Antonio, currently, he does not require any type of help or assistance.

## MENTAL STATUS EXAMINATION

Upon mental status examination, Antonio was alert, oriented, generally cooperative, and did not display any acute distress. There was no indication of auditory or visual hallucinations, bizarre thinking or suicidal or homicidal ideation. His affect was adequate. His thought processes varied. His eye contact varied. Antonio's attention, concentration and abstract thinking abilities varied. His recent, immediate, and remote memory varied. His insight and judgment varied. In light of his mental status throughout the evaluation, the test results are considered an accurate representation of his current intellectual and emotional functioning.

## MS. LEE

During the joint interview, Ms. Lee readily appeared frustrated as a result of the academic and emotional difficulties that Antonio was experiencing.

According to Ms. Lee, in the past, as a result of attempting to complete his IEP process, Antonio received a prior Psychoeducational Evaluation. In particular, in the past, Antonio was found to be two grade levels behind his expected performance. However, Ms. Lee stated that despite being assessed as two grade levels behind his expected performance, Antonio still did not appear to qualify for additional services. As such, Ms. Lee alleged that some of Antonio's school officials did not appear to fully recognize the extent of his difficulties. In contrast, Ms. Lee acknowledged that Antonio's teacher had begun to independently work with Antonio and their independent work was displaying some benefit.

Ms. Lee described Antonio and stated, "He acts out because he is frustrated." In particular, Ms. Lee remarked, "He shuts down as the work gets harder."

Ms. Lee reported that in the past, Antonio was retained within the first grade. According to Ms. Lee, currently, Antonio appears to require additional academic accommodations. In particular, Ms. Lee asserted that she believed if Antonio received appropriate academic accommodations, he would display improved academic functioning.

According to Ms. Lee, at the current time, Antonio is within the same classroom as his younger brother. Ms. Lee mentioned that by placing Antonio within the same classroom as his younger brother, Antonio experiences some academic distress. In particular, Ms. Lee described Antonio's younger brother as "the head of the class."

Ms. Lee described Antonio as occasionally displaying appropriate peer relationships. According to Ms. Lee, in the past, Antonio threatened another student because the other student completed all of his work.

According to Ms. Lee, Antonio displays an appropriate relationship with his stepfather. Overall, Ms. Lee described her husband as supportive of her choices regarding Antonio's academic functioning. In contrast, Ms. Lee alleged that Antonio's biological father as well as some of Antonio's paternal relatives displayed academic difficulties. Furthermore, Ms. Lee

alleged that as a result of suffering from significant disabilities, some of Antonio's paternal relatives received SSI benefits.

Ms. Lee indicated that during her pregnancy with Antonio, Antonio might have been exposed to illicit substances. Similarly, Ms. Lee reported that Antonio's obtainment of some of his developmental milestones was delayed. Furthermore, Ms. Lee described Antonio as somewhat clingy.

According to Ms. Lee, in the past, Antonio received counseling services.

**BACKGROUND INFORMATION**

According to the records, in the past, Antonio received a Speech and Language Evaluation. The results of the Speech and Language Evaluation did not recommend speech therapy for Antonio.

**TEST RESULTS**

GENERAL COGNITIVE RESOURCES

WECHSLER ABBREVIATED SCALE OF INTELLIGENCE (WASI)

| SUBTESTS | SCALED SCORE | CLASSIFICATION |
|---|---|---|
| VOCABULARY | 6 | LOW AVERAGE |
| BLOCK DESIGN | 6 | LOW AVERAGE |
| SIMILARITIES | 8 | AVERAGE |
| MATRIX REASONING | 4 | BORDERLINE |
| | | |
| VERBAL IQ | 86 | LOW AVERAGE |
| PERFORMANCE IQ | 76 | BORDERLINE |
| FULL SCALE-4 | 78 | BORDERLINE |

Antonio obtained a Full Scale-4 WASI IQ score of 78, which is classified within the Borderline range of functioning. Furthermore, his Performance IQ score of 76 was within the Borderline range. In contrast, his Verbal IQ of 86 was within the Low Average range. The 10-point difference between his Verbal IQ and his Performance IQ indicates that his verbal abilities are developing at a faster rate than his perceptual organizational abilities.

On the Verbal Scale, Antonio's performance varied. Specifically, on the Vocabulary subtest, which requires recall of verbal data typically learned in an academic environment, his performance was within the Low Average range. In contrast, on the test of verbal abstract reasoning, his performance was within the Average range. Taken together, these findings indicated that Antonio's Average verbal reasoning skills become mildly less efficient when utilized in a formal manner.

Antonio's performance on the Performance subtests varied. Specifically, the Block Design subtest measures someone's nonverbal and spatial reasoning efficiency, when combined with a psychomotor component, and in the absence of external guidance. His performance on the Block Design subtest was within the Low Average range. In contrast, the Matrix Reasoning

subtest measures a person's nonverbal and spatial reasoning efficiency, in the absence of a psychomotor component, and when presented with possible solutions. His performance on the Matrix Reasoning subtest was within the Borderline range. Taken together, these findings suggest that Antonio's almost Average nonverbal reasoning abilities become significantly less efficient when utilized in the absence of a psychomotor component.

## ACHIEVEMENT FUNCTIONING

The following interpretation is based on the Relative Proficiency Index (RPI), which will compare the proficiency of Antonio's academic skills to the proficiency of Antonio's peer group's academic skills. In particular, the RPI examines academic functioning in terms of, if Antonio's peer group can complete a task 90% of the time, what percent of the time can Antonio complete the same task. The RPI interpretation key is as follows: items on which he scores 90% or above will be easy for Antonio, items on which he scores from 80% to 89% will be manageable for Antonio, items on which he scores from 70% to 79% will be difficult for Antonio, and items on which he scores below 70% will be very difficult for Antonio.

### WOODCOCK JOHNSON 3RD EDITION, TEST OF ACHIEVEMENT, (WJ-III)

| Cluster/Test | RPI | Age Equivalent | Standard Score | Implications |
|---|---|---|---|---|
| **BROAD READING** | **07/90** | **7-5** | **74** | **Very Difficult** |
| Letter-Word Identify | 02/90 | 7-6 | 76 | Very Difficult |
| Passage Comprehension | 18/90 | 7-3 | 79 | Very Difficult |
| Reading Fluency | 12/90 | 7-6 | 78 | Very Difficult |
| **BASIC READING SKILLS** | **03/90** | **7-3** | **75** | **Very Difficult** |
| Word Attack | 05/90 | 7-0 | 77 | Very Difficult |
| Letter-Word Identify | 02/90 | 7-6 | 76 | Very Difficult |
| **BROAD MATH** | **84/90** | **9-2** | **96** | **Manageable** |
| Applied Problems | 57/90 | 8-4 | 90 | Very Difficult |
| Math Fluency | 90/90 | 9-8 | 100 | Easy |
| Calculation | 93/90 | 10-1 | 104 | Easy |
| **BROAD WRITTEN LANG.** | **42/90** | **7-8** | **76** | **Very Difficult** |
| Spelling | 05/90 | 7-4 | 71 | Very Difficult |
| Writing Samples | 82/90 | 8-3 | 91 | Manageable |
| Writing Fluency | 60/90 | 8-0 | 84 | Very Difficult |
| **ORAL LANGUAGE** | **73/90** | **7-3** | **82** | **Difficult** |
| Story Recall | 83/90 | 7-1 | 86 | Manageable |
| Understanding Directions | 61/90 | 7-3 | 84 | Very Difficult |
| Picture Vocabulary | 77/90 | 8-2 | 92 | Difficult |

On the Broad Reading section, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 5 months. Based on his Broad Reading skills, tasks that range from

:

fluent reading to comprehending short passages will be very difficult. As such, when individuals his age perform Broad Reading tasks with 90% success, Antonio performs them with 07% success.

On the Basic Reading Skills section, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 3 months. Based on his Basic Reading Skills, tasks that require word and letter identification skills or phonological decoding will be very difficult. As such, when individuals his age perform Basic Reading Skills tasks with 90% success, Antonio performs them with 03% success.

With regard to Broad Math Skills, Antonio's age equivalency level is comparable to that of an individual at age 9 years, 2 months. Based on his Broad Math skills, tasks that require him to analyze and solve practical math problems using his functional math abilities will be manageable. As such, when individuals his age perform Broad Math tasks with 90% success, Antonio performs them with 84% success.

With regard to his Calculation and Applied Problems abilities, Antonio's age equivalency level is comparable to that of an individual at age 10 years, 1 month and 8 years, 4 months, respectively. In comparison to the scores obtained by others at his age level, tasks that require him to solve higher-order arithmetic problems or consistently utilize arithmetic formulas will range from Easy to Very Difficult. As such, when individuals his age perform Calculation tasks using a pen and paper with 90% success, Antonio performs them with 93% success. In contrast, when individuals his age perform Applied Problems tasks, which contain word problems or mental mathematics, with 90% success, Antonio performs them with 57% success. In particular, Antonio's ability to successfully complete higher order arithmetic tasks varies significantly in regards to how the problem is presented (verbal word problems versus numerical presentation), or what type of mental processing is required (mental manipulation or pen and paper manipulation) to solve the problem.

With regard to Broad Written Language, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 8 months. Based on his Broad Written Language skills, tasks that require him to generate single-word responses or arrange sentences embedded in context will be very difficult. As such, when individuals his age perform Broad Written Language tasks with 90% success, Antonio performs them with 42% success.

With regard to Academic Fluency, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 11 months. The fluency of his reading, math, and written skills varied. Specifically, Antonio displayed a 90% success rate with regard to math fluency, a 60% success rate with regard to writing fluency, and a 12% success rate with regard to reading fluency. Overall, his ability to write and read fluently appears to be a considerable weakness.

With regard to Understanding Directions tasks, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 3 months. Based on his Understanding Directions skills, tasks that require him to follow verbal directions of varying levels of complexity as well as sequence verbal directions and complete actions based on verbal directions

will be very difficult. As such, when individuals his age perform Understanding Directions tasks with 90% success, Antonio performs them with 61% success.

With regard to Story Recall tasks, Antonio's age equivalency level is comparable to that of an individual at age 7 years, 1 month. Based on his Story Recall abilities, tasks that require him to store, retrieve, and communicate information presented in verbal formats of varying levels of complexity are manageable. As such, when individuals his age perform Story Recall tasks with 90% success, Antonio performs them with 83% success. In comparison to his performance on the Understanding Directions subtest, his performance on the Story Recall subtest indicated that he is better able to utilize his auditory processing skills when he has to recall stories that are laden with social content. In contrast, when he has to passively listen and patiently follow directions, his functioning is less proficient.

Overall, Antonio displayed Borderline overall cognitive aptitude. In addition, the level of difficulty that he faces when attempting to complete various functional academic tasks ranges from Very Difficult to Easy. In particular, all of his functional reading abilities were significantly impaired. Furthermore, his writing abilities were typically impaired. In addition, his oral language abilities were limited. Furthermore, when his functional arithmetic abilities were employed in conjunction with a verbal component, they became impaired. These findings strongly suggest that Antonio is experiencing verbal processing limitations.

On the Bender Gestalt test, a task requiring him to reproduce simple geometric designs and often used as a brief screen for neurological impairment, Antonio typically reproduced misshapen designs. His line quality was adequate. His planning and organization of the drawings was limited, as a result of his having reproduced the designs in a random manner across the page. In addition, his initial spacing was limited. His free recall of the drawings was less proficient than his initial reproductions. Overall, his results did not suggest the presence of major perceptual organizational, spatial, or visual motor concerns. However, some perceptual organizational difficulties were noted.

## SUMMARY

The results of this evaluation place Antonio's current cognitive functioning within the Borderline range. Specifically, his verbal cognitive aptitude was within the Low Average range. In contrast, his nonverbal cognitive aptitude was within the Borderline range. The pattern of Antonio's performance on the cognitive testing indicates that his verbal abilities are developing at a significantly faster rate than his nonverbal problem solving skills.

Analysis of Antonio's fundamental academic abilities in comparison to the pattern of his performance on cognitive testing suggests that he experiences a variable level of difficulty when attempting to employ his functional academic skills. For example, despite his almost Average level of verbal cognitive aptitude, on all reading tasks, Antonio displayed impaired functioning. Similarly, most of his writing abilities were impaired. In particular, Antonio's spelling abilities were extremely poor. Of note, given that he possesses Average abstract verbal reasoning abilities (a spelling precursor), Antonio's impaired spelling abilities are significantly noteworthy. Specifically, on writing tasks that require proficient spelling abilities, Antonio's performance will be extremely poor. In contrast, on writing tasks where efficient spelling abilities are not

required, Antonio's writing abilities will be more proficient.

On tasks that required attention and concentration abilities, Antonio's abilities were marginally adequate. Specifically, his ability to recall and immediately implement esoteric verbal directions was impaired. In contrast, he has a marginally adequate ability to utilize his attention and concentration abilities to recall socially laden information.

Despite his perceptual organizational limitations, Antonio's math skills were typically adequate. Of note, he displayed significant difficulty when attempting to solve math tasks that were combined with a verbal component. In contrast, Antonio's ability to solve written calculation tasks was significantly better improved. As such, even Antonio's arithmetic abilities, which were a relative cognitive strength, were reduced when combined with a verbal component.

Given his age, in a typical school day, Antonio confronts numerous tasks that are supposed to be completed by using effective verbal reasoning abilities. However, based on the discrepancy between his cognitive and academic testing results, Antonio appears to be experiencing verbal learning difficulties. As such, interventions that improve his verbal abilities are strongly recommended.

## DIAGNOSTIC IMPRESSIONS
### DSM IV-TR CLASSIFICATION SYSTEM

| | | |
|---|---|---|
| AXIS I | 315.00 | READING DISORDER |
| | 315.2 | DISORDER OF WRITTEN EXPRESSION |
| AXIS II | V71.09 | NONE |
| AXIS III | | NONE |
| AXIS IV | | PROBLEMS WITH PRIMARY SUPPORT GROUP, ACADEMIC CONCERNS |
| AXIS V | | GAF- CURRENT: 60, PAST: UNKNOWN |

## RECOMMENDATION FOR TREATMENT

Individuals who intervene with Antonio should be made aware of his cognitive and academic limitations. It is my opinion that Antonio can derive considerable benefit from the therapeutic milieu of highly structured services that can ensure compliance with therapeutic protocols that address the multifaceted aspects of his cognitive, academic, emotional, and interpersonal needs. As such, the following components should be considered for incorporation into the respondent's treatment plan:

1.        Antonio displayed a need for special education services. As such, Antonio may benefit from some highly structured education supportive services to provide supplemental and remedial intervention with regard to his functional academic abilities. He is in need of directive, focused, and intensive efforts to improve his reading skills, his writing skills, and his math skills. He has minimal basic skills in all of these areas. However, he should be able to perform at a higher level than he is presently functioning with appropriate teaching and intervention. At a minimum, the following skills should be incorporated into his instructional programming:

    A)        Initially, a functional curriculum should be used to solidify Antonio's

current vocabulary. Picture books that provide the name and a picture of a given object should be used to further develop Antonio's ability to bring meaning to the words in his vocabulary by connecting them to their picture and function.

B)    Antonio should also be provided with instruction that specifically focuses on increasing his vocabulary (spoken word) knowledge. Examples include the use of word boxes, word banks, word webs, etc. He will not be able to read or decode a word that he does not know exists in the English language.

C)    Specific reading instructional programming will need to be logically structured, and hierarchically based to address both "top down" (use of contextual cues, vicarious exposure to written material, etc.), and "bottom up" (a focus on very specific comprehension skills) approaches to reading instruction.

D)    Antonio's math computational skills will also require remediation. Antonio appears to have a rudimentary understanding of some basic arithmetic concepts. However, his ability to successfully conceptualize and solve higher order mathematical problems remains limited.

2.    Based on the results of the current evaluation, Antonio may benefit from a Clinical Evaluation to ascertain if his current verbal difficulties are having any effect on his emotional and interpersonal functioning. In particular, the antecedents of his limited frustration tolerance should be explored to determine if his limited frustration tolerance stems from his verbal difficulties, emotional stressors, or a combination of both factors. Completing a Clinical Evaluation to assess the extent and antecedents of his frustration tolerance difficulties will be of critical importance because improving his frustration tolerance will be an important step in eventually improving his academic functioning.

3.    The Clinical Evaluation should also be used to assess the impact of Antonio's limited verbal processing on his anger management abilities. In addition, Antonio's tendency to threaten his peers and occasionally engage in behavior that is harmful to himself should also be assessed.

4.    Antonio's family may benefit from learning disciplinary strategies that reduce their need for corporal punishment. In particular, Antonio's family may obtain benefit from learning disciplinary strategies that are effective for children with verbal processing difficulties.

EVALUATION COMPLETED AND REPORT
GENERATED BY:

MICHAEL GILLIARD, PSY.D.
CLINICAL PSYCHOLOGIST

# Exhibit 9



DISTRICT OF COLUMBIA
PUBLIC SCHOOLS

Office of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-1800, fax, 202-442-5518
www.k12.dc.us



# District of Columbia Public Schools
## Department of Special Education
### *Psycho-Educational Report*
### (Confidential--for professional use only)

NAME: Antonio Lee                    REPORT DATE: 11/15/04
AGE: 9 years 5 months                EXAMINER: Terrance Beason, M.Ed.,CAGS
DATE OF BIRTH: 06/03/95              TITLE: School Psychologist
GENDER: Male
GRADE: Third
SCHOOL: Bruce-Monroe ES
DATE OF EVALUATION: 11/09/04
TEACHER: Mrs. Drake

**Test Administered**

Wechsler Intelligence Scale for Children—Fourth Ed. (WISC-IV)
Wechsler Individual Achievement Test—Second Edition (WIAT-II)
Record Review
Teacher Interview

**Composite Scores Summary**

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|-------|----------------------|-----------------|-----------------|-------------------------|-------------------------|
| Verbal Comprehension (VCI) | 23 | **87** | 19 | 81-95 | **Low Average** |
| Perceptual Reasoning (PRI) | 23 | **86** | 18 | 79-95 | **Low Average** |
| Working Memory (WMI) | 16 | **88** | 21 | 81-97 | **Low Average** |
| Processing Speed (PSI) | 14 | **83** | 13 | 76-94 | **Low Average** |
| Full Scale (FSIQ) | 76 | **82** | 12 | 78-87 | **Low Average** |

*\*\*Arithmetic was substituted for Letter-Number Sequencing.*

## **Wechsler Intelligence Scale for Children—Fourth Ed**.

*IQ Scores          Classification*
*130 and above.........Very Superior*
*120-129..................Superior*
*110-119..................High Average*
***90-109...................Average***
*80-89......................Low Average*
*70-79......................Borderline*
*69 and Below..........Intellectually Deficient*

---

**Children First**

Antonio Lee                                                                                              2

## Reason for Referral

Antonio was referred for an evaluation due to some academic concerns. This evaluation was conducted to ascertain his current levels of intellectual and academic functioning. The results will assist in determining the need for special educational services. Antonio is a third grade student attending Bruce-Monroe Elementary School. The examiner had an opportunity to speak briefly to Antonio's third grade instructor, Mrs. , regarding his performance in the classroom. According to Mrs. Drake, Antonio is believed to possess more abilities than demonstrated. That notwithstanding, his computational skills are seen as more developed than his skills in reading. Antonio is said to be less confident in his abilities in reading, as a result he takes less risks in this area.

## Behavioral Observations (during testing)

Antonio presented as a polite, pleasant child who seemed poised for testing. He entered the testing room with no apprehensions, so rapport was easily established. Antonio's responses to items were fairly deliberate and thoughtful. His motivation and concentration were consistent throughout the evaluation. Nevertheless, the examiner submits the following as accurate appraisal of Antonio's current academic and cognitive functioning.

## Intellectual Functioning

### About the WISC-IV
Antonio was administered the Wechsler Intelligence Scale for Children– Fourth Edition (WISC–IV) on 11/9/2004. The WISC–IV is used to assess the general thinking and reasoning skills of children aged 6 years to 16 years. This test has five main scores: *Verbal Comprehension score, Perceptual Reasoning score, Working Memory score, Processing Speed score,* and *Full Scale* score.

The *Verbal Comprehension* score indicates how well Antonio did on tasks that required him to listen to questions and give spoken answers to them. These tasks evaluate his skills in understanding verbal information, thinking and reasoning with words, and expressing thoughts as words.

The *Perceptual Reasoning* score indicates how well Antonio did on tasks that required him to examine and think about things such as designs and pictures, and to solve problems without using words. These tasks evaluate his skills in solving nonverbal problems, sometimes using eye-hand coordination, and working quickly and efficiently with visual information.

The *Working Memory* score indicates how well Antonio did on tasks requiring him to learn and retain information in memory while utilizing the learned information to complete a task. These tasks measure his skills in attention, concentration, and mental reasoning. This skill is closely related to learning and achievement.

The *Processing Speed* score indicates how well Antonio did on tasks requiring him to quickly scan symbols and make judgments about them. These tasks measure his skills in

speed of mental problem-solving, attention, and eye-hand coordination. This skill may be important to his development in reading, and ability to think quickly in general.

The *Full Scale* score is derived from the combination of the Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed scores. The WISC-IV Full Scale score is one way to view Antonio's overall thinking and reasoning skills.

### How WISC-IV and WIAT-II Scores are Reported

The scores show how well Antonio performed compared to a group of children the same age from across the United States. The highest possible score is 160 and the lowest possible score is 40 for most skills tested. Half of all children will score less than 100, and half of all children will score more than 100. Scores from 90 to 109 are average.

A percentile rank is also given. This shows your child's rank in the national comparison group. If the percentile rank were 45, for example, it would mean that he scored higher than approximately 45 out of 100 children his age.

When reviewing Antonio's scores, remember that no test is perfectly accurate. Any child might score slightly higher or lower if tested again on a different day.

### Interpretation of WISC-IV Results

Antonio was administered ten subtests of the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV) from which his composite scores are derived. The Full Scale IQ (FSIQ) is derived from a combination of ten subtest scores and is considered the most representative estimate of global intellectual functioning. Antonio's general cognitive ability is within the *Low Average* range of intellectual functioning, as measured by the FSIQ. His overall thinking and reasoning abilities exceed those of approximately 12% of children his age (**FSIQ = 82**; 95% confidence interval = 78-87). **His ability to think with words is comparable to his ability to reason without the use of words. Both Antonio's verbal and nonverbal reasoning abilities are in the Low Average range.**

Antonio's verbal reasoning abilities as measured by the Verbal Comprehension Index are in the *Low Average* range and above those of only 19% of his peers (**VCI = 87**; 95% confidence interval = 81-95). The Verbal Comprehension Index is designed to measure verbal reasoning and concept formation. Antonio performed comparably on the verbal subtests contributing to the VCI, suggesting that these verbal cognitive abilities are similarly developed.

Antonio's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index are in the *Low Average* range and above those of only 18% of his peers (**PRI = 86**; 95% confidence interval = 79-95). The Perceptual Reasoning Index is designed to measure fluid reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid reasoning and perceptual organization abilities. Antonio's performance on the perceptual reasoning subtests contributing to the PRI is somewhat variable, although the magnitude of this difference in performance is not unusual among children his age. Examination of Antonio's performance on individual subtests provides additional information regarding his specific nonverbal abilities.

Antonio's ability to sustain attention, concentrate, and exert mental control is in the *Low Average* range. He performed better than approximately 21% of his age-mates in this area (**Working Memory Index** = 88; 95% confidence interval 81-97).

Antonio's ability in processing simple or routine visual material without making errors is in the *Low Average* range when compared to his peers. He performed better than approximately 13% of his peers on the processing speed tasks (**Processing Speed Index** = 83; 95% confidence interval 76-94). Antonio's performance on the subtests that comprise the PSI is quite variable; therefore, the PSI score should be interpreted with caution. He performed much better on Symbol Search (Scaled Score = 9), which is more demanding of attention to detail and mental control, than on Coding (Scaled Score = 5), which is more demanding of fine-motor skills, short-term memory, and learning.

### Personal Strengths and Weakness

Antonio achieved his best performance among the nonverbal reasoning tasks on the Picture Concepts subtest and lowest score on the Block Design subtest. His performance across these areas differs significantly, suggesting that these are the areas of most pronounced strength and weakness, respectively, in Antonio's profile of nonverbal reasoning abilities. His weak performance on the Block Design subtest was below that of most children his age. On the Picture Concepts subtest, Antonio was presented with two or three rows of easily identifiable pictures and asked to choose one picture from each row to form a group with a common characteristic. This subtest is designed to measure fluid reasoning and abstract categorical reasoning ability. The task invokes verbal concepts, but does not require verbal responses; (Picture Concepts scaled score = 11). The Block Design subtest required Antonio to use two-color cubes to construct replicas of two-dimensional, geometric patterns. This subtest assesses nonverbal fluid reasoning and the ability to mentally organize visual information. More specifically, this subtest assesses his ability to analyze part-whole relationships when information is presented spatially. Performance on this task also may be influenced by visual-spatial perception and visual perception-fine motor coordination, as well as planning ability; (Block Design scaled score = 5).

### Academic Functioning

On 11/09/04, Antonio was administered the Wechsler Individual Achievement Test- 2nd Ed. (WIAT-II), a measure that assesses levels of functioning in specific academic areas for individuals ages four through adulthood.

***The graphics of Antonio's specific academic performances appear as part of the addendum pages which follow this report.***

*The following is a description of each WIAT-II subtests given to Antonio*:

*Word Reading:* Depending on the student's age or grade, he or she identifies the letters of the alphabet, beginning and ending sounds of words, and rhyming words, or reads as quickly as possible from a list of words.

*Reading Comprehension:* The student reads sentences and short passages and then answers questions about the main idea, specific details, or the order of events.

He or she is also asked to make inferences, draw conclusions, or define unfamiliar words by using context clues.

***Pseudoword Decoding:*** the student uses his or her phonetic knowledge to sound out nonsense or unfamiliar words.

***Numerical Operations:*** the student solves written math problems requiring addition, subtraction, multiplication, and division using whole numbers, fractions, and decimals.

***Math Reasoning:*** The student solves a word or stated problem requiring single or multiple steps related to time, money, measurement, geometry, probabilty, and readiing/ interpreting graphs.

***Spelling:*** The student writes the initial or ending letters to stated sounds or words and spells a target word based on its meaning as it is used in a sentence.

### Reading

Antonio presents a diverse set of skills on different aspects of reading. He performed much better on tasks that assessed his capability to read sentences and paragraphs and answer questions about what was read (**Reading Comprehension standard score = 86**) than on tasks that required him to correctly read a series of printed words (**Word Reading standard score = 74**). *A relative strength in comprehension skills as compared to reading words in isolation may indicate that Antonio is able to derive meaning from text using context clues but may not have learned vocabulary words to automaticity.* For this reason, the Reading Composite score may not be the most accurate manner in which to summarize his reading skills. His Reading Comprehension subtest score is higher than only approximately 18% of his peers, placing these skills in the *Low Average* range, with a grade-equivalency of 2:0. Antonio's performance on Word Reading is within the *Borderline* range and exceeds that of approximately 4% of students his age. Antonio obtained a grade-equivalent of 1:8 on the Word Reading subtest.

### Mathematics

In overall mathematics skills Antonio performed in the *Borderline* range, as indicated by his **Mathematics Composite standard score (78)**. His skills in this area exceed that of only approximately 7% of students his age. Antonio's performance on tasks that required him to add and subtract one- to three-digit numbers and multiply and divide two-digit numbers (**Numerical Operations standard score = 85, grade-equivalency = 3:0**) is comparable to his performance on tasks that requires him to understand basic number concepts, including unit and geometric measurement, and solve one-step word problems (**Math Reasoning standard score = 75, grade-equivalency = 1:9**).

### Written Language/ Spelling

On tasks that required him to correctly spell verbally presented words Antonio performed in the *Borderline* range. He achieved a Spelling standard score of 75. His skills in this area exceed those of only approximately 5% of students his age. On this subtest, Antonio was only able to spell the words: *we, is, big, look,* and *two.*

## Ability-Achievement Discrepancy Analysis

Academic and cognitive assessments are administered largely to draw comparisons and/or analyze discrepancies between one's predicted ability and their actual level of achievement. Significant differentials between ability and achievement (i.e. High ability – Low achievement) typically suggest the presence of some sort of academic hindrance or learning deficit.

Antonio's scores on the WIAT-II were compared to the levels of achievement predicted for a student with his general cognitive ability, as indicated by his Verbal Comprehension score of 87 on the WISC-IV administered 11/9/2004.

He achieved WIAT-II scores that were slightly disparate with his overall level of cognitive ability in all areas tested. Antonio obtained a Composite score of 78 in both Math and Reading.

## Summary

Antonio is a 9-year-old child who completed the WISC-IV and WIAT-II. His general cognitive ability, as estimated by the WISC-IV, is in the *Low Average* range. Antonio's verbal comprehension and perceptual reasoning abilities were also both in the *Low Average* range (**VCI = 87, PRI = 86**). Academically, Antonio is achieving in the upper-first grade range in both Basic Reading and Spelling, with his Reading Comprehension skills falling in the beginning second grade range. In arithmetic, he appears to be functioning in the beginning third grade range in Numerical Operations and the upper-first grade range in Math Reasoning. In sum, excluding his Numerical Operations abilities, Antonio's achievement level falls below his current grade placement. In light of difficulties in reading and written language, remedial/ tutorial services are recommended to effectively address and ameliorate those weaknesses. Also, in the examiner's obligatory record review and teacher interview, there were no noteworthy social-emotional concerns to warrant a psychological evaluation.

Nevertheless, the MDT/ IEP will meet to review and discuss all relevant information--germane to Antonio's functioning--as a means of arriving at a decision on the most appropriate educational program, placement, and/ or services for him.

Notwithstanding the aforementioned, the following recommendations are offered.....

## Recommendations

1. Antonio could develop a list of his problem words, that is, words that he commonly misspells. He could then concentrate on learning these words and could add and remove words from the list as appropriate.

2. Antonio's teachers are encouraged to use words at his level of verbal development and

Antonio Lee                                           7

to encourage pleasure reading at a level consistent with his abilities and interests.

3. Antonio is encouraged to learn a new vocabulary word each day and to record this word in a log.

4. Family and teachers can assist in building Antonio's vocabulary by encouraging him to ask for definitions of unfamiliar words during reading activities.

5. Antonio's teachers and parents can encourage Antonio to engage in pleasure reading by setting aside a few minutes each day for this activity.

6. Computer programs that focus on vocabulary development, word attack, and phonics may be helpful in strengthening Antonio's reading skills. Programs that identify deficit skill areas and offer a means of monitoring progress are of particular value. Programs that emphasize verbal reasoning and comprehension would also be helpful.

7. Given Antonio's difficulty with reading comprehension, he may need to be taught specific comprehension strategies such as reading for the main idea, using context clues to determine word meaning, and identifying cause & effect.

8. Antonio may need assistance in choosing interesting reading materials that are at the appropriate reading level.

9. Teachers and family could assist Antonio with remembering important information by showing him how to imbed important points and activities within a story that is meaningful to him.

10. Antonio is encouraged to practice weekly spelling and sight-vocabulary words by using different modalities. For example, he could use a typewriter, computer, chalkboard, or plastic magnetic letters to work on these skills.

11. Antonio's parents are encouraged to be involved in a home-based plan to complement the reading program at school.

12. Antonio may benefit from a caring, positive, and supportive environment. For example, Antonio's teacher might make a point of daily saying something positive, such as "I like being your teacher and being with you," or "I like the way you are completing that assignment," or "I like the way you are drawing that picture."

This report is valid only if signed by a qualified professional:

Terrance Beason

Terrance Beason, M.Ed.,CAGS
School Psychologist

**Verbal Comprehension Subtest Scores Summary**

Antonio Lee                                                                              8

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|----------|-----------|--------------|-----------------|-----------------|
| Similarities | 15 | 8 | 8:6 | 25 |
| Vocabulary | 22 | 7 | 7:6 | 16 |
| Comprehension | 16 | 8 | 7:10 | 25 |

**Perceptual Reasoning Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|----------|-----------|--------------|-----------------|-----------------|
| Block Design | 10 | 5 | <6:2 | 5 |
| Picture Concepts | 18 | 11 | 10:10 | 63 |
| Matrix Reasoning | 14 | 7 | 7:6 | 16 |

**Working Memory Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|----------|-----------|--------------|-----------------|-----------------|
| Digit Span | 13 | 8 | 8:2 | 25 |
| (Arithmetic) | 18 | 8 | 8:2 | 25 |

**Processing Speed Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|----------|-----------|--------------|-----------------|-----------------|
| Coding | 26 | 5 | <8:2 | 5 |
| Symbol Search | 19 | 9 | 8:10 | 37 |

Antonio Lee                                                                                  9

## WISC-IV Composite Scores

### Composite Score Profile

| | VCI | PRI | WMI | PSI | FSIQ | |
|---|---|---|---|---|---|---|



| | VCI | PRI | WMI | PSI | FSIQ | |
|---|---|---|---|---|---|---|

Antonio Lee                                                                                    10

## WISC-IV Subtest Scaled Score Profile

# Exhibit 10



In the Matter of          )
                                )

Antonio Lee ("Student")    )
Date of Birth: June 3, 1995   )
               Petitioner,   )
                                )
                                )
             v.               )
                                )
                                )
District of Columbia Public Schools )
825 North Capitol Street, NE   )
Washington, DC 20002      )
("DCPS" or "District")      )
                                )
_____)

### PLAINTIFF'S MOTION FOR RECONSIDERATION

     **COMES NOW**, the plaintiff, Ms. Theresa Lee, by and through their educational

attorneys, the law offices of James E. Brown & Associates, PLLC, in submission of this

Motion for Reconsideration of the impartial hearing officer's decision and order

(hereinafter "order" or "decision") issued on June 22, 2007, wherein the hearing officer

dismissed plaintiff's Due Process Hearing request with prejudice and found that there

was no denial of FAPE based on the fact that the plaintiff did not meet their burden of

proof in this case because the parent failed to meet the *Reid* test for the hearing officer to

award Compensatory Education.

### FACTUAL BACKGROUND

     On April 9, 2007, a due process hearing request was filed on behalf of Antonio

Lee. In the complaint the parent alleged that: 1) DCPS denied the student a free and

appropriate public education to conduct an annual review of the student's IEP; 2) DCPS

failed to provide the student with the agreed upon compensatory education services; and

3) DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005. On June 11, 2007, the due process hearing took place, wherein the parent withdrew the first issue of the expired IEP due to the fact that the first issue was moot. The parent was prepared to go forward on the two remaining issues, however, the hearing officer stated that if the IEP issue was being withdrawn, the ESY would also have to be withdrawn due to the ESY being part of the May 26, 2005, IEP. Therefore the only issue remaining was the issue of compensatory education.

At the June 11, 2007, due process hearing, the hearing officer granted DCPS attorney motion for directed finding based on the fact that the plaintiff failed to meet the *Reid* test for the hearing officer to award Compensatory Education.

### Standard of Review

Pursuant to the Standard Operating Procedures Handbook §1005,

> Reconsideration of a hearing may be granted on the timely filing of a motion for reconsideration. Any motion for reconsideration must be filed within (10) days of the date of the Order is issued...The filing of a motion for reconsideration on a final order, if such motion is timely filed, the order shall not be deemed final for purposes of judicial review until the motion is ruled upon by the Hearing Officer or is denied by operation of law...If a motion for reconsideration is granted, the Hearing Officer may reopen the record in the matter, amend the findings of fact and conclusions of law, correct errors or mistakes, or make new findings of fact, conclusions of law, and issue a new order.

### Argument

**I.    The Hearing Officer Erred When He Dismissed the Extended School Year Services Claim.**

The parent's complaint alleged three issues: 1) DCPS denied the student a free and appropriate public education to conduct an annual review of the student's IEP; 2) DCPS

2

failed to provide the student with the agreed upon compensatory education services; and 3) DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005. The parent withdrew the first issue because the issue was moot due to an IEP being developed since the IEP expired on May 26, 2005. However, the hearing officer erroneously stated that because the ESY stemmed from the May 26, 2005 IEP, that the ESY issue had to also be withdrawn. The hearing officer erred in making that determination because the ESY issue was separate and distinct from the May 26, 2005 IEP.

## II. The Hearing Officer Erroneously Applied Reid to an already predetermined award for compensatory education.

The parent requested that DCPS implement the student with the agreed upon compensatory education services. On May 26, 2005, the Multidisciplinary Team met and agreed to provide the student with 17 hours and 15 minutes of compensatory education in the areas of reading and written expression starting May 27, 2005. DCPS did not implement the compensatory education plan and as a result the student did not receive reimbursement for missed education services.

In Reid v. District of Columbia, No. 02cv01611 (2005), it is clear that the court intended compensatory education to be a equitable remedy. The court stated that "compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." However, in the instant case *Reid*, does not apply. In *Reid,* the court stated "the officer order contains neither reasoning to support this hour-per-day formula nor factual findings showing that the 810-hour result satisfied Mathew's needs." Thus the court found the "hour-per day

formula" inappropriate. The hearing officer misinterpreted *Reid* and the facts of our case In the Hearing Officer's Determination, the Hearing Officer stated that "the parent's sole position was that the missed 17 hours and 15 minutes of Specialized Instruction during the 2004-2005 school year should be compensated in giving the student Compensatory Education in the amount of 17 hours and 15 minutes of Specialized Instruction" for an hour-for- hour of missed services. This is a misstatement of the facts. The hearing officer erred in understanding the facts of the case and as a result misapplied *Reid*. The parent did not request the compensatory education to be awarded based on the student missing 17 hours and 15 minutes of services in 2004-2005 school year, and therefore did not ask the Hearing Officer to award the 17 hours and 15 minutes of the compensatory education based on an hour-for-hour formula. The parent's position was that the multidisciplinary team developed the compensatory education plan on May 26, 2005, that was never implemented by the team. The plaintiff in *Reid* challenged the number of hours awarded as compensatory education for missed educational services. In our case, the parent did not challenge the number of hours awarded, but argued that the plan was not implemented by DCPS.

Moreover, although hearing officers may award compensatory education, in our case, the hearing officer ordered the MDT team to determine the amount, form and delivery of compensatory education. It would be unreasonable and certainly not the intent of *Reid* for a multidisciplinary team of educators to go to a Due Process Hearing to develop a Compensatory Education Plan. Thus the compensatory education plan was

4

developed and designed by the MDT team at the May 26, 2005, MDT/IEP, nevertheless DCPS failed to implement the plan.

Lastly, the *Reid* "test" does not apply to the instant case. According to the *Reid* "test", the plaintiff must first establish that there has been a harm to from failure to provide service, secondly, there must be measure of baseline data compared to new evaluative data to determine progress and third, there must be a proven ability to benefit from compensatory education. In our case, the *Reid* case need not apply because parent did not argue about the amount of the compensatory education, nor did the parent ask the hearing officer to fashion a new compensatory award as appropriate relief. The parent argued that the predetermined compensatory education plan was not implemented, thus to apply *Reid* in this matter was erroneous.

**III.    The Hearing Officer is Not Qualified to Preside Over Special Education Cases.**

According to 34 C.F.R. §300. 511,

> A hearing officer must not be (A) an employee of the SEA or the LEA that is involved in the education or care of the child or (B) a person having a personal or professional interest that conflicts with the person's objectivity in the hearing; (i) must possess knowledge of, and the ability to understand, the provisions, of the Act, Federal and State regulations pertaining to the Act, and legal interpretations of the Act by Federal and State courts; (iii) Must possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and (iv) must possess the knowledge and ability to render and write decisions in accordance with appropriate legal practice.

It is clear that the Hearing Officer does not possess the knowledge of, nor does he have the ability to understand the provisions, of the Act, or legal interpretations of the Act by Federal and State courts. The Hearing Officer *inter alia,* was unable to interpret the legal interpretations of the Act in order to appropriately apply the case law to the facts of this case in this Due Process Hearing. As a result of the Hearing Officer's inability to

understand the legal interpretations of the Act the Hearing Officer misapplied the case

law and the Act to the facts of this case. It is clear from the Hearing Officer's

Determination that the Hearing Officer lacks the ability to accurately recall the facts of

the case to appropriately render a decision. Further, the Hearing Officer was unaware of

how to ascertain what issues were related and unrelated for parent's counsel to move

forward on, specifically by failing to understand that the Extended School Year Services

issue was unrelated to the issue of the May 26, 2005 IEP.

IV.    **The Hearing Officer Erred When He Granted a Motion For Directed Verdict in Favor of DCPS.**

Pursuant to 20 U.S.C. Section 1415(c ) (2) (B), "if the local agency has not sent a

prior written notice to the parent regarding the subject matter contained in the parent's

due process complaint notice, such local agency shall, within 10 days of receiving the

complaint, send to the parent a response…" At the Hearing on June 11, 2007, parent's

counsel made a Motion for Directed Verdict for DCPS failure to conduct a resolution

meeting, failing to respond to the complaint within 10 days, and for DCPS failing to

submit any evidence to the contrary. The Hearing Officer did not rule on that motion,

however, after parent's counsel finished her *prima facie* case, the DCPS attorney, made a

Motion for Directed Verdict, without presenting a case. DCPS failed to call any

witnesses, or present any evidence to rebut case, nevertheless the hearing officer granted

the Motion for Directed Finding in favor of DCPS. The hearing officer erred in granting

this Motion because DCPS failure to do respond to the complaint puts the parent at a

disadvantage in preparation of a case for hearing. According to *Schaffer v. Weast*, 546

U.S. 49 (2005) the parent bears the burden of proof, however, the Court clearly stated

that "Congress added provisions requiring school districts to answer the subject matter of a complaint in writing, and to provide the parents with the reasoning behind the disputed action, details about the other options considered..." The Court goes on to state that "IDEA in fact, requires state authorities to organize hearings in a way that guarantees parents and children the procedural protections of the Act...These protections ensure that the school bears no unique informational advantage." In the instant case, the hearing officer allowed DCPS to have advantage over the parent by granting the Motion for Directed Finding by DCPS when DCPS did not respond to the due process complaint. This is the very thing Congress wanted to safeguard against when it added provisions of procedural safeguards to the Act.

V.     **The Hearing Officer Is Incapable of Presiding Over Due Process Hearings Because He Demonstrated A Lack of Impartiality.**

a)     Interference with Attorney-Client Relationship

At the June 11, 2007, Due Process Hearing the hearing officer made several attempts to interfere with the attorney-client relationship between parent and parent's counsel that created an environment that led to the parent's emotional outburst. The hearing officer several times stated that parents counsel did not understand the Reid case, and implied that parent's counsel did not understand what was going on. The hearing officer stated that he felt bad for the parent, because the parent was at a loss due to her attorney. The hearing officer also repeatedly asked the DCPS attorney to talk to, explain and advise my client. The hearing officer also spoke directly to my client. After the hearing officer granted the directed verdict, he continued to attempt to get DCPS' attorney to talk to my client after the hearing ended.

b)    Other Examples of Impartiality by The Hearing Officer

At the hearing on June 11, 2007, parent's counsel made a Motion for Directed Finding, based on DCPS failure to hold a resolution meeting, DCPS' failure to respond to parent's due process complaint as required by IDEIA, and DCPS' failure to submit any evidence to rebut parent's position in the 5-day disclosure. The hearing office did not respond to the Motion for Directed Finding, and failed to rule on or acknowledge that the Motion was made. The hearing officer asked the DCPS' attorney if there was anything she could do for my client, the DCPS' attorney then brought up taking the attorney fees off the table and then maybe she could do something. The hearing officer restated that DCPS had put an offer on the table for parent excluding the attorney fees. It is clear that only the Court can discuss attorney fees, and therefore by the hearing officer to entertain the idea further demonstrates bias. Upon completion of parent's case, DCPS made a Motion for Directed Finding without presenting a case. At that time the hearing officer, spoke directly to the parent explaining what a Motion for Directed Finding entailed and then proceeded to rule on the Motion. Although parent's counsel questioned how the hearing officer could make such a ruling without DCPS presenting no evidence to rebut parent's position, the hearing officer did not respond and granted the Motion for Directed Finding in Favor of the DCPS.

## CONCLUSION

Based on the law and facts provided and stated at the administrative due process hearing of June 11, 2007, as well as the foregoing Motion, the parent requests the Motion for Reconsideration be Granted.

8

## CERTIFICATE OF SERVICE

I, Jani S. Tillery, Esq., hereby certify that on this 29 day of June 2007, a copy of the

Plaintiff's Motion To Reconsider was delivered this day, via facsimile, to Tiffany

Puckett, Attorney Advisor for DCPS, 825 North Capitol Street, NE 9th Floor,

Washington, DC 20002 and the Impartial Due Process Hearing Officer Fredrick Woods

Student Hearing Office, District of Columbia Public Schools, 1150 5th Street,

Washington, DC 20003..

Respectfully Submitted,

Jani S. Tillery, Esq.
James E. Brown & Associates
1220 L Street, NW Suite 700
Washington, D.C. 20005
(202) 742-2000
Attorney for the Parent

```
**********************
***  TX REPORT  ***
**********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2860 |
| RECIPIENT ADDRESS | 92024425098 |
| DESTINATION ID | |
| ST. TIME | 06/29 16:36 |
| TIME USE | 02'07 |
| PAGES SENT | 18 |
| RESULT | OK |

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*
Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Jani Tillery
Kimberly Glassman

---
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:   **June 29, 2007**

TO: **Tiffany Puckett, Esq.**

FAX NO.:  **(202) 442-5098/97**

FROM:   **Jani S. Tillery, Esq.**

SUBJECT: **Antonio Lee DOB: 6-3-95**

NUMBER OF PAGES INCLUDING COVER SHEET:        **18**

COMMENTS: **Motion For Reconsideration**

```
*********************
***  TX REPORT  ***
*********************


TRANSMISSION OK

TX/RX NO              2861
RECIPIENT ADDRESS     92024425098
DESTINATION ID
ST. TIME              06/29 16:33
TIME USE              02'02
PAGES SENT            18
RESULT                OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram
----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Jani Tillery
Kimberly Glassman

------------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:  **June 29, 2007**

TO: **Tiffany Puckett, Esq.**

FAX NO.:  **(202) 442-5098/97**

FROM:    **Jani S. Tillery, Esq.**

SUBJECT: **Antonio Lee DOB: 6-3-95**

NUMBER OF PAGES INCLUDING COVER SHEET:        **18**

COMMENTS: **Motion For Reconsideration**

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown

Domiento C.R. Hill

Roberta Gambale

Miguel A. Hull

Christopher L. West

John A. Straus

Omar Karram

-----------------------------------

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+

Tilman L. Gerald

Roxanne D. Neloms

Jani Tillery

Kimberly Glassman

-----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:  **June 29, 2007**

TO: **Hearing Officer  Fredrick Woods**

FAX NO.:  **(202) 698-3825**

FROM:  **Jani S. Tillery, Esq.**

SUBJECT: **Antonio Lee DOB: 6-3-95**

NUMBER OF PAGES INCLUDING COVER SHEET:        **18**

COMMENTS: **Motion For Reconsideration**

The attached information is CONFIDENTIAL and is intended only for the use of the addressee(s) named above.  If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

```
                          *********************
                          ***   TX REPORT   ***
                          *********************


          TRANSMISSION OK

          TX/RX NO                2859
          RECIPIENT ADDRESS       92026983825
          DESTINATION ID
          ST. TIME                06/29 16:27
          TIME USE                02'06
          PAGES SENT              18
          RESULT                  OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown                     Attorneys at Law                Juan J. Fernandez!+
Domiento C.R. Hill                 1220 L Street, NW               Tilman L. Gerald
Roberta Gambale                    Suite 700                       Roxanne D. Neloms
Miguel A. Hull                     Washington, DC 20005            Jani Tillery
Christopher L. West                Telephone: (202) 742-2000       Kimberly Glassman
John A. Straus                     Facsimile: (202) 742-2098
Omar Karram                        e-mail: Admin@Jeblaw.biz
------------------------------                                     --------------------------------
                                                                   ! DC Bar Special Legal Consultant
                                                                   + Admitted in Bolivia

# FAX COVER SHEET

DATE:   **June 29, 2007**

TO: **Hearing Officer Fredrick Woods**

FAX NO.:  **(202) 698-3825**

FROM:   **Jani S. Tillery, Esq.**

SUBJECT: **Antonio Lee DOB: 6-3-95**

NUMBER OF PAGES INCLUDING COVER SHEET:        **18**

COMMENTS: **Motion For Reconsideration**

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown

Domiento C.R. Hill

Roberta Gambale

Miguel A. Hull

Christopher L. West

John A. Straus

Omar Karram

-----------------------------------

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+

Tilman L. Gerald

Roxanne D. Neloms

Jani Tillery

Kimberly Glassman

-----------------------------------

! DC Bar Special Legal Consultant

+ Admitted in Bolivia

# FAX COVER SHEET

DATE:  **June 29, 2007**

TO: **Tiffany Puckett, Esq.**

FAX NO.:  **(202) 442-5098/97**

FROM:  **Jani S. Tillery, Esq.**

SUBJECT: **Antonio Lee DOB: 6-3-95**

NUMBER OF PAGES INCLUDING COVER SHEET:        **18**

COMMENTS: **Motion For Reconsideration**

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

# Exhibit 11

## AFFIDAVIT OF DIANE CREWS-PINKNEY REGARDING HEARING OFFICER FREDERICK WOODS

I, Diane Crews-Pinkney, do hereby swear and affirm under penalty of perjury that

the following information is true and correct to the best of my knowledge, information,

and belief:

1. I am the Educational Advocate to the minor child, A. L.

2. I am a Special Education Advocate at the law offices of James E. Brown and

   Associates, PLLC, advocating for parents and students in Washington, DC.

3. I was present at the Due Process Hearing set for A. L. on June 11, 2007.

4. The hearing officer presiding over this hearing was Frederick Woods.

5. At the hearing, it was my belief from my observations that Mr. Woods was
   very unfair and seemed favorable with DCPS attorney Ms. Tiffany Puckett.
   He seemed bias, one-sided, and more receptive and accommodating to DCPS'
   requests.

6. Mr. Woods did not address attorney Jani Tillery when she made several
   requests for directed finding at the beginning of the hearing.

7. After attorney Tillery's many request for directed finding were made, Mr.
   Woods told attorney Tillery to move on to discuss her issues filed in her
   disclosures.

8. Mr. Woods questioned the issues filed in attorney Tillery's 5 day disclosure
   and tried to persuade attorney Tillery to withdraw her issues.

9. After several attempts to get attorney Tillery to withdraw her issues, Mr.
   Woods threaten to dismiss the IEP and ESY issues stating that he could not
   award the parent services for ESY because the summer was over.

10. Again, Mr. Woods made statements about attorney Tillery with reference to
    her not understanding how to represent the parent and that she was not
    properly prepared for the case.

11. Mr. Woods threw out the first two issues filed, leaving only the compensatory
    education plan from a previous HOD; at this point, upsetting the parent
    causing her to cry and become very emotional during her testimony.

12. Mr. Woods threw out the Comp Ed plan stating that he had no idea what services the child missed and that Comp Ed was not a right it was a remedy and that he could not award Comp Ed at that time.

13. Thereafter, Mr. Woods tried to persuade the parent and the opposing counsel to talk and forfeit attorney fees, the parent got upset and emotional; stating that she just wanted her child to have special education services and didn't care about attorney fees and/or anything else.

14. Mr. Woods made several statements on record to the parent, that if she wanted to fully understand the process of getting her child some help, that he recommends that she speak to the DCPS's counsel, Tiffany Puckett.

15. After Mr. Woods made his ruling; not granting any of the issues filed, he proceeded to allow the recorder to run as he tried to persuade the DCPS's attorney, Tiffany Puckett, to speak to the parent.

16. It is my belief as A. L. educational advocate and through my personal observations throughout the hearing that Ms. Theresa Lee and her son Antonio Lee will not have a fair due process hearing if Mr. Woods continues to preside over her child's case.

I declare and affirm under penalty of perjury that the foregoing is true and correct.

Diane Crews-Pinkney

District of Columbia SS:

Subscribed and Sworn before me this 29 day of June, 2007.

Notary Public, DC
My Commission Expires:

Kelly Dau
Notary Public, District of Columbia
My Commission Expires 1-1-2010

## AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER
### FREDERICK WOODS

I, Jani S. Tillery, do hereby swear and affirm under penalty of perjury that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am currently an attorney in good standing in the District of Columbia.

2. I am an associate attorney at the law offices of James E. Brown & Associates, PLLC, representing parents and students in Washington, D.C. pursuant to the Individuals with Disabilities Education Act and implementing regulations.

3. I appeared before Hearing Officer Frederick Woods for a due process hearing regarding special education, on June 11, 2007 for A.L. DOB: 06/03/1995. Mr. Woods demonstrated an inappropriate and unethical bias against me and my client.

4. On June 11, 2007, I appeared as parents' counsel before Mr. Woods for an administrative due process hearing in the matter of **A.L. DOB: 06/03/95 Public Schools.**

5. At the beginning of the hearing, I made a Motion for Directed Finding, based on DCPS' failure to hold a resolution meeting, DCPS' failure to respond to parent's due process complaint as required by IDEIA, and DCPS' failure to submit any evidence in their disclosures.

6. Mr. Woods ignored my Motion for Directed Finding, and failed to rule on or acknowledge that the motion was made.

7. Mr. Woods made insulting comments, and by stating that I did not understand the *Reid* case and belittled my professionalism repeatedly stating that I did not understand what was going on and saying that the parent was at a loss due to her attorney.

## AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER FREDERICK WOODS

8. During the hearing, Mr. Woods asked DCPS' Attorney what she could do to help the client, DCPS attorney brought up taking the prevailing party status, and attorney fees off the table, Mr. Woods questioned if the parent would take the offer, implying that the compensatory education may be awarded if no attorney fees were awarded.

9. Mr. Woods attempted to interfere in the attorney-client relationship by repeatedly asking the DCPS attorney to talk to and advise my client and by speaking directly to my client.

10. Upon finishing my *prima facie* case, DCPS' attorney made a Motion for Directed Finding. She did not present any evidence to rebut the allegations nor did she proffer testimony that presented countervailing evidence.

11. Mr. Woods ruled on and in favor of DCPS' Motion for Directed Finding pursuant to the *Reid* test for Compensatory Education not being met, although DCPS counsel did not provide a Response to the complaint.

12. After granting DCPS' Motion for Directed Finding, Mr. Woods continued to let the tape recording run, and again attempted to get the DCPS attorney to talk to my client after the hearing ended.

13. My client also informed me that she noticed he was very one-sided and that it appeared the Hearing Officer had already made his decision before hearing the case and favored the DCPS' attorney.

_____
Jani S. Tillery

$6 - 29 - 07$
Date

2

## AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER
## FREDERICK WOODS

I, _Kelly Dau_ Notary Public of the District of Columbia
hereby attest that on this _29th_ day of _June_ 2006, Jani Tillery appeared
before me in person and signed this AFFIDAVIT.

**Kelly Dau**
**Notary Public, District of Columbia**
**My Commission Expires 1-1-2010**

_____
Notary Public

_____
My Commission Expiration Date

3

## AFFIDAVIT OF THERESA LEE REGARDING HEARING OFFICER
## FREDERICK WOODS

I, Theresa Lee, do hereby swear and affirm under penalty of perjury that the following

information is true and correct to the best of my knowledge, information, and belief:

1. I am the parent of Antonio Lee.

2. I currently live at 722 Gerard St., NW, Washington, D.C 20001.

3. I had a hearing dated for June 11, 2007.

4. To my confoundment it wasn't really a hearing but it was a lash out concert.

5. When I came to the hearing, I wanted to get what I asked for in my complaint.
   I got frustrated when the hearing officer didn't care about my son getting
   services.

6. DCPS Attorney Ms. Puckett entered in moments after Mr. Woods the Hearing
   officer, my attorney Ms. Tillery her assistant Ms. Pinkney and myself Antonio
   mom.

7. Ms. Puckett was rude and loud she was not prepared for this hearing. She did
   not have any witnesses or paperwork concerning my son's case.

8. I believe because first she didn't respond in five business days as she was
   instructed.

9. Attorney Tillery asked the hearing officer early on in the hearing for a Motion
   for Directed Finding because DCPS was not prepared. But the question went
   unanswered. Not one time, but several times.

10. At this point, I really began to observe the relationship that Mr. Woods and
    Ms. Puckett shared.

11. Because of their relationship I believe that this concert was not in the best interest of my son's education.

12. There came a time that my attorney asked for a moment alone with me and it was granted (5 min.)

13. Before Mr. Woods returned Ms. Puckett came back into the room. Very rudely, she got on Mr. Woods telephone and proceeded with a personal call in our presents.

14. Even when Mr. Woods returned she was still on his telephone. He had to say "are we ready?" Then she got off the phone. She did this two times.

15. This hearing concert, got heated. I became so emotional and frustrated because Mr. Woods started to attack attorney Tillery ability to represent me as my attorney.

16. He even stated that she was not prepared nor was aware of the hearing rules and procedures.

17. I was disturbed and became very emotional. Because once again my son's education is not important to DCPS.

18. Ms. Puckett jumped on the wagon with Mr. Woods. She stated that she would help me get all the help I need for my son if I would drop all attorney fees if I would represent myself. I told her I didn't want anything from her.

19. At this point Mr. Woods stated that we were off the record. He turned off the record

20. I also stated that at this point I wouldn't care if any one didn't get paid, because this is not about a dollar but it is about my son getting what was

awarded to him in 2005. Here it is 2007 entering into 2008 school year and

my son Antonio Lee has not received any help from DCPS. Which was

awarded to him by DCPS in 2005.

I declare and affirm under penalty of perjury that the foregoing is true and correct.

Theresa Lee

District of Columbia SS:

Subscribed and Sworn before me this 29th day of November, 2006. June, 2007.

Notary Public, DC
My Commission Expires:

Kelly Dau
Notary Public, District of Columbia
My Commission Expires 1-1-2010

# Exhibit 12

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF

ANTONIO LEE


HEARING DATE:  JUNE 11, 2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.    (301) 277-5711

## APPEARANCES

PAGE

HEARING OFFICER:  Frederick Woods . . . . . . . . . . . . . 3,81

ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:  Tiffany Puckett . . 4,66

ATTORNEY FOR PARENT:  Jeannine Tillery . . . . . . . . . . 4,66

PARENT:  Teresa Lee . . . . . . . . . . . . . . . . . 3,4,52,88

WITNESSES:  Diane Cruise Pinkley . . . . . . . . . . . . . 60

———————

1                          <u>PROCEEDINGS</u>

2

3     [Hearing called to order t 9:33 a.m.]

4          HEARING OFFICER:  Good morning everyone, it's Monday,

5     June the 11th, 2007.  My name is Fred Woods the hearing

6     officer convening the due process hearing for Antonio Lee.

7     And Ms. Lee I have Antonio's birth date as June the 3rd,

8     1995.  Is that Correct?

9          MS. LEE:  That's correct.

10         HEARING OFFICER:  This hearing is convened in

11    accordance with the Individuals With Disabilities Education

12    Improvement Act and the Federal and the District of

13    Columbia laws and regulations that implement the act.  My

14    role as the Hearing Officer will be to receive testimony

15    and review the documents that the party will submit in

16    support of their case.  And based on that information and

17    the law I will reach a decision in regards to the issue

18    presented for resolution.

19         That decision will be provided to the party's through

20    their respective attorney's with - - in writing with in 10

21    days of this hearing date.

22         This hearing Ms. Lee is considered a closed hearing

23    meaning we will not invite anyone else into this room

24    unless they are a witness or party to this case.  The

                                 3

1   hearing is however is being audio recorded so I'd ask that

2   if each of you would make sure that your in front of a

3   microphone when you're speaking so that we can make sure

4   that we pick up your voice.

5       Before further explaining how the hearing will be

6   actually conducted in terms of how we will take the

7   testimony.  I'll first allow everyone present to introduce

8   their selves.  And then I would like to speak with the

9   lawyers to see if they have narrowed the issues in this

10  case.

11      Ms. Tillery?

12      MS. TILLERY:  Jeannine Tillery, Attorney for the

13  parent.

14      MS. LEE:  Teresa Lee, The mom of Antonio Lee.

15      MS. PINKLEY: Diane Cruise Pinkley, Educational

16  advocate for Antonio.

17      MS. PUCKETT:  Tiffany Puckett, Attorney for DCPS.

18      HEARING OFFICER:  Okay I want to welcome you all here.

19  Ms. Lee good morning to you it is always important to see

20  the mother's here and this hearing is about your son here.

21      Let me start by asking Ms. Tillery is Ms. Lee aware of

22  her due process rights?

23      MS. TILLERY:  Yes.  We talked about them.

4

1      HEARING OFFICER:  Okay and I'll admit if there are no

2  objections the documents that the party's have provided in

3  advance of the hearing.  That they want to rely on at the

4  hearing and for short hand Ms. Lee I'm going to refer to

5  those as disclosure letters.

6      I have received from Ms. Tillery on behalf of Ms. Lee

7  a disclosure letter dated June 4, 2007 that list four

8  witnesses and attached 15 exhibits.

9      Ms. Puckett, are you in receipt?

10     MS. PUCKETT:  I am in receipt.  I have no objection.

11     HEARING OFFICER:  Then it's admitted as part of our

12  record.  And I'll receive from Ms. Puckett a disclosure

13  letter dated June 6, 2007.  It was six witnesses and

14  attached no exhibits.

15     Ms. Tillery, are you in receipt of that disclosure?

16     MS. TILLERY:  Yes, I have an objection to the motion

17  to compel, being improperly filed by counsel within the

18  five day disclosure, instead the 14 days as per the

19  standard operating procedures.

20     MS. PUCKETT:  I think it's irrelevant at this point.

21  The parent is here.

22     HEARING OFFICER:  Is that in here?  Oh at the bottom?

23     MS. TILLERY:  Ah-uh.

24     HEARING OFFICER:  Okay.

1      MS. PUCKETT:   Parent is a moving party  Mr. Woods.

2  The parent brought the complaint.   It's very proper for the

3  parent to be at the hearing to address the issues in the

4  complaint.   I believe that the school district has a right

5  to confront the individual who is making allegations

6  against them.

7      This is not a situation where we're dealing with the

8  fact witness, or an expert witness or something like that.

9  We're dealing the party who brought the complaint.   And

10  like I said, I think it's irrelevant at this point because

11  the parent is here this morning.

12      HEARING OFFICER:   Okay.

13      MS. TILLERY:   That's fine, I just want to make it

14  clear that my objection is based on the fact that it was

15  the motion to compel was not properly done.   Not the fact

16  that the parents hear the fact that it was not properly

17  done.

18      HEARING OFFICER: Okay.   I don't a motion, it's in the

19  - -

20      MS. PUCKETT:   There's a - -

21      MS. TILLERY:   She, she, she just  - - That was not

22  disclosed to us.   The motion to dis - -

23      MS. PUCKETT:   What's not disclosed to you?

24      MS. TILLERY:   You have motion to compel - -

1        MS. PUCKETT:  He's looking at the scheduling

2    memorandum.

3        HEARING OFFICER:  You mean, in this document?

4        MS. TILLERY:  Yes.

5        HEARING OFFICER:  There was an attached motion?

6        MS. TILLERY:  No there was not.

7        HEARING OFFICER:  Okay.

8        MS. TILLERY:  It just says motion to compel at the

9    top.  And parent is here.

10       HEARING OFFICER:  Okay, I see but yeah I guess that

11   it's movement in light of the fact that what you were - -

12   Is that what you're saying?

13       MS. TILLERY:  Yeah I just wanted to just make it for

14   the record.

15       HEARING OFFICER:  Yeah you just wanted that noted.

16   Okay, any objections to the disclosure itself?

17       MS. TILLERY:  No.

18       HEARING OFFICER:  Okay, then without objection, it's

19   submitted.  Where are we with respect to issues presented

20   forward?

21       MS. TILLERY:  Well, I would start with - - I guess I

22   want to make a motion for directive finding at this time,

23   based on the fact that DCPS did not disclose any documents

24   pertaining to with her five-day disclosure.  Further, she

1    did not file a response to the complaint and to clarify

2    IDEIA and the Student Operating Manual.  The parent has a

3    right to prohibit the introduction of surprised evidence,

4    pursuant to the standard operating procedures.

5        DCPS also failed to hold a resolution meeting pursuant

6    to IDEIA and the standard operating procedure manual.

7        Lastly, documents basically speaks for themselves that

8    there has been a denial of fate.  DCPS counsel has

9    presented no evidence to prove anything to the contrary.

10       HEARING OFFICER:  Okay.  What are the issues now?

11       MS. TILLERY:  The issues are - -

12       HEARING OFFICER:  Yeah.

13       MS. TILLERY:  Umm, DC - -

14       HEARING OFFICER:  All of them still remain?

15       MS. PUCKETT:  Uh-umm.

16       HEARING OFFICER:  Okay.

17       MS. PUCKETT:  There still the same issues, and if I

18   could responds to - -

19       HEARING OFFICER:  Well let me get - -

20       MS. PUCKETT:  You want to get the issues first?

21       HEARING OFFICER:  Yeah if you can be clear on that.

22       MS. TILLERY:  The issues are DCPS failed to conduct an

23   annual IEP, review a IEP.  DCPS also failed to provide

24   student - -

1      HEARING OFFICER:  When was that due?

2      MS. TILLERY:  The IEP expired; the last one was

3  January '06.

4      MS. PUCKETT:  And just for the record, they did not

5  put that date in the complaint, the date that they put in

6  the complaint is at the last - - the IEP expired May 26th

7  of '06.  So I just wanted to let you know that we did to

8  stick to the four walls of the complaint.  The complaint

9  says that May 26, '06 the IEP was expired; since the

10  student's expiration of the student's IEP, May 26th of '06.

11      And this complaint cannot be amended here today on the

12  table.  The complaint is factually wrong if she's

13  indicating that the IEP expired in January, because if you

14  look at their documents, they do have a IEP that would have

15  expired in January of '07.  But the documents that they're

16  referring to in this complaint are not in existence because

17  there is no May 26th, '06 IEP, - - there's no May - -

18      There is a May 26th, '05 IEP, but there was a IEP done

19  after that.  So there was a January 26th, '06 IEP which is

20  not even mentioned in here.  So how can you bring up the

21  fact that the January 26th IEP is outdated when it was not

22  in this complaint.  I would ask that the hearing officer

23  keep the parties within the four walls of this complaint

1  and that amendments not be allowed in this complaint - - be

2  allowed today.

3      And if the party doesn't want to amend their

4  complaint, then the hearing officer can give them the

5  discretion to do that.

6      And there is an issue, as far there have not being a

7  resolution meeting.  Our Office of Special Ed makes an

8  initial phone calls to try to schedule these meetings, Mr.

9  Woods, because there are a whole bunch of resolution

10  meetings to be scheduled; and they have not been able to

11  schedule this meeting and there hasn't been a resolution

12  meeting.

13      Now, I can't tell you specifically right here today

14  how the parties were not able to come to a meeting of the

15  minds in regards to this resolution meeting, but there has

16  not been a resolution meeting here today.

17      And I will object to the complaint being amended at

18  the table.  Because, as you see, in the complaint, as you

19  see in the documents submitted by the parent's counsel,

20  there is a January '06 IEP.  The IEP that they're claiming

21  is outdated is a May 26th IEP.  It specifically says that

22  May 26th, '05 DCPS completely convened a IEP meeting to

23  draft initial IEP.  There is nothing that indicates that

1  DCPS convened a meeting to review and revise the IEP since

2  the expiration of the student's IEP on May 26th of '06.

3      The next allegation is a Comp Ed issue and then there

4  is an ESY issue.  But as far as the IEP issue, it was never

5  amended and I would object to it being amended today at the

6  table.  Because there is a IEP in the record that the

7  parents counsel submitted that is date from the date that

8  they put in this complaint.

9      MS. TILLERY:  May I respond?

10     HEARING OFFICER:  Yes ma'am.

11     MS. TILLERY:  Nevertheless, the IEP is still expired.

12  There hasn't been a IEP done for Antonio this year, number

13  one.  Number two, as far as the resolution goes, DCPS is

14  supposed to contact us.  I don't see any documents that

15  show that an attempt has been made.  If that was so, it

16  should have been included in the five-day disclosure as I

17  stated earlier.  There's no documents to include it in the

18  five-day disclosure.

19      If that was the case, any documents that bring up to

20  date stating the attempts have been made for a resolution

21  meeting should be not allowed based on the best evidence

22  rule.  Further, the IEP, the issue was that DCPS denied the

23  student of pre-appropriate public education, based on the

24  fact that there's no annual IEP.

11

1      If a IEP was not done, if there is no IEP for the

2   school year, there's no IEP for the school year.  This

3   child does not have a IEP at this time.  So, DCPS is in

4   violation of that.

5      MS. PUCKETT:  Mr. Woods, Congress intent with IDEIA

6   2004, was to make sure these complaints are filed with

7   specificity.  That you have to look at the complaint with

8   the facts that go along with it.  If Congress intended for

9   DC, for parents to be allowed to file complaints with just

10  issues, then they would not have changed the law.  It

11  specifically says with the facts and issues related to the

12  complaint.

13     You have - - it says that the IEP is out of date, but

14  right under it says, two lines under it, it says the IEP of

15  May 26th of '05 has there never been a meeting to amend the

16  IEP of May 26th '05 to come and revise that IEP.  The parent

17  cannot amend this complaint at the table here today.

18     MS. TILLERY:  The bottom line is pursuant to 34 C.F.R.

19  300.324, the IEP team reviews the IEP periodically, but not

20  less than annually.  There hasn't been an annual review of

21  the IEP at this time.

22     MS. PUCKETT:  Once the parent found out through her

23  documents request that there was a January 26th, '05, '06

24  IEP, there could have been a motion of contacting me to

1    asking me if I would agree to amend the complaint to make

2    it correct on his fate.  Or she could have motioned the

3    hearing officer to allow her to amend the facts in the

4    complaint.  But the reality is, the complaint says and

5    stands as it is, and it says May 26th, '05 IEP has never

6    been updated.

7          There is two addition issues that we can still go on

8    today but I'm going to object to them amending the first

9    issue.  I'm strongly going to object to it being amended at

10   the table.

11         HEARING OFFICER:  Is that right?  I mean, it says 5-

12   26-05, was that - -

13         MS. TILLERY:  Well that's when the last - - My, what I

14   said in the complaint was that that's the expiration

15   because the last one was done in '05.  The 1-26, was done

16   to review evaluations which is (where is that file) 8, 05.

17         The purpose of this meeting was to review the

18   evaluations completed and to determine eligibility of

19   Special Ed services.  Again, if one was done 1-26-06, then

20   it would have expired 1-26-07.

21         HEARING OFFICER:  She was saying you raised claim on

22   the 5-26-05; not on the 1-26-06.  Would that claim, if

23   there is a 1-26-06, that claim wouldn't be true, right?

13

1      MS. TILLERY:  If there is a 1-26, then the claim that

2   the annual IEP has been done?

3      HEARING OFFICER:  No, that you had - - the facts

4   though are that you challenged the 5-26-05.

5      MS. TILLERY:  Oh, the 5-26.

6      HEEARING OFFICER:  Yeah.  So if there is a 1-26-06,

7   that claim wouldn't be true, right?

8      MS. TILLERY:  Yes, if there is a 1-26.

9      HEARING OFFICER:  What do you want to doe with that

10   claim then, do you - -

11      MS. TILLERY:  Umm - -

12      HEARING OFFICER:  And I guess you might want to think

13   about it.  I don't how it impacts your other claims.

14      MS. TILLERY:  It doesn't impact the other two issues.

15      HEARING OFFICER:  It does not?  Because is there an

16   ESY on the 5-26-05?

17      MS. TILLERY:  There was an ESY - -

18      HEARING OFFICER:  On the 5-26-05?

19      MS. TILLERY:  Yes, but that was never implemented.

20      HEARING OFFICER:  Okay.

21      MS. TILLERY:  And a Comp Ed plan was just not.

22      HEARING OFFICER:  You had a plan already developed?

23      MS. TILLERY:  For Comp Ed, yes.

1          HEARIN OFFICER:  Okay.  And what's the concern with

2     the ESY now?

3          MS. TILLERY:  Concern with the ESY?

4          HEARING OFFICER:  Yes.  He didn't get it?

5          MS. TILLERY:  No he did not get it.

6          HEARING OFFICER: Okay.  For the school year, summer

7     05?

8          MS. TILLERY:  Yes, for the summer 05.  DCPS agreed to

9     provided it, but it was not provided.

10         HEARING OFFICER:  And what's the Comp Ed, what was

11    that for?

12         MS. TILLERY:  The Comp Ed plan was awarded from

13    previous HOD, 17 hours and 15 minutes of Comp Ed.  That is

14    found in Exhibit 4, and that's this service, for reading

15    and written expression.

16         HEARING OFFICER:  So what are you asking, you're

17    asking the hearing officer to order Comp Ed, because - -

18         MS. TILLERY:  I'm asking that DCPS fund the student

19    with 17 hours and 15 minutes of compensatory education and

20    DCPS.  And DCPS to fund 120 hours of extended school use

21    services for the miss-services during the summer of 2005

22    and 2006.

23         HEARING OFFICER:  Okay.  Ms. Puckett, are those to - -

24    and what are going to do this.

1          MS. PUCKETT:  And in - - If you look at the meeting

2     notes from that 5-26-05, and it's parent's Document no. 2,

3     the meeting notes indicates that the student will receive

4     Comp Ed 17 hours and 15 minutes beginning on 5-27-05 in a

5     Resource Special Ed center two hours daily.  The last day

6     was to be June 9th.

7          The student was to receive Comp Ed from Bruce Monroe,

8     the student's home school, and those services were offered.

9     I don't believe there has ever been a request for an

10    independent instead of in lieu of the services at the

11    student's home school.  At the time that the student, this

12    complaint was filed then, this child was at - - I'm sorry -

13    - At the time the Comp Ed plan was made, the student was

14    still enrolled with the DC Public School.  And the Comp Ed

15    services were to be provided by the student's home school.

16         The student, after that, transferred to a private

17    school which is not funded by DCPS at this point.  And

18    there has not been a request to, for the student to receive

19    these services independently.  Like I said, they've already

20    been ordered by a prior HOD.  This is a - - it comes out of

21    an HOD which was from miss-services from, if you look at

22    the Comp Ed plan AL-4, the miss-services was from February

23    19th to May 26th '07.  So they've already been ordered.

24    There is currently a Comp Ed plan.  The Comp Ed plan was

16

1   written to be implemented at the student's school.  As I

2   said, the student was attending a DC Public School at the

3   time the Comp Ed was written.  The student then, the next

4   school year, went to a private school, and there has never

5   been a request to the Care center to provide the student

6   with independent services, because when the student is in

7   private school we will fund ours for Comp Ed plan, because

8   it's very difficult to have teachers go into the private

9   school.

10      I also want to note, Mr. Woods, that even though the

11  student has Special Ed services, the student is not in a

12  Special Ed program.  He hasn't been in a Special Ed program

13  this past two school years.  So this is a IEP that DCPS is

14  developing.  But the student is not receiving any type of

15  Special education at the private school where the student

16  is at.

17      Secondly, the ESY services IEP was written for Bruce

18  Monroe, also.  So I'm not sure why the parent didn't

19  present the student to Bruce Monroe for ESY services.

20      I'm sure you've had many of these hearings when there

21  is an ESY plan, the student receives ESY at the

22  neighborhood school over the summer.  There is an ESY plan

23  for this child in place.  And once again, I'd like to point

24  out that student, the following school year for the 2005,

1    2006 school year, never received any type of Special Ed

2    services.   The student hasn't been receiving any type of

3    Special Ed services.

4         HAERING OFFICER:   What was the ESY for?

5         MS. PUCKETT:   That's DCPS's IEP.   We developed a IEP

6    for the student at the end of 2004, 2005 school year.   The

7    subsequent school year, that the only thing we had this

8    summer, the student started at a private school 2005, 2006.

9    Never again received any type of Special Ed services.   The

10   student is not currently receiving Special Ed services.

11   And the student is not currently in any type of Special Ed

12   program.

13        The private school is a General Ed program.   We need

14   to update the student's IEP but there is no Special Ed

15   program at this point.   It's just some, there's Care - -

16   you know how Care center for students who are non-

17   attending; they meet and they update the student's IEP.

18   But that doesn't mean that the IEP is being implemented.

19   The student's IEP is written for the neighborhood school.

20   The parent is choosing to keep the student in a private

21   school, which is not Special Ed at all.

22        MS. TILLERY:   May I respond?

23        HEARING OFFICER:   Yes, ma'am.

18

1      MS. TILLERY:  Ms. Puckett made reference that there

2   was a Comp Ed plan.  The Comp Ed plan was implemented but

3   there's - - I don't see anything that she's presented us

4   that said that there is a Comp Ed implemented.  The mom can

5   testify to the fact that the Comp Ed plan that he didn't

6   receive those Comp Ed services.

7      As far as the ESY services, the ESY services weren't

8   provided because Bruce Monroe was under renovation and

9   that' stated in notes from the 1-26-2006 IEP.  So the ESY

10  services weren't implemented.  This is emergency skills; it

11  was determined that he needed them, for emergency skills

12  and reading and written expression, and the schools wasn't

13  even available for him to have it.

14     Further, DCPS is responsible for monitoring the

15  student even when they're in a private school.  That's what

16  the Care center is for.  If that wasn't the case this

17  wouldn't have been developed by the Care center.

18     HEARING OFFICER:  Okay.  Let me make sure that I'm

19  clear on that.  The first then what are you doing with it?

20     MS. TILLERY:  The first issue?

21     HEARING OFFICER:  Right.

22     MS. TILLERY:  For the IEP?

23     HEARING OFFICER:  Right.

19

1      MS. TILLERY:  My feeling is that the IEP is still

2   expired.

3      HEARING OFFICER:  Okay, but based on your hearing

4   request.

5      MS. TILLERY:  Oh, based on that.  Unless I have to - -

6   I feel like that it's still expired the 5th, January, if we

7   have to say January '06 and - -

8      [Pause.]

9      MS. TILLERY:  Can we reserve that issue and come back

10   to it.

11      HEARING OFFICER:  When you say reserve it - -

12      MS. TILLERY:  I mean reserve it - -

13      HEARING OFFICER:  To another discussion right now?

14      MS. TILLERY:  Yeah.

15      HEARING OFFICER:  Okay.  But yeah we can reserve it to

16   another hearing.  With re - -

17      MS. PUCKETT:  I'm sorry, reserve it until - -

18      HEARING OFFICER:  I guess she doesn't want to answer

19   the question right now.

20      MS. PUCKETT:  Because I mean, the other option is to

21   withdraw it without prejudice, or to be dismissed without

22   prejudice, or to ask the hearing - - there's three options;

23   withdrawal without prejudice, dismissal without prejudice,

24   or request that the hearing officer allow her to amend the

1    complaint.  Which is gonna - - if there are any amendment,

2    it's gonna require a resolution meeting anyway.

3         HEARING OFFICER:  I think the way you're saying in

4    this case, if that first issue was not before the hearing

5    officer, you still could go forward on the other two.  Do

6    you feel like you could go forward or do you feel that that

7    would be impacted.

8         MS. TILLERY:  I could still go forward on the other

9    two issues without - -

10        HEARING OFFICER:  Now, the Comp Ed and the - - well,

11   the ESY was part of the '05 IEP.

12        MS. TILLERY:  Yes.

13        HEARING OFFICER:  If that issue is not before me, will

14   that affect it?

15        MS. TILLERY:  I'm not asking you to pull the 2005 IEP.

16   This issue as far the IEP being expired, I don't see how

17   that would affect that, using the IEP, the 5-26 IEP as far

18   as still using that as evidence.

19        HEARING OFFICER:  Well how are you gonna come up with

20   ESY wasn't it gonna be based on the IEP?

21        MS. TILLERY:  Yeah, that would then be based on the

22   IEP so I would still need to - -

23        HEARING OFFICER:  Right, that's what I said, the ESY

24   would be impacted by the IEP.

1        MS. TILLERY:  Yeah.

2        HEARING OFFICER:  And at this point, you really could

3    get ESY, you'd have to establish deficits that you need to

4    re-mediate under the retest.

5        MS. TILLERY:  For ESY based - -

6        HEAREING OFFICER:  ESY is always summer.  We can't go

7    back to the summer 2005.  So you have to deal with another

8    remedy.  I can't order ESY for the summer 2005; it's 2007.

9    It's the only thing I could do, you see what I'm saying.

10   It's too late, the summer of 2005 is over.

11       So now we'd have to establish under *Reed* what happened

12   to him as a result of that loss of services.  And what was

13   his deficit and based on that deficit what does he need

14   now?

15       MS. TILLERY:  I'm asking for the 120 hours for the

16   past for the summer of 2005 and 2006.  And your saying that

17   that can't be awarded at this time?

18       HEARING OFFICER:  Not in a cooki - - the court has

19   told us we can't award a cookie cutter relief.  We have to

20   substantively determine what the needs of the child are and

21   then base our relief on that.  And what your doing is

22   saying, here is what he would have gotten he didn't get it

23   cookie cut giving this for that.

1       We can't order 2005 or 2006 ESY because those two

2   summers have passed, or we would have to move it forward.

3       You're saying he missed two years?

4       MS. TILLERY:  Yes.

5       MS. PUCKETT:  I'm sorry, where is the two years ESY?

6       MS. TILLERY:  There are two summers.

7       MS. PUCKETT:  Because the complaint was only dealing

8   with in 2005.  That's the only thing that you have ESY

9   eligibility for, and actually you have the 2006 IEP in the

10  record which said that the student was not eligibility, the

11  ESY is not checked off, so we're doing one year and we're

12  doing of a IEP which only has five hours of specialized

13  instruction on it.  And ESY services is only for eight

14  weeks in the summer time.

15      MS. TILLERY:  So I'm not - -

16      MS. PUCKETT:  So I'm not sure where we're getting 120.

17  Well that's not my argument to make anyway, that's the

18  parent's under *Reed*, because it could be more, it could be

19  less than what the IEP has.  It really just depends on some

20  type of substantive evidence as to how the student was

21  harmed by missing services.

22      MS. TILLERY:  Well, as far as the ESY, if the child

23  didn't get ESY, what is the parent's recourse if the child

24  didn't get ESY because the school is under construction.

1    What is the parent's recourse for ESY service that the

2    child desperately needs.  It states right in the ESY plan

3    that what the services are needed for.

4        I'm trying to figure out what is our recourse if the

5    hearing officer cannot award services, this is not an issue

6    of ESY and it's not an issue of Comp Ed.  We're talking

7    about extended school year services based on the IEP.

8        MS. PUCKETT:  I think, - - I don't think the hearing

9    officer - - my understanding of this case is that the

10   hearing officer is not saying he can't award services.  I

11   believe the hearing officer is indicating that the parent

12   has the burden to show under *Reed*, to prove under *Reed*,

13   what Comp Ed is warranted due to the denial of fate and the

14   loss of services and that has to be done through some type

15   of substantive evidence that needs to be presented.

16       And that it, - - you can't, no one like I can't, - -

17   like I was making representations, but it was inappropriate

18   for me at the table to say well lets count the hours up and

19   how did you come up with 20 hours.  Because *Reed* has made

20   it clear that that's not the way it should be done, that

21   there needs to be more substantive evidence to show what

22   harm, and based on that harm, what is specifically needed

23   to put that student back in the place where that student

24   would be had that student receive the ESY services.

24

1      HEARING OFFICER:  Yeah, the law has changed here in

2  the District.  We can't do - - they call it cookie cutter -

3  - what you're saying he miss this, so give him this.  The

4  court told us we can't do that.  That the burden would be

5  on the - - you would have to - -

6      First of all, we can't get 2005 ESY the summer is

7  over.  It would be different if it's the beginning of the

8  summer, we could say, Okay, he's to get ESY, he hadn't

9  started, Bruce is under construction, using your argument.

10  Where can he go?

11      But we're in the summer of 2007.  So it would have to

12  be made up.  That's what you're asking for, so now that

13  you're asking to make it up, then, the way that we make it

14  up is, as Ms. Puckett was describing.

15      MS. TILLERY:  The fact that ESY services and she's

16  talking about that it's of substantive nature, but the fact

17  that ESY services, I won't even say the comp ed; that is,

18  they're not provided a, would be, the procedural violation

19  that would rise the level of a denial of fate.  Based on

20  the fact that the child has been deprived of educational

21  benefit.

22      HEARING OFFICER:  You have to prove that.  I can't

23  assume that.  What you're saying is - -

25

1          MS. TILLERY:  Well I had - - I mean - - I would like

2     my parent to testify.

3          HEARING OFFICER:  I don't know how I - - maybe you're

4     not familiar - - are you familiar with the *Reed* case?

5          MS. TILLERY:  I am familiar with the *Reed* case.

6          HEARING OFFICER:  Yeah, that's a pretty high burden to

7     meet.  Particularly, if the child is not in a Special

8     education program now, is that true?

9          MS. TILLERY:  He is at Nativity now, yes.

10         HEARING OFFICER:  And that's not a Special Ed program?

11         MS. TILLERY:  Yes.  No, no it's not, but the Care

12    center is supposed to be implementing these services for

13    him.

14         MS. PUCKETT:  I'm sorry the Care center is not

15    implementing services.  The student is at Care center

16    because the student is a non-attending student.  If the

17    student - - if DCPS would implement these services, the

18    student would have been at Bruce Monroe.

19         If you look at the IEP in '05 and '06, it says the

20    placement location is at Bruce Monroe, five hours of

21    service.  The IEP only requires five hours of service.  The

22    student is currently at a privately placed in a non-Special

23    Ed school.  And that's why the student is going over to

24    Care center.  Care center only deals with early childhood

1     students and non-attending students; students who have been

2     parentally placed and students who are early childhood.

3           If the student was placed at the private school by

4     DCPS, then the Office of Special Ed placement monitor would

5     be dealing with this case, but there is no placement

6     monitor, because the student is enrolled, parentally

7     enrolled in a non-attending school.

8           If the student was not parentally enrolled, and it was

9     something that DCPS was funding, and we were the funding

10    agent and responsible for the implementation of the

11    services at the private school, then the student would have

12    placement specialist in the Office of Special Ed.  But this

13    student is at Care center because it's non-attending and

14    it's parentally enrolled.

15          And if you look at the '06 IEP, Natalia Houston, who

16    is the director of the Care center, participated in that

17    meeting, and that's why the Care center is over this case

18    because it is a parentally enrolled case.

19          HEARING OFFICER:  Okay.

20          MS. PUCKETT:  And a non-Special Ed school.

21          HEARING OFFICER:  I had the wrong birth date, too, the

22    child's – – let me make sure this is right, Ms. Lee; 1995,

23    not '05; '95.  Because I said, '05.

24          MS. PUCKETT:  No, you said '95.

27

1        HEARING OFFICER:  I said '95?

2        MS. PUCKETT:  Uh-mm.

3        HEARING OFFICER:  Okay.  Because I was wondering how

4   did he get, if he was born in '05, how did he get to the

5   Care center, I'm sorry, to Bruce Monroe that quick.

6        MS. TILLERY:  That quick, he would have been three - -

7        HEARING OFFICER:  He wasn't three.

8        So this is a non-attending student whose services that

9   you're saying is made available for him at Bruce Monroe - -

10       MS. PUCKETT:  This is parentally placed, non-

11  attending.

12       HEARING OFFICER:  And he's not - -

13       MS. PUCKETT:  And we're not funding it.

14       HEARING OFFICER:  I see.

15       MS. PUCKETT:  It's parentally place, non-attending,

16  non-DCPS funded.

17       HEARING OFFICER:  Is that true?

18       MS. TILLERY:  Yes, he's at Nativity, placed there by

19  the parent.  But, nevertheless, the SEA is responsible.

20       HEARING OFFICER:  So you're challenging their

21  placement?

22       MS. TILLER:  Challenging her placing him there?

23       HEARING OFFICER:  No, the school's placement at Bruce

24  Monroe.

1       MS. TILLERY:  I'm not understanding your question.

2       HEARING OFFICER:  If fate has been made available, and

3  you're saying you're not getting it, why aren't you getting

4  it?

5       MS. TILLERY:  How has fate been made available to the

6  parent?  The parent has that Bruce Monroe has - -

7       HEARING OFFICER:  If fate has been available - -

8  what's Bruce Monroe?  Is that what fate was to be provided?

9       MS. TILLERY:  The home school was supposed to be

10 implementing the program.

11      HEARING OFFICER:  Okay, so why isn't he at the home

12 school, then?

13      MS. TILLERY:  They were supposed to be giving him the

14 services, at - -

15      HEARING OFFICER:  There's something that say that?

16      MS. TILLERY:  I don't have anything that says that.

17      HEARING OFFICER:  Well why did you think that?

18      MS. TILLERY:  From my parent.

19      HEARING OFFICER:  Oh I see.  If they - - I'm not sure

20 about that.  I mean if the school made fate available, why

21 would they transport it?

22      MS. PUCKETT:  And I'm sorry.

23      MS. TILLERY:  And I'm trying to figure out - -

1          MS. PUCKETT:   If you look at the meeting notes from

2     the 1-26-06 IEP; they actually did address the Comp Ed.   I

3     know you were talking that, it said the parent will enroll

4     Antonio in summer school to complete the Comp Ed services

5     completed on 5-26-05.  So they did address that in the '06

6     IEP meeting.  And if you look at the '06 IEP, the IEP was

7     written for Bruce Monroe.  It indicates that the student

8     was to receive five hours of specialized instruction.

9          The Care center updates these IEPs all the time for

10    the home school.  It says that the student attending school

11    is Nativity.  The home school is old for is, for, and

12    indicates that go to the, if you go to, - - the student is

13    supposed to have minimal's, specialized services, and

14    inclusion setting.  And that's General Ed.

15         There's nothing here that says - - and actually, if we

16    were supposed to be giving the student services at his non-

17    attending school, then you will have a services plan.  The

18    Care center completes a services plan that will go along

19    with this that is different from the IEP that the non-

20    attending student can go into the local school and receive

21    like related services; like speech and language, or

22    occupational therapy.

23         Because DCPS is only required to provide a certain

24    amount of services when students are parentally placed by

1    their parents.  So if this student had any of type of

2    related services on the IEP, then DCPS could provide those

3    related services at the home school through a service plan.

4    But this IEP was written for the student to attend Bruce

5    Monroe.  It wasn't written for the student for Nativity or

6    for DCPS to complete any type of services plan.

7        And if you look at the meeting notes, they had a

8    discussion about Comp Ed.  It says their son did not attend

9    summer school because it was under reconstruction; the

10   parents were not inform that he could get the services that

11   summer; and that, if he keeps going there, it says the

12   student was transferred to Nativity, where he is currently

13   not receiving specialized instruction, and that,

14   specialized services, specialized ed services.

15       And then, you know, you go through, there is report on

16   his educational performance and things of that nature.

17   Then it says, General Ed setting is accepted.  Combination

18   classroom rejected, outer General Ed rejected.

19       Location of services will be Bruce Monroe Elementary

20   School.  The parent will enroll Antonio in summer school to

21   complete the Comp Ed plan that was dated 5-26-05.

22       MS. TILLER:  May I respond?

23       The Comp Ed, summer school - - Comp Ed is

24   individualized.  So if they were gonna put him in summer

31

1    for Comp Ed, how is that addressing the compensatory

2    education plan?  If he's supposed to just be enrolled in

3    summer school.  That's not giving him compensatory

4    education services.  That's supposed to be individualized

5    services.

6         Further, it says in this, as you stated, it says that

7    ESY services were not provided because of summer school.

8    This is 1-26-06.  The ESY was supposed to be provided in

9    '05.  So obviously, it wasn't provided; it wasn't provided

10   here.  And they don't say where it's going to be provided.

11   And the summer school is not Comp Ed, and it is not ESY.

12   ESY is IEP based.

13        MS. PUCKETT:  Mr. Woods, you have had many cases here.

14   And I'm sure you are aware that DCPS does Comp Ed at summer

15   school.  We have many students' Comp Ed plans have been

16   implemented at summer school.  Summer school is not only

17   for students who are required to go the summer school.  A

18   lot of students right now are in summer, because they have

19   Comp Ed plans that need to be implemented.

20        And the services are provided to compensate that

21   student at summer school.  It's not just summer school

22   because you need to go there in order not to be retained or

23   you need to work on some type of subject area.  We have

1   implemented thousands of Comp Ed plans during summer

2   school.

3        MS. TILLERY:   Thousands - -

4        MS. PUCKETT:   Actually, DCPS has a right to implement

5   Comp Ed plans during summer school.

6        And furthermore, Mr. Woods, even though we're all

7   going through this, the reality is the parent still has to

8   establish that this child was harmed.   The student is, once

9   again, is not in a Special education program, he hasn't

10  been for two years.   Yes we are required to continue to

11  update the student's IEP and provide a placement for the

12  child, which is not being accepted at this time.   It's not

13  even on the table, there is no allegation that the

14  placement that we offered in the last two IEPs is

15  inappropriate.   You don't have any that.

16       So it's still, at this point, before I even move to

17  any type of Comp Ed discussion, there has to be an

18  establishment of a denial of fate how this child has been

19  harmed.   Especially, if there is no - - there is no

20  specialized instruction being requested right now.

21       We're doing this IEP, but it's a pointless IEP,

22  because if the student is not going to go to Bruce Monroe,

23  then there's not going to be any services provided for the

24  child.

1      MS. TILLERY:  Where is the proof that the Comp Ed plan

2  has been implemented?  Where is that proof?  You keep

3  saying that thousands of people have, you've done thousands

4  - -

5      MS. PUCKETT:  It's not my - - there has to be

6  established first, - -

7

8      MS. TILLERY:  So where is it?

9      MS. PUCKETT:  - - that the Comp Ed plan was not

10  implemented Mr. Woods.  And it's clearly in the notes that

11  this parent was going to enroll - -

12      MS. TILLERY:  The mom can testify that the Comp Ed

13  plan wasn't in the - -

14      MS. PUCKETT:  It's clearly in the notes, that the

15  parent's not that was submitted by parent's counsel, that

16  parent was supposed to enroll the student in summer school

17  for Comp Ed.  So they have to present their case.  They

18  have to present their case.

19      MS. TILLERY:  The parent can tes - -

20      HEARING OFFICER:  Well do you wanna, I mean, I, Do you

21  understand what's going on here, I mean because the burden

22  is pretty significant with respect to this issue.

23      Number one, if the 5-26-05 IEP is not before the

24  hearing officer because that claim is one that have to be

1    dealt with before you proceed here, then that would be your

2    claim for ESY as well.  But even for your claim of ESY and

3    for your Comp Ed, you'd have to the hearing officer the

4    entitlement to it.  I cannot.  The court has said that we

5    have to make substantive claim, we have to find the need

6    for those services.  We can't just order those services.

7        MS. TILLERY:  I understand what you're saying about

8    having to find a need for the services, but my point is

9    that, the plan has already been developed.  Obviously, the

10   need has already been established.  The Comp Ed plan

11   exists.  They've ordered it from a previous HOD.  Further,

12   the ESY plan exists.

13       This is already - - this is not us coming - - that's

14   why I'm saying there is more procedures because this is not

15   us coming to the table saying, He didn't get ESY; or he

16   didn't get comp ed; and, he should have got it; and we

17   don't have anything.

18       We're saying here is the plan that wasn't implemented;

19   here is the ESY that wasn't implement.  This has already

20   been established.

21       HEARING OFFICER:  In other - - have you attempted to

22   get any of than done, before coming here?

23       MS. TILLERY:  Attempted to get any of the services

24   done?

35

1     HEARING OFFICER:  Yes.

2     MS. TILLERY:  We have not attempted to get the

3     services done but from what I understand, its DCPS should

4     be contacting the parent in order to get these services

5     done.

6     MS. PUCKETT:  Just one additional comment, Mr. Woods,

7     the parent is indicating that there is a Comp Ed plan,

8     which essentially stands on its face.  The hearing officer

9     cannot make a denial of fate ruling off a prior denial of

10    fate; and that's what this Comp Ed plan came from.  The

11    failure to implement a Comp Ed plan is a procedural

12    violation which there needs to be some type of evidence to

13    show how it's raised to level of substantive violation to

14    find a denial of fate.  That's the first thing hat needs to

15    be done.

16     Secondly, what need's to be done is then there needs

17    to be an establishment after there is an establishment that

18    the student is harmed from the failure to development this,

19    to implement this Comp Ed plan.  What services are needed

20    to - - is there additional Comp Ed needed.  I mean, there

21    has to be a finding of a denial of fate first.  We can't

22    just say, here's a Comp Ed plan which came out of a prior

23    denial of fate and therefore, the student needs additional

1    Comp Ed.   There has to be some type of burden, the parent
2    has to present something to show this.

3        MS. TILLERY:   And the fact that it's a procedural
4    violation, in order for a procedural violation to rise to a
5    level of fate there's only three ways that can do that;
6    that's cause deprivation of education benefit;
7    significantly impede the parent's opportunity to
8    participate a decision making process; and impede the
9    child's right to fate.   I haven't even had a opportunity to
10   put my parent on the stand to testify to, if she has, if
11   there's been a cause of a deprivation of educational
12   benefits or if it significantly impeded the parent's
13   opportunity to participate in a decision making process.

14       And those are the only three ways a procedural
15   violation can raise the level of fate and I am stating that
16   we believe we have that.

17       MS. PUCKETT:   From my understanding we're going on
18   issues two and three.

19       HEARING OFFICER:   Okay.   I'll let you put on your
20   case.   It's a very - - if that's your evidence it's much
21   more than that.   I think you should make sure you
22   understand what the burden is in this case, because if you
23   lose on these issues, - - I'm not sure what - - what is it
24   that you want?   What did you want?

37

1      MS. TILLERY:  What do we want, well umm - -

2      HEARING OFFICER:  If the child is not receiving

3  Special Ed services now and haven't been for the last two

4  years, what Special Ed services do you want?

5      MS. TILLERY:  We're asking that they fund them, that

6  they fund the ESY and Comp Ed independently.  So, we're

7  asking for - -

8      HEARING OFFICER:  Is the child receiving Special Ed

9  services?

10      MS. TILLERY:  Is the child receiving Special Ed

11  services now?

12      HEARING OFFICER:  Yes.

13      MS. TILLERY:  No.  The child - -

14      HEARING OFFICER:  Has the child received Special Ed

15  services since that IEP was developed?

16      MS. TILLERY:  Since 1-26-06?

17      HEARING OFFICER:  Yeah.

18      MS. TILLERY:  No, the child has not received Special

19  Ed services.

20      HEARING OFFICER:  So have you rejected the services?

21      MS. TILLERY:  The parent hasn't - - no one has

22  contacted the parent to have his services implemented.

23  That's - -

```
1          HEARING OFFICER:  They did.  The IEP says where his

2    services was gonna be implemented.  Why isn't the student

3    at Boeing and at Bruce Monroe?

4          [Pause.]

5          HEARING OFFICER:  Why isn't the student at Bruce

6    Monroe?

7          MS. TILLERY:  Why isn't he?

8          HEARING OFFICER:  Yeah.

9          MS. TILLERY:  Bruce Monroe?

10         HEARING OFFICER:  Isn't that where the services are

11   going to be provided?

12         MS. TILLERY:  Well, according to - -

13         [Pause.]

14         MS. TILLERY:  Okay, umm.

15         HEARING OFFICER:  You want a minute to talk to your

16   client or?

17         MS. TILLERY:  Yeah.

18         HEARING OFFICER:  Okay, why don't I give you - - how

19   much time you want about?

20         MS. TILLERY:  About five minutes.

21         HEARING OFFICER:  About five minutes, that's the

22   target set.

23         MS. TILLERY:  Okay.

24         HEARING OFFICER:  Okay.
```

1          I'll come back in.

2          MS. TILLERY:  Okay.

3          HEARING OFFICER:  Okay.

4

5          [Break was taken 10:18 a.m. to 10:45 a.m.]

6

7          HEARING OFFICER:  Okay, back on the hearing record

8    here.  It's about time for attorneys to consult with their

9    client.  Where are we now with this case?  I know we're - -

10   yeah.  There are lots of things what was in the air when I

11   left, was - -

12         MS. TILLERY:  But we're still - -

13         My issue is still with the ESY services and I know

14   that we stated before that according to *Reed* the hour for

15   hour couldn't be done and that the division that the three

16   prongs need to be satisfied.  But based on the fact that

17   this - - we're talking ESY not as Comp Ed but as ESY.  Then

18   *Reed* does not apply to issues we're talking about

19   compensatory education.

20         ESY is supposed to be provided if it determined that

21   the services are necessary as a provision of fate to the

22   child's IEP, pursuant to IDEIA.  In this case it has been

23   determined that ESY services are supposed to be done.

1          Secondly, the IEP from 1-26-06; DCPS counsel says that

2     the IEP was supposed to be made but if that was the case

3     then why does it say that the managing schools, Care

4     center, and Bruce Monroe, and the goals are developed

5     should be evaluated monthly based on test and documented

6     observations.  So obviously, there's was, the IEP was to be

7     implemented at the school by Care center and Bruce Monroe.

8     If that was the case then, this schools would not have been

9     implemented when his IEP was done.  And it's clear that the

10    attending school at the time was Nativity.

11         And manager care center in Bruce Monroe and these

12    schools were developed with evaluation procedures in place,

13    and the evaluation schedule in place.  And annual goals and

14    short term objectives.

15         So if that was the case, then why would these be

16    developed if this was not supposed to be implemented at the

17    school by the Care center?

18         HEARING OFFICER:  I think we might as well take the

19    case because I have explained what you have to do.  You

20    disagree.  Unfortunately, I make the decisions, so.  The

21    law is very clear.  I'm not here to enforce his Comp Ed

22    plan; that you can't site me any authority where I have

23    authority to enforce a Comp Ed plan.

41

1      You have to establish for me, this hearing officer,

2    this student needs the Comp Ed.  There is no authority in

3    the IDEIA for me to enforce a Comp Ed plan; cited.

4      MS. TILLERY:  So you're saying that because the Comp

5    Ed plan that exists, you cannot enforce a Comp Ed plan

6    that's in existence?

7      HEARING OFFICER:  No.  I'd have to determine the

8    student is in need of the Comp Ed.  Plus the Comp Ed plan,

9    if I'm not mistaken is two years old and - -

10     MS. TILLERY:  Yes, but we still fall within the

11   timeline. The timeline has not expired.

12     HEARING OFFICER:  So that's more the reason I need

13   evidence of the need.  Particularly in light of the fact

14   that you said that the child is not in a Special Ed program

15   now.

16     MS. TILLERY:  So you're asking for the need of the

17   Comp Ed plan that was already, that was the reason for

18   that.

19     HEARING OFFICER:  I'm asking, Ma'am, when you come

20   here with a case, you have to be able to establish the

21   evidence for the case.  Unless you can site me authority

22   that; I'm here, here is your authority under the IDEIA to

23   enforce an existing Comp Ed plan, it's two years old.  Then

1  you would have to be prepared to put on your case that the

2  student is entitled to the services.

3      I think more so because the plan is two years old,

4  there has been, obviously, a change.

5      MS. TILLERY:  Even if there has been a change of the

6  services, he's still entitled to his services.

7      HEARING OFFICER:  Okay.  Well, you're evidence will

8  establish that; if you have evidence beyond the plan.

9      MS. TILLERY:  Can I have my parent testify?

10     HEARING OFFICER:  Yes.

11     Okay what we will do at this point - - let's make sure

12  that we're clear on our issue.  What are we gonna do with

13  the first one?  You can't reserve on it now if we are going

14  to start the case.

15     MS. TILLERY:  The IEP issues?

16     HEARING OFFICER:  Yes.

17     MS. TILLERY:  Well if that's the case then we would

18  like to - - if we could - - if we with drawl this issue

19     then that will leave us with the Comp Ed.  And if we

20  amend this issue, if we are allowed to amend this issue at

21  the table, then, we would be able to go through with the

22  ESY and the Comp Ed.

23     HEARING OFFICER:  I can't amend at the table.  The

24  court's made that - - the law it says I cannot amend it.

43

1      MS. TILLERY:  Well we would have liked to then

2  withdraw this issue without prejudice, Mr. Hearing Officer.

3      HEARING OFFICER:  How could you withdraw without

4  prejudice, you could never bring it back, there is another

5  IEP.  You would never bring back the 5-26-05; that claim is

6  no longer valid.

7      MS. TILLERY:  Oh, because of the 1-26-06 IEP?

8      HEARING OFFICER:  Right.

9      MS. TILLERY:  So you're saying the 5-26-05 - -

10     HEARING OFFICER:  You would never - -

11     MS. TILLERY:  Oh - -

12     HEARING OFFICER:  So that's - -

13     MS. TILLERY:  I understand what you're saying.

14     HEARING OFFICER:  Yeah, there would never be a need to

15  bring that claim back.  Now, the only problem with that,

16  link that to your ESY.  There's no ESY after that year?

17     [Pause.]

18     HEARING OFFICER:  Right at - -

19     MS. TILLERY:  That's what the year that ESY was

20  awarded.

21     HEARING OFFICER:  Yeah, you had said it was for '05

22  and '06 but then the 06 IEP didn't have ESY.

23     MS. TILLERY:  There is a '06 IEP that still states

24  that the ESY was not given.  So, - -

1        HEARING OFFICER:  There's no ESY in the '06 IEP

2   though, correct?

3        MS. TILLERY:  Correct.  They are referring to 5-26,

4   '03-'05 IEP.

5        [Pause.]

6        MS. TILLERY:  Well, then I would have to, I guess I -

7   -

8        HEARING OFFICER:  Let me give you one more thing to

9   factor in before you consider.  You've re-filed this, you

10  know you'd be on your statute of limitation there, because

11  5-26-07 was two years.

12       MS. TILLERY:  Uh-mm.

13       HEARING OFFICER:  Now it's June.

14       MS. TILLERY:  So at this point, then.

15       HEARING OFFICER:  Yeah, you'd be on your, so you

16  couldn't re-file it anyway.  You'd be on your statute of

17  limitations.

18       MS. TILLERY: [Whispering to her client.]

19       HEARING OFFICER:  There's a two year statute of

20  limitation.

21       MS. TILLERY: [Whispering to her client again.]

22       HEARING OFFICER:  You don't wanna think about this

23  because this puts you in a tough bind that you're placed in

1  because the claim would be, you couldn't bring it back,

2  it's already past May 26, '07.

3      MS. TILLERY:  Uh-mm.  So then our only option is to -

4  -

5      HEARING OFFICER:  Your only option is you have to deal

6  with is advice her, I mean, when you get into situations

7  like this you have to talk.

8      [Laughter.]

9      MS. TILLERY:  Our only option would be to request then

10  to amend - -

11      HEARING OFFICER: Well you have to get consent, see.

12      MS. PUCKETT:  To amend to what exactly what are we

13  talking about to amending to?

14      MS. TILLERY:  Um, the for the issue of the annual IEP,

15  review of the students IEP to we would have to, we would

16  like to then amend the issue of and then the facts to

17  reflect the it was expired 1-26-06.

18      MS. PUCKETT:  And were talking about issue one correct

19  Mr. Woods?

20      MS. TILLERY:  Um.

21      HEARING OFFICER:  Well were flowing from it is because

22  the problem is that - -

23      MS. TILLERY: Flowing from that is the ESY.

46

1      HEARING OFFICER:  Right because you don't have an ESY

2   in the '06.  That's the dilemma it places you in.

3      MS. TILLERY:  The ESY - -

4      HEARING OFFICER:  Is in the '05.  That's what I'm

5   saying that put in a little dilemma because you don't have

6   ESY in '06.

7      MS. TILLERY:  For the '06 - -

8      MS. PUCKETT:  But there's nothing I can do in regards

9   to that - -

10      HEARING OFFICER:  Yeah there's no - -

11      MS. PUCKETT:  There's - - I mean the issue I can agree

12   to amend that would be relevant with this case is the

13   information in regards to the DCPS failure to not have an

14   annual IEP and amending the days to be 1-26-06 instead of

15   the 5-26-05 and even if, even - -

16      MS. TILLERY:  That's what I just - - go ahead.

17      MS. PUCKETT:  And even when it's amended, it starts

18   essentially, you don't file a new complaint but it starts

19   over again so it's really no different.  So I have no

20   problem with the amendment of the language for that, for

21   that issue that 1-26-06 IEP because it's going to

22   essentially start over again anyway and the school wants to

23   do a resolution meeting which is going to be required

24   anyway.

47

1    MS. TILLERY:  So if an amendment is done, I didn't

2  think that a resolution meeting would be required to be - -

3    HEARING OFFICER:  You have to start over.

4    MS. PUCKETT:  It starts over.

5    MS. TILLERY:  From the beginning?

6    HEARING OFFICER:  Yes.

7    MS. TILLERY:  And how is that going to - - that's

8  still going to put us beyond the statue of limitations if

9  we - -

10    MS. PUCKETT:  Time line starts over.

11    HEARING OFFICER:  You're going to be, you're already

12  to lose the 5-26-05. That's why I'm saying technically you

13  lost that because if you change it you don't have it before

14  your hearing officer and if you wanted to re-file it's to

15  late.

16    MS. TILLERY:  What issue are we at Comp Ed?

17    HEARING OFFICER:  You want to talk about this?  You

18  want to just look at your case again?  And - -

19    MS. TILLERY:  No I'm familiar with - - I know that

20  that's the issue that we have left is a compensatory

21  education in 17 hours.

22    [Pause.]

23    HEARING OFFICER:  But we're not gonna bifurcate this;

24  either it's gonna to be amended and it's all one hearing or

48

1   we could withdraw it or it'd be dismissed, the other

2   claims.  But we can't two hearings.

3        MS. TILLERY:  No, I understand.  If we were to go

4   forward with the one issue and the other issues are not

5   going to be brought.

6        HEARING OFFICER: So what - -

7        MS. TILLERY:  That the ESY and the Comp Ed, I mean,

8   the ESY and the 5-26.

9        HEARING OFFICER:  So I can dismiss those?

10      MS. TILLERY: [Whispering.]

11      HEARING OFFICER:  I'm sorry.

12      MS. TILLERY:  The parent would like to proceed on the

13   issue of co-efficient situation.

14      HEARING OFFICER:  We gotta deal with the first ones

15   first though.

16      MS. TILLERY:  Oh the other-, the 5-, issue one and

17   issue three.  You just said that you were going to - -

18      HEARING OFFICER:  Dismiss them?  They'd be dismiss

19   with prejudice, they could not be brought back.  That means

20   they can never come back to the hearing officer.

21      MS. TILLERY:  But regardless they could never go back

22   because if we re-file they're still going to be, they're

23   going to be, after 5.607.

24      HEARING OFFICER:  That's correct.

1     MS. TILLERY:  So these issues are, are issues that we

2  could not bring regardless.

3     HEARING OFFICER:  Okay, so the IEP, - - so there's no

4  need to amend their complaint, then?

5     MS. TILLERY:  No, the parent would just like to

6  proceed on the one issue of the compensatory education so

7  we - -

8     HEARING OFFICER:  Okay, so we need to take the

9  evidence on the issue of the - - whether the student is

10  entitled to any compensatory education.

11     [Pause.]

12     HEARING OFFICER:  How would you like to proceed on

13  that issue?

14     MS. TILLERY:  Could I have my parent testify?

15     HEARING OFFICER:  Yeah, whoever you want.

16     MS. TILLER:  Okay.

17     HEARING OFFICER:  Okay.  We'll take the testimony in

18  this case on the sole issue remaining.  The hearing officer

19  will dismiss with prejudice the issue in the hearing

20  request that deals with a 5-26-05 IEP.  Because when that

21  issue was filed there was in fact a January 26, '06 IEP.

22  So that issue was incorrectly stated when filed.  And if

23  counsel has asked for leave to amend, even if she had to

1  leave to amend, it would be beyond the two years statute of

2  limitation that the IDEIA provides.

3      The claim for extended school year services for the

4  summer of 2007 falls within the, two thousand, 5-26-05 IEP.

5  So if you were to join the - - if the IEP was not going to

6  be an issue in the case then anything related to it would

7  seem to the hearing officer, at least it's my understanding

8  would not be in this case.

9      So the only issue remaining is, whether the student,

10 for the reasons that will be established, he's entitled to

11 any compensatory education.  The hearing officer is not

12 sure what the basis for that is, but the testimony will

13 provide the reasons for it and the need, pursuant to the

14 requirements of *Reed*.

15     And the parent, therefore, can call their witnesses

16 first.  Your attorney will call witnesses to testify who

17 will support her case.  Each witness would be sworn to give

18 their testimony by being asked questions by Ms. Tillery,

19 sot that would be followed by questions from Ms. Puckett.

20     Once the parent finishes her case, DCPS would put on

21 its case asking questions of its witnesses first, so that

22 would be followed from Ms. Tillery.  And at the conclusion

23 of that testimony, the parties can give, if they'd like

51

1  some of their remarks and that will conclude the

2  evidentiary phase of the hearing.

3      So Ms. Tillery, the case is yours, you would like to

4  proceed with calling your witnesses.

5      MS. TILLERY:  Could you tell us your name for the

6  record?

7      HEARING OFFICER:  Who is your first witness?

8      MS. TILLERY:  I'm sorry, my first witness is Ms.

9  Teresa Lee, here.

10      HEARING OFFICER:  Oh, Ms., pardon me, Teresa Lee,

11  okay, Ms. Lee before giving your testimony, do you swore

12  affirm you're about to give will be the truth?

13      MS. LEE:  Yes.

14

15                  **TESTIMONY OF TERESA LEE**

16

17      HEARING OFFICER:  Okay.  You may proceed, Ms. Tillery.

18      MS. TILLERY:  Could you tell us your name for the

19  record.

20      MS. LEE:  Teresa Lee.

21      MS. TILLERY:  What is your relationship to Antonio

22  Lee?

23      MS. LEE:  I'm his Mom.

1        MS. TILLERY:  What if any disability does Antonio

2   have?

3        MS. LEE:  He has a learning disability.

4        MS. TILLERY:  Can you identify this exhibit, can you

5   identify Exhibit 4 for me?

6        MS. LEE:  Yes.

7        MS. TILLERY:  What is this exhibit?

8        MS. LEE:  Comp Ed plan.

9        MS. TILLERY:  Do you remember this compensatory

10  education plan being developed?

11       MS. LEE:  Yap, yes I do.

12       MS. TILLERY:  Why was he given compensatory education?

13       MS. LEE:  Because he has a learning disability.

14       MS. TILLERY:  Can you be more specific?

15       MS. LEE:  He has issues in reading, and writing, and

16  expression.

17       MS. TILLERY:  What services, if any, was your son

18  given from this plan?

19       MS. LEE:  You mean what did he receive?

20       MS. TILLERY:  Yes.

21       MS. LEE:  Lies, nothing, promises.

22       MS. TILLERY:  Who, if anyone, did you speak with about

23  getting is compensatory education services implemented?

1    MS. LEE:  I spoke with DCPS, I've talked to the Care

2  Center, I've talked to the principals of the school,

3  teachers.

4    MS. TILLERY:  What did they tell you?

5    MS. LEE:  That he's gonna be alright.

6    MS. TILLERY:  Who told you - - who did you

7  specifically speak with?

8    MS. LEE:  In '06, or '05?

9    MS. TILLERY:  After the Comp Ed plan was developed.

10    MS. LEE:  In '06?

11    MS. TILLERY:  '05, and '06.

12    MS. LEE:  In '05, we had a team meeting at Bruce

13  Monroe.  Mr. Turner finally granted us the 17 hours and 15

14  minutes.  None of it was implemented.

15    MS. TILLERY:  Okay.  How is your child's academic

16  progress currently?

17    MS. LEE:  Poor.

18    MS. TILLERY:  How has his behavior affected his - -

19  how has his poor academics affected his behavior?

20    MS. LEE:  Whenever he is faced with a challenge, he

21  acts out.

22    MS. TILLERY:  What education benefits has Antonio been

23  deprived of?

24    MS. LEE:  The education.

1          MS. TILLERY:  Can you be more specific?

2          MS. LEE:  He's been deprived of one-on-one tutoring,

3    he's been deprived of one-on-one sessions in Reading.  He's

4    not that bad in Math but he just haven't been entitled to

5    that one-on-one Reading.

6          MS. TILLERY:  Okay, no further questions.

7          HEARING OFFICER:  Ms. Puckett?

8          MS. PUCKETT:  Ms. Lee, do you recall participating in

9    a IEP meeting on January 26, '06?

10         MS. LEE:  Yes.

11         MS. PUCKETT:  And do you recall there being some

12   discussion about Comp Ed at that meeting in regards to him

13   not getting a Comp Ed from DCPS?

14         MS. LEE:  Repeat that again.

15         MS. PUCKETT:  Do you recall there being a discussion

16   of Comp Ed at that meeting?

17         MS. LEE:  Yes.

18         MS. PUCKETT:  And do you recall that DCPS in their

19   being an indication that you will enroll your student in

20   summer school to implement that Comp Ed plan?

21         MS. LEE:  Not in '06, but in '05.

22         MS. PUCKETT:  I would like parent's counsel to refer

23   to the plans to the meeting notes from the 1-26-06 meeting.

24   That's parent's Document no. 5.  And I'm referring to the

1    last page of the meeting notes at the bottom it indicates,

2    under location of services, Bruce Monroe Elementary School;

3    it says, that with an asterisk, ``the parent will enroll

4    Antonio in summer school to complete Comp Ed plan completed

5    on 5-26-05.''

6         MS. LEE:  I remember, yeah, I'm thinking about,

7    Nativity.

8         MS. PUCKETT:  And did you enroll the student in summer

9    school for the summer of 2006 at Bruce Monroe?

10        MS. LEE:  Yes, ma'am.

11        MS. PUCKETT:  You enrolled the student in summer

12   school?

13        MS. LEE:  Uh-mm.

14        MS. PUCKETT:  Did he go to summer school?

15        MS. LEE:  No, they went under construction.

16        MS. PUCKETT:  Did they go under construction on '05,

17   or '06?

18        MS. LEE:  '05.  '06 CP was out on Bruce Monroe.

19        MS. PUCKETT:  Okay, but do you recall there being a

20   discussion that he can receive the Comp Ed plan at Bruce

21   Monroe, for the summer '06

22        MS. LEE:  No, I don't recall.

23        MS. PUCKETT:  And, is the student currently in a

24   Special Ed program at Nativity center?

1          MS. LEE:  Supposedly.

2          MS. PUCKETT:  What do you mean, supposedly?

3          MS. LEE:  Well actually the only way he ended up at

4    Nativity is because Nativity received his educational

5    issues on paper.

6          MS. PUCKETT:  Uh-mm.

7          MS. LEE:  His IEP, all of that was brought to them,

8    before, I enrolled him in Nativity.

9          MS. PUCKETT:  Okay.  And now are they implementing the

10   Comp, the IEP for him?

11         MS. LEE:  In the 5th grade, they did.

12         MS. PUCKETT:  Uh-uh.

13         MS. LEE:  I mean in the 45th grade, they did.  But the

14   5th grade, they didn't.

15         MS. PUCKETT:  Fourth grade, he was at Bruce Monroe,

16   correct?

17         MS. LEE:  No, 4th grade, - - He's now entering into the

18   6th grade.

19         MS. PUCKETT:  Okay so 4th grade at Nativity, they

20   implemented his IEP from DCPS?

21         MS. LEE:  Pretty much.

22         MS. PUCKETT:  And did they implement the IEP for this

23   school year?

24         MS. LEE:  No ma'am.

57

1        MS. PUCKETT:  Okay.  And do you know why they are not

2    implementing that IEP?

3        MS. LEE:  Well, after talking with the principal, she

4    went out under maternity leave.

5        MS. PUCKETT:  Uh-mm.

6        MS. LEE:  She was under the impression that the team

7    was gonna still communicate with me, we want to still have

8    our monthly meetings, and that we were gonna still have a

9    progress report on him.  However, when she was gone, none

10   of this was done.  Nothing.

11       MS. PUCKETT:  And you do understand that, Nativity is

12   not a DCPS school?

13       MS. LEE:  Yes ma'am.

14       MS. PUCKETT:  I don't have any additional questions.

15       HEARING OFFICER:  Anything further?

16       MS. TILLERY:  At the 1-26-06 meeting, was the Comp Ed

17   plan brought out?

18       MS. LEE:  Yes.

19       MS. TILLERY:  At this meeting where it says the parent

20   must enroll students to complete compensatory education

21   plan?

22       MS. LEE:  With at '06?

23       MS. TILLERY:  Yes, the 1-26-06 in January.

24       MS. LEE:  At Nativity?

58

1        MS. TILLERY:  Yeah.

2        MS. LEE:  The summer school part.  I can't recall us

3    talking about summer school because Bruce Monroe - - I mean

4    because Nativity doesn't have summer school.

5        MS. TILLERY:  Where you under the impression that the

6    Comp Ed plan that you went, did in '05 was gonna be done?

7        MS. LEE:  Yes.

8        MS. TILLERY:  In the summer of '06?

9        MS. LEE:  Actually, I'm thinking that they would want

10   to follow the plan that was presented to them.

11       MS. TILLERY:  Do you remember if that plan was brought

12   out at, on the table at the 1-26-06 meeting?

13       MS. LEE:  No, very vaguely.

14       MS. TILLERY:  At that meeting do you remember them

15   discussing how many hours of Comp Ed he was supposed to

16   get?

17       MS. LEE:  Yes.

18       MS. TILLERY:  Did they say who will be implementing

19   that Comp Ed plan in summer school?

20       MS. LEE:  Well I had to - - when I enrolled him into

21   summer school in '06, they said he would get an hour of

22   enrichment.  An hour of enrichment.

23       MS. TILLERY:  Can you explain to us what enrichment

24   is?

1      MS. LEE:  An enrichment is to bring out their skills,

2  other than just having fun all day long.  That's their

3  learning time for an hour, and that's what he did receive

4  from Nativity and when he went it's called, it was camp.

5  That was camp, it wasn't summer school, it was camp.  And

6  they had an enrichment program.

7      MS. TILLERY:  Can you tell us, was that a group

8  program or individualized program?

9      MS. LEE:  Until we found out, it was a group.

10      There was no individuals there.

11      MS. TILLERY:  Okay, I have no further questions for

12  her.

13      HEARING OFFICER:  Okay, anything further?  Any other

14  witness?

15      MS. TILLERY:  I'm not going to call Ms. Pinkley at

16  this time.

17      [Pause.]

18      MS. TILLERY:  Can I retract that?  Can I call Ms.

19  Pinkley?

20      MS. PUCKETT:  She hasn't rested, so that's fine.

21      HEARING OFFICER:  Yeah, you maybe - -

22      Ms. Pinkley, do you swear upon the testimony you're

23  about to give will be the truth?

24      MS. PINKLEY:  Yes.

1      HEARING OFFICER:  Okay.

2

3                **TESTIMONY OF DIANE CRUISE PINKLEY**

4

5      MS. TILLERY:  Please state your name for the record.

6      MS. PINKLEY:  Diane Cruise Pinkley.

7      MS. TILLERY:  Where are you currently employed?

8      MS. PINKLEY:  James E. Brown and Associates.

9      MS. TILLERY:  What is your position?

10     MS. PINKLEY:  Educational Advocate.

11     MS. TILLERY:  What is your educational background?

12     MS. PINKLEY:  I have 15-plus years in the field of

13  education.  I have a Masters Degree in Education, and I

14  have 18-plus hours towards a Special Education with

15  children working with behavioral and emotional

16  disabilities.

17     MS. TILLERY:  What are your duties?

18     MS. PINKLEY:  My duties are to attend IEP meetings of

19  the parent; correspond as a liaison with the school and

20  parent; review client's files; schedule resolution

21  meetings.

22     MS. TILLERY:  Did you review the file for Anthony Lee?

23     MS. PINKLEY:  Yes I did.

1      MS. TILLERY:  Can you look at Exhibit 4 for me,

2  please.

3      MS. PINKLEY:  Yes.

4      MS. TILLERY:  Can you identify this for me?

5      MS. PINKLEY:  That is the Compensatory Education plan.

6      MS. TILLERY:  Is this one of the documents you

7  reviewed?

8      MS. PINKLEY:  Yes I do.

9      MS. TILLERY:  What if any info did you gather from

10  this document?

11      MS. PINKLEY:  Information that I've gathered from this

12  document was that Antonio was awarded 17 hours and 15

13  minutes of Comp Ed time for reading and written expressions

14  services that he missed in May of '05.

15      MS. TILLERY:  What if any opportunity did you have to

16  observe Antonio?

17      MS. PINKLEY:  Yes, I had an opportunity to observe

18  Antonio at Nativity School.

19      MS. TILLERY:  Could you please describe what you

20  observed?

21      MS. PINKLEY:  I observed a Map lesson, in

22  participating in a map lesson.  He appeared to be involved.

23  He participated.  I had an opportunity at a short break to

24  speak with his teacher, Ms. Williams.  She indicated to me

1    that he had difficulty with reading and writing.  I asked

2    what was his overall average level, and she said that he

3    falls somewhere between a low average or below average as

4    far as her entire class was concerned.

5         She advised me through our discussion to speak with

6    Ms. Whampley the Title One resource teacher at Nativity,

7    and I had an opportunity to speak to her as well.

8         MS. TILLERY:  What she tell you?

9         MS. PINKLEY:  Mrs. Whampley shared with me that

10   Antonio comes to her a couple of times a week for maybe 45

11   minutes.  She also stated that he reads at somewhere at a

12   First to a Second grade reading level.  She stated that he

13   had difficulty with the coding words.  And she also stated

14   that he needed intense one-on-one time with the special

15   education teacher.

16        MS. TILLERY:  Okay, thank you.  No further question.

17        HEARING OFFICER:  Ms. Puckett?

18        MS. PUCKETT:  Yes, Ms. Pinkley, you indicated that you

19   spoke with Ms. Whampley.  She's not a Special Ed teacher,

20   correct?

21        MS. PINKLEY:  No she isn't.

22        MS. PUCKETT:  And did you find out if the student is

23   currently seeing a Special Ed teacher at Nativity?

24        MS. PINKLEY:  Yes I did.

1      MS. PUCKETT:  Is he receiving any type of Special Ed

2  services at Nativity?

3      MS. PINKLEY:  No he's not.

4      MS. PUCKETT:  And how long have you known the student?

5      MS. PINKLEY:  I know of him through way of reading his

6  file and conducting an observation for approximately an

7  hour.

8      MS. PUCKETT:  And when was that observation?

9      MS. PINKLEY:  That observation was done on May 14th.

10     MS. PUCKETT:  And prior to that, did you know the

11 student?

12     MS. TILLERY:  Objection.  Relevance.

13     What is relevance to that regarding compensatory

14 education?

15     MS. PUCKETT:  She's the student's advocate.  I'm

16 trying to figure out when she got involved with the case.

17 We have an observation that wasn't out.

18     HEARING OFFICER:  Any objects?  I mean - -

19     MS. PUCKETT:  I don't understand how it's irrelevant.

20     HEARING OFFICER:  Any objections I mean your offering

21 us as a person who has knowledge of the need for the

22 services.

23     MS. TILLERY:  That's fine, but the issue is the need

24 for the compensatory education plan.

1        MS. PUCKETT:  The Comp Ed plan goes back to 2005.  I'm

2   asking, I think it's very relevant the time period, she's

3   been working with the student.

4        HEARING OFFICER:  Wouldn't that be relevant with

5   respect to his needs?

6        MS. TILLERY:  She's reviewed the documents though.  So

7   - -

8        HEARING OFFICER:  Okay so she, we'll allow that

9   question because it certainly would appear that because the

10  person whose trying to establish his needs, we'd like to

11  know your first hand knowledge for those needs.

12       MS. PINKLEY:  My personal knowledge is - -

13       HEARING OFFICER:  No, if you could just answer her

14  question.

15       MS. PUCKETT:  Did you know the student prior to May

16  14th, '07?

17       MS. PINKLEY:  Yes I did.

18       MS. PUCKETT:  And what time frame did you first become

19  familiar with the student?

20       MS. PINKLEY:  In, beginning of May.

21       MS. PUCKETT:  Beginning of May?  I have no additional

22  questions.

23       MR. HEARING OFFICER:  May of what year?

24       MS. PUCKETT:  May what?

1       MS. PINKLEY:  May '07.

2       MS. PUCKETT:  I have no additional questions.

3       HEARING OFFICER:  Ms. - -

4       MS. TILLERY:  The only thing I'm waiting here is do my

5   closing.

6       HEARING OFFICER:  Are you done?

7       MS. TILLERY:  I don't have additional questions.

8       HEARING OFFICER:  Okay.

9       Ms. Puckett?

10      MS. PUCKETT:  Are you resting?

11      MS. TILLERY:  I - - once I do my closing.  So my - -

12      HEARING OFFICER:  So your - -

13      MS. TILLERY: - - my cases.

14      HEARING OFFICER:  You're resting your case at this

15  point?

16      MS. TILLERY:  Umm - -

17      HEARING OFFICER:  You do the closing after DCPS's

18  case.

19      MS. TILLERY:  I just want to add that in a claim of

20  the compensatory education - -

21      MS. PUCKETT:  I'm sorry, I don't know if she's doing

22  closing but I'm trying find out if there's gonna be

23  additional witnesses called, if not, then the case needs to

24  be rested.

1          MS. TILLERY:  There's no additional witnesses that I'm

2    going to be calling at this time.

3          HEARING OFFICER:  Okay, you rest?

4          MS. TILLERY:  Then I rest my case from him, I reserve

5    my closing.

6          HEARING OFFICER:  Okay.

7          MS. PUCKETT:  And DCPS is asking for a motion for

8    directive finding.  For two reasons: number one, there has

9    not been any evidence to establish any type of a denial of

10   fate in this case.  You do have a Comp Ed plan that came

11   out of an HOD prior to May 26th of '05 for a denial of fate.

12   There has not been an establishment of how a failure to

13   implement the Comp Ed plan has caused an additional denial

14   of fate.

15         The hearing officer cannot make a finding on a denial

16   of fate from a previous denial of fate.  There has to be an

17   establishment of how this procedural violation has harmed

18   the student.  There hasn't been any evidence to show that.

19         And actually, we all know that the student is

20   currently not receiving any Special Ed services. The

21   student is parentally placed, and a private school which

22   DCPS is not the LEA for.  We're not responsible for the

23   school and we're functioning right now as the SEA for this

24   child.

1      The parent indicated that Nativity was providing

2   services, providing some Special Ed services in 2005.  But

3   they're currently not providing Special Ed services this

4   year based on the IEP that DCPS did.

5      DCPS has nothing to do with that.  We can't force

6   Nativity to provide the student with Special Ed services.

7   We offer Special Ed services at Bruce Monroe.  The two IEPs

8   that you have in the record are for services at Bruce

9   Monroe.  There has not been an establishment of a denial of

10  fate.  Parents, counsel, witness, Ms. Pinkley, has gotten

11  involved with this case after the complaint was filed.

12  Then I believe she said that at the believe that the

13  beginning of May, she got involved with this case; she did

14  a classroom observation and reviewed some records.

15     There has not been any testimony as to what the loss

16  has been to this child as far as giving out the hearing

17  officer something to make a remedy on.  As we know, the

18  *Reed* case some type of substantial evidence as to what is

19  required.  You don't have any testimony in regards to the

20  amount of hours that are required, the loss that actually

21  took place due to a '05, 17 hours of specialized

22  instruction; you don't have anything as to what type of

23  specific programs the student would need.  And what level

1  the student should be at, should have been at after

2  receiving 17 hours of specialized instruction.

3      I don't believe that parent has met their burden in

4  his case, and DCPS is asking for a directive finding

5  dismissing this client.

6      HEARING OFFICER:  You may sit down.

7      Yes Ms. Tillery.

8      MS. TILLERY:  I don't understand how DCPS counsel can

9  ask for a motion for directive finding when they didn't

10 even put on a case.  They didn't present any evidence; they

11 didn't have a disclosure; didn't do a response.  And we had

12 no - - we're - - the parent is prejudiced as far as being

13 surprised evidence, or being unaware of what DCPS is going

14 to bring at this time.

15     Further, the issue of the compensatory education plan.

16 The fact that the plan exists, the prongs of *Reed* has

17 already been established if the plan is here.  We're not

18 asking for you to develop a Comp Ed plan.  We're asking for

19 one to be implemented.

20     And also this is the form for parent if the plan is

21 not being implemented.  DCPS has offered no evidence to

22 prove that this Comp Ed plan has been implemented.  The

23 child's old services has already been established from a

24 previous HOD.  We're not asking you to look at the

69

1   deficiencies and match all the prongs because that we're

2   saying that was already been established here.  If that was

3   not established, this compensatory education plan would not

4   be in existence, if the prongs of *Reed* had not already been

5   met.  We're asking that you implement, that this plan be

6   implemented through DCPS independently funding the 17 hours

7   and 15 minute.

8       We're not asking that at this time that you do the

9   qualitative hour by hour.  It's already said what is

10  necessary here.  Seventeen hours and 15 minutes.  It's not

11  a matter of us saying, He missed services, he didn't - - he

12  missed service, and so for those services that we're

13  talking about he missed today, we're saying a Comp Ed plan

14  is already here, DCPS to not implement this service.

15      So, the denial of fate has already been established.

16  If this plan is here, then, *Reed* has already been met at

17  this point.  This is not a point of going back and going

18  thru *Reed* again because then that would be going back to

19  the old HOD.

20      This Comp Ed plan exists because of a denial of fate

21  was found for missed services in the past, and therefore

22  *Reed* has already been met, the prongs of *Reed* has already

23  been met at this time.

24      MS. PUCKETT:  Mr. Woods, DCPS is not required to call

1    A witness; not required to put on a document.  I'm not

2  required to do anything in regards to disclosure.  The

3  parent has the burden of proof.  And I'm not making any

4  defense arguments or anything that they would have to be

5  put on notice for.

6    What I'm asking for is a motion for directive finding,

7  which is something, motion that the non-moving party could

8  make if the parent has not presented evidence to move the

9  case forward to the non-moving party.  They have not

10  presented evidence.  Parent's counsel just said, that there

11  has already been a denial of fate made, and there's already

12  a Comp Ed plan from a previous denial of fate.  Exactly,

13  there had already been a denial of fate.

14    This hearing officer in front of us has authority to

15  make findings in regards to denials of fate.  Not an old

16  denial of fate.  What we have in front of us is a

17  procedural violation where they need to establish how

18  failure to implement something created a new denial of fate

19  to this hearing officer.  There has not been any evidence

20  here presented today that can give you what you need to

21  make a ruling of a new denial of fate.

22    Especially, in light of the fact that, the student is

23  not currently receiving any specialized services.  DCPS is

24  not funding the private school; is not one of our schools.

1    The parent testified that the student was receiving Special

2    Ed from Nativity in '05, but has not been receiving it this

3    year.  In light of all of that, there has not been any - -

4    and especially with the notes in which the parent

5    participated in saying that we would implement the Comp Ed

6    plan.

7          The parent enrolls the student in summer school at

8    Bruce Monroe in summer of 2006.  There has not been

9    anything to establish a denial of fate in this case.  There

10   is nothing for you to make a new denial of fate finding and

11   I don't believe that you can go back to a 2005 HOD and say

12   because there was a, a there was a, in which the HOD at

13   this point is past two years old, so there can't be a alleg

14   - - there's no allegation as to failure to implement a HOD,

15   because that HOD was way before this case was even filed

16   then.

17         You can't just go back and say, okay Mr. So and so

18   made a denial of fate ruling and so I'm gonna automatically

19   say there's a denial of fate.  There has to be a new denial

20   of fate.  Hearing officers can't make a new ruling of a

21   denial of fate based on a previous denial of fate.

22         MS. TILLERY:  Do you suggest counsel has not provided

23   any evidence, yet, to prove - -

24         MS. PUCKETT:  I'm not required to.

1      MS. TILLERY:  You are not required to provide any

2   evidence of the compensatory education plan once it is

3   implemented?

4      MS. PUCKETT:  I'm not required to, Mr. Woods.  I'm

5   asking for a motion for directive finding.

6      MS. TILLERY:  What is parent's recourse if she says,

7   Well, there's one done.  She hasn't presented no evidence

8   to the contrary.  Parent testified that Comp Ed plan has

9   not been implemented.  The Comp Ed plan is here and it has

10   not been implemented.

11      MS. PUCKETT:  It's a procedural violation that

12   requires substantive evidence to move it to a substantive

13   violation.

14      MS. TILLERY:  A procedural violation only requires, it

15   only has to cause of deprivation of educational benefit.

16      MS. PUCKETT:  Where is it at?

17      MS. TILLERY:  Where is that found?

18      MS. PUCKETT:  Where is the cause of deprivation in

19   educational benefit.  It has not been presented.  Where is

20   any of the three prongs that the law requires that there is

21   a procedural violation.  They had not presented that.

22   Where is any evidence to go to one of those three prongs.

23   It has not been presented here today.

1      MS. TILLERY:  The parent and my advocate - - parent

2  stated that his progress is poor, and that he is below

3  level.  Stating what the advocate stated that she spoke

4  with his first hand with his teacher that the progress was,

5  that he is on a below level and first, I believe she said

6  First grade level.  And the fact is if he didn't need the

7  services then this plan wouldn't exist.  If that was the

8  case then this plan would not be here.  If he didn't need -

9  -

10     MS. PUCKETT:  And there is no evidence that these

11 calls are from DCPS, especially when you have a parent

12 testifying that the private school provided some Special Ed

13 services in 4th grade, but didn't provided any in 5th grade.

14 The advocate just met the student.  And the advocate even

15 said that the teacher said he needs a Special Ed teacher,

16 but the student is not getting what the student needs at

17 Nativity.

18     We offered this student a placement where the student

19 can have a Special Ed teacher.  It says five hours a week

20 with a Special Ed teacher to meet certain goals.  It's not

21 our fault that Nativity is not implementing this IEP, Mr.

22 Woods.  We can't require Nativity to implement this

23 student's IEP.


74

1    MS. TILLERY:  The issue of the IEP we are talking

2  about Comp Ed, she's talking about implementing the IEP.

3  The Comp Ed has not been given.  That's - -

4    MS. PUCKETT:  There hasn't been a relationship

5  established that - -

6    MS. TILLERY:  Not to mention - - not to mention - -

7    MS. PUCKETT: - - the student struggling because he

8  didn't get seven hours of Comp - - 17 hours of services

9  Comp Ed services, versus how much of it is DCPS not

10  providing 17 hours of Comp Ed services, versus Nativity not

11  providing a student with an appropriate education, which is

12  not our fault because we didn't place him there, and this

13  is a parentally placed child.

14    MS. TILLERY:  Nevertheless, the Care center is

15  responsible for the monitoring.  If that was the case they

16  would not have developed a IEP for him.  But the goals - -

17    MS. PUCKETT:  Care center is not responsible for

18  monitoring their student - - care center is respon - -

19    MS. TILLERY:  Yes, the SEA is responsible for

20  monitoring.

21    MS. PUCKETT:  Let me just say this Mr. Woods, we need

22  to go back and get the law.  Because the SEA is responsible

23  for providing the student with education opportunity and a

1    IEP.  What's what Care center did.  They provided the

2    student with a IEP, and a placement at Bruce Monroe.

3        We are not responsible for monitoring private schools

4    when we are not the LEA.  You have over 2,000 students in

5    DCPS right now that are placed at private schools by DCPS

6    and we are funding them, and they have placement monitors.

7    Those placement monitors, then considered the LEA for those

8    children because we're placing them there, and funding them

9    there.

10        So we are in a LEA capacity, so we're responsible if

11   that private school does not provide that student with

12   services.  Yes we are.  This is not the same situation.

13   This is why the student is at the Care center.  We're not

14   funding Nativity.  So we can't tell Nativity what they have

15   to do.  We're responsible for placing children at

16   appropriate placements that they can have their needs met.

17        So we're not funding Nativity.  We are not responsible

18   for Nativity not providing the student with Special Ed

19   services.  Had we been funding Nativity, then yes, the

20   person in the office of Special ED will be responsible for

21   making sure that Nativity provides him with five hours of

22   specialized instruction.  And if they didn't, they were

23   supposed to pull him out of there.  This is not the

24   situation.

1          MS. TILLERY:   The issue is not about the five hours of

2     Special Ed instruction.   As we stated, we are talking about

3     the compensatory education plan.   And DCPS counsel has

4     stated that the parent was supposed to enroll the child in

5     summer school.   Summer school is not Comp Ed.   Comp Ed is

6     services, for missed services in the past, number one.

7     Number two, it's supposed to be individualized.

8          Parent stated that, the child only had one hour of

9     enrichment, and that was with the group.   That's not

10    compensatory education.   If that was the case that it said

11    that it was supposed to be implemented from summer school

12    even if you were to say that.   That was not what the child

13    got.   The child did not get Comp Ed, the child got, one

14    hour of enrichment for summer school, which is not

15    individualized, and not grouped.   And not followed, in the

16    compensatory education plan was not followed, if it was in

17    a group.

18          MS. PUCKETT:   What's Comp Ed, Mr. Woods?   I mean, we

19    all - - Comp Ed is services, or miss-services.   It doesn't

20    say what type of service.

21          MS. TILLERY:   Comp Ed is not one size fits all.

22          MS. PUCKETT:   I'm not sure if parent's counsel under -

23    -

24          MS. TILLERY:   Comp Ed is not one size fits all.

                                    77

1    MS. PUCKETT:  I'm not sure if parent's counsel

2  understands the relationships as to private students,

3  students who attend private school that are parentally

4  placed that we're not funding, versus students who are

5  placed by DCPS or they come to a hearing and get a

6  placement, and we're funding it, therefore we are the LEA

7  for that child.  We are not the LEA for this student for

8  IDEIA purposes.

9    We are responsible for coming every year which Care

10  center does, and create in a plan.  If the private school

11  chooses to implement it, then that's fine.  If the private

12  school chooses not to implement it DCPS, not being the LEA,

13  cannot do anything about that.  But we did offer this

14  student a placement at Bruce Monroe.

15    There has been no establishment and no calls or link

16  to DCPS not providing 17 hours, and this student not being

17  able to function right now, especially when there's other

18  intervening factors, especially considering that this

19  student has been found eligible as a Learning Disabled

20  student.  But we have on the record that he is currently

21  not receiving any specialized instruction to address any of

22  his IEP goals.

23    And that's not upon DCPS because we issue a IEP for

24  him to receive these services at Bruce Monroe.  We don't

1    have any control over Nativity not providing the student

2    with specialized services.  So, if this was a case where we

3    had all these Comp Ed that we needed to provide, and there

4    was no other intervening factors that could relate to the

5    student being not making academic progress right now, then

6    it's different.

7        But you don't even have the child in a Special Ed

8    program right now.  The student is not even - - the IEP is

9    not being implemented by the private school, and there has

10   been testimony of that.  So how do you draw the conclusion

11   that he's on the First or Second grade level right now, and

12   that's because of DCPS's failure to implement 17 hours from

13   '05, five from two years ago?  You can't.

14       HEARING OFFICER:  Let me make sure that the parent is

15   aware of where we are in this case.  Because this motion is

16   asking me, before DCPS put on its case to decide that the

17   parent has lost their case, without DCPS putting on a case.

18       A motion for directed decision comes after the party

19   who has the responsibility of producing evidence to prove

20   their claim.  And the person who goes after that can say,

21   well they haven't presented you with the evidence to prove

22   their claim.  So that party says, we don't need to go

23   forward with our case, because you have no case that we

1  need to defend against.  So that's the first thing, that's

2  the status of a case.

3       If the hearing officer was to regret their motion the

4  case would be over.  So I wanted you to understand that

5  that's what a motion for directed decision is.  That

6  happens in basically every case.  And even if it takes you

7  to go before a court, once the party finished their case,

8  whoever goes first, the plaintiff typically, the other side

9  will ask for a directive finding.  Someone I was trying to

10  - -

11       MS. PUCKETT:  I have - -

12       HEARING OFFICER:  Okay.

13       MS. PUCKETT:  Can we go off the record for one second,

14  I think there's my 11 o'clock - - Ms. Covington is not

15  longer with their office so, Mr. West will just go on the

16  record to say that they're asking for a continuance for all

17  of her cases.

18       HEARING OFFICER:  Okay, why don't we - -

19       MS. PUCKETT:  Let me see if this is what she - - let

20  me just find out.

21       HEARING OFFICER:  I forgot that there - - oh, we do

22  have a 11:00?

23       MS. TILLERY:  No, I don't.

24       HEARING OFFICER:  Okay.

1        MS. TILLERY:  But I have a 1:00.

2        HEARING OFFICER:  Pardon me.

3        MS. TILLERY:  I have a 1:00.

4        HEARING OFFICER:  Oh I - -

5        MS. PUCKETT:  She says - - okay Quinn is gonna go in

6    and do it.

7        HEARING OFFICER:  Okay.

8        MS. PUCKETT:  Okay.

9        HEARING OFFICER:  So that was the first thing I just

10   wanted you to aware of.  No, we're wrapping it up, - -

11       MS. TILLERY:  I know.

12       HEARING OFFICER: - - but we wanted you to be aware of

13   that.  The other thing before I make this decision, I just

14   wanted to be clear, Comp Ed is not a right, it's a remedy,

15   it's a remedy that the hearing officer can give.  And

16   that's the way the court has set it up.  You don't get it

17   as a matter of right, it's of that - - once that the

18   hearing officer has made the determination, that a student

19   has been deprived of a free and appropriate public

20   education, one of the remedies, in other words, what you

21   can do, Hearing Officer, to re-mediate that situation is

22   offer compensatory education.

23       So the context that it has to be presented today.  How

24   do I remedy a situation.  So, what the concern is, well I

81

1    don't know what the situation is, that what was presented

2    was, here is a Comp Ed pointed in this record.   Somebody

3    else made the determination as to why it was needed.

4    That's enough for you, Hearing Officer, to say that it's

5    needed.

6         That's basically the posture of your case.   Do I have

7    evidence to make an independent judgment as to A) that the

8    student has been denied of free and appropriate public

9    education, and then B) the retest, has it been met, and

10   that would be, Well what services did the student miss?   I

11   have no idea.   When did he miss those services?   I have no

12   idea, whatsoever.

13        I don't know what the services are; when he missed it.

14   And then based on that, where would the student be had he

15   received those services?   And then, based on what he is

16   receiving, which really puts a big hole in this case

17   because, apparently receiving Nothing.   How do you remedy

18   that situation when the child has been down-taken.   I'd

19   suspect on his special education.

20        But that's how you fashion a Comp Ed relief.   That's

21   how the hearing officer would fashion a Comp Ed relief.

22   I'm not sure what to do because I tend to think that

23   counsel didn't completely understand.   I tried to explain

24   the burden, but I don't think it was completely understood.

1    And I always feel a little concern when I place

2  mothers, parents, in situations like this, where they

3  didn't understand and they expect someone else to

4  understand, and, here we are now that I'm explaining it,

5  this is what needs to be done, and, I think we can all sit

6  here and say, well we could listen to this tape a hundred

7  times and many of those things that I need are not on this

8  record.

9    I'm just wondering is there some other way that,

10  before deciding this motion that this case could be

11  resolved.  At this point the issue is simply in you don't

12  have to talk I already talked to DCPS because he needs

13  Special Ed services.  Number one, how do you anticipate

14  giving him those services and he is not in special

15  education program.  So that's number one, how do you want

16  that done.  Because obviously, Nativity is not gonna do it,

17  right?

18    MS. TILLERY:  Uh-mm.

19    HEARING OFFICER:  They're not gonna do it.  They're

20  not even providing him with special education.  So,

21  realistically, how do you want it done.  And then,

22  secondly, where do you want it done.  If they're not gonna

23  do it, why would you like to see that done.

1       I mean that, you know, when you get in situations like

2    this if it's the way you have good relationship with your

3    opposing county, you just talk to them and try to see in

4    what you can work out.

5       I'm not sure if you completely understood what the

6    obligation was and maybe I'm wrong, maybe there is some law

7    that says I don't have to make this finding, that I could

8    do it your way.  Unless some cited to that legal authority,

9    you know, it's not looking good here.

10       But on the other hand, should the mother suffer?  I

11   don't know if there's some middle ground somewhere that I

12   could reserve on this motion for just a few minutes for the

13   parties to talk.

14       MS. PUCKETT:  Talk about what?

15       HEARING OFFICER:  Can the mother get something.

16       MS. TILLERY:  I mean - -

17       HEARING OFFICER:  I mean - -

18       MS. PUCKETT:  We're talking about a Comp Ed plan from

19   2005 Mr. Woods.  What are we supposed to do about a Comp Ed

20   plan for 2005?  The parent brought the claim.  The parent

21   did not meet their burden.  And there's, I mean, the other

22   issues which could have possibly resolve some other stuff -

23   -

24       MS. TILLERY:  Or can't resolve.

1      MS. PUCKETT: - - that are, have not been, are not in

2   the record today.

3      HEARING OFFICER:  You were the one that wanted to just

4   sit here and just - - I mean this - -

5      MS. TILLERY:  Well counsel, I'm not asking for that.

6      HEARING OFFICER:  See I don't think she - -

7      MS. TILLERY:  I'm not asking for back comp.  I'm not

8   asking for that and I don't - -

9      HEARING OFFICER:  She may not understand what's going

10  on.

11     MS. PUCKETT:  I understand.  Mr. Woods, DCPS should

12  not to sit and resolve stuff because the parent's attorney

13  does not understand something.  Do you unders - -

14     MS. TILLERY:  I know he's asking you to think and act

15  on your heart, and not on your rules and regulations.

16     MS. PUCKETT:  I only know DCPS is not interested in

17  settling anything at this point Mr. Woods.  Especially not

18  on Comp Ed issue.  DCPS is not resolving this matter.

19     MS. TILLERY:  We are looking to have you ask about

20  where and what we want done, and what we want done is, the

21  17 hours funded independently.  That's our asking, to fund.

22  And the parent will have - - the parent will have these

23  services implemented.  We can talk to compensatory

1   educational services places such as Stepping Stones, and

2   have these 17 hours implemented as funded by DCPS.

3       MS. PUCKETT:  Mr. Woods, you would not be given them

4   anything that they don't already have.  There's nothing

5   here showing that they've requested, this, you know, when

6   we said the student can get in a summer school, you don't

7   have anything saying, we don't want the summer school.  Can

8   we have independent hours, we're talking about 17 hours of

9   services.

10      DCPS is not, is not gonna be, not gonna, and first of

11  all, we're dealing prevailing party status right now

12  anyway.  If we're taking the denial of fate off the record,

13  if we're taking the denial of fate out of here right now,

14  and we're taking prevailing party, where they give

15  attorney's fees, then yes, I'll be willing to sit here and

16  discuss this with the mother.

17      MS. TILLERY:  I wouldn't want you to.

18      MS. PUCKETT:  But I'll be willing to try to resolve

19  something off the record Mr. Woods, if the parent's counsel

20  was not seeking attorney's fees.  And not exceeding a

21  prevailing party status.

22      But the reality is they've already presented their

23  case.  And DCPS has asked for a motion for a directive

24  finding.  It's not our fault that if the parent's counsel

1    did not understand the claims or the arguments they were

2    being made.  I'm sorry, it's not our fault.  And I hope the

3    mother understand that it's not my fault that the parent's

4    attorney does not understand the claims.

5        MS. TILLERY:  That's not the case, the parent's

6    attorney is very well aware of the claims and I, you know,

7    am offended by the fact that you're sitting here on stating

8    that I don't know what I'm doing.  I don't unders - -

9        MS. PUCKETT:  I'm sorry, I didn't say it, the hearing

10   officer said it.  I'm just saying what the hearing officer

11   said.

12       MS. TILLERY:  No, I'm addressing you, and I'm stating

13   that, I do know what's - -

14       MS. PUCKETT:  Well don't address me, the hearing

15   officer - -

16       MS. TILLERY:  I do know what's - - I do know what - -

17       MS. PUCKETT:  - - indicated that he does not believe

18   that the parent's attorney - -

19       MS. TILLERY:  I do understand - -

20       MS. PUCKETT:  - - understood her claims.  I did not

21   make that statement.

22       MS. TILLERY:  Well, I do understand the claim.

23       MS PUCKETT:  I'm referring to what the hearing officer

24   said.

87

1      MS. TILLERY:  I do understand very well with what's

2    going on with my case.  Thank you.

3      And I've stated – –

4      HEARING OFFICER:  Did you understand what she's

5    offering you?

6      MS. TILLERY:  DCPS took – – we're asking for the 17

7    hours funding.  She has offered – – where did she offered?

8    She said she's not willing to do anything.

9      HEARING OFFICER:  She said she – –

10     MS. TILLERY:  She's willing to – –

11     MS. PUCKETT:  I'm not willing to do anything in this

12   venue Mr. Woods.  But I can – –

13     MS. TILLERY:  She's not willing to do anything, she's

14   not willing to – –

15     HEARING OFFICER:  But she said why, she said you have

16   to take off the table – –

17     MS. TILLERY:  The attorney's fees?

18     HEARING OFFICER:  Right, and prevailing party status.

19     MS. TILLERY:  We're not willing to not have attorney's

20   fees.  I mean, we worked just like Ms. – –

21     MS. LEE:  Well Ms., I don't understand that part.

22     MS. TILLERY:  – – Like Ms. Puckett works – –

23     MS. LEE:  What do you mean, no attorney fees.

24     HEARING OFFICER:  What's – –

1      MS. TILLERY: [Whispering to her client.]

2      MS. LEE:  And they would do what in return of that?

3   They would still up-grant me compensation, not

4   compensation, I just want him to have Special Ed setting.

5   That' all I want.  I don't want any of their back pay.  I

6   don't want any of that.  I want from this day forward, I

7   want him to be able to go into a DC Pubic School and be

8   granted Special Ed.  That's all I want.

9      MS. PUCKETT:  And see, that's the problem it's not

10  what the complaint is about.

11     MS. LEE:  I want him to be in setting where he could

12  get at least one hour of Special Ed.  I don't want any of

13  this back stuff.  I just want him to be able to learn with

14  a Special Ed teacher.  That's all I, I don't want anything

15  else.  That's all I want.  And that means that you all

16  don't get paid, I don't care.  It ain't about the money,

17  but it's about my son, learning how to read.  This isn't

18  the Sixth grade, or the First grade level.  And I am tired

19  of this, I've been reaching out Care centers and everybody

20  and no one wants to help me.  I'm fed up.

21     MS. TILLERY:  Could I have a moment with my client,

22  please?

1     HEARING OFFICER:  Yes.  Because it does seem that

2  we're really getting at to what her concerns are and that's

3  what the hearing officer was really trying to get at.

4     MS. PUCKETT:  Mr. Woods, I would just ask that

5  parent's counsel explains to the mother that when we are in

6  a private school setting, it's completely different 'cause

7  I'm not sure - -

8     MS. LEE:  He's going to - - I took him out of there

9  because - -

10     MS. PUCKETT:  Let me just say this, because I think

11  the mother is con - - it doesn't understand the

12  relationship between Nativity and DCPS.  I think the mother

13  might be confused as to these services that DCPS is

14  supposed to provide to the student and she probably doesn't

15  fully understand that.

16     When the student is parentally placed in private

17  school, the DCPS does not have to provide specialized

18  instruction.

19     MS. LEE:  I understand that, but if you can recall my

20  statement, the only reason that I placed him into Nativity

21  because I went to them with this in hand before I signed on

22  the dotted line.

1      MS. PUCKETT:  And see, that's the problem, Nativity is

2  their own L.E., they're their own school.  And DCPS can't

3  do anything about that.

4      MS. LEE:  I wouldn't have put him in there, if I was

5  under the impression that he wasn't going to receive

6  Special Ed.  They even changed their criteria of his Fourth

7  grade class to meet his need.  So I'm under the impression

8  that they're meeting his need.  They're gonna do what this

9  thing says, to the best of their ability.  This is what the

10  principal and the team of Nativity told me.  So, yes, I've

11  been misled all the way around the board.

12      MS. PUCKETT:  And the parent can't bring their

13  complaint against Nativity.

14      HEARING OFFICER:  But I understand.  That's what I

15  think what we were getting at.  Is there's other issues on

16  the lying, and now we see that there were, I mean, she,

17  this is were their real concern is, I mean, she really – –

18  it may be just being – –

19      MS. PUCKETT:  But there are issues with the private

20  school.

21      HEARING OFFICER:  No, no, are there any explanation.

22  What could she do – –

23      MS. PUCKETT:  Yeah I understand.

```
 1          HEARING OFFICER:  All she needs really is an

 2     explanation.

 3          MS. PUCKETT:  The parent can withdraw her student from

 4     a private school.

 5          MS. LEE:  I've done that.  I'm doing that now.

 6          HEARING OFFICER:  Let me get off the record for that

 7     please but so they could - -

 8          MS. PUCKETT:  Uh-uh.

 9          HEARING OFFICER:  But that's all, I think she really -

10     -

11          MS. PUCKETT:  I understand that but I'm just saying

12     regards to we're down to one issue right now.  DCPS,

13     there's nothing to resolve in regards to that one issue.

14     There are other issues with this child that once this case

15     is concluded, yes ma'am, Ms. Tillery can try to figure out

16     how this whole process can be furthered along as fast as it

17     can be done.

18          But we only have one issue on the table right now

19     that's going forward.  The other issues are not on the

20     table, so we can discuss anything further that's about to

21     come in the future after this one issue has been resolved

22     here in front of the hearing officer.

23          HEARING OFFICER:  Do you still want a minute with your

24     - -
```

92

1      MS. TILLERY:  Yes.

2      HEARING OFFICER:  Okay.

3      And would you mind, you know, talking? You know

4  talking. I mean, I understand your position.

5      MS. PUCKETT:  Talking to who?

6      HEARING OFFICER:  If the mother wants her questions

7  answered.

8      MS. PUCKETT:  I mean, if the mother wants questions

9  answered about what's going on and understanding in how the

10  DCPS process work, if her counsel doesn't have a problem

11  with me having a discussion with the parent, - -

12      HEARING OFFICER:  With her present, of course, yeah.

13      MS. PUCKETT:  With all three of us, afterwards, so I

14  can explain the system to you because you fully don't

15  understand how the Care center and the private school

16  relationship is, but I have no problem with doing that.

17  And I can help un-search what she can do next to deal with

18  the problem that she's having with Nativity.  And we can

19  discuss that afterwards, I have no problem with that, Mr.

20  Woods.  And I can put the person in contact who she needs

21  to be in contact with.

22      HEARING OFFICER:  Can we you a chance then, if you

23  want that opportunity you could - -

24      MS. TILLERY:  Okay, I need to talk to her first.

1          HEARING OFFICER:  By yourself?

2          MS. TILLERY:  Yeah.

3          HEARING OFFICER:  Yeah, okay.

4

5          [Off the record 11:47 a.m. to 12:11 p.m.]

6

7          HEARING OFFICER:  Okay, back on the hearing record

8    here and now we'll reset so that the parties can talk and

9    any new thoughts here Ms. Tillery?

10         MS. TILLERY:  Everything remains the same as far as

11   our request.

12         HEARING OFFICER:  Okay.

13         MS. TILLERY:  She wants the 17 hours independently of

14   comp Ed that was missed.

15         HEARING OFFICER:  Okay anything differently for DCPS?

16         MS. PUCKETT:  Yes.

17         HEARING OFFICER:  Motion for direct decision is

18   granted.  Hearing officer tried everything he humanly

19   possibly could to get this matter dealt with, without

20   having to make that decision.  The burden was on the parent

21   to establish that since their claim is based on an existing

22   request for Comp Ed that there is now a violation under the

23   IDEA for failure to implement that plan that resulted in a

24   denial of fate.  There's no evidence presented to this

94

1   hearing officer as required under the Reed standard.    I

2   think more troubling is that the hearing officer pretty

3   much said that before he had to make this decision and

4   hopes that we could do something else for this parent.    I'm

5   at a loss for why we're not doing anything for this parent.

6   I really am at a complete loss why we would risk this case

7   for and not deal with the mother and the mother's made it

8   clear what her underlining issue's are.    I would just ask

9   for someone to at least try to help the mother today I

10   can't order it, you know because I have to take the case as

11   presented to me.    And I'm just at a loss for why we didn't

12   address this mother's concerns, she pretty much said this

13   wasn't her concern.    Is there anything - - could you at

14   least talk to the mother?

15       MS. PUCKETT:    Talk to what?

16       HEARING OFFICER:    Talk to the mother.    I mean the case

17   is over now.

18       MS. PUCKETT:    I mean I could talk to parent's counsel.

19   I don't know how appropriate it is  - -

20       HEARING OFFICER:    I mean - -

21       MS. PUCKETT:    for me to talk to mom directly but I can

22   talk to parent's counsel in regards to information that I

23   have regarding the case as far as what, what, what possibly

24   I mean I don't if any of it is appropriate at this point

1    but I do understand as a parent myself the mother's

2    concerns about not having services at the private school.

3    I do understand that.

4         HEARING OFFICER:  Again you don't have to take it but

5    at least we could try to get the mother's needs addressed

6    with the appropriate people in the room and that was one of

7    the reasons that I was holding the motion open so that I

8    could be done.  Unfortunately I don't have a case before me

9    so I can't hold it open but apparently are willing to talk

10   to the mother?

11        MS. PUCKETT:  Through her Counsel yeah I mean - -

12        HEARING OFFICER:  I mean with the mother present in

13   the room.

14        Ms. PUCKETT: I mean I'm not because unfortunately my

15   office has a policy that were not supposed to talk to

16   parents like that - -

17        HEARING OFFICER:  Oh I see.

18        MS. PUCKETT:  So I can talk to Ms. Tillery as to what

19   information I have as far as what can probably facilitate

20   the parent's closer to the concern's that she has as far

21   as, I mean like I said DCPS is not the overseer of the

22   private school.  So I don't know how much we will be able

23   to do for the child if the child is not enrolled in a DCPS

24   public school that's the essential problem.  I'm not sure

1   what we, we can't do anything for the private school, we

2   can't do anything.  This is not a related services issue

3   which is we can provide related services at the public

4   school while the student is parentally placed enroll.  Like

5   if we if he had speech and language services or he had OT

6   services or some type of adaptive P.E.  Those related

7   services could be provided like after school or on the

8   weekend or things of that nature. We can provide those but

9   when we are dealing with specialized instruction that's

10  completely different.

11      HEARING OFFICER:  Okay so what your saying is I

12  understand because the student is receiving specialized

13  instruction that is not a supplement that DCPS can provide

14  at that private school.

15      MS. PUCKETT:  No like sometimes parent's request that

16  even though they want to keep their students in a private

17  school.  They might say well we still since you're the SEA

18  we still want you to give us the related services and that

19  would have to be done through a service agreement with the

20  care center where care center would create something

21  separate from the IEP which would which is a service

22  agreement and it will say that the student will receive

23  these related services at Monroe and it will list a

24  schedule of when the student might be going to after school

1   or there might be a bus picking the student up from

2   Nativity and taking the student over to Monroe to get the

3   occupational therapy, speech and language services or

4   adaptive P.E.

5       But when you're dealing with inclusion setting and

6   specialized instructions it completely different but

7   parents do request related services sometimes and they

8   still want them even though they're going to keep the

9   student in that educational setting they still want the

10  related services.  But were not the - - we can't, we can't

11  oversee, we can't force nativity to implement the IEP's

12  that we develop because we're not, we're not - - we have no

13  authority at all over the private school.  We're not

14  funding it and we didn't place the student there and the

15  student wasn't parentally placed through a HOD, so we have

16  no authority whatsoever over Nativity.

17      We have authority over our school in making them do

18  stuff.  But we have no authority whatsoever over Nativity

19  at all.  They're their own private school, not DCPS funded,

20  I mean they receive funds from the Federal government so

21  they are under their own certain obligations, as far as

22  services to students, but unfortunately, I don't believe

23  parents can bring complaints, due process complaints

24  against private schools.

1      HEARING OFFICER:  Okay.  If you wanna use this

2   opportunity that you'd get more information about what the

3   mother's next step may be, this might be a good

4   opportunity.

5      MS. TILLERY:  Well, we can talk to, I mean at this

6   point, at this point, the record, I mean you have already

7   made a decision, so I would rather talk to my client and

8   with my educational advocate at our own time.  I mean, Ms.

9   Puckett has said what she has decided what to say when I've

10   already explained this to the mother at this time.

11      So as far us adding anything else, we feel that we're

12   gonna discuss this, I will discuss this with the client,

13   and I've discussed this with the advocate.  I don't think

14   Ms. Puckett can add anything else to the case, or to Ms.

15   Lee at this time, and your ruling has already been made.

16   So, we would just like to - - just for the - - I have this

17   to be adjourned and, I mean, I can talk to my client and my

18   educational advocate and we can tell her what she needs and

19   where she can go.

20      HEARING OFFICER:  Okay.

21      MS. PUCKETT: Well if she wants to call me one day I'm

22   - -

23      MS. TILLERY:  They have my office number.

99

1        HEAARING OFFICER: Okay.  Then case is submitted and

2   order be issued in ten days of this hearing.

3        MS. PUCKETT:  Thank you.

4

5        [Hearing ended at 12:19 p.m.]

# Exhibit 13

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# ADMINISTRATIVE DUE PROCESS
# COMPLAINT NOTICE

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street. NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings**.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.    INFORMATION ABOUT THE STUDENT:

Name of the Student:  _Antonio Lee_ Date of Birth: _June 3, 1995_

Address: _722 Girard Street, N.W., Washington, DC 20001_

Present School of Attendance: __Nativity Catholic Academy__

Parent/Guardian of the Student: __Ms. Theresa Lee____

## B.    Legal Representative/Attorney (if applicable):

Name: _____Jani S. Tillery, Esq.____

Address: ___1220 L Street, NW, Suite 700, Washington, DC 20005____

Phone: (w) _202-742-2000_ (Fax) _202-742-2097_ (e-mail) _____

Will attorney / legal representative attend the resolution session?    $\underline{X}$ Yes         ☐ No

## C.    Complaint Made Against (check all that apply):

$\mathbf{X}$ DCPS

☐ Charter school (name of the charter school if different from page one)_____

☐ Non-public school or residential treatment facility (name) _____

☐ Parent

## D.    Resolution Session Meeting Between Parent and LEA:

I understand that it is my right to have a resolution meeting to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution meeting to avoid having this meeting.)

$\underline{X}$ I wish to waive the Resolution Session Meeting

## E.    Mediation Process:

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

**I am requesting an administrative due process hearing only at this time.**

## F.    Facts and Reasons for the Complaint:

### I.    Background Information

1. The student's name is Antonio Lee.

2. The student's date of birth is June 3, 1995.

3. The student's address is 722 Girard Street, N.W., Washington, D.C. 20001

4. The student's home school is Bruce-Monroe Elementary School in the District of Columbia.

5. The student currently attends Nativity Catholic Academy in the District of Columbia.

6. On May 26, 2005, the IEP team convened and drafted an initial IEP. The student was identified as a student with specific learning disabilities. The IEP provides for him to receive 5 hours of specialized instruction per week. *See* IEP meeting notes, dated May 26, 2005.

7. The May 26, 2005, IEP provided for ten (10) hours of ESY services per week for the summer of 2005. *See* IEP Addendum for ESY Services, dated May 26, 2005.

8. On May 26, 2005, a compensatory education plan was developed. The compensatory education services were to begin on May 27, 2005. *See* Compensatory Education Plan, dated May 26, 2005.

9. DCPS failed to implement the compensatory education plan and extended school year services as agreed by the team in the May 26, 2005 IEP meeting.

10. On April 6, 2007, the parent, through counsel, requested a comprehensive reevaluation of the student, including a psycho-educational, speech and language, audiological, and social history evaluation.

11. The student is in danger of failing the 5th grade.

## II. Issues presented.

**1. DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.**

Pursuant to 34 C.F.R. § 300.324 (b), DCPS

> must ensure that...the IEP team reviews the child's IEP periodically, but not less, than annually, to determine whether the annual goals for the child are being achieved; and revises the IEP, as appropriate, to address any lack of expected progress toward the annual goals...and in the general education curriculum, if appropriate; the results of any reevaluation conducted...information about the child provided to, or by, the parents...the child's anticipated needs; or other matters.

On May 26, 2005, DCPS convened an IEP team to draft an initial IEP. There is nothing in the record that indicates that DCPS convened an IEP team meeting to review and revise the IEP since the expiration of the student's IEP on May 26, 2006. Nor is there anything in the record that indicates that that student is receiving any specialized services. Therefore, in this case it is clear that DCPS has failed to comply with the requirements of IDEIA.

3

**2. DCPS failed to provide the student with the agreed upon compensatory services.**

*Harris v. District of Columbia* states that students with disabilities are entitled to compensatory services where they have been "deprived of special education in violation of the IDEA." Pursuant to *Reid v. District of Columbia*, "the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *See also, School Committee of the Town of Burlington Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985) (In *Burlington*, the United States Supreme Court concluded that retroactive reimbursement is available to parents. This led to courts allowing compensatory services to parents as an equitable remedy.) *Reid v. District of Columbia*, No. 02cv01611 (2005) (In Reid, the Circuit Court for the District of Columbia Circuit determined that "courts and hearing officers may award 'educational services...to be provided prospectively to compensate for a past deficient program.'" *See Id.* at 9 (quoting G. *ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003). Pursuant to D.C. Mun. Regs. tit. 5, § 3010.2 (2003), DCPS "shall implement an IEP as soon as possible after the meeting where the IEP is developed..."

On May 26, 2005, DCPS agreed to provide the student with 17 hours and 15 minutes of compensatory education in the areas of reading and written expression starting May 27, 2005. However, DCPS did not implement the compensatory education plan and as a result the student did not receive reimbursement for missed education services.

**3. DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005.**

District of Columbia Public Schools ("DCPS") failed to provide for Extended School Year services ("ESY") in the student's 2005 program, which the student requires to prevent regression and enable him to make appropriate progress. Under the IDEIA, schools are required to provide ESY services as necessary to provide a child with FAPE (*See* 34 C.F.R Section 300.106(a). ESY services are considered to be necessary when there is evidence of regression without such services and the student lacks the ability for recoupment in a reasonable period of time. See <u>Independent School District No. 709, Duluth v. Bonney</u>. 44 IDELR 191 (Minn Ct. App. 2005). ESY services are also considered to be necessary when emerging skills are at a breakthrough point. IDEA further states that "Extended school year services must be provided only if a child's IEP Team determines, on an individual basis...that the services are necessary for the provision of FAPE to the child." (*See* 34 C.F.R. Section 300.106(a)(2).

At the May 26, 2005 IEP meeting, the IEP team determined that the student was to receive ESY services to address the student's emerging skills in reading, written

4

expression, and to prevent regression in his educational progress. Nevertheless, the student did not receive ESY services in the summer of 2005.

## III.  Relief Sought.

1. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.

2. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his agreed upon compensatory services.

3. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his Extended School Year ("ESY") services for the summer of 2005 and the summer of 2006.

4. DCPS shall within five (5) business days convene an interim IEP meeting and develop an interim IEP for the student.

5. DCPS shall fund a comprehensive reevaluation including a psycho-educational, speech and language, audiological, social history reevaluation, and any other evaluations deemed necessary by the evaluators.

6. DCPS shall within ten (10) business days of receipt of the last evaluation, convene an IEP meeting to review the evaluations, revise the IEP consistent with the evaluations and determine an appropriate placement for the student where the IEP may be implemented.

7. DCPS shall fund student with seventeen (17) hours and fifteen (15) minutes of compensatory education services in the form of specialized instruction not to exceed sixty (60) dollars an hour.

8. DCPS shall fund one hundred and twenty (120) hours of Extended School Year Services ("ESY") for ESY services missed during the summer of 2005 and summer of 2006.

9. DCPS shall fund the student with Extended School Year Services ("ESY") during the 2007 summer.

10. DCPS agrees to pay counsel for the complainant reasonable attorney's fees and related costs incurred in the matter.

11. All meetings shall be scheduled through counsel for the complainant in writing, via facsimile, at 202-742-2098.

5

12. DCPS send all notices to counsel for the parent with copies of such to the parent and in the parent's native language.

13. DCPS within ten (10) calendar days of the filing of this complaint, pursuant to 34 C.F.R. § 300.508(e), shall provide the complainant's representative, through Jani S. Tillery, Esq., via facsimile, at 202-742-2098, the following: i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action.

14. In the event DCPS fails to answer/respond to the issues alleged in the complainant's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the complainant will be deemed true and accurate and act as a waiver, on the part of DCPS, for their desire to have a Resolution Session Meeting, and the complainant's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA.

15. DCPS, within fifteen (15) calendar days of receiving the complainant's complaint, pursuant to 34 C.F.R. § 300.508(d), shall respond to the complainant's request alleging any insufficiency of notice.

16. DCPS' failure to comply with 34 C.F.R. § 300.508(d), and allege any insufficiency of the complainant's administrative due process complaint, will constitute waiver on the part of DCPS to make such argument at any later date and time.

17. DCPS, pursuant to 34 C.F.R. § 300.510(a), within fifteen (15) calendar days of receiving the complainant's administrative due process complaint, shall contact the complainant's representative, in writing, via facsimile, at 202-742-2098, to schedule and convene a Resolution Session Meeting.

18. DCPS, pursuant to 34 C.F.R. § 300.510(a), shall convene the Resolution Session Meeting, with the complainant, the complainant's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. The relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student, and 6) any service providers for the student.

19. DCPS' failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified according to the 34 C.F.R. § 300.510(a) shall constitute joint waiver between DCPS and the complainant to have such meeting and the forty-five

6

(45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the complainant's counsel.

20. D.C. MUN. REGS. tit. 5 § 3030.1 provides that the public agency shall ensure that not later than 45 days after the receipt of a request for a hearing, a final decision is reached in the hearing and a copy of the decision is mailed to each of the parties. Should the hearing for this student take place 45 days after the date of this hearing request, DCPS shall be found to have violated the 45-day time line. DCPS shall provide the parent with a due process hearing within 15 calendar days of a request on any issue arising out of the noncompliance with DCPS' obligations hereunder, or any disagreement that the parent may have with the assessments, programming or placement. Such issue will be raised at the hearing with or without an amended hearing request.

21. Pursuant to D.C. MUN. REGS. tit. 5 § 3000 et. seq., DCPS shall ensure that BP's rights and his complainant's rights are protected, and consistent with the Hearing Officer's preamble to all due process hearing that, "the hearing officer will rule on the evidence as presented at the hearing and will ACT in the BEST INTEREST of the child," and make a ruling consistent with the obligation of DCPS and the hearing officer's responsibility.

22. The hearing officer shall find that the complainant is the prevailing party in this action.

## G.  Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____
- Special Accommodations for Disability (please be specific)_____
- Other_____

## H.  Signature:

Legal Representative //Advocate (if applicable)          4/9/07          Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**

Fax number: 202/442-5556

```
***********************
***   TX REPORT   ***
***********************


TRANSMISSION OK

TX/RX NO            4004
RECIPIENT ADDRESS  912024425556
DESTINATION ID
ST TIME            04/09 15:10
TIME USE           01'19
PAGES SENT         9
RESULT             OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Omar Karram |
| Christopher L. West | Telephone: (202) 742-2000 | Christie Fontaine-Covington |
| John A. Straus | Facsimile: (202) 742-2098 | Jani Tillery |
| ----------------------------------- | e-mail: Admin@Jeblaw.biz | ---------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:   Sharon Newsome, Hearing Coordinator
      Student Hearing Office

FROM: Clarence Hayes, Paralegal to Jani Tillery, Esq.

DATE: April 9, 2007

FAX NO: 202-442-5556

SUBJECT: Antonio Lee, DOB: 6-3-95

NUMBER OF PAGES INCLUDING COVER SHEET:   9

COMMENTS:  Administrative Due Process Complaint Notice

EXHIBIT

ALL-STATE LEGAL

$AL-1$

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
------------------------------------

Attorneys at Law
1220 L Street. NW
Suite 700
Washington. DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fer[...]
Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington
Jani Tillery
------------------------------------
' DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:   Sharon Newsome, Hearing Coordinator
      Student Hearing Office

FROM: Clarence Hayes, Paralegal to Jani Tillery, Esq.

DATE:  April 9, 2007

FAX NO: 202-442-5556

SUBJECT: Antonio Lee, DOB: 6-3-95

NUMBER OF PAGES INCLUDING COVER SHEET:   9

COMMENTS:   Administrative Due Process Complaint Notice

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

# Exhibit 14

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM
(MDT)
STUDENT EVALUATION PLAN
(SEP)**

MDT
SEP

MDT REFERRAL DATE: _____                    MEETING DATE: 5/7/07

STUDENT: Antonio Lee _____ DOB: 6/3/95 ___ AGE: 11 __ GRADE: 5 __ SCHOOL: Nativity

STUDENT IDENTIFICATION NUMBER: _____ TEACHER / HOMEROOM: _____

ADDRESS: 722 Girard St. NW WDC 20001

| Street # | Street Name, | Quadrant | Apartment # | City, | State. | Zip Code |

PARENT(S)/GUARDIAN: Theresa Lee _____ TELEPHONE (H): 2/322-5366 ____ (W): 240-605-8280

**Summarize Area(s) of Concern:**

Student requires an updated IEP.

**Team Recommendations:**

- Educational Update
- Teacher Interview, if available
- Classroom Observation, if available

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☐ Speech/Language | | | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☒ Educational | TBD | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other | Other: Teacher Interview  Other: | | | |
| X | Classroom Observation | | | |

| TEAM MEMBERS: NAME | POSITION | TEAM MEMBERS: NAME | POSITION |
|---|---|---|---|
| x Theresa Lee | Mother | | |
| Gayle Hall | | | |
| Natudia Houston | Assessment Coordinator | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

Place completed form in MDT folder.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

| MDT |
|-----|

MDT REFERRAL DATE: _____

STUDENT: Antonio Lee          SCHOOL: Nativity          DATE: 5/7/07

PARTICIPANTS: (Print Name)          PARTICIPANTS: (Sign Name)          POSITION

| Theresa Lee | *Theresa Lee* | Parent |
| Gayle Hall | *Gayle Hall* | Liaison Private and Religious |
| Natalia Houston | *Natalia Housten* | Asessessment Coordinator |
| | | |
| | | |
| | | |
| | | |

Purpose: To discuss concerns, strengths and weakness that may impact on the educational and academic growth of the student, to develop a Student Evaluation Plan (SEP), order and review assessments if warranted to confirm or rule out a confirmed or suspected disability and to sign consent to test.

The parent received the following documents:

☑ Parents Rights Manual
☑ Agreement between DC Public Schools and Private and Religious Schools
☑ Procedures for students parentally placed in private or religious schools
☑ Student Referral
☑ Parent Interview

Student has had an IEP dated 1/26/06 from the CARE Center. Student continues to struggle at Nativity. Ms. Lee states that Antonio reads on the 1st gr. level. She states that the school has not assisted him w/ his problems this year. He is very far behind in reading. He is in sub 1 for math. Mother does help him alot at home. His younger brother is also in his class due to his being retained. Antonio relies on his younger brother alot to help him.
Mother has applied to Paul for Antonio. Mr. Johnson was Antonio's 4th grade teacher & knows him well. His 5th grade teacher is no longer there — his new teacher has only worked w/ him 1 month. Spelling + written lang. is also poor. He becomes frustrated, avoids homework, decoding words a problem.

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| THERESA LEE, parent and next friend of A.L. a minor    110.01/ | DISTRICT OF COLUMBIA, ET AL |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Domiento C.R. Hill, Esq.
Roxanne D. Neloms, Esq.
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
(202) 742-2000

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01893
Assigned To : Collyer, Rosemary M.
Assign. Date : 10/19/2007
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust

☐ 410 Antitrust

○ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ C. Administrative Agency Review

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ E. General Civil (Other)        OR        ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(3)

| O **G. _Habeas Corpus/ 2255_** | O **H. _Employment Discrimination_** | O **I. _FOIA/PRIVACY ACT_** | O **J. _Student Loan_** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O **K. _Labor/ERISA (non-employment)_** | O **L. _Other Civil Rights (non-employment)_** | O **M. _Contract_** | O **N. _Three-Judge Court_** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

20 USC 1400-1491 as amended Federal Question review of agency decision involving rights to Free Appropriate Public Education

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐   NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☐   If yes, please complete related case form.

DATE 10/19/07   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.