## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THERESA LEE,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No. 07-1893 (RMC)** |
| | : | |
| **DISTRICT OF COLUMBIA,** | : | |
| | : | |
| **Defendant.** | : | |

## FILING OF ADMINISTRATIVE RECORD

Attached is an index of the administrative record, and the record documents themselves in this proceeding.  Consistent with LCvR 5.4(f), Defendant has redacted personal information about the minor A.L.[1]

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

*/s/ Amy Caspari*
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794

---

[1] Defendant has redacted the minor's name, date of birth, and social security number.

**Theresa Lee v. District of Columbia**
**Civil Action No. 07-1893 (RMC)**

## INDEX OF RECORD

| Description | | Page |
|---|---|---|
| Certification of Record | - | 1 |
| Plaintiff's Motion for Reconsideration, 6/29/07 | - | 2 |
| Affidavit of Diane Crews-Pinkney, 6/29/07 | - | 11 |
| Affidavit of Jani S. Tillery, 6/29/07 | - | 13 |
| Affidavit of Theresa Lee, 6/29/07 | - | 16 |
| Hearing Officer's Determination (HOD) dated 6/21/07 | - | 20 |
| Due Process Hearing Attendance Sheet, 6/11/07 | - | 32 |
| DCPS Disclosure Statement and Motion to Compel, 6/4/07 | - | 33 |
| Plaintiff's Disclosure Letter, dated 6/4/07 w/att. | - | 35 |
| AL-1 Admin. Due Process Complaint Notice, 4/9/07 | - | 37 |
| AL-2 IEP and Meeting Notes, 5/26/05 | - | 47 |
| AL-3 IEP Addendum for ESY Services, 5/26/05 | - | 55 |
| AL-4 Compensatory Education Plan, 5/26/05 | - | 57 |
| AL-5 IEP and Meeting Notes, 1/26/06 | - | 59 |
| AL-6 Report Cards, Year 2000 – 2001 | - | 70 |
| AL-7 Stanford Nines Achievement Tests, 4/02-4/05 | - | 75 |
| AL-8 Psycho-Educational Evaluation, 3/3/05 | - | 81 |
| AL-9 Psycho-Educational Evaluation, 11/15/04 | - | 91 |
| AL-10 Independent School District No. 709 v. Linda Bonney, 44 IDELR 191, (Minn Ct. App. 2005) | - | 101 |
| AL-11 Christopher Reusch v. Fountain, 21 IDELR 1107, 872 F. Supp. 1421 (1994) | - | 121 |
| AL-12 Harris v. D.C., 19 IDELR 105, (U.S. Dist. Ct, DC 1992) | - | 170 |

AL-13 ESY Eligibility Criteria, 11/9/01 - 182

AL-14 Reid v. D.C., No. 02cv01611 (D.C. Cir. 2005) - 183

AL-15 Hearing Notice, 5/30/07 - 204

Due Process Hearing Notice, 5/30/07 - 205

Plaintiff's Motion for Default Judgment, 4/24/07 - 207

Scheduling Memorandum, 4/9/07 - 210

Administrative Due Process Complaint Notice, 4/9/07 - 213

Transcript of Hearing, 6/11/07 - 222-321

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
### SPECIAL EDUCATION

In the Matter RE:          **L██, A██████ vs. DCPS**

Case Information:          Hearing Dates: **06/11/2007**
                           Held at: **District of Columbia Public Schools Headquarters**
                                    **1150 5th Street, S.E.**
                                    **Washington, D.C. 20003**
                           Student Identification Number:  **9078683**
                           Student's Date of Birth: **██████/1995**
                           Attending School: **Nativity Catholic Academy**
                           Managing School:
                           Hearing Request Date(s): **04/09/2007**

## CERTIFICATION OF RECORD

I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Wednesday, November 21, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

06/29/2007 16:27 FAX 2027422098   James E Brown & Assoc.   ☐002/018

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| A███████ L██ ("Student") | ) |
| Date of Birth: ██████ 1995 | ) |
|      Petitioner, | ) |
| | ) |
| | ) |
|     v. | ) |
| | ) |
| | ) |
| District of Columbia Public Schools | ) |
| 825 North Capitol Street, NE | ) |
| Washington, DC 20002 | ) |
| ("DCPS" or "District") | ) |
| | ) |
| | ) |

## PLAINTIFF'S MOTION FOR RECONSIDERATION

COMES NOW, the plaintiff, Ms. Theresa Lee, by and through their educational

attorneys, the law offices of James E. Brown & Associates, PLLC, in submission of this

Motion for Reconsideration of the impartial hearing officer's decision and order

(hereinafter "order" or "decision") issued on June 22, 2007, wherein the hearing officer

dismissed plaintiff's Due Process Hearing request with prejudice and found that there

was no denial of FAPE based on the fact that the plaintiff did not meet their burden of

proof in this case because the parent failed to meet the *Reid* test for the hearing officer to

award Compensatory Education.

## FACTUAL BACKGROUND

On April 9, 2007, a due process hearing request was filed on behalf of A███████

L██. In the complaint the parent alleged that: 1) DCPS denied the student a free and

appropriate public education to conduct an annual review of the student's IEP; 2) DCPS

failed to provide the student with the agreed upon compensatory education services; and

2

3) DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005. On June 11, 2007, the due process hearing took place, wherein the parent withdrew the first issue of the expired IEP due to the fact that the first issue was moot. The parent was prepared to go forward on the two remaining issues, however, the hearing officer stated that if the IEP issue was being withdrawn, the ESY would also have to be withdrawn due to the ESY being part of the May 26, 2005, IEP. Therefore the only issue remaining was the issue of compensatory education.

At the June 11, 2007, due process hearing, the hearing officer granted DCPS attorney motion for directed finding based on the fact that the plaintiff failed to meet the *Reid* test for the hearing officer to award Compensatory Education.

### Standard of Review

Pursuant to the Standard Operating Procedures Handbook §1005,

> Reconsideration of a hearing may be granted on the timely filing of a motion for reconsideration. Any motion for reconsideration must be filed within (10) days of the date of the Order is issued...The filing of a motion for reconsideration on a final order, if such motion is timely filed, the order shall not be deemed final for purposes of judicial review until the motion is ruled upon by the Hearing Officer or is denied by operation of law...If a motion for reconsideration is granted, the Hearing Officer may reopen the record in the matter, amend the findings of fact and conclusions of law, correct errors or mistakes, or make new findings of fact, conclusions of law, and issue a new order.

### Argument

I.     **The Hearing Officer Erred When He Dismissed the Extended School Year Services Claim.**

The parent's complaint alleged three issues: 1) DCPS denied the student a free and appropriate public education to conduct an annual review of the student's IEP;  2) DCPS

failed to provide the student with the agreed upon compensatory education services; and

3) DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005. The parent withdrew the first issue because the issue was moot due to an IEP being developed since the IEP expired on May 26, 2005. However, the hearing officer erroneously stated that because the ESY stemmed from the May 26, 2005 IEP, that the ESY issue had to also be withdrawn. The hearing officer erred in making that determination because the ESY issue was separate and distinct from the May 26, 2005 IEP.

## II. The Hearing Officer Erroneously Applied Reid to an already predetermined award for compensatory education.

The parent requested that DCPS implement the student with the agreed upon compensatory education services. On May 26, 2005, the Multidisciplinary Team met and agreed to provide the student with 17 hours and 15 minutes of compensatory education in the areas of reading and written expression starting May 27, 2005. DCPS did not implement the compensatory education plan and as a result the student did not receive reimbursement for missed education services.

In Reid v. District of Columbia, No. 02cv01611 (2005), it is clear that the court intended compensatory education to be a equitable remedy. The court stated that "compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." However, in the instant case Reid, does not apply. In Reid, the court stated "the officer order contains neither reasoning to support this hour-per-day formula nor factual findings showing that the 810-hour result satisfied Mathew's needs." Thus the court found the "hour-per day

formula" inappropriate.  The hearing officer misinterpreted *Reid* and the facts of our case

In the Hearing Officer's Determination, the  Hearing Officer stated that "the parent's sole

position was that the missed 17 hours and 15 minutes of Specialized Instruction during

the 2004-2005 school year should be compensated in giving the student Compensatory

Education in the amount of 17 hours and 15 minutes of Specialized Instruction" for an

hour-for- hour of missed services.  This is a misstatement of the facts.  The hearing

officer erred in understanding the facts of the case and as a result misapplied *Reid.*  The

parent did not request the compensatory education to be awarded based on  the student

missing 17 hours and 15 minutes of services in 2004-2005 school year, and therefore did

not ask the  Hearing Officer to award the 17 hours and 15 minutes of the compensatory

education based on an hour-for-hour formula.  The parent's position was that the

multidisciplinary team developed the compensatory education plan on May 26, 2005, that

was never implemented by the team. The plaintiff in *Reid* challenged the number of hours

awarded as compensatory education for missed educational services. In our case, the

parent did not challenge the number of hours awarded, but argued that the plan was not

implemented by DCPS.


Moreover, although hearing officers may award compensatory education, in our

case, the hearing officer ordered the MDT team to determine the amount, form and

delivery of compensatory education. It would be unreasonable and certainly not the intent

of *Reid* for a multidisciplinary team of educators to go to a Due Process Hearing to

develop a Compensatory Education Plan. Thus the compensatory education plan was

06/29/2007 16:28 FAX  2027422098                 James E Brown & Assoc.                       ☑ 006/018

developed and designed by the MDT team at the May 26, 2005, MDT/IEP, nevertheless DCPS failed to implement the plan.

Lastly, the *Reid* "test" does not apply to the instant case. According to the *Reid* "test", the plaintiff must first establish that there has been a harm to from failure to provide service, secondly, there must be measure of baseline data compared to new evaluative data to determine progress and third, there must be a proven ability to benefit from compensatory education. In our case, the *Reid* case need not apply because parent did not argue about the amount of the compensatory education, nor did the parent ask the hearing officer to fashion a new compensatory award as appropriate relief. The parent argued that the predetermined compensatory education plan was not implemented, thus to apply *Reid* in this matter was erroneous.

**III.    The Hearing Officer is Not Qualified to Preside Over Special Education Cases.**

According to 34 C.F.R. §300. 511,

> A hearing officer must not be (A) an employee of the SEA or the LEA that is involved in the education or care of the child or (B) a person having a personal or professional interest that conflicts with the person's objectivity in the hearing; (i) must possess knowledge of, and the ability to understand, the provisions, of the Act, Federal and State regulations pertaining to the Act, and legal interpretations of the Act by Federal and State courts; (iii) Must possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and (iv) must possess the knowledge and ability to render and write decisions in accordance with appropriate legal practice.

It is clear that the Hearing Officer does not possess the knowledge of, nor does he have the ability to understand the provisions, of the Act, or legal interpretations of the Act by Federal and State courts. The Hearing Officer *inter alia,* was unable to interpret the legal interpretations of the Act in order to appropriately apply the case law to the facts of this case in this Due Process Hearing. As a result of the Hearing Officer's inability to

6

understand the legal interpretations of the Act the Hearing Officer misapplied the case law and the Act to the facts of this case. It is clear from the Hearing Officer's Determination that the Hearing Officer lacks the ability to accurately recall the facts of the case to appropriately render a decision. Further, the Hearing Officer was unaware of how to ascertain what issues were related and unrelated for parent's counsel to move forward on, specifically by failing to understand that the Extended School Year Services issue was unrelated to the issue of the May 26, 2005 IEP.

IV. **The Hearing Officer Erred When He Granted a Motion For Directed Verdict in Favor of DCPS.**

Pursuant to 20 U.S.C. Section 1415(c ) (2) (B), "if the local agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local agency shall, within 10 days of receiving the complaint, send to the parent a response..." At the Hearing on June 11, 2007, parent's counsel made a Motion for Directed Verdict for DCPS failure to conduct a resolution meeting, failing to respond to the complaint within 10 days, and for DCPS failing to submit any evidence to the contrary. The Hearing Officer did not rule on that motion, however, after parent's counsel finished her *prima facie* case, the DCPS attorney, made a Motion for Directed Verdict, without presenting a case. DCPS failed to call any witnesses, or present any evidence to rebut case, nevertheless the hearing officer granted the Motion for Directed Finding in favor of DCPS. The hearing officer erred in granting this Motion because DCPS failure to do respond to the complaint puts the parent at a disadvantage in preparation of a case for hearing. According to *Schaffer v. Weast*, 546 U.S. 49 (2005) the parent bears the burden of proof, however, the Court clearly stated

7

that "Congress added provisions requiring school districts to answer the subject matter of

a complaint in writing, and to provide the parents with the reasoning behind the disputed

action, details about the other options considered…" The Court goes on to state that

"IDEA in fact, requires state authorities to organize hearings in a way that guarantees

parents and children the procedural protections of the Act…These protections ensure that

the school bears no unique informational advantage."  In the instant case, the hearing

officer allowed DCPS to have advantage over the parent by granting the Motion for

Directed Finding by DCPS when DCPS did not respond to the due process complaint.

This is the very thing Congress wanted to safeguard against when it added provisions of

procedural safeguards to the Act.

V.    **The Hearing Officer Is Incapable of Presiding Over Due Process Hearings Because He Demonstrated A Lack of Impartiality.**

a)    Interference with Attorney-Client Relationship

At the June 11, 2007, Due Process Hearing the hearing officer made several attempts to

interfere with the attorney-client relationship between parent and parent's counsel that

created an environment that led to the parent's emotional outburst. The hearing officer

several times stated that parents counsel did not understand the Reid case, and implied that

parent's counsel did not understand what was going on.  The hearing officer stated that he

felt bad for the parent, because the parent was at a loss due to her attorney. The hearing

officer also repeatedly asked the DCPS attorney to talk to, explain and advise my client. The

hearing officer also spoke directly to my client.   After the hearing officer granted the

directed verdict, he continued to attempt to get DCPS' attorney to talk to my client after the

hearing ended.

b)    Other Examples of Impartiality by The Hearing Officer

At the hearing on June 11, 2007, parent's counsel made a Motion for Directed Finding, based on DCPS failure to hold a resolution meeting, DCPS' failure to respond to parent's due process complaint as required by IDEIA, and DCPS' failure to submit any evidence to rebut parent's position in the 5-day disclosure. The hearing office did not respond to the Motion for Directed Finding, and failed to rule on or acknowledge that the Motion was made. The hearing officer asked the DCPS' attorney if there was anything she could do for my client, the DCPS' attorney then brought up taking the attorney fees off the table and then maybe she could do something. The hearing officer restated that DCPS had put an offer on the table for parent excluding the attorney fees. It is clear that only the Court can discuss attorney fees, and therefore by the hearing officer to entertain the idea further demonstrates bias.

Upon completion of parent's case, DCPS made a Motion for Directed Finding without presenting a case. At that time the hearing officer, spoke directly to the parent explaining what a Motion for Directed Finding entailed and then proceeded to rule on the Motion. Although parent's counsel questioned how the hearing officer could make such a ruling without DCPS presenting no evidence to rebut parent's position, the hearing officer did not respond and granted the Motion for Directed Finding in Favor of the DCPS.

### CONCLUSION

Based on the law and facts provided and stated at the administrative due process hearing of June 11, 2007, as well as the foregoing Motion, the parent requests the Motion for Reconsideration be Granted.

## CERTIFICATE OF SERVICE

I, Jani S. Tillery, Esq., hereby certify that on this 29 day of June 2007, a copy of the

Plaintiff's Motion To Reconsider was delivered this day, via facsimile, to Tiffany

Puckett, Attorney Advisor for DCPS, 825 North Capitol Street, NE 9th Floor,

Washington, DC 20002 and the Impartial Due Process Hearing Officer Fredrick Woods

Student Hearing Office, District of Columbia Public Schools, 1150 5th Street,

Washington, DC 20003..

Respectfully Submitted,

Jani S. Tillery, Esq.
James E. Brown & Associates
1220 L Street, NW Suite 700
Washington, D.C. 20005
(202) 742-2000
Attorney for the Parent

## AFFIDAVIT OF DIANE CREWS-PINKNEY REGARDING HEARING OFFICER FREDERICK WOODS

I, Diane Crews-Pinkney, do hereby swear and affirm under penalty of perjury that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am the Educational Advocate to the minor child, A. L.

2. I am a Special Education Advocate at the law offices of James E. Brown and Associates, PLLC, advocating for parents and students in Washington, DC.

3. I was present at the Due Process Hearing set for A. L. on June 11, 2007.

4. The hearing officer presiding over this hearing was Frederick Woods.

5. At the hearing, it was my belief from my observations that Mr. Woods was very unfair and seemed favorable with DCPS attorney Ms. Tiffany Puckett. He seemed bias, one-sided, and more receptive and accommodating to DCPS' requests.

6. Mr. Woods did not address attorney Jani Tillery when she made several requests for directed finding at the beginning of the hearing.

7. After attorney Tillery's many request for directed finding were made, Mr. Woods told attorney Tillery to move on to discuss her issues filed in her disclosures.

8. Mr. Woods questioned the issues filed in attorney Tillery's 5 day disclosure and tried to persuade attorney Tillery to withdraw her issues.

9. After several attempts to get attorney Tillery to withdraw her issues, Mr. Woods threaten to dismiss the IEP and ESY issues stating that he could not award the parent services for ESY because the summer was over.

10. Again, Mr. Woods made statements about attorney Tillery with reference to her not understanding how to represent the parent and that she was not properly prepared for the case.

11. Mr. Woods threw out the first two issues filed, leaving only the compensatory education plan from a previous HOD; at this point, upsetting the parent causing her to cry and become very emotional during her testimony.

11

12. Mr. Woods threw out the Comp Ed plan stating that he had no idea what services the child missed and that Comp Ed was not a right it was a remedy and that he could not award Comp Ed at that time.

13. Thereafter, Mr. Woods tried to persuade the parent and the opposing counsel to talk and forfeit attorney fees, the parent got upset and emotional; stating that she just wanted her child to have special education services and didn't care about attorney fees and/or anything else.

14. Mr. Woods made several statements on record to the parent, that if she wanted to fully understand the process of getting her child some help, that he recommends that she speak to the DCPS's counsel, Tiffany Puckett.

15. After Mr. Woods made his ruling; not granting any of the issues filed, he proceeded to allow the recorder to run as he tried to persuade the DCPS's attorney, Tiffany Puckett, to speak to the parent.

16. It is my belief as A. L. educational advocate and through my personal observations throughout the hearing that Ms. Theresa Lee and her son Antonio Lee will not have a fair due process hearing if Mr. Woods continues to preside over her child's case.

I declare and affirm under penalty of perjury that the foregoing is true and correct.

_Diane M. Pinkney_
Diane Crews-Pinkney

District of Columbia SS:

Subscribed and Sworn before me this _29_ day of June, 2007.

_Kelly Dau_
Notary Public, DC
My Commission Expires:

Kelly Dau
Notary Public, District of Columbia
My Commission Expires 1-1-2010

06/29/2007 16:28 FAX 2027422098    James E Brown & Assoc.    Ø013/018

Case 1:07-cv-01893-RMC    Document 9-2    Filed 01/30/2008    Page 13 of 46

# AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER FREDERICK WOODS

I, Jani S. Tillery, do hereby swear and affirm under penalty of perjury that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am currently an attorney in good standing in the District of Columbia.

2. I am an associate attorney at the law offices of James E. Brown & Associates, PLLC, representing parents and students in Washington, D.C. pursuant to the Individuals with Disabilities Education Act and implementing regulations.

3. I appeared before Hearing Officer Frederick Woods for a due process hearing regarding special education, on June 11, 2007 for A.L. DOB: 06/03/1995. Mr. Woods demonstrated an inappropriate and unethical bias against me and my client.

4. On June 11, 2007, I appeared as parents' counsel before Mr. Woods for an administrative due process hearing in the matter of **A.L. DOB: 06/03/95 Public Schools.**

5. At the beginning of the hearing, I made a Motion for Directed Finding, based on DCPS' failure to hold a resolution meeting, DCPS' failure to respond to parent's due process complaint as required by IDEIA, and DCPS' failure to submit any evidence in their disclosures.

6. Mr. Woods ignored my Motion for Directed Finding, and failed to rule on or acknowledge that the motion was made.

7. Mr. Woods made insulting comments, and by stating that I did not understand the *Reid* case and belittled my professionalism repeatedly stating that I did not understand what was going on and saying that the parent was at a loss due to her attorney.

1

## AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER
## FREDERICK WOODS

8.  During the hearing, Mr. Woods asked DCPS' Attorney what she could do to help
    the client, DCPS attorney brought up taking the prevailing party status, and
    attorney fees off the table, Mr. Woods questioned if the parent would take the
    offer, implying that the compensatory education may be awarded if no attorney
    fees were awarded.

9.  Mr. Woods attempted to interfere in the attorney-client relationship by repeatedly
    asking the DCPS attorney to talk to and advise my client and by speaking directly
    to my client.

10. Upon finishing my *prima facie* case, DCPS' attorney made a Motion for Directed
    Finding. She did not present any evidence to rebut the allegations nor did she
    proffer testimony that presented countervailing evidence.

11. Mr. Woods ruled on and in favor of DCPS' Motion for Directed Finding pursuant
    to the *Reid* test for Compensatory Education not being met, although DCPS
    counsel did not provide a Response to the complaint.

12. After granting DCPS' Motion for Directed Finding, Mr. Woods continued to let
    the tape recording run, and again attempted to get the DCPS attorney to talk to my
    client after the hearing ended.

13. My client also informed me that she noticed he was very one-sided and that it
    appeared the Hearing Officer had already made his decision before hearing the
    case and favored the DCPS' attorney.

_____                    6-29-07
Jani S. Tillery                            Date

2

14

## AFFIDAVIT OF JANI S. TILLERY REGARDING HEARING OFFICER FREDERICK WOODS

I, _Kelly Dau_ Notary Public of the District of Columbia hereby attest that on this _29th_ day of _June_ 200_7_, Jani Tillery appeared before me in person and signed this AFFIDAVIT.

**Kelly Dau**
**Notary Public, District of Columbia**
**My Commission Expires 1-1-2010**

_____
Notary Public

_____
My Commission Expiration Date

3

15

## AFFIDAVIT OF THERESA LEE REGARDING HEARING OFFICER FREDERICK WOODS

I, Theresa Lee, do hereby swear and affirm under penalty of perjury that the following information is true and correct to the best of my knowledge, information, and belief:

1. I am the parent of A██████L██

2. I currently live at 722 Gerard St., NW, Washington, D.C 20001.

3. I had a hearing dated for June 11, 2007.

4. To my confoundment it wasn't really a hearing but it was a lash out concert.

5. When I came to the hearing, I wanted to get what I asked for in my complaint. I got frustrated when the hearing officer didn't care about my son getting services.

6. DCPS Attorney Ms. Puckett entered in moments after Mr. Woods the Hearing officer, my attorney Ms. Tillery her assistant Ms. Pinkney and myself Antonio mom.

7. Ms. Puckett was rude and loud she was not prepared for this hearing. She did not have any witnesses or paperwork concerning my son's case.

8. I believe because first she didn't respond in five business days as she was instructed.

9. Attorney Tillery asked the hearing officer early on in the hearing for a Motion for Directed Finding because DCPS was not prepared. But the question went unanswered. Not one time, but several times.

10. At this point, I really began to observe the relationship that Mr. Woods and Ms. Puckett shared.

16

11. Because of their relationship I believe that this concert was not in the best interest of my son's education.

12. There came a time that my attorney asked for a moment alone with me and it was granted (5 min.)

13. Before Mr. Woods returned Ms. Puckett came back into the room. Very rudely, she got on Mr. Woods telephone and proceeded with a personal call in our presents.

14. Even when Mr. Woods returned she was still on his telephone. He had to say "are we ready?" Then she got off the phone. She did this two times.

15. This hearing concert, got heated. I became so emotional and frustrated because Mr. Woods started to attack attorney Tillery ability to represent me as my attorney.

16. He even stated that she was not prepared nor was aware of the hearing rules and procedures.

17. I was disturbed and became very emotional. Because once again my son's education is not important to DCPS.

18. Ms. Puckett jumped on the wagon with Mr. Woods. She stated that she would help me get all the help I need for my son if I would drop all attorney fees if I would represent myself. I told her I didn't want anything from her.

19. At this point Mr. Woods stated that we were off the record. He turned off the record

20. I also stated that at this point I wouldn't care if any one didn't get paid, because this is not about a dollar but it is about my son getting what was

awarded to him in 2005. Here it is 2007 entering into 2008 school year and

my son A̶n̶t̶o̶n̶i̶e̶ ̶L̶e̶e̶ has not received any help from DCPS. Which was

awarded to him by DCPS in 2005.

I declare and affirm under penalty of perjury that the foregoing is true and correct.

*Theresa Lee*

Theresa Lee

District of Columbia SS:

Subscribed and Sworn before me this 29th day of ~~November, 2006~~ June, 2007.

*Kelly Dau*

Notary Public, DC
My Commission Expires:

Kelly Dau
Notary Public, District of Columbia
My Commission Expires 1-1-2010

06/29/2007 16:27 FAX 2027422098          James E Brown & Assoc.                    ☑001/018

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
Omar Karram
------------------------

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Jani Tillery
Kimberly Glassman

------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:  **June 29, 2007**

TO: **Hearing Officer  Fredrick Woods**

FAX NO.:  **(202) 698-3825**

FROM:   **Jani S. Tillery, Esq.**

SUBJECT: A██████ L██ DOB: ██-95

NUMBER OF PAGES INCLUDING COVER SHEET:     **18**

COMMENTS: **Motion For Reconsideration**

The attached information is CONFIDENTIAL and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### Confidential

**FREDERICK E. WOODS,** Esq., Due Process Hearing Officer
Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
Facsimile: (202) 698-3825

| | | |
|---|---|---|
| **In the Matter of** | ) | **IMPARTIAL** |
| | ) | **DUE PROCESS HEARING** |
| A██████ L███ | ) | |
| Date of Birth: ████/95 | ) | |
| Petitioner, | ) | **DECISION AND ORDER** |
| | ) | |
| vs. | ) | Hearing Request: April 9, 2007 |
| | ) | **Hearing Date: June 11, 2007** |
| The District of Columbia Public Schools, | ) | Held at: Van Ness Elementary School |
| Home School: Bruce Monroe Elementary | ) | 1150 5th Street, S.E., 1st Floor |
| Attending: Nativity Catholic Academy | ) | Washington, D.C. 20003 |
| | ) | |
| Respondent. | ) | |

| | |
|---|---|
| **Parent:** | Theresa Lee, Mother |
| | 722 Grand Street, N.W. |
| | Washington, D.C. 20001 |
| | |
| **Counsel for the Parent/Student:** | Jani Tillery, Esq. |
| | James E. Brown & Associates, PLLC |
| | Attorneys at Law |
| | 1220 L Street N.W., Suite 700 |
| | Washington, D.C. 20005 |
| | |
| **District of Columbia Public Schools:** | Tiffany S. Puckett, Esq. |
| | Attorney Advisor |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E., 9th Floor |
| | Washington, D.C. 20002 |

1

## I.     JURISDICTION

The Due Process Hearing was convened and this Order written pursuant to Public Law 108-446, the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400 et seq.; 34 C.F.R. §§ 300 et seq.; 5 D.C.M.R. §§ 3000 et seq.; and Section 143 of the D.C. Appropriations Act, effective October 21, 1998.

## II.     DUE PROCESS RIGHTS

The parent through counsel waived a formal reading of the due process rights.

## III.     FIVE-DAY DISCLOSURES

Petitioner:     Admitted, without objection, a disclosure letter filed on 06/04/07 that list four witnesses and attached fifteen exhibits sequentially labeled and tabbed AL-01 through AL-15. Two witnesses were present: the student's mother; and Diane Crews-Pinkney, education advocate.

Respondent:     Admitted, without objection a disclosure letter filed on 06/04/07 that list six witnesses. No exhibits were offered into evidence. No witnesses were present or called to testify because DCPS' Motion for Directed Decision was granted after the parent rested their case.

## IV.     STATEMENT OF THE CASE

A.L., born 06/03/95, age 11, is a 4th grade, 16% out-of-general education, Specific Learning Disabled (SLD) student attending Nativity Catholic Academy in the District of Columbia. (R. at AL-01, 05)

Parent's counsel Jani Tillery alleged in the student's 04/09/07 Due Process Hearing Request that DCPS violated the IDEIA and denied A.L. a Free Appropriate Public Education (FAPE) by failing to implement his 05/26/05 Compensatory Education Plan. (R. at AL-01, 04) Each and every other claim raised in A.L.'s 04/09/07 due process hearing request was dismissed, with prejudice at the due process hearing.

The DCPS Student Hearing Office scheduled the Due Process Hearing for 9:00 a.m., Monday, June 11, 2007 at Van Ness Elementary School, 1150 5th Street, S.E., 1st Floor, Washington, D.C. 20003. The hearing convened as scheduled.

Attorney Advisor Tiffany S. Puckett appeared in-person for DCPS. Attorney Jani Tillery appeared in-person representing A.L. who was not present; and his mother who was present. After the testimony of the parent's two witnesses the parent rested: and DCPS' Motion for Directed Decision was granted. Here are the reasons why.

## V.    SUMMARY OF THE EVIDENCE

The testimony of these two (2-listed witnesses and these three (3)-listed admitted exhibits are relied upon in reaching the decision.

### Witnesses:

(1) A.L.'s mother; and

(2) Diane Crews-Pinkney, Education Advocate.

### Exhibits:

| | | |
|---|---|---|
| 1. | AL-01 | The 04/09/07 Parent's Due Process Hearing Request |
| 2. | AL-04 | The 05/26/05 Compensatory Education Plan |
| 3. | AL-05 | The 01/26/06 IEP and MDT Meeting Notes |

### Issue

Did DCPS violate the Individuals with Disabilities Education Improvement Act (IDEIA) at 20 U.S.C. §§ 1400 et seq. and deny A.L. a Free Appropriate Public Education (FAPE) by failing to implement his 05/26/06 Compensatory Education Plan?

### Answer

No because: (1) the parent did not meet the Reid test for Compensatory Education relief; and (2) even if there was a procedural violation of the IDEIA there was no evidence presented at the due process hearing that the procedural violation resulted in a denial of FAPE.

## VI.    FINDINGS OF FACT:

1.    A.L., born 06/03/95, age 11, is a 4th grade, 16% out-of-general education, Specific Learning Disabled (SLD) student attending Nativity Catholic Academy in the District of Columbia. (R. at AL-01, 05)

2.    A.L.'s 01/26/06 IEP calls for him to receive this special education service to accommodate his SLD disability—

   a. Specialized Instruction    5-hours/week.
   (R. at AL-05)

3.      On 05/26/05, over two (2)-years ago, DCPS developed a Compensatory Education Plan awarding A.L., "17-hours 15-minutes of Specialized Instruction." (R. at AL-04)

4.      According to the credited testimony of the mother, who expressed her frustration by raising her voice because her concerns about A.L. were not raised in the hearing request therefore not being addressed—

   a.   A.L.'s 05/26/05 Compensatory Education Plan had not been implemented.

   b.   A.L. was, however, to enroll at Bruce Monroe ES for the summer 2006 to receive his Compensatory Education award but the school was not open that summer.

   c.   A.L. had been enrolled in a private, general education school for the entire 2005-06 school year; and she neither sought nor received any special education services for him at that school.

   d.   Suddenly, although her body language evinced a build-up of frustration with the issue being litigated, the mother said in a loud voice, "I do not care about any prior services but want services for my son from this day forward."

   e.   **Side bar:** Sadly, however, even after granting parent's counsel two recesses to consult with her client and DCPS counsel, parent's counsel incredulously continued to litigate the Compensatory Ed claim each time the hearing reconvened.

5.      Finally, as the parent's last witness, the student's education advocate testified but offered no probative evidence about the 05/26/05 Compensatory Education Plan. That's because the advocate did not even know A.L. until May 2007—one (1)-month after A.L.'s 04/09/07 due process hearing request was filed.

6.      There is no record evidence about how failing to implement the Compensatory Education Plan did or would impact A.L.'s special education program—particularly since the Plan is two (2)-years old and A.L. no longer receives special education services.

7.      And there is no record evidence that A.L. was denied a FAPE as required by the IDEIA when the parent alleges an IDEIA procedural violation.

8.      So based on the record evidence the hearing request is dismissed, with prejudice. And the hearing request was frivolous when filed, and it became patently frivolous based upon the evidence presented at the due process hearing yet parent's counsel continued to litigate.

## VII.   DISCUSSION and CONCLUSIONS OF LAW:

### I

**DCPS is required to make a FAPE available to all children with disabilities within the jurisdiction of the District of Columbia.**

The IDEIA at 20 U.S.C. § 1400 et seq. and 5 D.C.M.R. § 3000.1 (2003) requires DCPS to fully evaluate every child suspected of having a disability within the jurisdiction of the District of Columbia, ages 3 through 22, determine their eligibility for special education and related services and, if eligible, provide special education and related services through an appropriate IEP and Placement.

There was no IDEIA violation at the time the hearing request was filed because the parent alleged an IDEIA procedural violation but proffered no evidence whatsoever that the alleged procedural violation resulted in a denial of a FAPE to the student. Here is why.

1.  Pursuant to 5 D.C.M.R. § 3002.1, LEA Responsibility, "[t]he services provided to the child must address all of the child's identified special education and related services needs and must be based on the child's unique needs and not on the child's disability."

2.  Pursuant to 5 D.C.M.R. § 3013.1(e), Placement, "[t]he LEA shall ensure that the educational placement decision for a child with a disability is ...based on the child's IEP."

3.  Pursuant to 5 D.C.M.R. § 3025, Procedural Safeguards—Prior Written Notice, DCPS shall provide written notice to the parent of a child with a disability before it proposes...an educational placement of the child.

4.  Pursuant to the IDEIA at 20 U.S.C. § 1414 (d) (A), (B) Requirement that Program be in Effect—

    1.  At the beginning of each school year, each local educational agency ... shall have in effect for each child with a disability in the agency's jurisdiction an IEP.

5.  DCPS complied with these cited IDEIA obligations based on the parents 04/09/07 hearing request because A.L. had an IEP for the 2005-06 school year and a placement to implement it. But that year his mother enrolled him

in a private, general education school where he did not receive any special education services. (R. at AL-01, 05)

6. The parent's only claim is that A.L. did not receive his 05/26/05 Compensatory Education award of 17-hours 15-minutes of Specialized Instruction—albeit he has not received special education services since the 2004-05 school year.

7. Since Compensatory Education is relief that a hearing officer can award for missed services, the parent, however, is required to meet the Reid test for the hearing officer to award Compensatory Education. The parent did not meet that burden. So DCPS' Motion for Directed Decision was granted.

8. That's because the parent's requested relief, Comp. Ed in the form of 17-hours 15-minutes of Specialized Instruction, was not supported by any credible evidence that complies with the standards established in Reid v. District of Columbia, 401 F.3d 516, 523-24 (D.C. 2005), that held, "Compensatory Education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a period of time to provide a FAPE to a student."

9. Pursuant to Reid v. District of Columbia, 401 F.3d 516, 522 (D.C. 2005), "Under the theory of 'compensatory education' courts and hearing officers may award educational services ... to be provided prospectively to compensate for a past deficient program."

10. "The ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." Reid, 401 F.3d at 524.

11. Joining sister circuits, the District of Columbia Circuit Court held that "Compensatory Education awards fit comfortably within the 'broad discretion' of courts fashioning and enforcing IDEA remedies, see Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16 (1993)." Reid, 401 F.3d at 523.

12. In sum, the Reid decision expressly states that courts and hearing officers may award Compensatory Education. Reid, 401 F.3d at 522. However, a BLMDT, as required under the IDEIA, includes LEA and SEA representatives who are employees of the state, who, under the IDEIA, cannot conduct due process hearings. So if a hearing officer ordered a BLMDT to decide the parent's Compensatory Education claim, that team is being ordered to engage in a function reserved to courts and hearing officers. And, according to Reid, "under the statute [IDEIA] a hearing

officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." <u>Reid</u>, 401 F.3d at 526.

13. Consequently, in the absence of an agreement between the parties that a certain type, form and amount of Compensatory Educations services are warranted, Compensatory Education is not an appropriate subject of discussion for a BLMDT/IEPT pursuant to a hearing officer's decision. Therefore, a BLMDT/IEPT is not being ordered to decide Compensatory Education services.

14. The parent, therefore, must meet the <u>Reid</u> test to receive a Comp Ed award. And in this matter, the parent did not meet that burden.

15. That is because the parent provided no evidence about how the requested 17-hours 15-minutes of Specialized Instruction was "reasonably calculated to provide educational benefits that likely would have accrued from special education services the school should have supplied in the first place." <u>Reid</u>, 401 F.3d at 524.

16. Instead, the parent's sole position was that the missed 17-hours 15-minutes of Specialized Instruction during the 2004-05 school year should be compensated by giving the student Comp. Ed in the amount 17-hours 15-minutes of Specialized Instruction for each hour of missed services. This hour-for-hour formula was expressly rejected by the Court in <u>Reid</u>." <u>Reid</u>, 401 F.3d at 523-24.

17. In Reid, the parent's advocated for a one-for-one formula. The Court held that, "[a]s to the Reids, we [the Court] reject the one-for-one formula they advocate. Rather, designing [the student's] remedy will require a fact-specific exercise of discretion by either the district court or a hearing officer." <u>Reid</u>, 401 F.3d at 523-24.

18. Ergo, the parent's one-for-one formula in this case suffers the same fate as the parent's in the <u>Reid</u> case where that formula was expressly rejected by the Court. So this hearing officer employs the holding in <u>Reid</u> and rejects the one-for-one formula advocated by the parent in this case.

19. So there is no procedural violation of the IDEIA. But even if there was, that procedural violation did not result in DCPS denying A.L. a FAPE. Here is why.

20. Pursuant to the IDEIA at 20 U.S.C. § 1414 (E) (ii), and 34 C.F.R. § 300.513 (a) Decision of hearing officer on procedural issues, states that, "[i]n matters alleging a procedural violation, a hearing officer may find that a child did

not receive a free appropriate public education [FAPE] only if the procedural inadequacies—

| | (I) | impeded the child's right to a free appropriate public education; |

| | (II) | significantly impeded the parent's opportunity to participate in the decision making process regarding the provisions of a FAPE to the parent's child; or |

| | (III) | caused a deprivation of educational benefits." |

21. And pursuant to 34 C.F.R. § 300.513 (3) Hearing Decisions, "[n]othing in paragraph (a) of this section shall be construed to preclude a hearing officer from ordering an LEA to comply with procedural requirements."

22. A.L. was not denied a FAPE because the alleged procedural inadequacy did not impede his right to a FAPE nor deprive him of educational benefit since he remains at his current placement selected by his parent—a private general education school. And since A.L.'s mother participated in the 05/26/05 BLMDT/IEPT/Comp Ed Meeting where the 05/26/05 Comp Ed Plan was developed, the parent's right to participate in the decision making process regarding the provisions of a FAPE was not impeded.

23. Moreover, according to the testimony of two witnesses who testified in this case the student's mother, and the student's education advocate, they did not even state, let alone prove that the missed services either impeded A.L.'s right to a FAPE or deprived him of educational benefit.

24. Equally troubling is once the parent's case-in-chief was completed, it was patently obvious there was no record evidence about why the requested hours of Specialized Instruction was necessary in compliance with <u>Reid</u>. But parent's counsel continued to litigate. Even after the hearing officer recessed the case to allow counsel to reflect on the record evidence before deciding DCPS' Motion for Directed Decision.

25. Consequently, pursuant to the IDEIA at 34 C.F.R. § 300.517 (a)(ii) Attorney's Fees, "the court, [not a hearing officer] may award reasonable attorney's fees as part of the costs to—to the prevailing party who is an SEA or LEA against the parent or attorney of a parent who files a complaint …that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after litigation clearly became frivolous, unreasonable, or without foundation."

26. Based on this credited testimony of the mother—particularly when she said "I do not care about any prior missed services;" the student's education advocate; and the student's two (2)-year old Compensatory Ed Plan, the litigation was patently frivolous yet parent's counsel continued to litigate.

27. But counsel proffered no evidence about how the missed services and unimplemented 05/26/05 Compensatory Education Plan has, is or would impact A.L.'s special education program progress. And that abyss made the claim patently frivolous.

28. So based on this hearing record, there exists no evidence supporting the parent's claim that A.L. was denied a FAPE.

29. And there was no evidence presented at the due process hearing that complied with <u>Reid</u> that held, "an ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." <u>Reid,</u> 401 F.3d at 524. So Compensatory Education is denied.

30. Pursuant to 5 D.C.M.R. § 3030.3, "The burden of proof shall be the responsibility of the party seeking relief; either the parent/guardian of the child or the LEA. Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student a Free Appropriate Public Education (FAPE)."

31. The parent, who filed the hearing request, had and did not meet their burden of proof in this case because the parent:

    a. failed to meet the <u>Reid</u> test for the hearing officer to award Compensatory Education.

Therefore, in consideration of the record evidence, the hearing officer finds that DCPS did not deny A.L. a FAPE, and issues this:

# <u>ORDER</u>

1. The parent's 04/09/07 Due Process Hearing Request is dismissed, with prejudice.

2. There is no finding that A.L. was denied a FAPE.

3. This Order resolves all issues raised in the student's 04/09/07 Due Process Hearing Request that is dismissed, with prejudice; and the hearing officer made no additional findings.

This is the FINAL ADMINISTRATIVE DECISION.  An Appeal can be made to a court of competent jurisdiction within ninety (90)-days of this Order's issue date pursuant to 20 U.S.C. § 1415 (i)(1)(A), (i)(2)(B).

_____          6/21/07
Frederick E. Woods                                    Date
Hearing Officer


Issued: _____
DCPS Student Hearing Office

10

# District of Columbia Public Schools
## State Enforcement & Investigation Division

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| A.L. | ) | |
| Petitioner, | ) | **IMPARTIAL** |
| vs. | ) | **DUE PROCESS HEARING** |
| | ) | |
| The District of Columbia Public Schools, | ) | |
| Bruce Monroe Elementary School | ) | |
| Respondent. | ) | |

The Individuals with Disabilities Education Improvement Act (IDEIA) 20 U.S.C. §§ 1400 et seq.

Case Information:     Hearing Request Date: April 9, 2007
**Hearing Date: June 11, 2007**
Held at:   Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
SETS Case Number: _____
Student's Birth Date: ███████, 1995
Attending School: Nativity Catholic Academy
Managing School: Bruce Monroe Elementary School

## CERTIFICATION OF RECORD

I, Frederick E. Woods, Impartial Due Process Hearing Officer in this matter, do hereby certify that the attached Record of Proceedings and Index of Exhibits itemizes the entire record in the above captioned matter as of this date, consisting of all letters, pleadings, orders, exhibits, depositions, and tapes.

I further certify that the materials placed in the SHO file for this student are either the original or true copy of the original documents submitted in this matter.

Executed this 21st day of _____June_____, 2007.

_____
Due Process Hearing Officer

11

30

Re: MATTER OF
**A.L. v. DCPS, BRUCE MONROE ELEMENTARY SCHOOL**

# RECORD OF PROCEEDINGS

## DATE:                  DESCRIPTION:

04/09/07          **Due Process Hearing Request Filed By Parent**

05/30/07          **Notice of Due Process Hearing Date Sent to Parties**

06/11/07          **Due Process Hearing Convened; Completed; and
                   Recorded in HR-7A, Start Time 9:00 a.m. and End
                   Time 12:15 p.m.**

06/21/07          **Hearing Officer's Decision Filed with the SHO**

06/21/07          **Hearing Officer's Decision Issued by the SHO**


_____                    6/21/07
    Frederick E. Woods                        _____
**Due Process Hearing Officer**                    **Date**


12

**ATTENDANCE SHEET**

STUDENT'S NAME: ___A████ C████___

SCHOOL OF ATTENDANCE: ___████████___ Nod...ly Crihelse Acde

D.O.B: ___████/95___

12:15

| HEARING DATE: Mon 6/11/07 ROOM: 7 A | TIME: 9:0 (A.M.) P.M. | |
|---|---|---|
| **PARTICIPANT NAME:** | **ON BEHALF OF DCPS OR STUDENT:** | **TITLE:** |
| Jon Tillery | Student | Attorney |
| Theresa Lee | Son | Mom |
| Diane Crews Pinkney | Student | Ed. Advocate |
| Tiffany Roberts | DCPS | Atty Advisor |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Impartial Hearing Officer



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
*825 North Capitol Street, N.E., 9ᵗʰ Floor*
202-442-5000   Fax # 202-442-5098
www.k12.dc.us

June 4, 2007

Jani Tillery, Esq.
1220 L Street, NW Suite 700
Washington, DC 20002

**DISCLOSURE STATEMENT AND \*\*MOTION TO COMPEL**

**VIA FACSIMILE 202/742-2098**

**Subject: Due Process Hearing for A█████ I██**
**DOB:** ███-95

Dear Ms. Tillery:

At the upcoming due process hearing in the above-referenced matter, scheduled for Monday, June 11, 2007, and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

**Witnesses**

Pat Young, or her designee(s), Director, CARE Center, DCPS,
Cindy Brown, or her designee(s), Case Manager, DCPS
Natalia Houston, or her designee(s), Case Manager, DCPS
Gayle Hall, or her designee(s), Case Manager, DCPS
Zondra Johnson, or designee(s), Case Manager, DCPS
Chandra King, or designee(s), Case Manager, DCPS

\* DCPS intends to call the parent as a witness. DCPS requests that mother attend the hearing. Pursuant to 34 C.F.R. 300.509(a)(2) and 5 DCMR 3031.1(b), DCPS hereby compels the attendance of the above witness.

**Documents\***

---

[1] Witnesses may testify by telephone.

*Children First*

DCPS reserves the right to examine any witnesses called or identified as a potential witness by the representative of the student as though the witness was called by DCPS.

DCPS reserves the right to rely upon and /or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Also, DCPS reserves the right to call rebuttal witnesses in its case.

\*DCPS reserves the right to rely upon documents submitted by the parent and DCPS in prior disclosures regarding this student.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5000.

Sincerely,

Tiffany Puckett
Attorney Advisor

cc: Student Hearing Office

*Children First*

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Christie Fontaine-Covington |
| Christopher L. West | Telephone: (202) 742-2000 | Jani Tillery |
| John A. Straus | Facsimile: (202) 742-2098 | Kimberly Glassman |
| Omar Karram | e-mail: Admin@Jeblaw.biz | |

------------------------------------

------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

June 4, 2007

**Via Facsimile and/or Hand Delivery**
Attorney Advisor
Office of General Counsel
District of Columbia Public Schools
825 North Capitol Street, NE, 9th Floor
Washington, DC 20002

Re:  **Five-Day Disclosure for A██████L██ DOB: ██████/05**
     **Student at Nativity Catholic Academy**

Dear Attorney Advisor:

For the upcoming hearing scheduled for June 11, 2007 at 9:00 a.m. or any subsequent hearing regarding this student and pursuant to 34 C.F.R. 300.509 (a)(3); Assistance to States for the Education of Children with Disabilities, 70 Fed. Reg. 35782, 35872 (June 21, 2005) (to be codified at 34 C.F.R. pt. 300); and D.C. MUN. REGS. tit. 5, § 3031.2 (2003), and in addition to any documents and witnesses that the District of Columbia Public Schools ("DCPS") may disclose, the parent may rely on the following documents and witnesses:

### Witnesses*

1.    A██████ L██, Student;
2.    Theresa Lee, Mother;
3.    Diane Crews-Pinkney, Educational Advocate, James Brown & Associates, PLLC, or designee; and
4.    Clarence Hayes, Legal Assistant, James Brown & Associates, PLLC, or designee.

Witnesses' names, addresses, and phone numbers:
1 and 2-Witnesses reside at 722 Gerard Street, N.W., Washington, D.C. 20001; (202)-332-5366.
3 and 4-Witnesses can be reached at James E. Brown & Associates, PLLC, 1220 L Street, N.W., Washington, D.C. 20005; (202)-742-2000.

**\*Witnesses may testify via telephone**

35

Page Two
5-Day Disclosure for A̲̅̅̅̅̅̅̅ I̲̅̅̅
June 4, 2007

## Documents

| | |
|---|---|
| AL-1 | Administrative Due Process Hearing Complaint (4-09-07); |
| AL-2 | IEP and Meeting Notes (5-26-05); |
| AL-3 | IEP Addendum for ESY Services (5-26-05) |
| AL-4 | Compensatory Education Plan (5-26-05) |
| AL-5 | IEP and Meeting Notes (1-26-06) |
| AL-6 | Report Cards |
| AL-7 | Stanford Nines Achievement Tests |
| AL-8 | Psychoeducational Evaluation (3-3-05) |
| AL-9 | Psychoeducational Evaluation (11-15-04) |
| AL-10 | Independent School District No. 709 v. Linda Bonney, 44 IDELR 191, (Minn Ct. App. 2005) |
| AL-11 | Christopher Reusch v. Fountain, 21 IDELR 1107, 872 F. Supp. 1421 (1994) |
| AL-12 | Harris v. District of Columbia, 19 IDELR 105, (U.S. Dist. Ct, D.C 1992) |
| AL-13 | ESY Eligibility Criteria |
| AL-14 | Reid v. District of Columbia, No. 02cv01611 (D.C. Cir. 2005) |
| AL-15 | Hearing Notice (5-30-07) |

**\* Witnesses may testify via telephone**

Parent reserves the right to rely on any documents presented by DCPS that the parent deems relevant in this case.

Parent will object to the testimony of any expert witnesses if a curriculum vitae and/or résumé is not provided with the DCPS' 5-day disclosure.

Additionally, parent reserves the right to introduce any and all witnesses and/or documents for the purpose of impeachment and rebuttal.

If you should have any questions or wish to discuss any aspect of this case before the hearing, please contact me at (202) 742-2000.

Sincerely,

Jani S. Tillery, Esq.

Attachments
cc:  Sharon Newsome, Hearing Coordinator

36

EXHIBIT

$AL-1$

ALL-STATE LEGAL®

## JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez
Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington
Jani Tillery

------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

**TO:** Sharon Newsome, Hearing Coordinator
Student Hearing Office

**FROM:** Clarence Hayes, Paralegal to Jani Tillery, Esq.

**DATE:** April 9, 2007

**FAX NO:** 202-442-5556

**SUBJECT:** A██████ L██, DOB: ██-95

**NUMBER OF PAGES INCLUDING COVER SHEET:** 9

**COMMENTS:** Administrative Due Process Complaint Notice

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

37

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# ADMINISTRATIVE DUE PROCESS
# COMPLAINT NOTICE

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child.  **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice.  Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting.  You will be contacted by a representative of the Local Educational Agency to schedule the meeting.  **The Student Hearing Office does NOT schedule resolution meetings**.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.    INFORMATION ABOUT THE STUDENT:

Name of the Student:   A████ L██ Date of Birth: ████, 1995

Address:  722 Girard Street, N.W., Washington, DC 20001

Present School of Attendance:   Nativity Catholic Academy

Parent/Guardian of the Student:    Ms. Theresa Lee

**B.    Legal Representative/Attorney (if applicable):**

Name:        Jani S. Tillery, Esq.

Address:        1220 L Street, NW, Suite 700, Washington, DC 20005

Phone: (w) _202-742-2000_ (Fax) _202-742-2097_ (e-mail) _____

Will attorney / legal representative attend the resolution session?    **X** Yes        ☐ No

**C.    Complaint Made Against (check all that apply):**

**X** DCPS
☐ Charter school (name of the charter school if different from page one)_____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**D.    Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

**X** I wish to waive the Resolution Session Meeting

**E.    Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent.  Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing.  Please check all that apply:

**I am requesting an administrative due process hearing <u>only</u> at this time.**

**F.    Facts and Reasons for the Complaint:**

**I.    Background Information**

1.    The student's name is A████ L██

2.    The student's date of birth is ███████, 1995.

3.    The student's address is 722 Girard Street, N.W., Washington, D.C. 20001

4. The student's home school is Bruce-Monroe Elementary School in the District of Columbia.

5. The student currently attends Nativity Catholic Academy in the District of Columbia.

6. On May 26, 2005, the IEP team convened and drafted an initial IEP. The student was identified as a student with specific learning disabilities. The IEP provides for him to receive 5 hours of specialized instruction per week. *See* IEP meeting notes, dated May 26, 2005.

7. The May 26, 2005, IEP provided for ten (10) hours of ESY services per week for the summer of 2005. *See* IEP Addendum for ESY Services, dated May 26, 2005.

8. On May 26, 2005, a compensatory education plan was developed. The compensatory education services were to begin on May 27, 2005. *See* Compensatory Education Plan, dated May 26, 2005.

9. DCPS failed to implement the compensatory education plan and extended school year services as agreed by the team in the May 26, 2005 IEP meeting.

10. On April 6, 2007, the parent, through counsel, requested a comprehensive reevaluation of the student, including a psycho-educational, speech and language, audiological, and social history evaluation.

11. The student is in danger of failing the 5th grade.

## II. Issues presented.

**1. DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.**

Pursuant to 34 C.F.R. § 300.324 (b), DCPS

> must ensure that...the IEP team reviews the child's IEP periodically, but not less, than annually, to determine whether the annual goals for the child are being achieved; and revises the IEP, as appropriate, to address any lack of expected progress toward the annual goals...and in the general education curriculum, if appropriate; the results of any reevaluation conducted...information about the child provided to, or by, the parents...the child's anticipated needs; or other matters.

On May 26, 2005, DCPS convened an IEP team to draft an initial IEP. There is nothing in the record that indicates that DCPS convened an IEP team meeting to review and revise the IEP since the expiration of the student's IEP on May 26, 2006. Nor is there anything in the record that indicates that that student is receiving any specialized services. Therefore, in this case it is clear that DCPS has failed to comply with the requirements of IDEIA.

40

**2. DCPS failed to provide the student with the agreed upon compensatory services.**

*Harris v. District of Columbia* states that students with disabilities are entitled to compensatory services where they have been "deprived of special education in violation of the IDEA." Pursuant to *Reid v. District of Columbia*, "the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *See also, School Committee of the Town of Burlington Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985) (In *Burlington*, the United States Supreme Court concluded that retroactive reimbursement is available to parents. This led to courts allowing compensatory services to parents as an equitable remedy.) *Reid v. District of Columbia*, No. 02cv01611 (2005) (In Reid, the Circuit Court for the District of Columbia Circuit determined that "courts and hearing officers may award 'educational services…to be provided prospectively to compensate for a past deficient program.'" *See Id.* at 9 (quoting *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003). Pursuant to D.C. Mun. Regs. tit. 5, § 3010.2 (2003), DCPS "shall implement an IEP as soon as possible after the meeting where the IEP is developed…"

On May 26, 2005, DCPS agreed to provide the student with 17 hours and 15 minutes of compensatory education in the areas of reading and written expression starting May 27, 2005. However, DCPS did not implement the compensatory education plan and as a result the student did not receive reimbursement for missed education services.

**3. DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005.**

District of Columbia Public Schools ("DCPS") failed to provide for Extended School Year services ("ESY") in the student's 2005 program, which the student requires to prevent regression and enable him to make appropriate progress. Under the IDEIA, schools are required to provide ESY services as necessary to provide a child with FAPE (*See* 34 C.F.R. Section 300.106(a). ESY services are considered to be necessary when there is evidence of regression without such services and the student lacks the ability for recoupment in a reasonable period of time. See Independent School District No. 709, Duluth v. Bonney, 44 IDELR 191 (Minn Ct. App. 2005). ESY services are also considered to be necessary when emerging skills are at a breakthrough point. IDEA further states that "Extended school year services must be provided only if a child's IEP Team determines, on an individual basis…that the services are necessary for the provision of FAPE to the child." (*See* 34 C.F.R. Section 300.106(a)(2).

At the May 26, 2005 IEP meeting, the IEP team determined that the student was to receive ESY services to address the student's emerging skills in reading, written

expression, and to prevent regression in his educational progress. Nevertheless, the student did not receive ESY services in the summer of 2005.

### III.    Relief Sought.

1. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.

2. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his agreed upon compensatory services.

3. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his Extended School Year ("ESY") services for the summer of 2005 and the summer of 2006.

4. DCPS shall within five (5) business days convene an interim IEP meeting and develop an interim IEP for the student.

5. DCPS shall fund a comprehensive reevaluation including a psycho-educational, speech and language, audiological, social history reevaluation, and any other evaluations deemed necessary by the evaluators.

6. DCPS shall within ten (10) business days of receipt of the last evaluation, convene an IEP meeting to review the evaluations, revise the IEP consistent with the evaluations and determine an appropriate placement for the student where the IEP may be implemented.

7. DCPS shall fund student with seventeen (17) hours and fifteen (15) minutes of compensatory education services in the form of specialized instruction not to exceed sixty (60) dollars an hour.

8. DCPS shall fund one hundred and twenty (120) hours of Extended School Year Services ("ESY") for ESY services missed during the summer of 2005 and summer of 2006.

9. DCPS shall fund the student with Extended School Year Services ("ESY") during the 2007 summer.

10. DCPS agrees to pay counsel for the complainant reasonable attorney's fees and related costs incurred in the matter.

11. All meetings shall be scheduled through counsel for the complainant in writing, via facsimile, at 202-742-2098.

42

12. DCPS send all notices to counsel for the parent with copies of such to the parent and in the parent's native language.

13. DCPS within ten (10) calendar days of the filing of this complaint, pursuant to 34 C.F.R. § 300.508(e), shall provide the complainant's representative, through Jani S. Tillery, Esq., via facsimile, at 202-742-2098, the following:  i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action.

14. In the event DCPS fails to answer/respond to the issues alleged in the complainant's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the complainant will be deemed true and accurate and act as a waiver, on the part of DCPS, for their desire to have a Resolution Session Meeting, and the complainant's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA.

15. DCPS, within fifteen (15) calendar days of receiving the complainant's complaint, pursuant to 34 C.F.R. § 300.508(d), shall respond to the complainant's request alleging any insufficiency of notice.

16. DCPS' failure to comply with 34 C.F.R. § 300.508(d), and allege any insufficiency of the complainant's administrative due process complaint, will constitute waiver on the part of DCPS to make such argument at any later date and time.

17. DCPS, pursuant to 34 C.F.R. § 300.510(a), within fifteen (15) calendar days of receiving the complainant's administrative due process complaint, shall contact the complainant's representative, in writing, via facsimile, at 202-742-2098, to schedule and convene a Resolution Session Meeting.

18. DCPS, pursuant to 34 C.F.R. § 300.510(a), shall convene the Resolution Session Meeting, with the complainant, the complainant's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint.  The relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons:  1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student, and 6) any service providers for the student.

19. DCPS' failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified according to the 34 C.F.R. § 300.510(a) shall constitute joint waiver between DCPS and the complainant to have such meeting and the forty-five

(45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the complainant's counsel.

20. D.C. MUN. REGS. tit. 5 § 3030.1 provides that the public agency shall ensure that not later than 45 days after the receipt of a request for a hearing, a final decision is reached in the hearing and a copy of the decision is mailed to each of the parties. Should the hearing for this student take place 45 days after the date of this hearing request, DCPS shall be found to have violated the 45-day time line.  DCPS shall provide the parent with a due process hearing within 15 calendar days of a request on any issue arising out of the noncompliance with DCPS' obligations hereunder, or any disagreement that the parent may have with the assessments, programming or placement.  Such issue will be raised at the hearing with or without an amended hearing request.

21. Pursuant to D.C. MUN. REGS. tit. 5 § 3000 et. seq., DCPS shall ensure that BP's rights and his complainant's rights are protected, and consistent with the Hearing Officer's preamble to all due process hearing that, "the hearing officer will rule on the evidence as presented at the hearing and will ACT in the BEST INTEREST of the child," and make a ruling consistent with the obligation of DCPS and the hearing officer's responsibility.

22. The hearing officer shall find that the complainant is the prevailing party in this action.

**G.    Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____
- Special Accommodations for Disability (please be specific)_____
- Other_____

**H.    Signature:**

_____    4/9/07_____
Legal Representative //Advocate (if applicable)         Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC  20002**

44

**Fax number: 202/442-5556**

```
            ***********************
            ***   TX REPORT   ***
            ***********************


  TRANSMISSION OK

  TX/RX NO             4004
  RECIPIENT ADDRESS    912024425556
  DESTINATION ID
  ST. TIME             04/09 15:10
  TIME USE             01'19
  PAGES SENT           9
  RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*
*Attorneys at Law*

| | | |
|---|---|---|
| James E. Brown | | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Omar Karram |
| Christopher L. West | Telephone: (202) 742-2000 | Christie Fontaine-Covington |
| John A. Straus | Facsimile: (202) 742-2098 | Jani Tillery |
| ----------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

TO:    Sharon Newsome, Hearing Coordinator
       Student Hearing Office

FROM: Clarence Hayes, Paralegal to Jani Tillery, Esq.

DATE:  April 9, 2007

FAX NO: 202-442-5556

SUBJECT: A██████ L██, DOB:███-95

NUMBER OF PAGES INCLUDING COVER SHEET:    9

COMMENTS:  Administrative Due Process Complaint Notice

46

**EXHIBIT**

AL-2

ALL-STATE LEGAL

## DISTRICT OF ___ BIA PUBLIC SCHOOLS
### WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page ___

Additional Comment ___

### I. IDENTIFICATION INFORMATION

Student Name: Last L___    First A___    MI ___

Student ID 9078616    Soc. Sec. No. ___    Age: 9.11    Grade 3

Gender ☒ M ☐ F    Date of Birth ___ 95    Ethnic Group Afro-American

Address 722 Girard Street, N.W.
House No.  Street Name    Quadran  Apartment #

☐ Non-attending    Washington    D.C.
City    State    Zip Code

Attending School Bruce Monroe    Home School Bruce Monroe

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS1

Parent Mr. & Mrs. Lee

Address of (if different from student):    ☐ Parent ☐ Guardian ☐ Surrogate

House No.    Street Name    Quad.    Apt. No.    City    State    Zip Code
Telephone: Home 202-327-4128 Cell    Work

### II. CURRENT INFORMATION

Date of IEP Meeting: 5-26-05
Date of Last IEP Meeting: ___
Date of Most Recent Eligibility Decision: ___

Purpose of IEP Conference:
☒ Initial IEP    ☐ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

Indicate Level of Standardized Assessment: ___

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | - | TRANSPORTATION |
|---|---|---|
| ESY | | TRANSITION |

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral ___ |
| Parent | English | English | English | Native Language | Rdg / Written ___ |
| Home | English | English | English | Native Language | Instrument: ___  Date: ___ |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SpEd | Total | FREQUENCY Hr./Min. | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos. |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | | 5 | 5 | H | W | Sp. Ed. Teacher | 5-27-05  5-26-05 | 10 Mos |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | | | | Hours Per Week | 5 hrs per w/k. | | | |

- Disability(ies) Specific Learning Disabled

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%    ☐ 21-60%    ☐ 61-100%

Percent of time NOT in a Regular Education Setting 16-70

### I. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Terrance Beason (school psychologist)    _Terrance B_
Viola Wu (General Ed. Teacher)    _Viola Wu_
Mary Battle Sp.Ed. Teacher    _Wm. E. Duganit 18_
Teacher Williar, (CSW)    _(illegible)_
Jennia L. Hurtado    _Connell (administrator)_
Barbara Bailey SP.Ed. Spec    x Theresa Lee (mom)

I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature X _Theresa_    Date 5-26-05

District of Columbia Public Schools  07-02-200___    Division of Special Education    Appendix - A    IEP Page 1 of 4

PARENT AGREES WITH THE IMPLEMENTATION OF IEP BUT NOT ALL CONTENTS

47

| Student Name | A_____ L_____ | Managing School | Bruce Monroe | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number: 907 86 16 | | DOB: _____ 95 | Attending School Bruce Monroe | Page 2 of 4 |

**VII. Present Educational Performance Levels in Areas Affected by the Disability**     Additional Comments: ☐

**Academic Areas:** (Evaluator) Terrance Beason (Reviewer)

**Score(s) When Available**

**Math Strengths:**
Based on A_____ performance on the Woodcock-Johnson, (WJ) he possesses grade level difficulties in arithmetic

| | |
|---|---|
| Math Cal. | 104  10-1 |
| Math Rea. | 90  8-4 |

**Impact of disability on educational performance in general education curriculum:**
Academically A_____ skills aren't expected to impact his classwork.

See goal page:
Date: 3-3-05

**Reading Strengths:**
Based on his performance in on the (W-J), A_____ core Reading & written language skills aren't

| | |
|---|---|
| Rdg. Com | 79  7-3 |
| Rdg. Basic | 76  7-6 |
| Written Ex. | 71  7-4 |

**Impact of disability on educational performance in general education curriculum:** 71-A found to strengths
His deficits on reading are expected to impact him academically

See goal page:
Date: 3-3-05

**Communication (Speech & Language)** (Evaluator)

**Score(s) When Available**

Strengths:

| |
|---|
| Exp.Lang. |
| Rec- Lang. |
| Artic |
| Voice |
| Fluency |
| Exp. Voc. |
| Rec. Voc. |

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Motor/Health** (Evaluator)

**Score(s) /Results When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Social Emotional Behavioral Areas:** (Evaluator)

**Score(s) When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

**Cognitive/Adaptive Behavior:** (Evaluator) Terrance Beason (Reviewer)

**Score(s) When Available**

Strengths:
Based on the WASI A_____ demonstrated more developed abilities verbally than non-verbally

Verbal IQ = 86
Performance IQ = 76
Full Scale IQ = 78

**Impact of disability on educational performance in general education curriculum:**
A_____ is expected to experience difficulties academically in light of his cognitive functioning

See goal page:
Date: 3-3-05

**Prevocational Skills:** (Evaluator)

**Score(s) When Available**

Strengths:

Impact of disability on educational performance in general education curriculum:

See goal page:
Date:

| ent Name _____ | Managing School _Bruce Monroe_ | DCPS - IEP |
| ent ID Number 9678616  DOB ___ 95 | Attending School _Bruce Monroe_ | Page 3 of 4 |

| **SPECIALIZED SERVICES** | Additional Comments: ☐ | Goal Number: ☐ |

Area addressed by goal: _Academic: Reading_
_Readiness Skills_

IAL GOAL: (including mastery criteria)

Improve A_____ Reading Skills
for an approximate growth of Ten (school)
months or to the greatest extent possible as
evidenced by 80% or better accuracy

ler(s): _Special Education Teacher_

der audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| A_____ will classify objects by categories as evidenced by 80% (or better) accuracy | | Quarterly |
| A_____ will classify pictures by categories as evidenced by 80% (or better) accuracy | | Quarterly |
| A_____ will drill practice with Teacher step-by-step assistance to learn the vowels and consonants sounds given varies combinations as evidenced by 80%... | | Quarterly |
| A_____ will match the vowels and the consonants to make blends of specific sounds as evidenced by 80-100% accuracy | | Quarterly |
| A_____ will construct a mixture of letters and sounds to make words, phrases, and sentences to read as evidenced by 80-100% accuracy | | Quarterly |
| A_____ will sequence the consonant ers and sounds in the order they should mastered P,B,M,W,h,T,Dn,G,K,NG,Y,FV,th (voiced) invoiced) L,SZ,wH zh, sh, ch, J, K as denced by 80% accuracy. | | Quarterly |

**EVALUATION PROCEDURE(S)**

tfolio  ☐Log  ☐Chart  ☐Test  ☐Documented Observation  ☐Report  ☐Other _____

| ne | ▓▓▓▓ ▓ ▓▓▓▓ | Managing School | *Bruce Monroe* | DCPS - IEP |
|---|---|---|---|---|
| Number 9078616 | DOB ▓▓▓ 95 | Attending School | *Bruce Monroe* | Page 3 of 4 |

| CIALIZED SERVICES | Additional Comments: | | Goal Number: ▢ |
|---|---|---|---|

Area addressed by goal: *Academic Reading: Critical Comprehension*

:OAL: (including mastery criteria.)

=Improve Reading Skills for an approximate of Ten months or better or to the extent ssible as evidenced by 80% accuracy

=Special Education Teacher

udience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| ▓▓▓▓ will be able to find identify the main idea in Tory or TExt as evidenced by 80% accuracy | | Quarterly |
| ▓▓▓ will be able to iden-y the supporting details as evidenced y 80% accuracy | | Quarterly |
| A▓▓▓▓ will be able to pre-ict what will happen after Reading ortion of a story as evidenced by 80% acc | | Quarterly |
| ▓▓▓ will be able to dis-guish fantasy from reality as evi-enced by 80% accuracy | | Quarterly |
| ▓▓▓ will be able to decipher t from opinion as evidenced by o performance using examples. | | Quarterly |
| ▓▓▓ will be able to discuss characteristics of an antagonist in s vs a protagonist as evidenced by 90% accuracy. | | Quarterly |
| ▓▓▓ will be able to analyze stories and ians draw his own conclusions in 80% accuracy q... | | |

EVALUATION PROCEDURE(S)

| ? | Log | Chart | Test | Documented Observation | Report | Other _____ |
|---|---|---|---|---|---|---|

Student Name A_____ L_____
Student ID Number 907 8616    DOB ____95

Managing School ___ _ _____ ES
Attending School Bruce Monroe

DCPS - IEP
Page 3 of 4

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |

Area addressed by goal: *Academic: Written Expression*

**ANNUAL GOAL:** (including mastery criteria)

Improve Written Expression skills for an approximate growth of ten months as to the extent possible as evidenced by 80% accuracy

Provider(s): *Special Education Teacher*

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| — A_____ will be able to write a grammatically correct sentence by using the correct subject and verb agreement as evidenced by 80-100% accuracy | | Quarterly |
| — A_____ will be able to write capital letters at the beginning of a word which begins a sentence ..1 80% accuracy | | Quarterly |
| — A_____ will be able to write a simple sentence by subject-verb-object (SVO) as evidenced by 80% accuracy. | | Quarterly |
| — A_____ will be able to write a compound sentence connected by an "and" conjunction as evidenced by 80%... | | Quarterly |
| — A_____ will be able to write a complex sentence using subjunctions to connect the sentence as evidenced by 80% accuracy | | Quarterly |
| — A_____ will learn and practice write the proper//logical syntax (placement of words in written text) as evidenced by 80-100% accuracy | | Quarterly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☐ Documented Observation  ☐ Report  ☐ Other _____

| | | |
|---|---|---|
| Student Name ▓▓▓▓▓▓ L. ▓▓▓ | Managing School Br. Monroe | DCPS - IEP |
| Student ID Number 907 86 16   DOB ▓▓▓ 95 | Attending School Bruce Monroe | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐    Goal Number: ☐

Area addressed by goal: _Academic: Written Expression_

**ANNUAL GOAL: (including mastery criteria.)**

A▓▓▓ will improve written Expres-
sion for an approximate growth of
Ten months or better — or to the extent possible
as evidenced by 80% performance.

Provider(s): _Special Education Teacher_

**Consider audience, behavior, condition, degree and evaluation.**

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| • A▓▓▓ will write declarative (telling) sentences to make statements about the world around him ...80%... | | Quarterly |
| • A▓▓▓ will write interrogative (asking) sentences from statements as evidenced by 80% accuracy | | Quarterly |
| • A▓▓▓ will be able to write imperative (command/order) sentences to show distress and or a directive to do ...80%... | | Quarterly |
| • A▓▓▓ will be able to write exclamatory sentences, depicting urgency or excitement as evidenced by 80% accuracy | | Quarterly |
| • A▓▓▓ will be able to write a descriptive paragraph where he describes who, what, when, where and how ... by 80%... | | Quarterly |
| • A▓▓▓ will write to the higher-order thinking spectrum by responding to: Examples: A▓▓▓, what do you think about a 12 month school year as evidenced by 80% accuracy of subject-verb agreement, capitalization, syntax, and end marks punctuation. | | Quarterly |

| EVALUATION PROCEDURE(S) | | | | | | |
|---|---|---|---|---|---|---|
| ☑ Portfolio ☐ Log ☐ Chart ☐ Test ☐ Documented Observation ☐ Report ☐ Other _____ |

ent Name _____     Managing School _Bruce Monroe_     DCPS - IEP
ent ID Number _9078616_   DOB ___93_   Attending School _Bruce Monroe_     Page 4 of 4

Additional Comments: ☐

EAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
VICE ALTERNATIVES

curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education?  Yes ☐  No ☑

anation for removal out of regular education classroom.

*needs in reference to written language and Reading will be addressed in a Special Education setting with the special education teacher.*

**upplementary Aids and Services**

**Classroom Needs**

| name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

k and list modifications and/or accommodations for testing:  ☐ None needed

iming/Scheduling: *Flexible Scheduling*
etting: *Small group*
resentation: *Repetition - of clear directions*
esponse: *Immediate*
quipment:

**ATE AND DISTRICT ASSESSMENTS:**

evel I   Tested with non-disabled peers under standard conditions without accommodations.   ☐ Level II   (Describe accommodations for level II) Tested under standard conditions with special accommodations.

evel III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations   ☐ Level IV   (Describe the alternative assessment)

evel V  Portfolio:

**reas Requiring Specialized Instruction and Related Services:**

Modifications:

| Reading | ☑ Physical Sensory | ☐ Transition | ☐ Language Arts/English |
| Mathematics | ☐ Social Emotional | ☐ Vocational | ☐ Social Sciences |
| Written Expression | ☐ Physical Development | ☐ Independent Living | ☐ Biological & Physical Sciences |
| Other | | ☐ Speech/Language | ☐ Fine Arts |

Note:     Apply annual goals/objectives and/or modifications to address barriers in each area checked above.

**LACEMENT CONSIDERATIONS AND JUSTIFICATION**

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| *General & Special Education Combined* | *accepted* | *Varied his Specialized instruction and travel time lost @ Non disabled peers* |

ditional reccommendations to address the harmful effects:
*Specialized instruction in the resource center 16% of each school day to address Reading and writing skills.*

53

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT _____     SCHOOL _Bruce_     DATE: _5.26.05_

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| _Therm_ | _Martha_ | |
| _Kevin A. Washington_ | _Faith_ | |
| _Mary Battle_ | _Mary Battle_ | Sp. Ed. |
| _Jean Wu_ | _Wu_ | Social Worker |
| VIOLA WU | _Viola Wu_ | General Ed. Teacher |
| _Marta Palacios_ | _Marta Palacin_ | Principal |
| TERRANCE BEASON | _Jenn_ | School psychologist |
| _Senmith L. Hurtado_ | _Senmith Hurtado_ | Counselor |

After reviewing all of the documents, the MDT determined that the student is eligible for special education as a _Learning Disabled Student_

Specialized instruction is required in the following academic areas: _Reading, and Written Expression, and math_

The total number of hours for specialized instruction is _5 hours per week_

Related services are required in the following areas:

The following accommodations and /or modifications will made: _IEP Addendum, for ESY Services, along with a compensatory Educational plan, for 17 HRS and 15 /minutes beginning 5.27.05 in Resource special Education Center 2hrs daily; last day June 9, 2005_ _2 HRS 15 min_

Placement Discussion: The IEP can be implemented at the neighborhood school which is _Bruce Monroe Elementary School. 3012 Georgia Avenue Washington, D.C. 2001_



EXHIBIT
AL-3
ALL-STATE LEGAL®

IEP Attachment - D
ESY Services
Page 1 of 2

**District of Columbia Public Schools**
**Division of Special Education**

## IEP ADDENDUM FOR ESY SERVICES

Student Name: A_____ l_____  Initial ✓  Date of Birth: _____.95

Gender: ☑ Male ☐ Female                     Grade _3_

School: _Brice Monroe Elementary_, Date IEP Written _5·26·05_

**Checklist:**

|   |   | Yes | No |
|---|---|-----|-----|
| 1. | IEP is appropriate and reasonable for student | ☑ | ☐ |
| 2. | All or most IEP goals and objective are being achieved | ☐ | ☐ |
| 3. | Severity of student's disability requires individualized programming in areas of : _Reading and Written Expression_ | ☑ | ☐ |
|  | • Self sufficiency and independence from caretaker or • _Reading and Written Expression_ | ☑ | ☐ |
| 4. | Student record shows serious regression following interruptions in the school program. | ☑ | ☐ |
| 5. | Student record shows inability to recoup skills a reasonable time following regression. | ☐ | ☐ |
| 6. | Student has critical need for continuity in programming to facilitate achieving educational benefit from her or his education program. | ☑ | ☐ |
| 7. | Transportation services needed | ☐ | ☐ |

**Determination**

After review the IEP team **RECOMMENDS** the provision of an extended school year program for the above student.        ☑ ☐

**Reason**

A_____ has demonstrated emerging skills breakthrough in critical skill, which will be lost without ESY Services which will most likely prevent him from acquiring the full benefit from the educational program during the regular school year. Also, he needs ESY to recoup his current level of information, skills, and behavior in areas necessary for self- sufficiency.

55

## Special Education Goal and Objective for ESY

Goals and objectives from the IEP which are to be specifically addressed during ESY are:

| Annual Goal(s) | Skills Area(s) |
|---|---|
| • Comprehend direct meanings of words sentences or passages; judge reality or fantasy and fact/opinion | Reading Skills |
| • Identify main ideas and supporting details Recall sequences; predict outcomes. | |
| • Demonstrate syntax fluency; correct use of grammar, mechanics; | Written Expression |
| • Connect verbs to agree with the subjects | |
| • Write the four (4) types of sentences | |

| Special Education Services for ESY | | RELATED SERVICES | | | | |
|---|---|---|---|---|---|---|
| Skills Area(s) | *Setting | Time to be Provided | | | Projected Date of Initiation | Number of Weeks |
| | | Amount | Unit ( Hours/ Mins ) | Period ( D/ W/ M ) | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

\* Setting : A - Full Time General Education B - Combo. General Education / Resources Classroom ; C - Out of Regular Education

| ESY Least Restrictive Environment (LRE) | |
|---|---|
| ☑ Placement as in regular school year | Hours/Week |
| ☐ Placement different from regular school year | 10 Hrs |

Placement

Specify placement (setting and alternate) of ESY service:
General and Special Education combination

Explain why options selected above are the most appropriate and the least restrictive. The combination of general education setting and a special ed. re-source center provides a balance of a least restrictive environment for _____ which serves to address needs adequately

Describe any other options considered, and provide reasons those options rejected.

| Parent Name | Date | Signature |
|---|---|---|
| | | |

56

EXHIBIT

AL-4

ALL-STATE LEGAL®

## COMPENSATORY EDUCATIONAL PLAN*

Comp-ED Servi____
Page 1 of 2

___ion I:

___dent Name _[redacted]_ L___ DOB _[redacted]_ .95 Sex _M_ Grade _3_

_9.11_ Date of IEP _5.26.05_ Date of Proposal _5.26.05_ Home School _Bruce Monroe_

___nding School: _Bruce Monroe E.S._ Disability _Specific Learning Disability_

___guage _English_ Address: _722 Girard Street NW_

___ent Name: _Theresa Lee_ Phone (H): _____ (W): _____

___uctional/Related Services Missed: _Reading and Written Expression Skills_

___e Period in which service Delay/Disruption occurred: _February 19, 2005 – May 26, 2005_

___cription of Compensatory Education due to ✓ HOD** ___ SA** ___ MA** ___ Other

*(Describe the requirements for DCPS' Comp. ED services based on the HOD/SA/MA document checked above.)*

_Minus Holidays, Record Keeping days, and a_
_____dent's Absences, DCPS reimbursed the time A___
___ssed to compensate the delay or disruption of the service._

___ion II: Compensatory Education Services to be provided:

| Skill Areas | Provider | Beginning Date | Duration/Total Hours |
|---|---|---|---|
| ___eading | Class room/Sp.Ed. Teacher | 5.27.05 | 17 Hrs. 15 Min |
| ___itten | | | |
| Expression | | | |

___ial Education Goals and Objectives for Compensatory Education Services

___s and objectives from the current IEP which are to be implemented for Compensatory Education.

| Annual Goals (s) and Objective (s) | Skills Area (s) |
|---|---|
| ___al Goal: _Comprehend the direct meaning of words, sentences, or passages (Literal Comprehension)._ ___ctive: _Recognize main ideas, comparisons; recall ___porting details; recall Sequence; predict outcomes ___ment of reality or fantasy – fact/opinion and worth_ | - Reading Skills: - Sight Word Recognition - phonic skills - Decoding - oral Paragraph Reading |
| ___al Goal: _Demonstrate Fluency in Syntax, grammar and Mechanics of Written Expression._ ___ctive: _Make grammatically correct Subject/verb agree ___t; use Capital letters for proper Nouns and first word ___ Sentence; indent 1st line of a paragraph_ | Written Expression Skills: Sentences: declarative, interrogative imperative; exclamatory |
| ___al Goal: ___ctive: | |
| ___al Goal: ___ctive | |

___t Signature: _____ Principal Signature: _Marty Palacios_

___f Members: _Terrance Beason_ psychol___ Position: _Psychologist Jerome ___

_Heather Williams_ Soc___ _Sonova Hurtado Dennis Hike___

_Viola Wu_ General Ed. Teacher _GEA_

_Barbara Bailey_ Sp.Ed.Spec.

_M. Battle Special Education_

57

**tion III:** Signatures for Services Rendered:

| Provider | Service | Total Hours Received | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

ncipal Signature:_____  Date:_____

**tion IV:** If the services on the plan are not completed by the end of the school year, or if the student sfers before the services are concluded, the IEP/MDT completes the bottom portion of this proposal, ches the proposal, lesson objectives, and progress report to the new or current IEP and files the IEP in the ent's special education folder. For the transferring student, the special education records, inclusive of IEP and compensatory education documents are forwarded to the receiving school. Copies of documents t be forwarded to the designated office.

| Services | Frequency | | Setting | Total Hours of Comp. ED services to be provided. |
|---|---|---|---|---|
|  | Hr/Min | Wk/Mo. | Sp Ed |  |
| _eading | 10 Hrs | Wk | Sp Ed Resource | 17 HRS · 15 M |
| _itten Expression |  |  |  |  |
|  |  |  |  |  |

mplete a MDT/IEP Meeting Note Page and attach meeting page and Compensatory Education Plan to _. Copy of the plan must be forwarded to the designated office in the Office of Special Education within (5) school days. **HOD/SA/MA must be attached.

**EXHIBIT**

ALL-STATE LEGAL

**AL-5**

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page 1 of 4

Additional Comments: ☐

### I. IDENTIFICATION INFORMATION

Student Name: Last **Lee**    First **Antonio**    MI

Student ID 9078616    Soc. Sec. No.    Age: 10    Grade 4

Gender ☒ M ☐ F    Date of Birth **/95**    Ethnic Group African American

Address 722 Girard St., NW
Hours No.    Street Name    Quadrant    Apartment #
Washington, DC
City    State    Zip Code

☐ Non-attending

Attending School Nativity    Home School Bruce Monroe

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent Mr and Mrs. Lee

Address of (if different from student): ☒ Parent ☐ Guardian ☐ Surrogate

Hours No.    Street Name    Quad.    Apt. No.    City    State    Zip Code
Telephone: Home 202 327-4128 cell    Work

### II. CURRENT INFORMATION

Date of IEP Meeting: 1/26/06

Date of Last IEP Meeting: 5/26/2005

Date of Most Recent Eligibility Decision: 1/26/2006

Purpose of IEP Conference:
☒ Initial IEP    ☐ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

Indicate Level of Standardized Assessment: _____

**ADDENDA TO BE ATTACHED AS NEEDED**
Check the appropriate box(es)

| BEHAVIOR | TRANSPORTATION |
| ESY | TRANSITION |

### III. LANGUAGE

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | n/a | native language | Oral |
| Parent | English | n/a | English | native language | Rdg / Written |
| Home | English | n/a | n/a | native language | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd SpEd Total | | | FREQUENCY Hr./Min DR/WM. | | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # wks./mos |
|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | | | | | | | | |
| Specialized Instructions | | 5 | 5 | hour | W | Sp. Ed. teacher | 1/27/2006 | 10 months |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | | | 5 | Hours Per Week | | | | |

### V. Disability(ies)    SLD

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%    ☐ 21-60%    ☐ 61-100%

Percent of time NOT in a Regular Education Setting    16%

### VI. IEP TEAM (Participants in the development of the IEP)

Theresa Lee
Nicole Pelter-Lewis
Janet Shema m.s.
Aidia Jenkins
Leslie J. Charles, MS, SLP, DCPS
Nicole Champagne

Print and sign your name below.

Natalie Housh
Theresa Lee
Nicole Otten
Anthony Shema
Lydia Jenkins
Leslie Charles
Nicole Champagne

✓ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature ✓ Theresa Lee    Date 2/14/06

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 1 of 4

59

| Student Name | A_____ L__ | Managing School | CARE Center/Bruce Monroe | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9078616 | DOB ____95 | Attending School Nativity | Page 2 of 4 |

| VII. Present Educational Performance Levels in Areas Affected by the Disability | Additional Comments: ☐ |
|---|---|

**Academic Areas: (Evaluator)** Janet Burns

**Score(s) When Available**

Math Strengths:

> Able to solve addition ,subtraction and multiplication facts within a 3 minute time frame.

Math Cal.  GE  3.5

Math Rea. ___ ___

Impact of disability on educational performance in general education curriculum:

> Difficulty completing division problems impacts computation skills.

See goal page: ___ ___

Date:  1/13/06

Reading Strengths:

> Able to read a short story.

Rdg. Com  GE  1.8

Rdg. Basic  GE  2.7

Written Ex. ___ ___

Impact of disability on educational performance in general education curriculum:

> Difficulty with decoding words impacts reading skills.

See goal page: ___ ___

Date:  1/13/06

---

**Communication (Speech & Language) (Evaluator)** _____

**Score(s) When Available**

Strengths:

Exp.Lang. ___ ___

Rec-Lang. ___ ___

Artic ___ ___

Voice ___ ___

Impact of disability on educational performance in general education curriculum:

Fluency ___ ___

Exp. Voc. ___ ___

Rec. Voc. ___ ___

See goal page: ___ ___

Date: ___

---

**Motor/Health (Evaluator)** _____

**Score(s) /Results When Available**

Strengths:

___ ___

___ ___

Impact of disability on educational performance in general education curriculum:

___ ___

See goal page: ___ ___

Date:

---

**Social Emotional Behavioral Areas: (Evaluator)** _____

**Score(s) When Available**

Strengths:

___ ___

___ ___

Impact of disability on educational performance in general education curriculum:

___ ___

See goal page: ___ ___

Date:

---

**Cognitive/Adaptive Behavior: (Evaluator)** _____

**Score(s) When Available**

Strengths:

___ ___

___ ___

Impact of disability on educational performance in general education curriculum:

___ ___

See goal page: ___ ___

Date:

---

**Prevocational Skills: (Evaluator)** _____

**Score(s) When Available**

Strengths:

___ ___

___ ___

Impact of disability on educational performance in general education curriculum:

___ ___

See goal page: ___ ___

Date:

---

60

| Student Name | A_____ L___ | | Managing School | CARE Center/Bruce Monroe | | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9078616 | DOB | _/_/95 | Attending School | Nativity | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |
|---|---|---|

Area addressed by goal:   Academics

**ANNUAL GOAL: (including mastery criteria.)**

A_____ will demostrate measurable growth in the area of reading with 80% accuracy.

Provider(s):  Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| A_____ will  recognize words with multiple meanings (e.g., sentence, hard, school) and be able to determine which meaning is intended from the context of the sentence  with 80% accuracy. | | monthly |
| A_____ will determine meanings of words and alternate word choices using intermediate level dictionaries and/ or thesauri  with 80% accuracy. | | montly |
| A_____ will identify the meaning of common prefixes and sufuxes (e.g., un,-re,in,dis,ful,ly,less) with 80% accuracy. | | monthly |
| A_____ will  identify playful uses of language ( e.g., tongue twisters, riddles) with 80% accuracy. | | monthly |
| A_____ will identify roots of words ( e.g., "graph" is a common root...autograph, photograph, biography) with 80% accuracy. | | monthly |
| A_____ will retell and paraphrase information shared orally by others  with 80% accuracy. | | monthly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

61

| Student Name  A_____ L__ | Managing School  CARE Center/Bruce Monroe | DCPS - IEP |
|---|---|---|
| Student ID Number  9078416    DOB  __/__/95 | Attending School  Nativity | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |
|---|---|---|

Area addressed by goal:  Academics

**ANNUAL GOAL: (including mastery criteria.)**

A_____ will demostrate measurable growth in the area of reading with 80% accuracy.

Provider(s):  Special Education Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| A_____ will  apply knowledge of basic syllabication rules when reading four or five writen words ( e.g. information, multiplication, pepperoni)  with 80% accuracy. | | monthly |
| A_____ will apply knowledge of the following common spelling patterns:<br>1. that drop the final e and add endings such as -ing, -ed, or-able<br>2. that require changing the final y to i (e.g., baby to babies)<br>3. that include common prefixes, suffixes and root words  with 80% accuracy. | | montly |
| A_____ will summarize main ideas and supporting details in text with 80% accuracy. | | monthly |
| A_____ will distinguish fact from opinion with 80% accuracy. | | monthly |
| A_____ will identify cause and effect relationships with 80% accuracy. | | monthly |
| A_____ will decode words using a phonetic approach with 80% accuracy. | | monthly |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☑ Test  ☑ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools        07-02-2001        Division of Special Education        Appendix - A        IEP Page 3 of 4

62

| Student Name | A_____ L____ | | Managing School | CARE Center | | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9078616 | DOB ___-95 | Attending School | | | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments:                                    Goal Number: [  ]

Area addressed by goal: *Academic ; Written Expression*

**ANNUAL GOAL: (including mastery criteria.)**

A_____ will demonstrate growth in the area of written expression as evidenced by mastery of short-term objectives with 80% accuracy.

Provider(s): *Special Education Teacher*

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| A_____ will write a grammatically correct sentence using correct subject-verb agreement so with overlook 80% accuracy. | | Monthly |
| A_____ will write capital letters at the beginning of a word which begins sentence with 80% accuracy. | | Monthly |
| A_____ will write a compound sentence using connector words such as "and", "because" or "if" with 80% accuracy. | | Monthly |
| A_____ will write declarative sentences to make a statement with 80% accuracy. | | Monthly |
| A_____ will write interrogative sentences with 80% accuracy. | | Monthly |
| A_____ will write exclamatory sentences with 80% accuracy. | | Monthly |

**EVALUATION PROCEDURE(S)**

Portfolio     Log     Chart     ✓Test     ✓Documented Observation     Report     Other _____

| Student Name _____ X_____ | Managing School *CARE Center* | DCPS - IEP |
| Student ID Number **9078616**    DOB ____-95 | Attending School | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | Goal Number: ☐ |

Area addressed by goal: ~~*Academic*~~ ~~*Communication*~~ *Written Expression* ~~*Written Lang*~~

**ANNUAL GOAL: (including mastery criteria.)**

A_____ will demonstrate improved written language skills as evidenced by mastery of short-term objectives with 80% accuracy.

Provider(s): _____

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| A_____ will write exclamatory sentences depicting urgency or excitement with 80% accuracy. | | Monthly |
| A_____ will be able to write a descriptive paragraph with 80% accuracy. | | Monthly |
| | | |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

64

| Student Name A___ L__ | Managing School CARE Center | DCPS - IEP |
| Student ID Number 9078616    DOB __95 | Attending School Nativity | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in regular education? ☒ Yes ☐ No

Explanation for removal out of regular education classroom.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
| | GenEd | SpEd | Total | Hr./ Min. | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing: ☐ None needed

Timing/Scheduling: *Extended time repeated direction*
Setting: *Small group*
Presentation: *Frequent breaks,*
Response:
Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☒ Level III  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio

☐ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV  (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:

☒ Reading
☐ Mathematics
☒ Written Expression
☐ Other:
☐ None

☐ Physical/Sensory
☐ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☐ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
| General Education | *accepted* | Continued School Failure |
| Combination General Ed/Special Ed | *rejected* | Impact on Self Esteem |
| Out of General Education | *rejected* | Time away from nondisabled peers |

Modification(s)/Accommodation(s) to address the harmful effects:

*Scheduling for minimal specialized services in ~~Accom~~ inclusion (general education)*

Location for Services  *Bruce-Monroe ES*

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 4 of 4

65

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

MDT ☐

STUDENT: ~~A_____ L__~~          SCHOOL: Nativity          DATE: 1/26/2006

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Theresa Lee | Theresa | mother |
| Gloria Everett | | Social Worker |
| Janet Burns | | Psychologist |
| Kevin Washington | Kevin Washington | Father |
| Lydia Jenkins | Lydia Jenkins | Librarian |
| Anthony Johnson | Anthony Johnson | teacher |
| LESLIE CHARLES | Leslie Charles | Speech-lang. Pathologist |
| NICOLE CHAMPAGNE | Nicole Champagne | School Counselor NCA |
| Nicole Pelter-Lewis | Nicole Pelter Lewis | principal |

The purpose of today's meeting to to review the evaluation completed by Janet Burns dated 1/13/2006 and determine A_____ eligibilty for Special Education Services. If found eligible DCPS will update his IEP.

Introductions were made by the MDT.

According to parents she requested that student repeat 1st grade at Bruce Monroe. The mother was concerned that her son was not working at grade level since 1st grade. She had requested testing & only recieved services in the 3rd grade, but no services (IEP was not implemented). In 3rd grade he was to recieve ESY services for 17.5 hours in specialized instruction. Her son did not attend summer because Bruce Monroe was under renovation. The parents were not informed where he could get the services that summer. The mother sought outside help in getting her son tested & for 4th grade, mother transferred her son to Nativity School were he recieved no sp. ed. services.

WASHINGTON, DC

**MULTIDISCIPLINARY TEAM (MDT)**
**CONTINUATION MEETING NOTES**
MDT REFERRAL DATE _____     MEETING TYPE: _____Eligibility_____     ____ of ____

STUDENT A_____ L_____    SCHOOL CASE Center   DATE 1/26/06

**The Psychologist Reports:**

A_____ is a ten-year youngster who is attending Nativity Catholic School. Findings from the educational re-evaluation along with review of previous assessments, reflect continued weakness in the areas of reading and written language. His handicapping condition of "Learning Disabled" remains.

Garet R. M____
Psychologist

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: _MDT_

Page: _____ of ___

STUDENT: A_____ L___    SCHOOL: _Nativity C.A._    DATE: _1-26-06_

A_____ was assessed in the area of speech and language on November 30, 2004 by Yuan-Jie Hsu, MA, CCC-SLP DCPS speech-language pathologist. Results of the CELF-4 revealed expressive and receptive language skills to be within normal limits.

A_____ demonstrates significant reading deficits. To further explore his deficiencies, the Comprehensive Test of Phonological Processing was administered on December 13, 2005.

A_____ achieved the following scores:—

Phonological Awareness — Standard Score - 76 (Poor)
Phonological Memory — Standard Score - 88 (Below Average)
Rapid Naming — Standard Score - 79 (Poor)

Subtest Scores:
Elision - SS=5 ; Blending Word- SS= 7; Memory for Digits- SS=8
Rapid Digit Naming - SS=6 ; Nonword Repetition- SS= 8;
Rapid Naming for Letters- SS= 7.

Results of the CTOPP revealed A_____ phonological processing skills, specifically deficits in phonological awareness and rapid naming skills, were significantly delayed and could be impacting upon his reading skills. Deficiencies in phonological processing should be addressed by the reading specialist. No speech or language intervention services are recommended.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

INDIVIDUALIZED EDUCATION PROGRAM
(IEP)
MEETING NOTES

STUDENT _A_____ L___                    SCHOOL Nativity/Bruce Monroe        DATE: 1/26/2006

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Theresa Lee | _Theresa Lee_ | mother |
| Gloria Everett | _Gloria T. Everett_ | Social Worker |
| Janet Burns | | |
| NICOLE CHAMPAGNE | _Nicole Champagne_ | School Counselor. NCA |
| Nicole Peltier-Lewis | _Nicole Peltier-Lewis_ | Principal NCA |
| Lydia Jenkins | _Lydia Jenkins_ | Librarian NCA |
| Kevin Washington | _Kevin Washington_ | mother |
| Natalia Houston | _Natalia Houston_ | IEP Developer |

The student is eligible for special education as a student with _learning disability_

He will receive the following services: _reading + written expression_

Specialized Instruction _5 hrs_ per week

The following settings were discussed:

General Education- _accepted_

Combination General Education and Special Education- _rejected_

Out of General Education- _rejected_

Location of services will be: _Bruce Monroe ES_

\* _The parents will enroll A_____ is resume
school to complete Compensatory education plan completed
on 5/26/05._

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    IEP MEETING NOTES

AL-6

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
# KINDERGARTEN PROGRESS REPORT

(Page 1 of 3)

Student: _____
ID#: _____
Teacher: Ms. J. Thompson / Barnard
School: _____

2000 - 2001

**Parents:** This report is to inform you of your child's progress so that we may work together in guiding his/her development.

SCORING KEY
P = Progressing Satisfactorily

FOR INDIVIDUAL OBJECTIVES
+ = Excellent
√ = Satisfactory

## READING PREPARATION

| | Sem 1 | Sem 2 |
|---|---|---|
| Names/Recognizes letters of the alphabet | √ | √ |
| Associates most letters with sounds | — | √ |
| Seeks likenesses and differences in objects, in letters, in words | √ | √ |
| Names familiar signs, labels, book titles | √ | √ |
| Works from left to right | √ | √ |
| Names/Identifies basic colors | — | √ |
| Recognizes name in print | — | √ |
| Matches like/same objects | — | √ |
| Finds the one that is different | — | √ |
| Plays simple board games | — | √ |
| Completes 10 to 12 piece interlocking puzzles | — | √ |

## WRITING PREPARATION

| | Sem 1 | Sem 2 |
|---|---|---|
| Aware of some purposes for writing | √ | √ |
| Attempts to print to convey own ideas | — | √ |
| Writes using invented spelling | — | √ |
| Enjoys/shares own writing | — | √ |

## LISTENING & SPEAKING

| | Sem 1 | Sem 2 |
|---|---|---|
| Follows directions | — | √ |
| Listens attentively | √ | P |
| Hears likenesses/differences in sounds of letters | — | √ |
| Tells the sounds made by letters | — | √ |
| Retells nursery rhymes, short stories, short poems | — | √ |
| Answers questions in sentences | — | √ |
| Expresses ideas clearly in keeping with age | NA | √ |
| Participates in class discussions | NA+ | √ |

## LITERATURE

| | Sem 1 | Sem 2 |
|---|---|---|
| Names picture/story characters | — | P |

## SCIENCE/SOCIAL STUDIES

| | Sem 1 | Sem 2 |
|---|---|---|
| Has a sight-word vocabulary (up to 40 words) | NA | — |
| Identifies main idea | √ | — |
| Connects text with personal experiences | √ | — |
| Enjoys "reading" picture books | — | √ |
| Participates in care of living things | √ | P |
| Recognizes/Describes seasons | — | √ |
| Participates in guided experiments | — | √ |
| Makes observations and discoveries about the environment/community | — | √ |

## SPECIAL SERVICES (Please check if applicable)

| | |
|---|---|
| ESL/Bilingual | |
| Special Education | |
| Speech & Language | |
| Other | |

## ATTENDANCE

| | 1 | 2 | 3 | 4 | Advisories |
|---|---|---|---|---|---|
| Days of Instruction | 3_ | — | — | — | |
| Days Absent | — | — | — | T | |
| Days Tardy | 0 | — | — | 0 | |

TEACHER COMMENTS Attached

70



**...A PUBLIC SCHOOLS**
**PROGRESS REPORT**

(Page 2 of 3)

| | Sem 1 | Sem 2 |
|---|---|---|
| Recognizes shapes | | |
| ...MATICS | | |

**MATHEMATICS**

| | Sem 1 | Sem 2 |
|---|---|---|
| Duplicates patterns | | |
| Matches items one-to-one | | |
| Identifies sets with ten items | | |
| Identifies numbers 1 through 12 | | |
| Counts by rote to 50 | | |
| Names wholes and parts of wholes | | |
| Reads/Interprets simple graphs | | |
| Orders/Sorts objects by specific characteristics (size, shape) | | |
| Uses math terms (less, equal) | | |
| Names hour on analog clock | | |
| Identifies penny, nickel, dime, quarter | | |
| Tells use of measuring devices (clock, calendar, ruler, thermometer) | | |
| Compares objects by length, weight | | |

**ART AND MUSIC**

| | Sem 1 | Sem 2 |
|---|---|---|
| Identifies and uses line, shape, color, texture, form and direction | | |
| Creates images that represent ideas and feelings through symbols | | |
| Responds rhythmically and expressively to music | | |
| Imitates dance | | |
| Sings individually and in groups | | |

**PHYSICAL DEVELOPMENT**

| | Sem 1 | Sem 2 |
|---|---|---|
| Manages fastenings (zips, ties) | | |
| Cuts on the line with preschool scissors | | |
| Holds and uses pencil with a mature pencil grasp | | |
| Prints full name | | |
| Copies simple geometric shapes | | |

**HEALTH/PHYSICAL EDUCATION**

| | Sem 1 | Sem 2 |
|---|---|---|
| Walks down stairs alternating feet | | |
| Skips and hops | | |

**SOCIAL DEVELOPMENT**

| | Sem 1 | Sem 2 |
|---|---|---|
| Catches, bounces, throws ball | | |
| Displays age-appropriate health and safety practices | | |
| Tells full name | | |
| Tells address/telephone number | | |
| Tells age/Birthday | | |
| Shares and takes turns | | |
| Displays self-discipline | | |
| Adjusts to new situations | | |
| Respects property of others | | |
| Names persons who make up family | | |
| Tells function of body parts | | |
| Completes actions in toileting | | |
| Shows responsibility for own things | | |
| Follows class rules | | |
| Gets along well with peers | | |

**WORK HABITS**

| | Sem 1 | Sem 2 |
|---|---|---|
| Works at task until complete | | |
| Seeks help when needed | | |
| Takes care of materials | | |
| Cleans up after work period | | |
| Asks questions | | |

Grade Next Year

TEACHER COMMENTS Attached

**SCORING KEY**
P = Progressing Satisfactorily
N = Needs Support

**FOR INDIVIDUAL OBJECTIVES**
+ = Excellent
— = Unsatisfactory
√ = Satisfactory

7



**District of Columbia Public Schools Report Card**
sy 2000-2001 (Page three of three)
**TEACHER COMMENTS**

Student Name: _____   Grade: Kgn

**First Advisory**

Teacher Signature _____   Date _____

**Second Advisory** _____ has made very little progress both academically and socially. He is very proud that he can write his name and some numbers. He needs improvement in his social behavior. He continues to disrupt the class on a daily basis. Please discuss these issues with him!

Teacher Signature JThompson   Date 1/31/01

**Third Advisory**

Teacher Signature _____   Date _____

**Fourth Advisory** _____ needs support in both reading and math. His emotional outbursts has interfered with his progress tremendously. He needs great assistance this summer in all skills. Enjoy your summer.

Teacher Signature JThompson   Date 6/19/01

72



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**3RD GRADE REPORT CARD SY _____**
(Page one of three)
Student Name: _____

ID#: _____

School: _____

Teacher: _____

------------------------------------------------

| INSTRUCTIONAL LEVEL | above level | on level | below level |
|---|---|---|---|
| **Reading** | | | |
| 1st Advisory | — | — | ✓ |
| 2nd Advisory | — | — | ✓ |
| 3rd Advisory | — | — | ✓ |
| 4th Advisory | — | — | ✓ |
| **Mathematics** | | | |
| 1st Advisory | — | — | ✓ |
| 2nd Advisory | — | — | ✓ |
| 3rd Advisory | — | — | ✓ |
| 4th Advisory | — | ✓ | ■ |

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **READING** | | | | |
| Uses word attack skills & vocabulary building strategies | ✓ | ✓ | ✓ | ✓ |
| Reads and comprehends 25 books | — | ✓ | ✓ | ✓ |
| Identifies main idea and supporting details | | ✓ | ✓ | ✓ |
| Reads aloud with accuracy and fluency | ✓ | ✓ | ✓ | ✓ |
| Determines cause and effect relationships in text | | ✓ | ✓ | ✓ |
| **WRITING** | | | | |
| Writes a personal letter | | | ✓ | ✓ |
| Writes a personal narrative | — | ✓ | ✓ | ✓ |
| Writes a brief report | | ✓ | ✓ | ✓ |
| Uses technology to create, revise and publish work | | ✗ | NI | — |
| Uses correct grammar, capitalization & spelling | | — | ✓ | ✓ |
| Uses writing process | — | — | — | — |
| **LISTENING SKILLS** | 1 | 2 | 2 | |
| Exhibits appropriate audience behavior | ✓ | ✓ | ✓ | ✓ |
| Comprehends oral presentations | | ✓ | — | ✓ |
| **SPEAKING SKILLS** | 1 | 2 | 2 | |
| Gives & understands oral directions | ✓ | ✓ | ✓ | |
| Participates in group discussions | | ✓ | ✓ | ✓ |
| Makes oral presentations | — | ✓ | ✓ | ✓ |

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **MATHEMATICS** | 1 | 2 | 2 | |
| Adds & subtracts whole numbers with regrouping | | ✓ | ✓ | ✓ |
| Applies place value concepts | | ✓ | ✓ | ✓ |
| Models concepts of multiplication and division | | ✓ | + | + |
| Applies estimation and rounding strategies | | ✓ | + | + |
| Counts money & makes change | | ✓ | ± | ± |
| Classifies three-dimensional shapes | — | ✓ | ✓ | ✓ |
| Identifies geometric figures | — | ✓ | ✓ | ✓ |
| Interprets data from charts, graphs and tables | — | ✓ | ✓ | ✓ |
| Models & solves problems | — | — | ✓ | ✓ |

**Reporting Key:**
For overall grade in subject area:
**4 = Exceeds the standard (Advanced)**
Student takes initiative to exceed the standard; consistently produces excellent work, applying skills/concepts correctly; shows creativity and insight.
**3 = Meets the standard (Proficient)**
Student produces work that meets the standard; frequently produces very good work of high quality; applies skills/concepts correctly.
**2 = Approaches the standard (Basic)**
Student shows a basic working knowledge of skills/concepts; produces satisfactory work; usually applies skills/concepts correctly.
**1 = Does not meet the standard (Below Basic)**
Student does not show basic working knowledge of skills/concepts; seldom produces work of satisfactory quality.

For skills/expectations within subject area:
+ = Excellent          -- = Unsatisfactory
√ = Satisfactory       NI = Not Introduced

*Revised 2000-2001*

73



**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**3RD GRADE REPORT CARD** SY ___ ___
(Page two of three)
Student Name: _____

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|

## SOCIAL STUDIES _ _ 2 _

| | | | | |
|---|---|---|---|---|
| Identifies historical landmarks & key geographical features of the nation's capital | | ✓ | ✓ | |
| Recognizes significant persons, documents & events shaping Washington, D.C. | _ | ✓ | ✓ | |
| Describes the contributions of diverse groups to Washington, D.C. society | | ✓ | ✓ | |
| Demonstrates recognition of names of other large cities & capitals | | ✓ | _ | |
| Demonstrates map & globe skills | _ | ✓ | ✓ | |

## SCIENCE 1 _ 2 _

| | | | | |
|---|---|---|---|---|
| Uses scientific methods to ask & answer questions about the natural world | _ | ✓ | ✓ | |
| Describes how structures of living things adapt to function | | ✓ | ✓ | |
| Describes physical features of local environment | _ | ✓ | | |
| Describes how vibrating objects produce sound | _ | ✓ | ✓ | |
| Describes how matter changes | | | ✓ | |
| Explains seasonal changes | | ✓ | ✓ | |

## MUSIC _ 3 3 ⊥

| | | | | |
|---|---|---|---|---|
| Identifies music of various cultures and styles | ✓ | ✓ | ⊥ | |
| Interprets music through singing, listening, performing, creating, reading & writing | | ✓ | ⊥ | ? |

## ART

| | | | | |
|---|---|---|---|---|
| Applies different media, techniques & processes in artworks | ✓ | | | |
| Uses symbols & images to convey meaning | ✓ | | | |

## HEALTH & PHYSICAL EDUCATION _ 2 3 4

| | 2 | 3 | 4 |
|---|---|---|---|
| Explains consequences of negative & positive behaviors in conflict | _ | ✓ | + |
| Scores in acceptable levels for physical fitness: e.g. sit & reach, running | _ | ✓ | + |
| Displays increased motor skills in individual & team sports | _ | ✓ | + |

(brace) 2

For the section on **WORK HABITS, PERSONAL & SOCIAL SKILLS**, the following key is used:
+ = Excellent
✓ = Satisfactory
-- = Unsatisfactory

| Advisory | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| **WORK HABITS** | | | | |
| Follows directions | _ | ✓ | ✓ | ✓ |
| Completes classwork on time | _ | ✓ | ✓ | |
| Works well with others/cooperates | _ | ✓ | ✓ | ± |
| Uses time wisely | _ | ✓ | ✓ | |
| Completes and returns homework | _ | ✓ | _ | ✓ |
| Participates in class discussions | _ | ✓ | ✓ | ± |
| Makes an effort | _ | ✓ | ✓ | ± |
| **PERSONAL & SOCIAL SKILLS** | | | | |
| Follows classroom rules | _ | ✓ | ✓ | |
| Follows playground/school rules | _ | ✓ | ✓ | |
| Respects the rights/property of others | _ | ✓ | ✓ | ± |
| Listens while others speak | _ | ✓ | ✓ | ± |
| Practices self-control | _ | ✓ | ✓ | ✓ |

## ATTENDANCE

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Days of Instruction | _ | 40 | 47 | |
| Days Absent | _ | 1 | 1 | 2(E) |
| Days Tardy | _ | 0 | 0 | 0 |

**SUPPORT SERVICES**  Check where applicable.
Additional comments from support staff attached.

| | | | | |
|---|---|---|---|---|
| Resource: Reading | _ | _ | _ | _ |
| Resource: Mathematics | _ | _ | _ | _ |
| Special Education | _ | _ | _ | _ |
| Bilingual/ESL | _ | _ | _ | _ |

*Revised 2000-2001*

Grade Next Year ___ 4 ___

74

EXHIBIT

AL-7

**STANFORD**

*ACHIEVEMENT TEST SERIES, NINTH EDITION*
SELECT

STUDENT REPORT with
PERFORMANCE STANDARDS FOR
A_____ L____

TEACHER:  JOHNSON
SCHOOL:   BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE:      01
TEST DATE: 04/02

Age:  6 Yrs  10 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 106 | DNA | |
| Word Study Skills | 36 | DNA | |
| Word Reading | 30 | 6 | BELOW BASIC |
| Reading Comp. | 40 | 11 | BELOW BASIC |
| Total Mathematics | 69 | 29 | BASIC |
| Problem Solving | 44 | 22 | BASIC |
| Procedures | 25 | 7 | BELOW BASIC |

Performance Standards are criterion-referenced scores that reflect what students know and should be able to do in given subject areas. The Stanford Performance Standards were determined by expert panels of educators who judged each test question on the basis of how students at different levels of achievement should perform. These expert judgments yielded four categories or levels of student performance.

**Below Basic** indicates little or no mastery of fundamental knowledge and skills.

**Basic** denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

**Proficient** represents solid academic performance, indicating that students are prepared for the next grade. At the high school level, this indicates preparedness for democratic citizenship, responsible adulthood, and productive work.

**Advanced** signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

N O T E S

STANFORD LEVEL/FORM: Primary 1/T
1995 NORMS:  Spring    National

OTHER INFO:  2_____        Copy 01
Process No. 1029200-1592344-0121-47106-1

Scores based on normative data copyright © 1996 by Harcourt, Inc.  All rights reserved.

# STANFORD

**ACHIEVEMENT TEST SERIES, NINTH EDITION**
SELECT

**STUDENT REPORT**
FOR
A_____ L___

TEACHER: JOHNSON
SCHOOL: BRUCE-MONROE EL SCH – 296          GRADE:   01
DISTRICT: DC PUBLIC SCHOOLS               TEST DATE: 04/02
TEST TYPE: MULTIPLE CHOICE

Age: 6 Yrs. 10 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE | | |
|---|---|---|---|---|---|---|---|
| Total Reading | 106 | DNA | | | | | |
| Word Study Skills | 36 | DNA | | | | | |
| Word Reading | 30 | 6 | 636 | 3-1 | 10.4 | | |
| Reading Comp. | 40 | 11 | 457 | 6-2 | 17.3 | | |
| Total Mathematics | 69 | 29 | 588 | 12-3 | 25.3 | | |
| Problem Solving | 46 | 22 | 513 | 18-3 | 30.7 | | |
| Procedures | 23 | 7 | 558 | 9-2 | 21.8 | | |

NATIONAL GRADE PERCENTILE BANDS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 30 | 50 | 70 | 90 | 99 | | |

## CONTENT CLUSTERS

| | RS/ NP/ NA | Below Average | Average | Above Average | | | Below Average | Average | Above Average |
|---|---|---|---|---|---|---|---|---|---|
| Word Study Skills | DNA/ 36/ 0 | | | | | | | | |
| Structural Analysis | DNA/ 12/ 0 | | | | | | | | |
| Phonetic Analysis-Consonants | DNA/ 12/ 0 | | | | | | | | |
| Phonetic Analysis-Vowels | DNA/ 12/ 0 | | | | | | | | |
| | | | | | | | | | |
| Word Reading | 6/ 30/ 27 | ✓ | | | | | | | |
| | | | | | | | | | |
| Reading Comprehension | 11/ 40/ 39 | ✓ | | | | | | | |
| Two-Sentence Stories (Riddles) | 2/ 5/ 5 | ✓ | | | | | | | |
| Short Passages (Cloze) | 3/ 15/ 14 | ✓ | | | | | | | |
| Short Passages w/Questions | 6/ 20/ 20 | ✓ | | | | | | | |
| Recreational | 4/ 10/ 10 | | ✓ | | | | | | |
| Textual | 2/ 5/ 5 | | ✓ | | | | | | |
| Functional | 0/ 5/ 5 | ✓ | | | | | | | |
| Initial Understanding | 4/ 9/ 9 | ✓ | | | | | | | |
| Interpretation | 2/ 11/ 11 | ✓ | | | | | | | |
| Mathematics: Problem Solving | 22/ 44/ 43 | ✓ | | ✓ | | | | | |
| Concepts/Whole No. Comput. | 5/ 12/ 12 | | ✓ | | | | | | |
| Number Sense and Numeration | 7/ 12/ 12 | | ✓ | | | | | | |
| Geometry and Spatial Sense | 2/ 5/ 5 | ✓ | | | | | | | |
| Measurement | 4/ 8/ 8 | | ✓ | | | | | | |
| Statistics and Probability | 1/ 5/ 5 | ✓ | | | | | | | |
| Fraction and Decimal Concepts | 1/ 3/ 3 | ✓ | | | | | | | |
| Patterns & Relationships | 2/ 5/ 4 | ✓ | | | | | | | |
| Problem-Solving Strategies | 2/ 3/ 3 | ✓ | | | | | | | |
| | | | | | | | | | |
| Mathematics: Procedures | 7/ 25/ 24 | ✓ | | | | | | | |
| Number Facts | 1/ 8/ 8 | ✓ | | | | | | | |
| Computation/Symbolic Notation | 2/ 11/ 10 | ✓ | | | | | | | |
| Computation in Context | 4/ 6/ 6 | | ✓ | | | | | | |

STANFORD LEVEL/FORM: Primary 1/T
1995 NORMS: Spring          National

OTHER INFO: 2 ----          Copy 01
Process No. 10292001-1592344-0121-47105-1

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.

# STANFORD

ACHIEVEMENT TEST SERIES, NINTH EDITION
SELECT

**STUDENT REPORT**
FOR

A_____ L_____

TEACHER: PARRY
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 02
TEST DATE: 04/04

Age: 8 Yrs, 11 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE |
|---|---|---|---|---|---|
| Total Reading | 110 | 47 | 529 | 10-2 | 23.0 |
| Word Study Skills | 48 | 24 | 538 | 21-3 | 33.0 |
| Vocabulary | 30 | 12 | 495 | 7-1 | 6.0 |
| Reading Comp. | 40 | 11 | 540 | 15-3 | 28.2 |
| Total Mathematics | 76 | 35 | 552 | 15-2 | 28.1 |
| Problem Solving | 46 | 21 | 561 | 14-3 | 27.2 |
| Procedures | 28 | 14 | 517 | 20-3 | 32.3 |

**NATIONAL GRADE PERCENTILE BANDS**

| 1 | 10 | 30 | 50 | 70 | 90 | 99 |
|---|---|---|---|---|---|---|

| CONTENT CLUSTERS | RS/ NP/ NA | Below Average | Average | Above Average |
|---|---|---|---|---|
| Word Study Skills | 24/ 48/ 48 | ✓ | | |
| Structural Analysis | 9/ 12/ 12 | | ✓ | |
| Phonetic Analysis-Consonants | 11/ 18/ 18 | ✓ | | |
| Phonetic Analysis-Vowels | 4/ 18/ 18 | ✓ | | |
| | | | | |
| Reading Vocabulary | 7/ 30/ 30 | ✓ | | |
| Synonyms | 6/ 18/ 18 | | ✓ | |
| Context | 0/ 6/ 6 | ✓ | | |
| Multiple Meanings | 1/ 6/ 6 | ✓ | | |
| | | | | |
| Reading Comprehension | 11/ 40/ 40 | ✓ | | |
| Recreational | 6/ 14/ 14 | ✓ | | |
| Textual | 3/ 13/ 13 | ✓ | | |
| Functional | 2/ 13/ 13 | ✓ | | |
| Initial Understanding | 4/ 14/ 14 | ✓ | | |
| Interpretation | 6/ 20/ 20 | ✓ | | |
| Critical Analysis | 0/ 3/ 3 | ✓ | | |
| Process Strategies | 1/ 3/ 3 | | ✓ | |
| | | | | |
| Mathematics: Problem Solving | 21/ 46/ 46 | ✓ | | |
| Concepts/Whole No. Comput. | 1/ 4/ 4 | ✓ | | |
| Number Sense and Numeration | 3/ 10/ 10 | ✓ | | |
| Geometry and Spatial Sense | 3/ 5/ 5 | | ✓ | |
| Measurement | 7/ 10/ 10 | | ✓ | |
| Statistics and Probability | 2/ 6/ 6 | | ✓ | |
| Fraction and Decimal Concepts | 3/ 3/ 3 | | | ✓ |
| Patterns & Relationships | 1/ 3/ 3 | ✓ | | |
| Problem-Solving Strategies | 1/ 5/ 5 | ✓ | | |
| | | | | |
| Mathematics: Procedures | 14/ 28/ 28 | ✓ | | |
| Number Facts | 3/ 8/ 8 | ✓ | | |
| Computation/Symbolic Notation | 7/ 12/ 12 | | ✓ | |
| Computation in Context | 4/ 8/ 8 | | ✓ | |

STANFORD LEVEL/FORM: Primary 2/T
1995 NORMS: Spring    National

OTHER INFO: 2 _____    Copy 02
Process No: I0492015167213804600749222

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.

77



**STANFORD** ACHIEVEMENT TEST SERIES, NINTH EDITION
SELECT

**STUDENT REPORT with
PERFORMANCE STANDARDS FOR**
A_____ L___

TEACHER: PARRY
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 02
TEST DATE: 04/04
Age 8 Yrs 11 Mos.
Student No: 9074616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 118 | 44 | BELOW BASIC |
| Word Study Skills | 48 | 24 | BASIC |
| Vocabulary | 30 | | BELOW BASIC |
| Reading Comp. | 40 | 11 | BELOW BASIC |
| Total Mathematics | 72 | 35 | BELOW BASIC |
| Problem Solving | 46 | 21 | BELOW BASIC |
| Procedures | 26 | 14 | BELOW BASIC |

Performance Standards are content-referenced scores that reflect what students know and should be able to do in four subject areas. The Stanford Performance Standards were determined by expert panels of educators, who judged each test question on the basis of how students at different levels of achievement should perform. These expert judgments yielded four categories or levels of student performance.

Below Basic indicates little or no mastery of fundamental knowledge and skills.

Basic denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

Proficient represents solid academic performance indicating that students are prepared for the next grade. At the high school level, this indicates preparedness for responsible citizenship, responsible adulthood, and productive work.

Advanced signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

**NOTES**

STANFORD LEVEL/FORM: Primary 2/T
1995 NORMS: Spring    National

OTHER INFO:  2 ____    Copy 02
Process No. 1049201S-1672138-0460-07493-2

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.

# STANFORD

ACHIEVEMENT TEST SERIES, NINTH EDITION
SELECT

TEACHER: VIOLA WU
SCHOOL: BRUCE-MONROE EL SCH - 296
DISTRICT: DC PUBLIC SCHOOLS
TEST TYPE: MULTIPLE CHOICE

GRADE: 03
TEST DATE: 04/05

STUDENT REPORT
FOR
A_____ L___
Age: 9 Yrs 10 Mos
Student No: 9078616

| SUBTESTS AND TOTALS | No. of Items | Raw Score | Scaled Score | National PR-S | National NCE |
|---|---|---|---|---|---|
| Total Reading | 86 | 42 | 567 | 14-3 | 28.5 |
| Vocabulary | 30 | 5 | 456 | 1-1 | 1.0 |
| Reading Comp. | 56 | 18 | 569 | 16-3 | 27.8 |
| Total Mathematics | 76 | 39 | 572 | 25-4 | 35.8 |
| Problem Solving | 46 | 21 | 567 | 17-5 | 28.9 |
| Procedures | 30 | 18 | 579 | 45-5 | 47.4 |

### NATIONAL GRADE PERCENTILE BANDS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 30 | 50 | 70 | 90 | 99 |

### CONTENT CLUSTERS

| | RS/ NP/ NA | Below Average | Average | Above Average |
|---|---|---|---|---|
| Reading Vocabulary | 5/ 30/ 30 | ✓ | | |
| Synonyms | 4/ 18/ 18 | ✓ | | |
| Context | 1/ 6/ 6 | ✓ | | |
| Multiple Meanings | 0/ 6/ 6 | ✓ | | |
| | | | | |
| Reading Comprehension | 18/ 54/ 54 | ✓ | | |
| Recreational | 8/ 18/ 18 | ✓ | | |
| Textual | 4/ 18/ 18 | ✓ | | |
| Functional | 6/ 18/ 18 | ✓ | | |
| Initial Understanding | 6/ 14/ 14 | ✓ | | |
| Interpretation | 5/ 24/ 24 | ✓ | | |
| Critical Analysis | 3/ 8/ 8 | ✓ | | |
| Process Strategies | 4/ 8/ 8 | ✓ | | |
| | | | | |
| Mathematics: Problem Solving | 21/ 46/ 46 | ✓ | ✓ | |
| Concepts/Whole No. Compul. | 3/ 8/ 8 | | ✓ | |
| Number Sense and Numeration | 1/ 6/ 6 | ✓ | | |
| Geometry and Spatial Sense | 3/ 6/ 6 | | ✓ | |
| Measurement | 6/ 10/ 10 | | ✓ | |
| Statistics and Probability | 3/ 4/ 4 | | ✓ | |
| Fraction and Decimal Concepts | 2/ 3/ 3 | | ✓ | |
| Patterns & Relationships | 1/ 3/ 3 | ✓ | | |
| Estimation | 0/ 4/ 4 | ✓ | | |
| Problem-Solving Strategies | | | | |
| | | | | |
| Mathematics: Procedures | 18/ 30/ 30 | | ✓ | |
| Number Facts | 4/ 6/ 6 | | ✓ | |
| Computation/Symbolic Notation | 10/ 12/ 12 | | | ✓ |
| Computation in Context | 3/ 9/ 9 | ✓ | | |
| Rounding | 1/ 2/ 3 | | ✓ | |

OTHER INFO: 3
Process No. 10592001-1601457-1359-29325-1

Copy 01

79


# STANFORD

ACHIEVEMENT TEST SERIES, NINTH EDITION
SELECT

**STUDENT REPORT with PERFORMANCE STANDARDS FOR**
A_____ L___

Age: 9 Yrs 10 Mos
Student No: 9078616.

| TEACHER: | VIOLA WU |
| SCHOOL: | BRUCE-MONROE EL SCH - 296 |
| DISTRICT: | DC PUBLIC SCHOOLS |
| TEST TYPE: | MULTIPLE CHOICE |

GRADE: 03
TEST DATE: 04/05

| SUBTESTS AND TOTALS | No. of Items | Raw Score | PERFORMANCE STANDARD |
|---|---|---|---|
| Total Reading | 84 | 23 | BELOW BASIC |
| Vocabulary | 30 | 5 | BELOW BASIC |
| Reading Comp. | 54 | 18 | BELOW BASIC |
| Total Mathematics | 76 | 39 | BASIC |
| Problem Solving | 46 | 21 | BELOW BASIC |
| Procedures | 30 | 18 | BASIC |

Performance Standards are content-referenced scores that reflect what students know and should be able to do in given subject areas. The Stanford Performance Standards were determined by expert panels of educators, who judged how test questions, on the basis of how students at different levels of achievement should perform. These expert judgments related four categories or levels of student performance:

Below Basic indicates little or no mastery of fundamental knowledge and skills.

Basic denotes partial mastery of the knowledge and skills that are fundamental for satisfactory work. At the high school level, this is higher than minimum competency skills.

Proficient represents solid academic performance, indicating that students are prepared for the next grade. At the high school level, this indicates preparedness for democratic citizenship, responsible adulthood, and productive work.

Advanced signifies superior performance beyond grade-level mastery. At the high school level, this shows readiness for rigorous college courses, advanced technical training, or employment requiring advanced academic achievement.

## NOTES

STANFORD LEVEL/FORM: Primary 3/T.
1995 NORMS: Spring    National

OTHER INFO: 2———    Copy 01
Process No. 1092001-1601457-1359-29326-1

Scores based on normative data copyright © 1996 by Harcourt, Inc. All rights reserved.



FRANCIS & ASSOCIATES, P.C.
601 PENNSYLVANIA AVENUE, NW
SUITE 900
WASHINGTON, DC 20004

## CONFIDENTIAL PSYCHOEDUCATIONAL EVALUATION

**NAME:** A██████ L██
**DOB:** ██████, 1995
**DOE:** FEBRUARY 18, 2005
**GRADE:** THIRD GRADE
**DOR:** MARCH 3, 2005

**REASON FOR REFERRAL:** A██████ L██, a nine-year-old, African American male, was referred for a Psychoeducational Evaluation to assess his cognitive and academic functioning. The referral information indicated that in the recent past, A██████ experienced academic difficulties. As a result of his prior academic difficulties, previously, A██████ received a Psychoeducational Evaluation. However, the results of the prior Psychoeducational Evaluation appeared somewhat irregular. Consequently, the current Psychoeducational Evaluation was requested. A██████ was accompanied to the evaluation by his mother, Ms. Theresa Lee.

**EVALUATION METHOD**
1. Woodcock Johnson 3rd Edition, Test of Achievement, (WJ-III)
2. Wechsler Abbreviated Scale of Intelligence, (WASI)
3. Bender Visual Motor Gestalt Test (Bender Gestalt)
4. Clinical Interview with A██████ L██
5. Clinical Interview with A██████ L██ and Ms. Theresa Lee

**EVALUATION NOTE**
During November of 2004, Antonio previously received a Psychoeducational Evaluation. As a part of his previous Psychoeducational Evaluation, A██████ was administered the Wechsler Intelligence Scale for Children-4th Edition, (WISC-IV). Given this current Psychoeducational Evaluation's relatively close proximity to his prior Psychoeducational Evaluation, A██████ could not be readministered the WISC-IV. Consequently, during the current Psychoeducational Evaluation, in an attempt to obtain his cognitive functioning, A██████ was administered the Wechsler Abbreviated Scale of Intelligence.

**BEHAVIORAL OBSERVATIONS AND CLINICAL INTERVIEW**
A██████ appeared to be average height and average weight. He appeared his stated age. There were no difficulties with his gross motor or fine motor movements. There were no apparent difficulties with his hearing or vision. He understood some of the instructions and directions as presented. When he did not appear to understand the directions, he rarely asked for clarification. He appeared to formulate his thoughts and ideas with some difficulty. In addition, when A██████ appeared to be thinking, he would often tap or scratch his head. Rapport was tentatively established. His hygiene was adequate.

81

REPORT OF PSYCHOEDUCATION... EVALUATION
A▓▓▓▓▓ L▓▓
PAGE: 2

A▓▓▓▓▓ cooperation and motivation to complete the evaluation were adequate. As such, he did not engage in any oppositional mannerisms. In contrast, on occasion, before he responded to an evaluation prompt, A▓▓▓▓ displayed some latency and appeared somewhat distracted. In addition, at times, A▓▓▓▓ appeared to be a somewhat limited and guarded reporter.

Throughout the evaluation, as a result of apparently suffering from a cold, A▓▓▓▓ readily displayed some nasal congestion.

During the evaluation, A▓▓▓▓ speech was limited. As such, typically, he remained quiet. In contrast, during instances when A▓▓▓▓ spoke, at times, he displayed some verbal dysfluency. For instance, he displayed somewhat limited vocabulary skills as well as a somewhat limited ability to pronounce unfamiliar words. In addition to his speech and language limitations, his spelling abilities were also very poor.

A▓▓▓▓ performance on the verbal tasks varied. For example, at times, when completing reading tasks, A▓▓▓▓ would read the first letter of a word, then think of a word that started with that letter, and then state the word from his memory. For instance, when presented with a word like "doll," A▓▓▓▓ would read the letter "D," and then state, "day." Furthermore, on occasion, if A▓▓▓▓ misread a word while reading a sentence, he would readily restart reading the sentence from the beginning. Additionally, at some points, while A▓▓▓▓ was reading, he would substitute synonyms for the word that was actually written. In particular, while reading a sentence, A▓▓▓▓ substituted the word "hen" for "chicken." Overall, A▓▓▓▓ displayed somewhat limited reading abilities. In particular, at times, A▓▓▓▓ readily skipped words he did not understand. As such, he had a very limited ability to comprehend the context of a sentence.

A▓▓▓▓ performance on the nonverbal tasks appeared consistent. Typically, while completing the nonverbal tasks, he remained quiet. In addition, his strategies for completing the nonverbal tasks appeared ordered and focused. For example, while completing the nonverbal tasks, A▓▓▓▓ readily utilized concrete aids, such as counting on his fingers. Of note, on arithmetic tasks that included a verbal component, A▓▓▓▓ readily attempted to utilize a pen and paper while completing the tasks. However, he displayed a limited ability to determine what information was important and should be written down as opposed to what information was inconsequential. As such, he frequently wrote down all of the information, which negated the utility of using a pen and paper.

Throughout the evaluation, A▓▓▓▓ occasionally appeared to be monitoring this writer. As such, at times, while completing the evaluation tasks, A▓▓▓▓ readily looked at this writer seemingly in an attempt to ascertain if this writer was observing him.

A▓▓▓▓ indicated that he was born and raised in Washington, DC. A▓▓▓▓ denied being aware of whether or not his parents were married at the time of his birth. In contrast, A▓▓▓▓ mentioned that at the time of his birth, he resided with his father. Overall, A▓▓▓▓ described his prior relationship with his father as appropriate. A▓▓▓▓ described his father's primary form of discipline as "talking to me."

REPORT OF PSYCHOEDUCATIONAL EVALUATION
A_____ L___
PAGE: 3

According to A_____, at some point during his childhood, his mother obtained custody of him from his father. A_____ denied being able to provide a rationale explaining the transfer of custody. A_____ indicated that at the time the transfer was enacted, he wanted to remain in the care of his father. In contrast, A_____ mentioned that he most recently saw his father during his birthday party at Chuck E. Cheese. A_____ denied ever spending the night at his father's residence since the custody transfer.

A_____ described his mother as "nice." In particular, A_____ mentioned that his mother typically provides for his needs. A_____ described his mother's primary form of discipline as corporal punishment or coming to his school. He denied having ever been corporally punished for no reason. In addition, he denied having ever felt as if he were abused.

A_____ described his stepfather as "nice." According to A_____, he and his stepfather maintain an appropriate relationship. A_____ described his stepfather's primary form of discipline as "sometimes he talks to me or I get spankings."

According to A_____, he has two brothers and one sister. A_____ indicated that he maintained appropriate relationships with his siblings. According to A_____, at times, he and his siblings may engage in verbal arguments. However, he denied having ever engaged in a physical altercation with his siblings. A_____ mentioned that during the times when he and his siblings are arguing, his mother will "holler or say stuff."

According to A_____, currently, he is displaying appropriate academic functioning. However, A_____ denied having any knowledge regarding his current grades. In contrast, he denied having ever failed any academic courses. A_____ denied being aware of whether or not he was ever held back from being promoted to his next subsequent grade.

A_____ indicated that currently, he received services from Sylvan Learning Center. In particular, he mentioned that he was receiving services to improve his reading. A_____ also mentioned that he enjoyed working with his current teacher.

According to A_____, in the past, as a result of engaging in a physical altercation, he was sent to the Principal's office. A_____ mentioned that while at the Principal's office, the principal talked to him. Overall, A_____, attributed the physical altercation to the other student's inappropriateness.

A_____ described himself as having somewhat limited frustration tolerance. In particular, he stated, "When I get hard stuff, I get frustrated, and I don't want to do it." Similarly, A_____ described himself when he becomes angry, and said, "I try to stop myself, but he makes me hit him [the other student in which he engaged in the physical altercation]."

According to A_____, in the past, when he was emotionally distressed, he attempted to hurt himself. For example, he stated, "I scratched my face because I was getting angry, when my sister kept playing all the time." In contrast, A_____ denied having ever tried to kill himself. Furthermore, he denied having ever experienced suicidal ideation.

According to A█████, currently, he does not require any type of help or assistance.

## MENTAL STATUS EXAMINATION

Upon mental status examination, A██████ was alert, oriented, generally cooperative, and did not display any acute distress. There was no indication of auditory or visual hallucinations, bizarre thinking or suicidal or homicidal ideation. His affect was adequate. His thought processes varied. His eye contact varied. A███████ attention, concentration and abstract thinking abilities varied. His recent, immediate, and remote memory varied. His insight and judgment varied. In light of his mental status throughout the evaluation, the test results are considered an accurate representation of his current intellectual and emotional functioning.

## MS. LEE

During the joint interview, Ms. Lee readily appeared frustrated as a result of the academic and emotional difficulties that A█████ was experiencing.

According to Ms. Lee, in the past, as a result of attempting to complete his IEP process, A█████ received a prior Psychoeducational Evaluation. In particular, in the past, A█████ was found to be two grade levels behind his expected performance. However, Ms. Lee stated that despite being assessed as two grade levels behind his expected performance, A█████ still did not appear to qualify for additional services. As such, Ms. Lee alleged that some of A██████ school officials did not appear to fully recognize the extent of his difficulties. In contrast, Ms. Lee acknowledged that A██████ teacher had begun to independently work with A█████ and their independent work was displaying some benefit.

Ms. Lee described A██████ and stated, "He acts out because he is frustrated." In particular, Ms. Lee remarked, "He shuts down as the work gets harder."

Ms. Lee reported that in the past, A██████ was retained within the first grade. According to Ms. Lee, currently, A██████ appears to require additional academic accommodations. In particular, Ms. Lee asserted that she believed if A█████ received appropriate academic accommodations, he would display improved academic functioning.

According to Ms. Lee, at the current time, A██████ is within the same classroom as his younger brother. Ms. Lee mentioned that by placing A██████ within the same classroom as his younger brother, A█████ experiences some academic distress. In particular, Ms. Lee described A██████ younger brother as "the head of the class."

Ms. Lee described A██████ as occasionally displaying appropriate peer relationships. According to Ms. Lee, in the past, A█████ threatened another student because the other student completed all of his work.

According to Ms. Lee, A█████ displays an appropriate relationship with his stepfather. Overall, Ms. Lee described her husband as supportive of her choices regarding A██████ academic functioning. In contrast, Ms. Lee alleged that A██████ biological father as well as some of A██████ paternal relatives displayed academic difficulties. Furthermore, Ms. Lee

REPORT OF PSYCHOEDUCATION. EVALUATION
A█████ L██
PAGE: 5

alleged that as a result of suffering from significant disabilities, some of A███████ paternal relatives received SSI benefits.

Ms. Lee indicated that during her pregnancy with A███████, A██████ might have been exposed to illicit substances. Similarly, Ms. Lee reported that A███████ obtainment of some of his developmental milestones was delayed. Furthermore, Ms. Lee described A██████ as somewhat clingy.

According to Ms. Lee, in the past, A██████ received counseling services.

**BACKGROUND INFORMATION**
According to the records, in the past, A██████ received a Speech and Language Evaluation. The results of the Speech and Language Evaluation did not recommend speech therapy for A██████.

**TEST RESULTS**
### GENERAL COGNITIVE RESOURCES

WECHSLER ABBREVIATED SCALE OF INTELLIGENCE (WASI)

| SUBTESTS | SCALED SCORE | CLASSIFICATION |
|---|---|---|
| VOCABULARY | 6 | LOW AVERAGE |
| BLOCK DESIGN | 6 | LOW AVERAGE |
| SIMILARITIES | 8 | AVERAGE |
| MATRIX REASONING | 4 | BORDERLINE |
| | | |
| VERBAL IQ | 86 | LOW AVERAGE |
| PERFORMANCE IQ | 76 | BORDERLINE |
| FULL SCALE-4 | 78 | BORDERLINE |

A██████ obtained a Full Scale-4 WASI IQ score of 78, which is classified within the Borderline range of functioning. Furthermore, his Performance IQ score of 76 was within the Borderline range. In contrast, his Verbal IQ of 86 was within the Low Average range. The 10-point difference between his Verbal IQ and his Performance IQ indicates that his verbal abilities are developing at a faster rate than his perceptual organizational abilities.

On the Verbal Scale, A██████ performance varied. Specifically, on the Vocabulary subtest, which requires recall of verbal data typically learned in an academic environment, his performance was within the Low Average range. In contrast, on the test of verbal abstract reasoning, his performance was within the Average range. Taken together, these findings indicated that A██████ Average verbal reasoning skills become mildly less efficient when utilized in a formal manner.

A██████ performance on the Performance subtests varied. Specifically, the Block Design subtest measures someone's nonverbal and spatial reasoning efficiency, when combined with a psychomotor component, and in the absence of external guidance. His performance on the Block Design subtest was within the Low Average range. In contrast, the Matrix Reasoning

REPORT OF PSYCHOEDUCATION EVALUATION
A██████ I.███
PAGE: 6

subtest measures a person's nonverbal and spatial reasoning efficiency, in the absence of a psychomotor component, and when presented with possible solutions. His performance on the Matrix Reasoning subtest was within the Borderline range. Taken together, these findings suggest that A██████ almost Average nonverbal reasoning abilities become significantly less efficient when utilized in the absence of a psychomotor component.

## ACHIEVEMENT FUNCTIONING

The following interpretation is based on the Relative Proficiency Index (RPI), which will compare the proficiency of A██████ academic skills to the proficiency of A██████ peer group's academic skills. In particular, the RPI examines academic functioning in terms of, if A██████ peer group can complete a task 90% of the time, what percent of the time can A██████ complete the same task. The RPI interpretation key is as follows: items on which he scores 90% or above will be easy for A██████, items on which he scores from 80% to 89% will be manageable for A██████, items on which he scores from 70% to 79% will be difficult for A██████, and items on which he scores below 70% will be very difficult for Antonio.

### WOODCOCK JOHNSON 3ᴿᴰ EDITION, TEST OF ACHIEVEMENT, (WJ-III)

| Cluster/Test | RPI | Age Equivalent | Standard Score | Implications |
|---|---|---|---|---|
| **BROAD READING** | 07/90 | 7-5 | 74 | Very Difficult |
| Letter-Word Identify | 02/90 | 7-6 | 76 | Very Difficult |
| Passage Comprehension | 18/90 | 7-3 | 79 | Very Difficult |
| Reading Fluency | 12/90 | 7-6 | 78 | Very Difficult |
| **BASIC READING SKILLS** | 03/90 | 7-3 | 75 | **Very Difficult** |
| Word Attack | 05/90 | 7-0 | 77 | Very Difficult |
| Letter-Word Identify | 02/90 | 7-6 | 76 | Very Difficult |
| **BROAD MATH** | 84/90 | 9-2 | 96 | **Manageable** |
| Applied Problems | 57/90 | 8-4 | 90 | Very Difficult |
| Math Fluency | 90/90 | 9-8 | 100 | Easy |
| Calculation | 93/90 | 10-1 | 104 | Easy |
| **BROAD WRITTEN LANG.** | 42/90 | 7-8 | 76 | **Very Difficult** |
| Spelling | 05/90 | 7-4 | 71 | Very Difficult |
| Writing Samples | 82/90 | 8-3 | 91 | Manageable |
| Writing Fluency | 60/90 | 8-0 | 84 | Very Difficult |
| **ORAL LANGUAGE** | 73/90 | 7-3 | 82 | **Difficult** |
| Story Recall | 83/90 | 7-1 | 86 | Manageable |
| Understanding Directions | 61/90 | 7-3 | 84 | Very Difficult |
| Picture Vocabulary | 77/90 | 8-2 | 92 | Difficult |

On the Broad Reading section, A██████ age equivalency level is comparable to that of an individual at age 7 years, 5 months. Based on his Broad Reading skills, tasks that range from

86

fluent reading to comprehending short passages will be very difficult. As such, when individuals his age perform Broad Reading tasks with 90% success, A█████ performs them with 07% success.

On the Basic Reading Skills section, A██████ age equivalency level is comparable to that of an individual at age 7 years, 3 months. Based on his Basic Reading Skills, tasks that require word and letter identification skills or phonological decoding will be very difficult. As such, when individuals his age perform Basic Reading Skills tasks with 90% success, A█████ performs them with 03% success.

With regard to Broad Math Skills, A██████ age equivalency level is comparable to that of an individual at age 9 years, 2 months. Based on his Broad Math skills, tasks that require him to analyze and solve practical math problems using his functional math abilities will be manageable. As such, when individuals his age perform Broad Math tasks with 90% success, A█████ performs them with 84% success.

With regard to his Calculation and Applied Problems abilities, A██████ age equivalency level is comparable to that of an individual at age 10 years, 1 month and 8 years, 4 months, respectively. In comparison to the scores obtained by others at his age level, tasks that require him to solve higher-order arithmetic problems or consistently utilize arithmetic formulas will range from Easy to Very Difficult. As such, when individuals his age perform Calculation tasks using a pen and paper with 90% success, A█████ performs them with 93% success. In contrast, when individuals his age perform Applied Problems tasks, which contain word problems or mental mathematics, with 90% success, A█████ performs them with 57% success. In particular, A██████ ability to successfully complete higher order arithmetic tasks varies significantly in regards to how the problem is presented (verbal word problems versus numerical presentation), or what type of mental processing is required (mental manipulation or pen and paper manipulation) to solve the problem.

With regard to Broad Written Language, A██████ age equivalency level is comparable to that of an individual at age 7 years, 8 months. Based on his Broad Written Language skills, tasks that require him to generate single-word responses or arrange sentences embedded in context will be very difficult. As such, when individuals his age perform Broad Written Language tasks with 90% success, A█████ performs them with 42% success.

With regard to Academic Fluency, A██████ age equivalency level is comparable to that of an individual at age 7 years, 11 months. The fluency of his reading, math, and written skills varied. Specifically, A█████ displayed a 90% success rate with regard to math fluency, a 60% success rate with regard to writing fluency, and a 12% success rate with regard to reading fluency. Overall, his ability to write and read fluently appears to be a considerable weakness.

With regard to Understanding Directions tasks, A██████ age equivalency level is comparable to that of an individual at age 7 years, 3 months. Based on his Understanding Directions skills, tasks that require him to follow verbal directions of varying levels of complexity as well as sequence verbal directions and complete actions based on verbal directions

will be very difficult. As such, when individuals his age perform Understanding Directions tasks with 90% success, A_____ performs them with 61% success.

With regard to Story Recall tasks, A_____ age equivalency level is comparable to that of an individual at age 7 years, 1 month. Based on his Story Recall abilities, tasks that require him to store, retrieve, and communicate information presented in verbal formats of varying levels of complexity will be manageable. As such, when individuals his age perform Story Recall tasks with 90% success, A_____ performs them with 83% success. In comparison to his performance on the Understanding Directions subtest, his performance on the Story Recall subtest indicated that he is better able to utilize his auditory processing skills when he has to recall stories that are laden with social content. In contrast, when he has to passively listen and patiently follow directions, his functioning is less proficient.

Overall, A_____ displayed Borderline overall cognitive aptitude. In addition, the level of difficulty that he faces when attempting to complete various functional academic tasks ranges from Very Difficult to Easy. In particular, all of his functional reading abilities were significantly impaired. Furthermore, his writing abilities were typically impaired. In addition, his oral language abilities were limited. Furthermore, when his functional arithmetic abilities were employed in conjunction with a verbal component, they became impaired. These findings strongly suggest that A_____ is experiencing verbal processing limitations.

On the Bender Gestalt test, a task requiring him to reproduce simple geometric designs and often used as a brief screen for neurological impairment, A_____ typically reproduced misshapen designs. His line quality was adequate. His planning and organization of the drawings was limited, as a result of his having reproduced the designs in a random manner across the page. In addition, his initial spacing was limited. His free recall of the drawings was less proficient than his initial reproductions. Overall, his results did not suggest the presence of major perceptual organizational, spatial, or visual motor concerns. However, some perceptual organizational difficulties were noted.

## SUMMARY

The results of this evaluation place A_____ current cognitive functioning within the Borderline range. Specifically, his verbal cognitive aptitude was within the Low Average range. In contrast, his nonverbal cognitive aptitude was within the Borderline range. The pattern of A_____ performance on the cognitive testing indicates that his verbal abilities are developing at a significantly faster rate than his nonverbal problem solving skills.

Analysis of A_____ fundamental academic abilities in comparison to the pattern of his performance on cognitive testing suggests that he experiences a variable level of difficulty when attempting to employ his functional academic skills. For example, despite his almost Average level of verbal cognitive aptitude, on all reading tasks, A_____ displayed impaired functioning. Similarly, most of his writing abilities were impaired. In particular, A_____ spelling abilities were extremely poor. Of note, given that he possesses Average abstract verbal reasoning abilities (a spelling precursor), A_____ impaired spelling abilities are significantly noteworthy. Specifically, on writing tasks that require proficient spelling abilities, A_____ performance will be extremely poor. In contrast, on writing tasks where efficient spelling abilities are not

required, A▮▮▮▮▮▮ writing abilities will be more proficient.

On tasks that required attention and concentration abilities, A▮▮▮▮▮▮ abilities were marginally adequate. Specifically, his ability to recall and immediately implement esoteric verbal directions was impaired. In contrast, he has a marginally adequate ability to utilize his attention and concentration abilities to recall socially laden information.

Despite his perceptual organizational limitations, A▮▮▮▮▮ math skills were typically adequate. Of note, he displayed significant difficulty when attempting to solve math tasks that were combined with a verbal component. In contrast, A▮▮▮▮▮ ability to solve written calculation tasks was significantly better improved. As such, even A▮▮▮▮▮ arithmetic abilities, which were a relative cognitive strength, were reduced when combined with a verbal component.

Given his age, in a typical school day, A▮▮▮▮▮ confronts numerous tasks that are supposed to be completed by using effective verbal reasoning abilities. However, based on the discrepancy between his cognitive and academic testing results, A▮▮▮▮▮ appears to be experiencing verbal learning difficulties. As such, interventions that improve his verbal abilities are strongly recommended.

### DIAGNOSTIC IMPRESSIONS
### DSM IV-TR CLASSIFICATION SYSTEM

| AXIS I | 315.00 | READING DISORDER |
| | 315.2 | DISORDER OF WRITTEN EXPRESSION |
| AXIS II | V71.09 | NONE |
| AXIS III | | NONE |
| AXIS IV | | PROBLEMS WITH PRIMARY SUPPORT GROUP, ACADEMIC CONCERNS |
| AXIS V | | GAF- CURRENT: 60, PAST: UNKNOWN |

### RECOMMENDATION FOR TREATMENT

Individuals who intervene with A▮▮▮▮▮ should be made aware of his cognitive and academic limitations. It is my opinion that A▮▮▮▮▮ can derive considerable benefit from the therapeutic milieu of highly structured services that can ensure compliance with therapeutic protocols that address the multifaceted aspects of his cognitive, academic, emotional, and interpersonal needs. As such, the following components should be considered for incorporation into the respondent's treatment plan:

1.      A▮▮▮▮▮ displayed a need for special education services. As such, A▮▮▮▮▮ may benefit from some highly structured education supportive services to provide supplemental and remedial intervention with regard to his functional academic abilities. He is in need of directive, focused, and intensive efforts to improve his reading skills, his writing skills, and his math skills. He has minimal basic skills in all of these areas. However, he should be able to perform at a higher level than he is presently functioning with appropriate teaching and intervention. At a minimum, the following skills should be incorporated into his instructional programming:

A)      Initially, a functional curriculum should be used to solidify A▮▮▮▮▮

current vocabulary. Picture books that provide the name and a picture of a given object should be used to further develop A▆▆▆▆▆ ability to bring meaning to the words in his vocabulary by connecting them to their picture and function.

B)      A▆▆▆▆▆ should also be provided with instruction that specifically focuses on increasing his vocabulary (spoken word) knowledge. Examples include the use of word boxes, word banks, word webs, etc. He will not be able to read or decode a word that he does not know exists in the English language.

C)      Specific reading instructional programming will need to be logically structured, and hierarchically based to address both "top down" (use of contextual cues, vicarious exposure to written material, etc.), and "bottom up" (a focus on very specific comprehension skills) approaches to reading instruction.

D)      A▆▆▆▆▆ math computational skills will also require remediation. A▆▆▆▆ appears to have a rudimentary understanding of some basic arithmetic concepts. However, his ability to successfully conceptualize and solve higher order mathematical problems remains limited.

2.      Based on the results of the current evaluation, A▆▆▆▆▆ may benefit from a Clinical Evaluation to ascertain if his current verbal difficulties are having any effect on his emotional and interpersonal functioning. In particular, the antecedents of his limited frustration tolerance should be explored to determine if his limited frustration tolerance stems from his verbal difficulties, emotional stressors, or a combination of both factors. Completing a Clinical Evaluation to assess the extent and antecedents of his frustration tolerance difficulties will be of critical importance because improving his frustration tolerance will be an important step in eventually improving his academic functioning.

3.      The Clinical Evaluation should also be used to assess the impact of A▆▆▆▆▆ limited verbal processing on his anger management abilities. In addition, A▆▆▆▆▆ tendency to threaten his peers and occasionally engage in behavior that is harmful to himself should also be assessed.

4.      A▆▆▆▆▆ family may benefit from learning disciplinary strategies that reduce their need for corporal punishment. In particular, A▆▆▆▆▆ family may obtain benefit from learning disciplinary strategies that are effective for children with verbal processing difficulties.

EVALUATION COMPLETED AND REPORT
GENERATED BY:

MICHAEL GILLIARD, PSY.D.
CLINICAL PSYCHOLOGIST

90



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

Office of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800; Fax: 202-442-5518
www.k12.dc.us





# District of Columbia Public Schools
## Department of Special Education
### *Psycho-Educational Report*
### (Confidential--for professional use only)

NAME: A████ L██

AGE: 9 years 5 months

DATE OF BIRTH: ████/95

GENDER: Male

GRADE: Third

SCHOOL: Bruce-Monroe ES

DATE OF EVALUATION: 11/09/04

TEACHER: Mrs. Drake

REPORT DATE: 11/15/04

EXAMINER: Terrance Beason, M.Ed., CAGS

TITLE: School Psychologist

**Test Administered**

Wechsler Intelligence Scale for Children—Fourth Ed. (WISC-IV)
Wechsler Individual Achievement Test—Second Edition (WIAT-II)
Record Review
Teacher Interview

**Composite Scores Summary**

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 23 | 87 | 19 | 81-95 | Low Average |
| Perceptual Reasoning (PRI) | 23 | 86 | 18 | 79-95 | Low Average |
| Working Memory (WMI) | 16 | 88 | 21 | 81-97 | Low Average |
| Processing Speed (PSI) | 14 | 83 | 13 | 76-94 | Low Average |
| Full Scale (FSIQ) | 76 | 82 | 12 | 78-87 | Low Average |

**\*\*Arithmetic was substituted for Letter-Number Sequencing.**

## Wechsler Intelligence Scale for Children—Fourth Ed.

*IQ Scores*          *Classification*
130 and above.........Very Superior
120-129...................Superior
110-119...................High Average
90-109....................Average
80-89......................Low Average
70-79......................Borderline
69 and Below...........Intellectually Deficient

91

**Children First**

A███████ I████                                                                        2

## Reason for Referral

A██████ was referred for an evaluation due to some academic concerns. This evaluation was conducted to ascertain his current levels of intellectual and academic functioning. The results will assist in determining the need for special educational services. A████████ is a third grade student attending Bruce-Monroe Elementary School. The examiner had an opportunity to speak briefly to A███████ third grade instructor, Mrs. , regarding his performance in the classroom. According to Mrs. Drake, A██████ is believed to possess more abilities than demonstrated. That notwithstanding, his computational skills are seen as more developed than his skills in reading. A██████ is said to be less confident in his abilities in reading, as a result he takes less risks in this area.

## Behavioral Observations (during testing)

A██████ presented as a polite, pleasant child who seemed poised for testing. He entered the testing room with no apprehensions, so rapport was easily established. A████████ responses to items were fairly deliberate and thoughtful. His motivation and concentration were consistent throughout the evaluation. Nevertheless, the examiner submits the following as accurate appraisal of A████████ current academic and cognitive functioning.

## Intellectual Functioning

### About the WISC-IV
A██████ was administered the Wechsler Intelligence Scale for Children– Fourth Edition (WISC–IV) on 11/9/2004. The WISC–IV is used to assess the general thinking and reasoning skills of children aged 6 years to 16 years. This test has five main scores: *Verbal Comprehension score, Perceptual Reasoning score, Working Memory score, Processing Speed score,* and *Full Scale* score.

The *Verbal Comprehension* score indicates how well A██████ did on tasks that required him to listen to questions and give spoken answers to them. These tasks evaluate his skills in understanding verbal information, thinking and reasoning with words, and expressing thoughts as words.

The *Perceptual Reasoning* score indicates how well A██████ did on tasks that required him to examine and think about things such as designs and pictures, and to solve problems without using words. These tasks evaluate his skills in solving nonverbal problems, sometimes using eye-hand coordination, and working quickly and efficiently with visual information.

The *Working Memory* score indicates how well A██████ did on tasks requiring him to learn and retain information in memory while utilizing the learned information to complete a task. These tasks measure his skills in attention, concentration, and mental reasoning. This skill is closely related to learning and achievement.

The *Processing Speed* score indicates how well A██████ did on tasks requiring him to quickly scan symbols and make judgments about them. These tasks measure his skills in

A████ I███                                                                      3

speed of mental problem-solving, attention, and eye-hand coordination. This skill may be important to his development in reading, and ability to think quickly in general.

The *Full Scale* score is derived from the combination of the Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed scores. The WISC–IV Full Scale score is one way to view A████ overall thinking and reasoning skills.

### How WISC-IV and WIAT-II Scores are Reported

The scores show how well A████ performed compared to a group of children the same age from across the United States. The highest possible score is 160 and the lowest possible score is 40 for most skills tested. Half of all children will score less than 100, and half of all children will score more than 100. Scores from 90 to 109 are average.

A percentile rank is also given. This shows your child's rank in the national comparison group. If the percentile rank were 45, for example, it would mean that he scored higher than approximately 45 out of 100 children his age.

When reviewing A████ scores, remember that no test is perfectly accurate. Any child might score slightly higher or lower if tested again on a different day.

### Interpretation of WISC-IV Results

A████ was administered ten subtests of the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV) from which his composite scores are derived. The Full Scale IQ (FSIQ) is derived from a combination of ten subtest scores and is considered the most representative estimate of global intellectual functioning. A████ general cognitive ability is within the *Low Average* range of intellectual functioning, as measured by the FSIQ. His overall thinking and reasoning abilities exceed those of approximately 12% of children his age (FSIQ = 82; 95% confidence interval = 78-87). **His ability to think with words is comparable to his ability to reason without the use of words. Both A████ verbal and nonverbal reasoning abilities are in the Low Average range.**

A████ verbal reasoning abilities as measured by the Verbal Comprehension Index are in the *Low Average* range and above those of only 19% of his peers (VCI = 87; 95% confidence interval = 81-95). The Verbal Comprehension Index is designed to measure verbal reasoning and concept formation. A████ performed comparably on the verbal subtests contributing to the VCI, suggesting that these verbal cognitive abilities are similarly developed.

A████ nonverbal reasoning abilities as measured by the Perceptual Reasoning Index are in the *Low Average* range and above those of only 18% of his peers (PRI = 86; 95% confidence interval = 79-95). The Perceptual Reasoning Index is designed to measure fluid reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid reasoning and perceptual organization abilities. A████ performance on the perceptual reasoning subtests contributing to the PRI is somewhat variable, although the magnitude of this difference in performance is not unusual among children his age. Examination of A████ performance on individual subtests provides additional information regarding his specific nonverbal abilities.

93

A▮▮▮▮ L▮▮

4

A▮▮▮▮ ability to sustain attention, concentrate, and exert mental control is in the **Low Average** range. He performed better than approximately 21% of his age-mates in this area (**Working Memory Index = 88**; 95% confidence interval 81-97).

A▮▮▮▮ ability in processing simple or routine visual material without making errors is in the **Low Average** range when compared to his peers. He performed better than approximately 13% of his peers on the processing speed tasks (**Processing Speed Index = 83**; 95% confidence interval 76-94). A▮▮▮▮ performance on the subtests that comprise the PSI is quite variable; therefore, the PSI score should be interpreted with caution. He performed much better on Symbol Search (Scaled Score = 9), which is more demanding of attention to detail and mental control, than on Coding (Scaled Score = 5), which is more demanding of fine-motor skills, short-term memory, and learning.

## Personal Strengths and Weakness

A▮▮▮▮ achieved his best performance among the nonverbal reasoning tasks on the Picture Concepts subtest and lowest score on the Block Design subtest. His performance across these areas differs significantly, suggesting that these are the areas of most pronounced strength and weakness, respectively, in A▮▮▮▮ profile of nonverbal reasoning abilities. His weak performance on the Block Design subtest was below that of most children his age. On the Picture Concepts subtest, A▮▮▮▮ was presented with two or three rows of easily identifiable pictures and asked to choose one picture from each row to form a group with a common characteristic. This subtest is designed to measure fluid reasoning and abstract categorical reasoning ability. The task invokes verbal concepts, but does not require verbal responses; (Picture Concepts scaled score = 11). The Block Design subtest required A▮▮▮▮ to use two-color cubes to construct replicas of two-dimensional, geometric patterns. This subtest assesses nonverbal fluid reasoning and the ability to mentally organize visual information. More specifically, this subtest assesses his ability to analyze part-whole relationships when information is presented spatially. Performance on this task also may be influenced by visual-spatial perception and visual perception-fine motor coordination, as well as planning ability; (Block Design scaled score = 5).

## Academic Functioning

On 11/09/04, A▮▮▮▮ was administered the Wechsler Individual Achievement Test- 2nd Ed. (WIAT-II), a measure that assesses levels of functioning in specific academic areas for individuals ages four through adulthood.

***The graphics of A▮▮▮▮ specific academic performances appear as part of the addendum pages which follow this report.***

*The following is a description of each WIAT-II subtests given to A▮▮▮▮.*

*Word Reading:* Depending on the student's age or grade, he or she identifies the letters of the alphabet, beginning and ending sounds of words, and rhyming words, or reads as quickly as possible from a list of words.

*Reading Comprehension:* The student reads sentences and short passages and then answers questions about the main idea, specific details, or the order of events.

94

A██████ I██                                                                                          5

He or she is also asked to make inferences, draw conclusions, or define unfamiliar words by using context clues.

*Pseudoword Decoding:* the student uses his or her phonetic knowledge to sound out nonsense or unfamiliar words.

*Numerical Operations:* the student solves written math problems requiring addition, subtraction, multiplication, and division using whole numbers, fractions, and decimals.

*Math Reasoning:* The student solves a word or stated problem requiring single or multiple steps related to time, money, measurement, geometry, probabilty, and readiing/ interpreting graphs.

*Spelling:* The student writes the initial or ending letters to stated sounds or words and spells a target word based on its meaning as it is used in a sentence.

## Reading

A██████ presents a diverse set of skills on different aspects of reading. He performed much better on tasks that assessed his capability to read sentences and paragraphs and answer questions about what was read (**Reading Comprehension standard score = 86**) than on tasks that required him to correctly read a series of printed words (**Word Reading standard score = 74**). *A relative strength in comprehension skills as compared to reading words in isolation may indicate that A██████ is able to derive meaning from text using context clues but may not have learned vocabulary words to automaticity.* For this reason, the Reading Composite score may not be the most accurate manner in which to summarize his reading skills. His Reading Comprehension subtest score is higher than only approximately 18% of his peers, placing these skills in the ***Low Average*** range, with a grade-equivalency of **2:0**. A██████ performance on Word Reading is within the ***Borderline*** range and exceeds that of approximately 4% of students his age. A██████ obtained a grade-equivalent of **1:8** on the Word Reading subtest.

## Mathematics

In overall mathematics skills A██████ performed in the ***Borderline*** range, as indicated by his **Mathematics Composite standard score (78)**. His skills in this area exceed that of only approximately 7% of students his age. A██████ performance on tasks that required him to add and subtract one- to three-digit numbers and multiply and divide two-digit numbers (**Numerical Operations standard score = 85, grade-equivalency = 3:0**) is comparable to his performance on tasks that requires him to understand basic number concepts, including unit and geometric measurement, and solve one-step word problems (**Math Reasoning standard score = 75, grade-equivalency = 1:9**).

## Written Language/ Spelling

On tasks that required him to correctly spell verbally presented words A██████ performed in the ***Borderline*** range. He achieved a Spelling standard score of 75. His skills in this area exceed those of only approximately 5% of students his age. On this subtest, A██████ was only able to spell the words: *we, is, big, look,* and *two*.

95

A██████ L██                                                                    6

## Ability-Achievement Discrepancy Analysis

Academic and cognitive assessments are administered largely to draw comparisons and/or analyze discrepancies between one's predicted ability and their actual level of achievement. Significant differentials between ability and achievement (i.e. High ability – Low achievement) typically suggest the presence of some sort of academic hindrance or learning deficit.

A██████ scores on the WIAT-II were compared to the levels of achievement predicted for a student with his general cognitive ability, as indicated by his Verbal Comprehension score of **87** on the WISC-IV administered 11/9/2004.

He achieved WIAT-II scores that were slightly disparate with his overall level of cognitive ability in all areas tested. A██████ obtained a Composite score of **78** in both Math and Reading.

## Summary

A██████ is a 9-year-old child who completed the WISC-IV and WIAT-II. His general cognitive ability, as estimated by the WISC-IV, is in the ***Low Average*** range. A██████ verbal comprehension and perceptual reasoning abilities were also both in the ***Low Average*** range (**VCI = 87, PRI = 86**). Academically, A██████ is achieving in the upper-first grade range in both Basic Reading and Spelling, with his Reading Comprehension skills falling in the beginning second grade range. In arithmetic, he appears to be functioning in the beginning third grade range in Numerical Operations and the upper-first grade range in Math Reasoning. In sum, excluding his Numerical Operations abilities, A██████ achievement level falls below his current grade placement. In light of difficulties in reading and written language, remedial/ tutorial services are recommended to effectively address and ameliorate those weaknesses. Also, in the examiner's obligatory record review and teacher interview, there were no noteworthy social-emotional concerns to warrant a psychological evaluation.

Nevertheless, the MDT/ IEP will meet to review and discuss all relevant information--germane to A██████ functioning--as a means of arriving at a decision on the most appropriate educational program, placement, and/ or services for him.

Notwithstanding the aforementioned, the following recommendations are offered.....

## Recommendations

1. A██████ could develop a list of his problem words, that is, words that he commonly misspells. He could then concentrate on learning these words and could add and remove words from the list as appropriate.

2. A██████ teachers are encouraged to use words at his level of verbal development and

A██████ L██                                                                              7

to encourage pleasure reading at a level consistent with his abilities and interests.

3. A██████ is encouraged to learn a new vocabulary word each day and to record this word in a log.

4. Family and teachers can assist in building A██████ vocabulary by encouraging him to ask for definitions of unfamiliar words during reading activities.

5. A██████ teachers and parents can encourage A██████ to engage in pleasure reading by setting aside a few minutes each day for this activity.

6. Computer programs that focus on vocabulary development, word attack, and phonics may be helpful in strengthening A██████ reading skills. Programs that identify deficit skill areas and offer a means of monitoring progress are of particular value. Programs that emphasize verbal reasoning and comprehension would also be helpful.

7. Given A██████ difficulty with reading comprehension, he may need to be taught specific comprehension strategies such as reading for the main idea, using context clues to determine word meaning, and identifying cause & effect.

8. A██████ may need assistance in choosing interesting reading materials that are at the appropriate reading level.

9. Teachers and family could assist A██████ with remembering important information by showing him how to imbed important points and activities within a story that is meaningful to him.

10. A██████ is encouraged to practice weekly spelling and sight-vocabulary words by using different modalities. For example, he could use a typewriter, computer, chalkboard, or plastic magnetic letters to work on these skills.

11. A██████ parents are encouraged to be involved in a home-based plan to complement the reading program at school.

12. A██████ may benefit from a caring, positive, and supportive environment. For example, A██████ teacher might make a point of daily saying something positive, such as "I like being your teacher and being with you," or "I like the way you are completing that assignment," or "I like the way you are drawing that picture."

This report is valid only if signed by a qualified professional:

*Terrance Beason*

_____
Terrance Beason, M.Ed.,CAGS
School Psychologist

**Verbal Comprehension Subtest Scores Summary**                                        97

A████ L██                                                                                    8

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Similarities | 15 | 8 | 8:6 | 25 |
| Vocabulary | 22 | 7 | 7:6 | 16 |
| Comprehension | 16 | 8 | 7:10 | 25 |

**Perceptual Reasoning Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Block Design | 10 | 5 | <6:2 | 5 |
| Picture Concepts | 18 | 11 | 10:10 | 63 |
| Matrix Reasoning | 14 | 7 | 7:6 | 16 |

**Working Memory Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Digit Span | 13 | 8 | 8:2 | 25 |
| (Arithmetic) | 18 | 8 | 8:2 | 25 |

**Processing Speed Subtest Scores Summary**

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Coding | 26 | 5 | <8:2 | 5 |
| Symbol Search | 19 | 9 | 8:10 | 37 |

A▬▬▬ L▬▬                                                                    9

## WISC-IV Composite Scores

### Composite Score Profile

|  | VCI | PRI | WMI | PSI | FSIQ |  |
|---|---|---|---|---|---|---|

| | VCI | PRI | WMI | PSI | FSIQ | |

A_____ I___                                                              10

## WISC-IV Subtest Scaled Score Profile

| | Verbal Comprehension | | | | Perceptual Reasoning | | | | Working Memory | | | Processing Speed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SI | VC | CO | IN | WR | BD | PCn | MR | PCm | DS | LN | AR | CD | SS | CA |

EXHIBIT

AL-10

ALL-STATE LEGAL®

44 IDELR 191
4 ECLPR 679
105 LRP 53948

**Category**
Special Education, Judicial Decisions

*INDEPENDENT SCHOOL DISTRICT NO. 709, DULUTH, Relator,*
*vs. Linda BONNEY, Complainant; Commissioner of Minnesota*
*Department of Education, Respondent*
705 N.W. 2d 209

**Minnesota Court of Appeals**
A05-84

November 1, 2005

**Related Index Numbers**
515.005 Entitlement to Transportation
195.015 In General
165.015 Infants and Toddlers Program

**Ruling**

A Minnesota appeals court applied state law and the IDEA to determine that districts must provide transportation to and from the home of a preschool student with a disability if the child receives special education services outside of the home, even if those services are provided at the child's daycare. And, it agreed with the **Minnesota Department of Education's** conclusions that the district violated the IDEA's procedural rules. But, it ordered the state ED to correct its calculations for the amount of compensatory educational services awarded.

**Meaning**

In Minnesota, districts must provide transportation services whenever special education services are delivered to children outside of their home. There is no minimum amount of time in which the child will receive services that triggers the obligation. Since the IDEA does not require that transportation be provided if the services are provided by the child's daycare, the Minnesota statute requires a greater obligation to provide transportation services.

**Case Summary**

The state ED appropriately interpreted the law when it found a Minnesota district had violated state and federal law with respect to children with disabilities attending its private early intervention program. An appeals court rejected the district's arguments that state and federal law did not require it to provide ESY services, transportation or otherwise conform to the requirements of the IDEA. Although the court found state law went beyond the IDEA in imposing requirements on the district, those standards must be met. The court said "generally, courts have upheld state educational requirements that go beyond those delineated in the IDEA." It also found ample evidence in the record to support the state ED's findings that the district failed to appropriately implement the children's IEPs and failed to consider ESY services, even when indicated by a child's regression. Finally, the court found the state ED appropriately determined that the district did not comply with procedural requirements with respect to notice and complaint procedures. But, the court found possible mathematical errors in the state ED's calculations of the amount of compensatory education the district should provide.

**Judge / Administrative Officer**

Kalitowski

Crippen

102

**Full Text**

Opinion:
Facts
Issues
Analysis
I.
II.
III.
1. ESY Policy
2. ESY Consideration
IV.
V.
1. District Representatives
2. LLEC Representatives
3. Regular Education Teachers
VI.
Decision

APPEARANCES:

For Relator: Elizabeth A. Storaasli, Agnew Dryer Storaasli Knutson & Pommerville, Ltd., Duluth, MN.

For Complainant: Luther A. Granquist, Minnesota Disability Law Center, Minneapolis, MN.

For Respondent: Mike Hatch, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, MN.

JUDGES: Considered and decided by Minge, Presiding Judge; Kalitowski, Judge; and Crippen, Judge.[*]

## Opinion:

KALITOWSKI, Judge

Relator Independent School District No. 709, Duluth, challenges respondent Minnesota Board of Education's (MDE) order concluding that relator violated state and federal law as it pertains to children with disabilities attending Little Learners Enrichment Center (LLEC), a private early intervention program. On appeal, relator argues that respondent acted arbitrarily, unreasonably, and in violation of the law by (1) deciding that relator failed to provide transportation to children attending LLEC; (2) deciding that relator did not properly implement individualized education plans (IEP) for children attending LLEC and requiring relator to provide compensatory education; (3) deciding that relator did not adequately consider extended school year (ESY) services for children attending LLEC and requiring relator to revise those services; (4) concluding that relator failed to provide parents of children attending LLEC with adequate written notice of proposed special-education services and ordering corrective action; (5) concluding that members of relator's IEP teams were not qualified as district representatives and requiring that an LLEC representative be part of every IEP team for children attending LLEC. Relator also argues that MDE's complaint process was arbitrary, unreasonable, and contrary to the requirements of 34 C.F.R. 300.660-300.662 (2004).

## Facts

The Individuals with Disabilities in Education Act (IDEA) requires school districts to provide special education and related services. 20 U.S.C.

104

1400(d)(1)(A) (2000). Independent School District Number 709 in Duluth, Minnesota, provides early childhood special education services at Little Learners Enrichment Center (LLEC), a licensed treatment and daycare program. Children at LLEC receive special education services as well as other preschool or daycare services. Details of the services provided to each child are described in that child's individual education program (IEP). Each IEP sets out the types of special education and related services that the child should receive at LLEC.

On August 3, 2004, complainant Linda Bonney of the Minnesota Disability Law Center entered a complaint against relator with respondent on behalf of students attending LLEC. Respondent's investigator gathered information regarding the claims in the complaint and respondent issued a complaint decision addressing them on January 4, 2005.

Relevant to this appeal, respondent found that relator (1) failed to provide transportation for LLEC students; (2) failed to properly implement students' IEPs; (3) failed to properly address whether students required extended school year (ESY) services and failed to provide proper notice to parents when ESY was refused; (4) failed to provide proper written notice to parents of LLEC students; and (5) did not have the required personnel present at IEP team meetings. In conjunction with its findings, respondent ordered relator to undertake corrective action, including orders (1) to provide transportation for children enrolled at LLEC; (2) to develop compensatory education plans for students; (3) to revise and implement policies concerning ESY and notice of ESY refusal; (4) to revise policies regarding parental notice; and (5) to revise policies so that all required team members will attend IEP team meetings.

Relator petitioned this court for a writ of certiorari to review respondent's decision. This court issued a writ of certiorari on January 14, 2005. Petitioner challenges each of the aforementioned findings and corrective orders as well as respondent's complaint process itself.

## Issues

1. Did respondent err in finding that relator was required to provide transportation for children attending LLEC?

2. Is respondent's finding that relator failed to properly implement children's IEPs supported by substantial evidence?

3. Are respondent's findings that relator's Extended School Year services (ESY) policy was deficient and that relator did not properly consider ESY services for children attending LLEC supported by substantial evidence?

4. Is respondent's finding that relator failed to provide proper written notice to parents of LLEC students supported by substantial evidence?

5. Is respondent's finding that relator failed to meet attendance requirements at IEP meetings supported by substantial evidence?

6. Did respondent's complaint resolution process violate the Individuals with Disabilities in Education Act?

## Analysis

"When reviewing agency decisions we adhere to the fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 278 (Minn. 2001) (quotation omitted).

"When an agency performs the quasi-judicial function of receiving and weighing evidence, making factual findings, and applying a prescribed standard to reach a conclusion, a reviewing court applies the

106

substantial-evidence test." *Hurrle v. County of Sherburne,* 594 N.W.2d
246, 249 (Minn. App. 1999) (quotation omitted). Substantial evidence is
defined as: "(1) such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion; (2) more than a scintilla of evidence;
(3) more than some evidence; (4) more than any evidence; or (5) the
evidence considered in its entirety." *Minn. Ctr. for Envtl. Advocacy v.
Minn. Pollution Control Agency,* 644 N.W.2d 457, 466 (Minn. 2002).
Under the substantial evidence test, the reviewing court evaluates "the
evidence relied upon by the agency in view of the entire record as
submitted." *Cable Commc'ns Bd. v. Nor-west Cable Commc'ns P'ship,*
356 N. W. 2d 658, 668 (Minn. 1984). If an agency engages in reasoned
decision-making, the reviewing court will affirm, even though it may
have reached a different conclusion than the agency. *Id.* at 669.

## I.

Relator argues that respondent erred in its interpretation of Minn. Stat.
123B.88 (2004) by construing the statute to require school districts to
transport children with disabilities when the children receive special
instruction and daycare services in the same location. Relator contends
that such a broad interpretation impermissibly contradicts the
transportation requirements of the federal IDEA. We disagree.

Both Minnesota and federal laws address transportation requirements for
disabled students. The plain language of the Minnesota statute requires
transportation of preschool children for special education services. A
school board "must provide transportation to and from the home of a
child with a disability not yet enrolled in kindergarten when special
instruction and services under sections 125A.03 to 125A.48, and
125A.65 are provided *in a location other than in the child's home.*" Minn.
Stat. 123B.88, subd. 1 (2004) (emphasis added). "Special instruction and
services" means "a free and appropriate public education provided to an
eligible child with disabilities and includes special education and related

107

services defined in the Individuals with Disabilities Education Act." Minn. Stat. 125A.03(a) (2004).

Under the federal IDEA, children with disabilities are entitled to a "free appropriate public education," (FAPE) which is defined as "special education and related services." 20 U.S.C. 1401(8) (2000). One such "related service" is transportation, or the "travel to and from school and between schools." 20 U.S.C. 1401(22); 34 C.F.R. 300.24(b)(15)(i) (2004). Specifically, the IDEA covers "transporting a preschool-aged child to the site at which the public agency provides special education and related services to the child, *if that site is different from the site at which the child receives other preschool or day care service.*" 34 C.F.R. pt. 300, app. A (2004) (emphasis added).

Relator argues that the Minnesota statute's phrase, "includes special education and related services defined in the Individuals with Disabilities Education Act," limits the definition of "special instruction and services" to those defined in the IDEA. Thus, relator argues, because the IDEA only requires transportation when a child receives special education and daycare at different sites, children who receive both daycare and special education services at the same site are not entitled to transportation under the IDEA as incorporated by Minn. Stat. 123B.88, 125A.03(a).

This court retains the authority to review de novo questions of law, which arise when an agency decision is based upon the meaning of words in a statute. *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39-40 (Minn. 1989). A reviewing court is not bound by an agency's interpretation of a statute. *Id.*

When interpreting Minnesota statutes, "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. 645.08(1) (2004). If a statute, construed according to ordinary rules of grammar, is unambiguous, a court may engage in no further statutory construction and must apply its plain

meaning. *State by Beaulieu v. RSJ, Inc.,* 552 N.W.2d 695, 701 (Minn. 1996). "The word includes is usually a term of enlargement, and not of limitation."*Janssen v. Janssen,* 331 N.W.2d 752, 756 (Minn. 1983) (quotation omitted). Therefore, transportation to and from services including "special education and related services defined in the Individuals with Disabilities Education Act" is unambiguously not limited to those instances when transportation is required under the IDEA.

Generally, courts have upheld state educational requirements that go beyond those delineated in the IDEA.*See, e.g., CJN by SKN v. Minneapolis Pub. Sch.,* 323 F.3d 630, 639 (8th Cir. 2003) (holding that when state educational benefits exceed minimum federal standards, the state standards are enforceable through the IDEA); *Town of Burlington v. Dep't of Educ.,* 736 F.2d 773, 785 (1st Cir. 1984) (holding that states may enforce their own laws for disabled children and are not limited to the minimum standards of the federal law), *aff'd,* 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985). As such, respondent did not err in applying the more expansive Minnesota standard to require transportation for LLEC students.

We conclude that the plain language of Minn. Stat. 123B.88 requires transportation when special instruction and services are provided "in a location other than in the child's home" even if that location is not, as the IDEA requires, "different from the site at which the child receives other preschool or day care services."

In addition, the Minnesota statute does not set minimum educational time requirements before triggering a district's transportation duties. Thus, we reject relator's argument that respondent's interpretation of the statute was unreasonable as it applied to children who receive only minimal amounts of educational services while at the daycare location. "The wisdom or propriety of the statute is not a judicial question, but one solely for the Legislature."*Common Sch. Dist. No. 85 v. County of Renville,* 141 Minn. 300, 304, 170 N.W. 216, 218 (1918).

## II.

Relator argues that respondent's finding that relator failed to properly implement children's individual education programs (IEPs) was erroneous. Therefore, relator contends, respondent's order requiring the district to provide compensatory education plans was also in error. Relator also asserts that respondent was required to negotiate and to reconsider its decision. We disagree.

Respondent's conclusion that the district owed the children compensatory time is supported by substantial evidence in the record. Respondent examined calendars, attendance sheets, and IEPs to determine that services were owed to, but not received by, certain children. Relator suggests a different method of calculating compensatory time. But the fact that there is an alternate method does not establish a lack of substantial evidence to support the reasoned decision-making employed by respondent. Once respondent found that relator failed to provide services to children, respondent had the authority to order relator to develop compensatory education plans. See 34 C.F.R 300.660(b)(1) (2004).

In conducting our independent review of respondent's calculations, we have determined that there are possible mathematical errors concerning the precise amount of compensatory time owed to the children. Therefore, we direct respondent to review its calculations and, where appropriate, correct the amount of compensatory time ordered.

Finally, we reject relator's contention that respondent had a duty to negotiate or reconsider its decision. Under 34 C.F.R. 300.661(b)(2) (2004), a state educational agency may develop negotiation procedures "if needed," but it is not affirmatively required to negotiate its final decision. And although respondent's decision stated that "disputes over compensatory education plans will be resolved by the MDE," an agency

110

can no longer correct its errors when it loses jurisdiction by appeal or certiorari. *Anchor Cas. Co. v. Bongards Co-operative Creamery Ass'n,* 253 Minn. 101, 106, 91 N.W.2d 122, 126 (1958). Here, the record indicates that this court granted relator's petition for writ of certiorari on January 14, 2005, but relator did not request reconsideration from respondent until February 4. By then, respondent did not have jurisdiction to reconsider its decision.

## III.

Respondent found that relator's extended school year services (ESY) policy was inconsistent with state and federal law and that the record lacked evidence that IEP teams actually considered ESY for some children. Relator contends that those findings are arbitrary, unreasonable, unsupported by substantial evidence, and under an erroneous theory of law. We disagree.

Under the IDEA, ESY must be provided during a break in instruction if a child's IEP team determines that the services are necessary in order to provide FAPE to the child. 34 C.F.R. 300.309(a)(2) (2004); Minn. R. 3525.0755, subp. 1 (2003). Minnesota law requires an IEP team to consider ESY and dictates the circumstances under which the team must order ESY. At least annually, the IEP team must determine a pupil is in need of ESY services if:

A. there will be a significant regression of a skill or acquired knowledge from the pupil's level of performance on an annual goal that requires more than the length of the break in instruction to recoup unless the IEP team determines a shorter time for recoupment is more appropriate;

B. services are necessary for the pupil to attain and maintain self-sufficiency because of the critical nature of the skill addressed by an annual goal, the pupil's age and level of development, and the timeliness for teaching the skill; or

111

C. the IEP team otherwise determines, given the pupil's unique needs, that ESY services are necessary to ensure the pupil receives a free appropriate public education.

Minn. R. 3525.0755, subp. 3.

### 1. ESY Policy

Relator's Total Special Education Systems handbook includes a complete copy of Minn. R. 3525.0755 and a document outlining the procedure for determining when ESY is appropriate for a child. Relator's procedure states that "if the student is able to maintain or recoup skills in a reasonable amount of time, and self-sufficiency or a unique need is not a concern, the student does NOT qualify for ESY services." Citing that statement, respondent found that relator's policy was inconsistent with federal and state law, specifically Minn. R. 3525.0755, because its rewording of the state's requirement in the negative was confusing and could result in limiting the group of children for whom ESY may be an option.

Relator argues that because a complete copy of Minn. R. 3525.0755 is in its handbook, respondent erred in finding that it failed to comply with the statute. But respondent based its finding that the policy was in violation on relator's failure in its summary of the procedure to include paragraph C. Thus, although relator included the appropriate statute in its manual, the actual procedural standard was confusing and left out the statute's residual qualification for ESY when the team "otherwise determines" it "necessary."[1] See Minn. R. 3525.0755, subp. 3. We conclude that substantial evidence supports respondent's finding that relator's ESY policy failed to properly cite the circumstances in which a child should receive ESY.

## 2. ESY Consideration

The record indicates that parents of an LLEC child receive a notice when an IEP team is going to review their child's IEP. The notice informs parents of topics the team will discuss, "including consideration of extended school year services." The only mention of ESY in some IEPs is a question asking whether extended school year services are required for the child. Following that question is a box marked "no." Those IEPs did not discuss or explain why ESY was inappropriate.

Respondent examined relator's handbook, IEPs, and notices and determined that there was no evidence that the IEP teams considered ESY for some students. A review of the record indicates that the evidence was such that a "reasonable mind might accept as adequate" to support the conclusion that the IEP teams failed to adequately consider ESY. Therefore, we conclude that respondent's finding was supported by substantial evidence in the record.

## IV.

The IDEA requires prior written notice when the district or educational agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of a child or the provision of a FAPE to a child. 34 C.F.R. 300.503(a)(1)(i) (2004); Minn. R. 3525.3600 (2003). State and federal laws require seven specific items in each notice: (1) a description of the action that the district proposes or refuses; (2) an explanation of why the district proposes or refuses to take the action; (3) a description of any other options the district considered and the reason why it rejected the options; (4) a description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action; (5) a description of any other factors relevant to the proposal or refusal; (6) a statement that the child's parents are protected under procedural safeguards and, if the notice is not an initial

113

referral for evaluation, the means by which a copy of the procedural safeguards can be obtained; and (7) sources for parents to contact for help understanding the law. 34 C.F.R. 300.503(b); Minn. Stat. 125A.091, subd. 3 (2004).

Here, respondent considered relator's notices and its IEPs and determined that they failed to meet all of the required components. The record indicates that when relator's IEP teams declined to provide a service to a child, the team failed to consistently elaborate on the reasoning behind those decisions. Such failure to explain why the district refused to take certain action is a violation of the second statutory requirement under 34 C.F.R. 300.503(b) and Minn. Stat. 125A.091, subd. 3.

Relator argues that it would be "absurd" for respondent to require an explanation each time an omitted goal, service, or accommodation was rejected. But neither the statute nor respondent requires explanations for every issue that the evaluation does not consider. They merely require explanations for refused services.

We conclude that respondent properly cited the statutory requirements for written notices under 34 C.F.R. 300.503(a)(1)(i) and Minn. R. 3525.3600 and that substantial evidence supports respondent's conclusion that relator failed to meet all of the requirements.

## V.

Respondent concluded that relator violated federal regulations because qualified district representatives, LLEC representatives, and regular education teachers did not attend some IEP team meetings. Relator challenges that holding, arguing that respondent erred because relator's district representatives were qualified under the statute and because neither LLEC representatives nor regular education teachers were required to be in attendance. We disagree.

114

## 1. District Representatives

A public agency must ensure that the IEP team for each child includes a representative of the public agency who "(i) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (ii) is knowledgeable about the general curriculum; and (iii) is knowledgeable about the availability of resources of the public agency." 34 C.F.R. 300.344(a)(4) (2004).

Here, respondent's investigator sent e-mails to two of relator's district representatives asking questions about the district's general curriculum and resources. One representative's response indicated a lack of familiarity with the curriculum. Another representative's response did not address the district's resources beyond suggesting others who would have such information. We conclude that respondent's determination that relator's representatives failed to meet the statutory requirements is supported by substantial evidence in the record.

Relator contends for the first time on appeal that another individual who attended IEP meetings, D.B., was qualified as a district representative. Because relator did not identify D.B. as a district representative in the earlier proceeding before respondent, this court cannot consider that identification for the first time on appeal. *See Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship,* 356 N.W.2d 658, 668 (Minn. 1984) (stating that the substantial evidence test requires a reviewing court to evaluate the evidence relied upon by the agency). Therefore, this decision does not address D.B.'s qualifications as a district representative.

## 2. LLEC Representatives

A public agency "shall ensure that a representative of the private school or facility attends the meeting." 34 C.F.R. 300.349(a)(2) (2004). Respondent found that relator, the public agency, violated that regulation

115

by failing to ensure that LLEC representatives attended specific IEP team meetings.

Relator acknowledges that no LLEC representative attended the meetings, but argues that, because LLEC is a treatment facility and daycare center, and not a school, the regulation does not apply to its representatives. But, the statute unambiguously applies to public schools or facilities. Because it is undisputed that LLEC is a facility, the statute applies. Respondent accurately cited 34 C.F.R. 300.349(a) and respondent's conclusion that relator violated it is supported by substantial evidence in the record.

### 3. Regular Education Teachers

A public agency must ensure that the IEP team for each child with a disability includes "at least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)." 34 C.F.R. 300.344(a)(2). Relator challenges respondent's conclusion that a regular education teacher was required at student D.D.'s May 2004 IEP team meeting.

Relator admits that D.D. would have been placed in special needs kindergarten the next year and possibly integrated "in art and/or music." The record further indicates that D.D. was to be "mainstreamed with the rest of her class for specialist, center/story time, and other activities as determined by the child study team in the Fall." Taken in its entirety, we conclude that the evidence supports respondent's conclusion that D.D. would be participating in a regular education environment so that a regular education teacher should have attended her IEP meeting.[2]

### VI.

Relator also argues that respondent's complaint resolution procedure violated federal complaint regulations. Federal regulations, 34 C.F.R.

300.660-300.662 (2004), require state educational agencies (SEAs) to develop a written complaint resolution procedure (CRP). Additionally, the regulations outline minimum requirements that SEAs must meet in administering complaint procedures under the IDEA. Whether relator complied with the regulations is a question of law, which we review de novo. *Hibbing Educ. Ass'n v. Pub. Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985).

Relator asserts this process argument for the first time on appeal. The general rule that matters not raised below are not addressed on appeal extends to appeals from administrative decisions. *E.N. v. Special Sch. Dist. No. 1*, 603 N.W.2d 344, 348 (Minn. App. 1999). But an appellate court, in its discretion, may review any matter in the interest of justice. *Agra Res. Coop v. Freeborn County Bd. of Comm'rs*, 682 N.W.2d 681, 684 (Minn. App. 2004).

First, relator argues that respondent's CRP violated federal regulations because it was adversarial. As authority requiring that the CRP process be nonadversarial, relator cites a case from the federal district court, *Megan C. v. Indep. Sch. Dist. No. 625*, 57 F. Supp. 2d 776 (D. Minn. 1999). But *Megan C.* does not support relator's contention. The court in *Megan C.* does not require that the CRP process be nonadversarial; it merely describes the CRP as "informal and less adversarial" when compared to due process hearings. 57 F. Supp. 2d at 791.

Second, relator argues that respondent's investigation was not independent. Under 34 C.F.R. 300.661(a), each SEA shall "carry out an independent on-site investigation" and "make an independent determination" as to whether a public agency is violating the IDEA. Relator argues that respondent's CRP lacked independence because respondent allowed complainant and the LLEC director to respond in writing about the allegations in the complaint. Although the regulations require the SEA to "give the complainant the opportunity to submit additional information, either orally or in writing, about the allegations in

the complaint," a school district has no corresponding right to submit additional information. 34 C.F.R. 300.661(a)(2). As such, we find no violation under the regulation where respondent did not allow relator to submit additional information.

Relator also argues that respondent's CRP was not independent because respondent did not provide relator with copies of the complaint or other materials. But the record indicates that respondent provided relator a summary of the complaint. And there is no statutory duty for respondent to provide a copy of the complaint where, as here, relator did not request a copy until after this court granted certiorari. Relator fails to demonstrate how failing to provide relator documentation, when there was no duty to provide it and relator never requested it, destroys respondent's independence.

Third, relator argues that respondent violated 34 C.F.R. 300.661(b)(2) because it failed to provide technical assistance or negotiation procedures for effective implementation of its decision. Under 34 C.F.R. 300.661(b)(2), an SEA's CRP must "include procedures for effective implementation of the SEA's final decision, if needed, including -- (i) technical assistance activities; (ii) negotiations; and (iii) corrective actions to achieve compliance." But the regulation does not "require" technical assistance or negotiations; it only demands them "if needed." Moreover, the record does not indicate that such assistance or negotiation was requested prior to relator's petition for a writ of certiorari.

Fourth, relator argues that respondent failed to include an internal review process within its CRP. A state "may choose to establish procedures for reconsideration of complaint decisions." *Memorandum to Chief State School Officers,* 34 IDELR 264 (OSEP, July 17, 2000). But relator does not provide any legal authority affirmatively requiring respondent to develop an internal review process.

Finally, we note that respondent extended the deadline for issuing its

118

decision five times but required relator to immediately implement its orders. Given the complexities of this matter, it would have been in the best interests of all parties for respondent to initially have allowed relator some of the same latitude it allowed itself by providing additional time for review and informal dispute resolution. Nevertheless, as a matter of law, we cannot say respondent's CRP process violated the law.

## Decision

Under the plain language of Minn. Stat. 123B.88, subd. 1 (2004), a school district must provide transportation to and from the home of a child with a disability not yet enrolled in kindergarten when special instruction and services are provided in a location other than in the child's home, even when the instruction and services take place at the same site where the child receives daycare.

In addition, we conclude that because respondent's findings and complaint decision were supported by substantial evidence in the record, respondent did not act arbitrarily or unreasonably and that neither respondent's decision nor its complaint resolution process violated the law.

We therefore affirm respondent's order but remand in part for respondent (1) to review its calculations and, where appropriate, correct the amount of compensatory time ordered; and (2) to amend its order regarding the regular education teacher's attendance at D.B.'s IEP meeting.

Affirmed in part and remanded in part.

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, 10.

[1] Relator contends that respondent approved its ESY policy in connection

with a prior complaint. But, the record indicates that respondent only examined relator's memorandums to staff and training materials at that time, and neither reviewed nor approved relator's actual policy.

[2]In its complaint decision, respondent also held that no regular education teacher attended D.B.'s IEP meeting. On appeal respondent concedes possible error in that conclusion. Respondent should amend its decision accordingly.

**Statutes Cited**

20 USC 1400(d)(1)(A) [Find other cases with 20 USC 1400(d)(1)(A)]

20 USC 1401(8) [Find other cases with 20 USC 1401(8)]

20 USC 1401(22) [Find other cases with 20 USC 1401(22)]

**Regulations Cited**

34 CFR 300.660-300.662 [Find other cases with 34 CFR 300.660-300.662]

34 CFR 300.24(b)(15)(i) [Find other cases with 34 CFR 300.24(b)(15)(i)]

34 CFR 300.660(b)(1) [Find other cases with 34 CFR 300.660(b)(1)]

34 CFR 300.661(b)(2) [Find other cases with 34 CFR 300.661(b)(2)]

34 CFR 300.309(a)(2) [Find other cases with 34 CFR 300.309(a)(2)]

34 CFR 300.503(a)(1)(i) [Find other cases with 34 CFR 300.503(a)(1)(i)]

34 CFR 300.503(b) [Find other cases with 34 CFR 300.503(b)]

34 CFR 300.344(a)(4) [Find other cases with 34 CFR 300.344(a)(4)]

34 CFR 300.349(a)(2) [Find other cases with 34 CFR 300.349(a)(2)]

34 CFR 300.344(a)(2) [Find other cases with 34 CFR 300.344(a)(2)]

34 CFR 300.661(a) [Find other cases with 34 CFR 300.661(a)]

34 CFR 300.661(a)(2) [Find other cases with 34 CFR 300.661(a)(2)]

**Cases Cited**

736 F.2d 773 [Find other cases with 736 F.2d 773]

120

## 21 IDELR 1107
21 LRP 2735

### Category
Special Education, Judicial Decisions

### *Christopher Reusch, et al., Plaintiffs v. Dr. Hiawatha Fountain, et al., Defendants*
872 F.Supp. 1421

### U.S. District Court, Maryland
MJG-91-3124

December 29, 1994

**Related Index Numbers**
195.015 Extended School Day/Year, In General
370.020 Practice and Procedure, Class Actions

**Case Summary**

The extended school year (ESY) services provided by a district to a class of students with disabilities did not meet its obligations under the IDEA. Among these violations included inadequate and untimely notice to parents regarding ESY rights which failed to fully and clearly explain such services, the use of procedures to determine ESY eligibility which precluded meaningful, independent review and excluded parents and teachers from participation, the issuance of ESY decisions too late in the school year, the failure to address ESY at every annual review as required, the application of an incorrect standard in its eligibility

determination, the misrepresentation of its provision of ESY services to certain students, and the lack of individualized ESY services for those students deemed eligible.

A class of students with disabilities in the district alleged that the district failed to meet its obligations to provide them with an opportunity to obtain extended school year services (ESY).

*HELD:* for the class of students.

The district court determined that the district's ESY provisions were procedurally and substantively invalid. Among the procedural violations committed by the district included inadequate and untimely notice to parents regarding ESY rights which failed to fully and clearly explain such services; the use of a two-step process for determination of ESY eligibility which precluded meaningful, independent review at the upper level, excluded parents and teachers from participation, and contributed to delays in reviewing these matters; ESY decisions which came too late in the school year, interfering with parents' rights to seek administrative review within established timeframes; and the failure to address ESY at every annual review as required under the state education code and create appropriate documentation of that discussion. The district's substantive violations included the use of a standard for ESY eligibility which was incorrectly limited to a regression-recoupment analysis and did not consider other factors which were relevant in the ESY determination, and the misrepresentation of services to students with disabilities who attended nonpublic schools in order to create the appearance of propriety with ESY services. Additionally, in the few instances where ESY services were provided, the district placed the students in fixed-length programs and neglected to consider the LRE requirement, and thus the students did not receive the individualized ESY programs to which they were entitled. Via a supplemental order, the district court required the district to "cease and desist" from such practices, and established guidelines for bringing its ESY services into compliance with the IDEA. The court also deemed

the class of students prevailing parties entitled to an award of attorneys' fees.

**Judge / Administrative Officer**

Marvin J. Garbis, United States District Judge

**Full Text**

Memorandum Decision
I. Introduction
II. Legal Setting
A. In General
B. Standard For IDEA Compliance
C. The Individualized Education Program ("IEP")
D. Notice to Parents Regarding IEP Reviews
E. Extended School Year Services ("ESY") in a Free Appropriate Public Education
III. Background to This Dispute
A. MCPS Hostility to Providing ESY
B. Procedures in This Case
IV. Procedural Claims
A. Inadequate Notice of ESY
B. Problems with MCPS's Two-Step Process
C. Late Decisions
D. Failure to Address ESY At Approval Reviews
V. Plaintiffs' Substantive Claims
A. The Appropriate Standard
B. Inconsistent and Arbitrary Application
1. Interpretation of "Critical Life Skills"
2. Mischaracterization of Nonpublic School Program
C. Individualization Requirements
D. Least Restrictive Environment ("LRE") Requirements

123

VI. Attorney's Fees

VII. Remedies

VIII. Conclusion

Order

Exhibit A

Timeline of 1994-1995 ESY Decisions[1]

Exhibit B

Extended School Year Eligibility Standard

November 1994

Counsel for Students: Maryland Disability Law Center, Maureen O'Connell, Steve Ney, Landover, MD 20785.

Counsel for District: David Hjortsberg, Reese & Carney, Columbia, MD 21044; Zvi Greissman, Montgomery County Public Schools, Rockville, MD 20850-1747.

## Memorandum Decision

This case was tried before the Court without a jury. The Court, having heard the evidence, reviewed the exhibits and considered the legal memoranda submitted by the parties, issues this Memorandum Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rule of Civil Procedure.

In this case, a group of disabled children residing in Montgomery County, Maryland, claim that Montgomery County Public Schools ("MCPS") has systematically failed to meet its obligation to provide them with an opportunity to obtain extended school year services ("ESY") in violation of the Individuals with Disabilities Education Act (the "IDEA" or "Act"),

124

20 U.S.C. ? 1400-1485 (1990 & Supp. 1994), and Section 504 of the
Rehabilitation Act, 29 U.S.C. ? 794 (Supp. 1994). MCPS disputes that
contention, claiming that the standards and procedures it has established
satisfy all statutory requirements and that the Plaintiffs seek benefits in
excess of those to which they are entitled.

## I. Introduction

It is the purpose of the Individuals with Disabilities Education Act:

to assure that all children with disabilities have available to them . . . a
free appropriate public education ["FAPE"] which emphasizes special
education and related services designed to meet their unique needs.

20 U.S.C. ? 1400(c) (Supp. 1994).

In carrying out this purpose, it is essential that an Individualized
Education Program ("IEP") be developed for each disabled child. The
development of each IEP requires consideration of the disabled child's
unique needs for special education and any related services.

One of the related services that must be considered, and included in a
disabled child's IEP when appropriate, is an extended school year
program. The provision of ESY as part of an IEP is not simply the
extension of time in school. Rather, it is the inclusion of extended
services designed for the particular child as part of that child's
*individualized* education program. There is no requirement that ESY be
made a part of every disabled child's IEP even if there would be some
educational benefit. Indeed, it appears that ESY would appropriately be
part of an FAPE for a relatively small number of disabled children.
Nevertheless, while there is no requirement that all disabled children have
ESY in their IEP, there is a legal obligation to consider and fairly evaluate
the appropriateness of ESY in developing every IEP for every disabled
child.

125

As discussed in detail herein, Defendant MCPS[1] has not complied with the IDEA in regard to ESY. Instead, MCPS has acted affirmatively to avoid its legal obligations to consider, and when appropriate, provide ESY to disabled children.

Parents of disabled children are given inadequate notice of their children's ESY rights. MCPS has created obstacles to parents and/or teachers who wish to advocate for ESY for a particular disabled child. MCPS has established procedures that cause excessive delays and a negative bias in the process of deciding upon ESY for a disabled child. And, in addition to its procedural shortcomings, MCPS also applies an overly restrictive standard in determining whether ESY should be a part of a disabled child's IEP. Furthermore, even in those all too few cases in which MCPS provides ESY, it still fails to comply with the IDEA's requirement that the ESY be part of an *individualized* educational plan and arranged in the least restrictive environment that is practical.

The disabled children of Montgomery County, Maryland, are entitled to speedy and effective relief. MCPS must now, after years of avoidance of its responsibilities, give disabled students their full measure of rights under the IDEA, including rights regarding ESY. The MCPS procedures, substantive bases of decision, and the design of IEPs including ESY when appropriate must, and shall, be in compliance with the Individuals with Disabilities Education Act.

## II. Legal Setting

### A. In General

The Individuals with Disabilities Education Act[2], 20 U.S.C. ?? 1400-1485 (1990 & Supp. 1994):[3]

126

provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures.

*Hendrick Hudson Dist. Bd. of Educ. v. Rowley,*  458 U.S. 176, 179 (1982).

The IDEA and its implementing regulations[4] guarantee all disabled children in states (such as Maryland) receiving IDEA funds the right to a free appropriate public education. 20 U.S.C. ? 1400(c) (Supp. 1994). All such states must enact legislation to ensure that right. If those state statutes establish broader or more specific entitlements than those expressly granted in the federal laws, the state entitlements are deemed to be incorporated into the federal right to a FAPE. *See Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 982-83 (4th Cir. 1990); *Johnson v. Independent Sch. Dist. No. 4,* 921 F.2d 1022, 1029 (10th Cir. 1990), *cert. denied,* 500 U.S. 905 (1991); *David D. v. Dartmouth Sch. Comm.,* 775 F.2d 411, 417 (1st Cir. 1985) ("It would seem beyond cavil that the federal standard explicitly incorporates some of a state's substantive law into the federal Act."), *cert. denied,* 475 U.S. 1140 (1986).

Maryland receives IDEA funds and has enacted enabling legislation.*See* Md. Code Ann., Educ. ? 8-401 to -417.61 (1992), and its implementing regulations, COMAR ? 13A.05.01.

## B. Standard For IDEA Compliance

In the landmark *Rowley* case, the Supreme Court established a two-part test for determining whether the requirements of the IDEA have been met:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive

127

educational benefits?

458 U.S. at 206-07.

Stressing the importance of the procedural aspects of the IDEA, the Court noted: "It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Id.* at 205-06. Moreover, the United States Court of Appeals for the Fourth Circuit has stated that "[u]nder *Rowley*, . . . failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that the school failed to provide [a disabled student] a FAPE." *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir. 1985) *see also Board of Educ. v. Dienelt,* 843 F.2d 813, 815 (4th Cir. 1988).

With regard to the substantive component of the *Rowley* test, federal appellate courts have warned that the "some educational benefit" prong will not be met by the provision of *de minimis,* trivial learning opportunities.[5] *See Hall,* 774 F.2d at 636; *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 180-84 (3rd Cir. 1988) (holding "that Congress intended to afford children with special needs an education that would confer meaningful benefits"), *cert. denied,* 488 U.S. 1030 (1989). Nor can the sufficiency of the educational benefits offered be measured by any single, narrow standard. *See Hall,* 774 F.2d at 635; 20 U.S.C. ? 1412(5) (Supp. 1994) ("[N]o single procedure shall be the sole criterion for determining an appropriate educational program for a child.").

## C. The Individualized Education Program ("IEP")

The "centerpiece of the [IDEA]'s education delivery system for disabled

children" is the individualized education program.[6] 20 U.S.C. ?
140(a)(20). The IEP establishes the means by which the educational plan
for each disabled child is to be developed. As the Third Circuit noted in
*Polk,* "The system of procedural protections only works if the state
devises an *individualized* program and is willing to address the
handicapped child's 'unique needs.'" *Polk,* 853 F.2d at 177. *See also
Johnson,* 921 F.2d at 1027 ("The individualization requirement is of
paramount importance in the Act."); 20 U.S.C. ? 1401(a)(20) (Supp.
1994). Each child's IEP must be reviewed, and updated if necessary, at
least annually, 34 C.F.R. ? 300.343(d).

The IDEA requires that schools fully involve parents in the formulation,
review, and revision of their child's IEP. As stated by the Court in
*Rowley:*

Congress sought to protect individual children by providing for parental
involvement in the development of state plans and policies . . . and in the
formulation of the child's individual education program.

458 U.S. at 208. The federal regulations state that "parents of a child with
a disability are expected to be equal participants along with school
personnel, in developing, reviewing, and revising the child's IEP." 34
C.F.R. ? 300 app. C, ? 26.

The Fourth Circuit consistently has found this obligation to be a critical
one. In *Hall,* the Fourth Circuit stressed "the importance of the Act's
provisions ensuring *meaningful* parental participation in formulating and
implementing a child's IEP." 774 F.2d at 634 (emphasis added). In
*Dienelt,* the same Court ruled that the school board "utterly failed to
determine the special educational needs of [the child] or to provide him
with an adequate IEP" primarily because the board failed to "adequately
involve the parents in the preparation of [their child's] IEP." 843 F.2d at
815.

All school placements must be based on the IEP and the Act's least-restrictive-environment provision ("LRE"),[7] reinforcing the IDEA's mandate of an individualized approach to the education of disabled children. *See* 34 C.F.R. ? 300.552; COMAR ? 13A.05.01.08(E)(2)(b). De-individualized placements expressly violate the regulations and impact negatively on parental rights. In *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256 (4th Cir. 1988), *cert. denied,* 489 U.S. 1016 (1989), the Fourth Circuit held that after-the-fact IEPs---IEPs developed retrospectively to fit an already made placement decision---violate the IDEA, explaining that:

Under the [IDEA], the general rule is that placement should be based on the IEP. 34 C.F.R. ? 300.552. . . . The decision to place [the child] at [a particular school] before developing an IEP on which to base that placement violates this regulation as interpreted by the Secretary of Education. It also violates the spirit and intent of the [IDEA], which emphasizes parental involvement.

*Id.* at 259.

The development of the IEP also triggers the "extensive due process requirements" imposed by the IDEA. *Polk,* 853 F.2d at 173. *See also Johnson,* 921 F.2d at 1026-27; *Cordrey v. Euckert,* 917 F.2d 1460, 1464 (6th Cir. 1990), *cert. denied,* 499 U.S. 938 (1991); *Hall,* 774 F.2d at 634. The specificity of the timing requirements in the IDEA, the Maryland Code, and the relevant regulations for the review and appeal of IEP conflicts demonstrate the direct connection between timely decision-making and the provision of a FAPE itself. *See, e.g.,* 20 U.S.C. ? 1415 (1990 & Supp. 1994); Md. Code Ann., Educ. ? 8-415 (1992); 34 C.F.R. ?? 300.343(c), 300.512; COMAR ?? 13A.05.01.14, .15. Systematic or unreasonable delays in the formulation and implementation of IEPs violate the Act. *See Tice v. Botentourt County Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir. 1990); *Evans v. Evans,* 818 F.Supp. 1215, 1222 (N.D. Ind. 1993).

130

### D. Notice to Parents Regarding IEP Reviews

The IDEA requires that school boards provide parents with advance written notice of all available procedures when they propose to review a child's IEP, 20 U.S.C. ? 1415(b) (1990); COMAR ? 13A.05.01.13(C)(1). This notice must include a "full explanation" of all procedural safeguards, 34 C.F.R. ? 300.505(a), so that it "fully informs" parents of all of their procedural rights and opportunities. 20 U.S.C. ? 1415(b)(1)(D). In addition, the IDEA requires that the notice be "[w]ritten in language understandable to the general public," 34 C.F.R. ? 300.505(b). The Fourth Circuit emphasized the significance of appropriate notice when it stated:

Unless school systems apprise parents of their procedural protections, however, parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say, and the participatory function envisioned by *Rowley* will go unfulfilled.

*Hall,* 774 F.2d at 634.

In notifying parents of an upcoming IEP meeting, schools "must indicate the purpose, time, and location of the meeting and who will be in attendance." 34 C.F.R. ? 300.345. Moreover, in Maryland, school systems must have "procedures for making and documenting reasonable efforts to inform parents of and involve them in the special education decision-making process." COMAR ? 13A.05.01.08(F)(3).[8]

### E. Extended School Year Services ("ESY") in a Free Appropriate Public Education

Neither federal nor Maryland law require that every disabled child receive

extended school year services as part of the child's IEP. However, those laws do require that ESY be available in those cases in which it is deemed to be a part of a particular child's free appropriate public education.

In *Johnson, supra,* the United states Court of Appeals for the Tenth Circuit summarized the findings of a number of circuits, reiterating that "under the Act itself, states, must provide a continuous educational experience through the summer under the child's IEP if that is the 'appropriate' educational experience for the handicapped child's situation." 921 F.2d at 1030. In the landmark ESY decision of *Battle v. Pennsylvania,* 629 F.2d 269 (3rd Cir. 1980), *cert. denied,* 452 U.S. 968 (1981), the Third Circuit concluded that "inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class [of disabled children]." *Id.* at 281. *See also Cordrey,* 917 F.2d at 1473 (6th Cir.); *Georgia Ass'n of Retarded Citizens v. McDaniel,* 716 F.2d 1565, 1576-77 (11th Cir. 1983), *cert. denied,* 469 U.S. 1228 (1985); *Crawford v. Pittman,* 708 F.2d 1028, 1034-35 (5th Cir. 1983). Moreover, when ESY is appropriate, the Office of Special Education Programs has determined that least restrictive environment ("LRE") requirements apply. EHA Ruling/Policy Letter, 213 IDEALR 255 (July 19, 1989).

ESY is expressly addressed in the Maryland legislation, which becomes in essence part of the federal law for Maryland's disabled children. Indeed, the section of the Maryland code that sets forth the general duties of the State and counties in this area contains only two directives; one is that free educational programs be made available to all disabled students, the other is that parents be notified of the availability of ESY. Md. Code Ann., Educ. ? 8-402 (1992). The Maryland regulations further this emphasis by including a decision on ESY as one of the four determinations expressly required at every annual IEP review.[9] COMAR ? 13A.05.01.09(G)(1)(d). Admission, Review, and Dismissal ("ARD") Committees---the committees that develop and review IEPs in Maryland---are specifically charged with ensuring that parents are aware of two things: Maryland's

132

graduation requirements and the availability of ESY. COMAR ?
13A.05.01.08(E)(4). Furthermore, Maryland regulations expressly require
that ESY "be provided pursuant to a properly developed [IEP] as soon as
possible, and in accordance with [LRE] requirements. . . . " COMAR ?
13A.05.01.09(G)(3). [10] Under the *David D.* line of authority, *supra,*
Maryland's ESY provisions are incorporated into the federal right.


### III. Background to This Dispute


### A. MCPS Hostility to Providing ESY

Despite MCPS's awareness since 1979 of its obligation to provide ESY to
deserving students, it failed to provide any such services to public school
students for at least the next ten years. The hostile attitude of MCPS
toward ESY is illustrated by a July 27, 1979, memorandum written by
Defendant Fountain (then Associate Superintendent for Continuum
Education). In the memo, he noted the "hard line" Maryland had taken on
the 180-day school year, detailed the problems he foresaw with any
requirement that MCPS make ESY generally available, and advocated that
"an appeal [be] filed and the ruling reversed" in *Armstrong v. Kline,* 476
F.Supp. 583 (E.D. Pa. 1979), the case that first established ESY as a
right under the IDEA.

The Court finds that MCPS's disinclination to provide ESY as part of a
FAPE has continued to this date. As admitted by the principal of
Longview School (where children with severe and profound mental
retardation are taught) "our students somewhat systematically have not
been recommended for [ESY]," but rather have been encouraged to enroll
in summer enrichment programs. These summer enrichment programs
are neither IEP-based nor free. Moreover, a January 1993 memo from
Fountain to county principals, containing the special education annual
review procedures for that year, downplayed ESY in two dramatic ways.

133

First, the "Sample Annual Review ARD Agenda" omitted any reference to ESY as a topic of discussion. Second, the procedures promote the avoidance of any ESY discussion at the school-based IEP meeting under the following directive:

Should parents have questions about [ESY] programming during the meeting, continue with decisions about the 93-94 program and refer summer program discussion to the field office supervisor/assistant supervisor of special education and pupil services.

(Fountain memo dated Jan. 15, 1993, Pl.'s Ex. 18.) Thus, parents of disabled children found themselves forced to fight the school bureaucracy for ESY or, if they could afford the cost, send their child to a non-individualized summer enrichment program for which fees were charged. As the Supreme Court has stated, "The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *School Comm. of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 372 (1985). MCPS cannot meet its legal obligation to provide a disabled child free ESY when appropriate by steering parents to an alternative that is neither individualized nor free.

### B. Procedures in This Case

The present case commenced when two students filed due process appeals against MCPS for its failure to consider and/or acknowledge their eligibility for ESY. The state-level hearing review board ("HRB") ultimately sided with the students and issued written decisions. *(See* HRB Decisions dated May 10, 1989, May 24, 1989, and April 24, 1989, Pl.'s Ex. 53.) In the decisions, the HRB criticized MCPS for not having a written policy regarding ESY, for not having teachers present at IEP meetings, for using a single narrow criterion for determining ESY eligibility, and for not informing parents about ESY. The HRB

134

recommended, *inter alia,* that MCPS "develop procedures which at least notify parents and teachers that they can initiate requests for ESY programs" and broaden the ESY standard to include factors other than regression and recoupment, mentioning emerging skills and the nature and severity of the handicapping condition as two relevant considerations.

Following the HRB decisions, MCPS developed interim guidelines regarding ESY. These, however, met with less than glowing reviews. In its comment letter, Montgomery County Association for Retarded Citizens continued to "see the regression/recoupment standard as too narrow." (Letter from Karasik to Fountain, dated Apr. 20, 1990, Pl.'s Ex. 51.). Even MCPS insiders found the standards flawed. Dr. Harry Pitt, then superintendent of MCPS, found certain key language to be "very poorly worded [and] confusing." (Transcript of ESY meeting, dated May 5, 1990, at 6, Pl.'s Ex. 50.) A member of the Board of Education stated his concerns more broadly:

The difficulty with [how the guidelines are written] is that somebody who's neither a lawyer nor a professional in the field, but is perhaps a parent of a child who needs help, is going to take a look at this, and is going to say this is written so that I can't break the code; and if I have a view different than that of the school system, I can't win.

*(Id.* at 11 (comments of Ewing).)

The following year, in the very guidelines designed to ensure consideration of ESY, MCPS again directed its personnel to encourage disabled children away from ESY and toward its tuition-based enrichment programs. *(See* "Preparing for [ESY] Discussion at Annual Review," ? 2, Pl.'s Ex. 44.)

Plaintiffs filed suit in October 1991. By agreement, this case was certified as a class action with regard to the claims resolved herein.[11]

## IV. Procedural Claims

### A. Inadequate Notice of ESY

In 1992, MCPS sent an "Invitation to Annual Review Meeting" letter to the parents of all disabled students, which set forth the time and place of the meeting, the expected attendees, and a detailed list of the issues to be discussed. The invitation also referenced an enclosed "Due Process: Parents' Rights in Special Education Placement" brochure, explaining parental rights in the process. (Df.'s Ex. 18, at B-9; Df.'s Ex. 11.) Of the four determinations to be made at every annual review under COMAR ? 13A.05.01.09(G), three were mentioned in the letter as issues to be addressed---whether the student has achieved his IEP goals, whether the IEP need be modified, and whether a less restrictive environment can be found for the student. Conspicuous by its absence---in both the letter and the accompanying brochure---was any mention of whether ESY would be appropriate, the fourth determination specifically required under Maryland law.

The only notice of ESY that parents might have received from MCPS in 1992 was contained in the "Elementary and Secondary Summer School Programs" brochure distributed to all MCPS students. At the end of that brochure, in the section covering summer enrichment programs for disabled students (for which tuitions were charged), a parent could find two general paragraphs about ESY. This "notice" contained a brief description of the regression-based standard used by MCPS, the need to develop an ESY IEP, and a direction for "[p]eople who believe their children may qualify" to contact an area supervisor or the central placement office, (Pl.'s Ex. 20, at 7.). The brochure was not even sent out until mid-May, after many of the annual reviews had been held.

In 1993, MCPS sent out essentially the same materials with the same shortcomings, except that the enclosed procedural rights brochure---now

entitled "Procedural Safeguards---Parental Rights"---was amended to
include a single-paragraph regarding ESY. This stated:

You are to be notified of the availability of extended school year services
if necessary to meet the unique needs of an individual student with
disabilities.

(Pl.'s Ex. 7, at 4.) No mention was made of any parental right to initiate
a request for ESY for their child. Moreover, the "you are to be notified"
passive voice of the quoted statement promoted the very evil targeted by
the *Hall* court---presumed parental helplessness.

Such notice that MCPS provided to the parents of disabled children failed
to inform them that a ESY was required to be considered at each and
every annual review meeting. *See* COMAR ? 13A.05.01.09(G)(1). Rather,
it suggested the opposite---that ESY would be addressed only in
exceptional cases. Moreover, MCPS failed to inform parents that written
guidelines were available. Nor did MCPS explain adequately the ESY
process or that ESY eligibility for any individual student was evaluated in
a complicated two-step process, requiring the approval of both a
school-based Admission Review and Dismissal "ARD" committee (the
"SARD") and the central ARD committee (the "CARD").

The notice required under federal law must contain "full explanation[s]"
of IDEA procedures in plain language that "fully informs" parents of their
rights. 20 U.S.C. ? 1415(b)(1); 34 C.F.R. ? 300.505. Under Maryland
regulations, schools must take "reasonable efforts" to keep the parents of
disabled students informed and involved. As defined by those regulations,
reasonable efforts include, *inter alia,* "fully explaining to the parents their
rights in the special education decision-making process. "*See* COMAR ?
13A.05.01.02(B)(7).

MCPS has not provided notice reasonably calculated to fully explain ESY
rights and procedures or to fully inform parents of disabled children of
such rights and procedures. To the contrary, MCPS has utilized such

137

"notice" as was given to avoid its obligation to provide such services to deserving disabled students. This conduct violates the IDEA. The present case presents an apt confirmation of the Fourth Circuit's warning that "[u]nless school systems apprise parents of their procedural protections, . . . parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say. . . . " *Hall,* 774 F.2d at 634.

The MCPS practice of inadequate and untimely ESY notice must cease. Notice of ESY designed to fully explain such services must be provided to parents of disabled children in a timely fashion before annual review meetings. The notice must not disguise or downplay the true nature of ESY or attempt to confuse parents between free extended year services and tuition-charging summer enrichment programs. MCPS must, consequently, also adjust and improve its personnel training to ensure that its staff is aware of all proper standards and procedures, as required by 34 C.F.R. ? 300.382 and COMAR ? 13A.05.01.04(H).

## B. Problems with MCPS's Two-Step Process

MCPS has implemented a unique[12] two-step process for its annual ESY eligibility determinations. At the first step---a School Admission, Review and Dismissal ("SARD") Committee---ESY may be either denied outright or referred for consideration to the second step---the Central Admissions, Review and Dismissal ("CARD") Committee. A SARD denial is final and will not be reconsidered by the CARD Committee unless a parent presses the issue. A SARD referral for ESY, however, is reevaluated at the CARD level. The CARD Committee has final authority to find students eligible for ESY and, consequently, it also determines the duration, location, and content of those services: Data regarding ESY eligibility for particular students is to be collected on the local level.

The 1992 ESY guidelines set forth in detail the process by which ESY

eligibility is determined. (Pl.'s Ex, 30.) A "Referral for Consideration of Extended School Year" form is attached to the guidelines that, when filled out by the SARD, triggers the CARD consideration of ESY and provides the CARD Committee with information about the student's educational progress and ESY eligibility. The 1993 guidelines, though essentially the same as the previous year, contained certain changes that undercut the teacher attendance requirement at CARD meetings, on one hand, but appeared to broaden the substantive standard for ESY, on the other. (Pl.'s Ex. 8.)

MCPS makes one exception to the two-step process. In response to requests from parents of children with autism for faster ESY decisions, those students undergo a one-step process wherein a CARD member attends the SARD meeting, which is then authorized to make final ESY decisions. The result has been earlier decisions for children with autism. *(See* Pl.'s Ex. 1, charts 17-20.) Under the guidelines, the Associate Superintendent for Special and Alternative Education could authorize other programs to make final ESY determinations at the SARD level.

Plaintiffs argue that the two-step process is an artificial stratagem preventing disabled children from receiving ESY by building delays into the system, frustrating meaningful parent and teacher participation at IEP meetings, de-individualizing ESY considerations, and hampering the collection of relevant,and necessary supporting data. MCPS claims that the two-step process is necessary for administrative and efficiency reasons, noting that certain schools and buildings are unavailable and staffing is different during the summer.

There may be a legitimate function for a second level procedure for ESY determinations. However, any such function must be performed in a manner that does not serve the illegal purpose of adversely affecting the rights of disabled children. The present MCPS two-step ESY process violates the IDEA both in structure and in practice.

139

All IEPS must be developed by a properly constituted IEP committee, including:

a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities.

20 U.S.C. ? 1401(a)(20) .It is readily apparent that the MCPS two-level structure undermines the viability of the SARD committees. An IEP committee not authorized to factor ESY into a student's overall educational program cannot be deemed a properly constituted IEP committee. First, it is not only the titles of the IEP committee members that makes a committee properly constituted; their attendant authority is essential as well. Second, different school-year IEPs may be expected depending on whether the child receives ESY, a condition SARD committees are unable to factor into their broader considerations to the detriment of the child's "appropriate" education.[13] Even if this Court were to accept the SARD committees as proper, however, the inherent delay and inconvenience of MCPS's second IEP meetings and the isolation of ESY apart from the rest of a student's program cannot be sanctioned under the Act.

In practice, the CARD Committee presents only the appearance of a review in ESY matters. In every case in which the SARD committee recommended against providing ESY the CARD committee unanimously affirmed. In every case in which there was a referral from the SARD for consideration of ESY, the CARD Committee acted unanimously. In view of the nature of the inherently debatable individualized decisions required with regard to ESY, the absence of a single dissenting vote in so many cases provides a strong indication that the CARD Committee members are not actually providing a meaningful and individualized decision. As stated by the United States Court of Appeals for the Fifth Circuit (albeit in a different context):

140

Statistics are not, of course, the whole answer, but nothing is as emphatic as zero.

*United States v. Hinds County Sch. Bd.,* 417 F.2d 852, 858 (5th Cir. 1969), *cert. denied,* 396 U.S. 1032 (1970). The absence of real independent consideration or meaningful review at the CARD meeting supports the Court's conclusion that the two-step process for ESY decisions has functioned as a road block and must be terminated.

The Court further finds the two-step process to create problems regarding parent and teacher participation and timely and individualized decision-making guaranteed under the IDEA. It is required that parents and teachers most familiar with the disabled student are to be present at, and included in, all IEP discussions.[14] 34 C.F.R. ? 300-344, .345; COMAR ? 13A.05.01.09(B). In the MCPS scheme, the extra CARD meeting creates scheduling conflicts and additional burdens and inconveniences that interfere with those rights. In particular, the centralized CARD meetings effectively prevent a large number of school-based teachers from being present at the ESY discussions of their students. *(See* Pl.'s Ex. 1, chart 15,) when dealing with a child's educational program, it is wholly inappropriate to erect barriers to the input of the child's teachers, who not only are charged with providing the very special education services at issue but also best know that child in his or her educational setting.

As discussed above, timeliness and individualization are also pivotal to the IDEA's substantive and procedural rights. By centralizing ESY decisions, focusing on administrative concerns such as building closings, and reducing teacher input, MCPS has de-individualized students' IEPS in violation of the Act. In essence, Defendants committed the same error identified by the Fourth Circuit in *Spielberg*---putting the cart before the horse.[15] Nor can the IDEA be construed to permit schools to thwart parents' procedural rights of appeal by unduly delaying final IEP

141

decisions. By requiring parents seeking ESY for their children to petition for and attend a second meeting, however, that is exactly what is happening. If, for reasons of efficiency and administrative necessity, MCPS desires to retain a centralized overseer of ESY programming, it must find a way to do so without violating the Act.

In their post-trial memorandum, Defendants state that "Plaintiffs' policy goals are to run the school system. They presented no testimony from anyone with any management expertise, but ignorantly propose to dismantle the CARD system without regard to the consequences to students who are entitled to have a well-managed system of providing ESY services." Defendants' rhetoric is unwarranted. [16] In any contest between systemic efficiency and the provision of a FAPE to a disabled child, Congress and the Supreme Court have made clear that the child must prevail. *Cf. Florence County Sch. Dist. Four v. Carter,* 114 S.Ct. 361, 366 (1993).

The evidence establishes, moreover, that the MCPS two-step ESY process is not the benign engine of efficiency portrayed by Defendants. Rather, it is a device that in operation presents an effective obstacle to the right of a disabled child to receive ESY when appropriate. This obstacle must be eliminated.

### C. Late Decisions

The present procedures of MCPS, including the two-step process, have caused a violation of the IDEA due to delays in making ESY decisions. It is, simply put, unacceptable for MCPS to make decisions so late in the school year that the disabled child cannot exercise rights of review and/or be given the ESY to which that child was entitled.

Nearly 75% of all ESY decisions for the summer of 1992 were made after May 1, 1992. All denials of ESY occurred after that date and several

142

occurred as late as June 23, 1992. (Pl.'s Ex. 1, charts 17, 18.) On at least one occasion, Defendants contemporaneously acknowledged that ESY decisions were being made too late in the school year. *(See* Memo from Fountain to Pitt, dated Mar. 13, 1991, Pl.'s Ex. 42.) At trial, however, Dr. Stanley Sirotkin, Supervisor of MCPS's Diagnostic Support Team, testified that he would not consider a decision to be too late until mid- to late-August. The Court could not disagree more with this remark.

Generally, matters of timing are left to the school board's discretion under 34 C.F.R. ? 300.343. That discretion is abused, however, when decisions are delayed for illegitimate purposes---such as to deny parents the ability to exercise their due process rights guaranteed under other sections of the regulations. Timely decision-making is critical to the integrity of the rights granted under the IDEA. In particular, unduly late decisions infringe upon parents' rights to administrative review of IEP decisions within established timeliness. *See* 34 C.F.R. ? 300.506 (giving parents a right to a due process hearing); *id.* ? 300.512 (setting a 45-day limit on the review process).

The Court concludes that MCPS has violated the IDEA by delaying many ESY decisions so long as to infringe the procedural rights of disabled students. The delays have, in effect, fostered the overall scheme of MCPS to minimize the availability of ESY to disabled children.

The precise steps that MCPS must take to avoid illegal delays in decision remain to be resolved. Plaintiffs argue that an April 15 deadline would be reasonable, as it would provide for a sixty-day window for administrative review before the end of the school year. [17] Defendants claim that such a deadline would de-individualize the decision process, prevent later, better-informed decisions, and deny MCPS the use of spring break for data gathering. To the extent that delays past April 15 are truly necessary for making an informed ESY decision for a given child, MCPS should be permitted to defer particular decisions. However, the deferral of decisions on a systematic basis must cease. Because of the academic year calendar,

decisions must be made---on the best available data if complete information is not available---sufficiently early to preserve the ability of the child to pursue procedural rights of review. Disabled children can no longer have their right to obtain appropriate ESY during the summer recess blocked by MCPS delays in making decisions.

The Court notes that significant timing benefits will be achieved by the elimination of the present two-step process. Further, MCPS has demonstrated by its handling of the autism program that it is capable of making reasonably early decisions. Accordingly, the Court is confident that a workable and effective remedy for the decisional delay problem can be achieved.

### D. Failure to Address ESY At Approval Reviews

Plaintiffs allege that MCPS has failed to address ESY at every annual review, as is required under COMAR ? 13A.05.01.09(G). Defendants deny the allegation. The Court finds that the Defendants are flatly wrong. Not only was there a failure to comply with the express requirement that ESY be discussed, MCPS affirmatively sought to avoid such discussions.

MCPS's internal "Special Education Annual Review Process" packet for 1993 directs school personnel to refer parents raising ESY questions to officials involved in mid-level management, rather than to address the issue directly, (Pl.'s Ex. 18.) In that same packet, ESY is omitted from the detailed list of considerations to be addressed at IEP meetings found on the "Sample Annual Review ARD Agenda" form. No other integral educational component is excluded from that agenda. Under the 1992 ESY guidelines, MCPS pledged that ESY would "be discussed with parents at the annual review, *as necessary.*" (Pl.'s Ex. 30 (emphasis added).) Because discussion of ESY is always necessary by virtue of state law, MCPS was guiding its staff away from the duty to discuss ESY in every annual meeting.

144

Maryland regulations require not only that ESY be addressed at every annual review, but also that a written summary of that review be available to the parents. COMAR ? 13A.05-01-09(H). *See also id.* ? 13A.05.01.08(F)(3) (requiring boards to "develop procedures for making *and documenting* reasonable efforts to inform parents of and involve them in the special education decision-making process"); 34 C.F.R. ? 300.501. Under these provisions, MCPS is obligated to record in some accessible place and reasonable manner that ESY has been raised and discussed at each student's annual review meeting. Yet, in reviewing the sample files (provided by MCPS) of the most seriously disabled students, it appears that ESY was not discussed---or, at least, no such discussion was documented on the students' files---in more than 80% of the samples.

MCPS must meet its obligations to address ESY at all annual reviews and to create appropriate documentation. Therefore, MCPS must have in place a system whereby those conducting an annual review affirmatively confirm that ESY was addressed and record a summary of the ESY discussion.

### V. Plaintiffs' Substantive Claims

### A. The Appropriate Standard

In general, for there to be an obligation to provide ESY in a given case, it must appear "that an ESY is 'necessary to permit [the child] to benefit from his instruction.'" *Cordrey,* 917 F.2d at 1473 (citation omitted). In general, this standard is satisfied when it is shown that the student will suffer some significant regression of skills or knowledge without a summer program, followed by an insufficient recoupment of the same during the next school year. *See id.* at 1470. However, several courts have warned against "converting what should [be] a multifaceted inquiry

145

into application of a single, inflexible criterion."*Johnson,* 921 F.2d at 1031. *See also Cordrey,* 917 F.2d at 1472; *Polk,* 853 F.2d at 184; *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1158 (5th Cir. 1986).

Plaintiffs claim that MCPS limits its analysis of ESY eligibility in individual cases to a regression-recoupment standard that violates the IDEA. In so claiming, they echo the 1989 decision of the HRB which found that MCPS "adhered to a single criterion of severe regression and limited recoupment and this standard in itself is too limiting." (Pl.'s Ex. 53.) Any student evaluation that uses a single-criterion test to determine an appropriate educational program would violate the Act. 20 U.S.C. ? 1412(5) (Supp. 1994); *Hall,* 774 F.2d at 635.

Defendants respond by denying the allegation, claiming reliance on the established Maryland standard, and criticizing Plaintiffs as unable to articulate any alternative other than an unworkable *ad hoc* standard. Here again, Defendants' briefs present more literary than legal merit.

The Maryland regulations set forth the following standard by which ESY eligibility is to be determined:

In making its determination whether to provide [ESY] . . . , the [ARD] Committee shall consider whether there is a likelihood of substantial regression of critical life skills caused by the normal school break and a failure to recover these lost skills in a reasonable time.

COMAR ? 13A.05.01.09(G)(2). MCPS's ESY guidelines have mirrored this standard, listing as relevant factors the nature and severity of the disability, the student's IEP objectives, the severity of past or projected regression, and the rate of recoupment. In 1993, in an apparent attempt to address criticisms that its standard was too narrow, MCPS followed its list of factors for consideration with the following:

These factors are not exclusive of other factors and all factors relevant to

the students [sic] individual needs should be considered.

(1993 MCPS ESY Guidelines, Pl.'s Ex. 8.)

While MCPS's standard may appear on paper to be broad enough to survive IDEA scrutiny, the Court finds that in practice Defendants apply a narrow, single-criterion standard under the guise of an expansive evaluation. In his testimony, Dr. Sirotkin of MCPS conceded that students in Montgomery County must display a likelihood of regression and insufficient recoupment and stated that, without a showing of likely regression, ESY would be denied. *(See* Tr. at 71-72, 77, Sept. 24, 1993.) That is in accord with the testimony of other MCPS officials. In practice, MCPS has provided ESY only when it has deemed it necessary to prevent substantial regression, bypassing other considerations relevant to the satisfaction of *Rowley's* underlying "some educational benefit" guideline.

Defendants claim that the Sixth Circuit, in *Cordrey v. Euckert,* 917 F.2d 1460, found the regression-recoupment standard to satisfy *Rowley.* That interpretation of *Cordrey* does not appear to be sound. Finding "some merit" to the proposition that "a regression/recoupment standard, *strictly defined,* would stray too far from its statutory source and take on a life of its own," 917 F.2d at 1471 (emphasis added), the *Cordrey* court concluded that

if the existing regression-based standard for ESY is *defined loosely* to allow for individualized expert opinion and not just empirical predictions based on actual prior regression, *the standard would seem flexible enough* to accommodate [a full range of] refinements in professional understanding of when a child needs an ESY.

*Id.* at 1472 (emphasis added). In sum, the *Cordrey* opinion says that while the ESY standard may be *described* by the shorthand phrase "regression-recoupment," it must be *applied* in such a way as to give meaningful effect to a broader range of factors. Based on all the evidence presented regarding the standard at issue here, this Court is unable to find

147

MCPS's regression-based standard to be "loosely defined" or subject to "flexible" application. Thus, *Cordrey* does not support Defendants' position.

The United States Court of Appeals for the Fifth Circuit, explained that regression-recoupment

is, of course, a general standard, but it must be applied to the individual by the ARD Committee in the same way that juries apply other general legal standards such as negligence and reasonableness.

*Alamo Heights,* 790 F.2d at 1158. Understood in this way, a variety of nonregression-based factors---for example, "emerging skills" and "breakthrough opportunities" (as when a child is on the brink of learning to read)---can and should be incorporated into the eligibility analysis. This, in turn, will enable MCPS to meet the *Rowley* mandate, that its educational programs be designed to produce some more-than-trivial progress for disabled students. *See Hall,* 744 F.2d at 636. Moreover, construing the standard in this manner belies Defendants' concerns about ad hoc evaluations and shields the Maryland regulation itself from questions of infirmity under the IDEA.

MCPS must, henceforth, use a correct standard for determining whether ESY will be made part of a disabled child's IEP.

## B. Inconsistent and Arbitrary Application

Plaintiffs claim that MCPS applies its ESY guidelines in an arbitrary and inconsistent manner, thereby preventing deserving students from receiving such services. Among its examples of the impediments causing this problem, Plaintiffs list MCPS's single-minded reliance on summer enrichment programs, failure to address ESY at annual reviews, confused interpretation of the term "critical life skills," and inappropriate comparison of the services provided to public and nonpublic special

148

education students. Defendants, in essence, [18] deny committing any violation.

The Court has previously noted that Plaintiffs are correct with regard to MCPS's unjustified substitution of tuition-charging summer enrichment programs for ESY and MCPS's failure to address ESY at annual meetings. The remaining allegations warrant discussion.

### 1. Interpretation of "Critical Life Skills"

Plaintiffs assert that MCPS interprets "critical life skills," the focus of the regression-recoupment analysis, to require academic regression for students most likely to have behavioral problems and behavioral regression for students most likely to have academic problems. Such a practice---designed to misfocus ESY analysis and prevent deserving children from qualifying for it---would certainly raise an issue under the IDEA. However, it does not appear that MCPS is guilty of this offense. As front-line educators in Montgomery County daily facing individual students with complicated mixtures of academic and behavioral problems, they must have flexibility in the interpretation of the term "critical life skills." This, in fact, conforms with the expansive definition of the term adopted by the Maryland State Department of Education ("MSDE"), including "any skill determined by the [ARD] Committee to be critical to the student's overall educational progress." *(Resource Information for Extended School Year Services,* Apr. 1993, issued by MSDE, Pl.'s Ex. 10, at 3.)

The evidence does not warrant a finding that MCPS engaged in the practice of defining "critical life skills" in a rigid, unreasonable or improper manner.

### 2. Mischaracterization of Nonpublic School Program

149

Put bluntly, as it must be, MCPS has sought to play fast and loose with reality in order to project the appearance of providing a reasonable level of ESY for disabled students. The "gimmick" used was for MCPS to assert that disabled students in nonpublic schools with programs in excess of 180 days were receiving ESY. The Court does not accept this mischaracterizations of the facts. The problem in this regard is not the different treatment of public and nonpublic school students,[19] but rather Defendants' manipulation of statistical data as to the nonpublic school group to mask its deficiencies in the provision of ESY to the public school group.

When MCPS sends a student with a disability to a nonpublic school, that child is usually sent to either Frost School, The Episcopal Center for Children, or Broschart School. All three schools program their regular school years for a period longer than 180 days. Frost has a twelve-month program, Episcopal runs eleven months, and Broschart incorporates a summer component into its programming that essentially gives it an eleven-month school year. Children at these schools receive their education based on a single, year-long IEP. They undergo no regression-recoupment analysis to determine if they need additional services, primarily because the length of the existing programs would make such a determination immaterial.

While there is nothing wrong with this type of educational programming, it is not ESY. Maryland regulations define ESY as "*an individualized extension of specific services* beyond the regular school year. . . . " COMAR ? 13A.05.01.02(B)(1) (emphasis added). The decision of the nonpublic schools to continue their regular programming through the summer and the decision of MCPS to place its students in that type of program---both within the sound discretion of those institutions---prevent either from labeling those services "ESY."

Even if the summer services provided at these nonpublic schools were deemed to be ESY, they cannot be lumped together with those services

150

provided to public school students for purposes of gaining a meaningful understanding of MCPS's practices. Because the nonpublic programs run through the summer regardless of the individualized needs of individual students, the cost of the summer education provided to these students is incorporated into the initial cost of their placement. MCPS would suffer no additional expense by liberally granting so called "ESY" to these students.

Providing ESY to public school students (with a 180 day school year) does place an additional financial burden on MCPS. MCPS must contribute extra funds, staffing, and resources for any ESY the students receive. Consequently, a *combination* of public and nonpublic statistics is misleading. A more accurate insight into MCPS' ESY practices is gained by a *comparison* of the treatment of public *vis-a-vis* nonpublic school students.

Focusing on Intensity V students in MCPS, those with the most severe disabilities in day-programs,[20] it becomes apparent that the number of students in public schools receiving ESY is alarmingly low in comparison to similarly situated students in nonpublic schools. Of the approximately one thousand students attending the eight public schools providing services only to Intensity V students, only four students received ESY in 1992. None of the approximately 50 students at Longview, which serves students with severe and profound mental retardation, received ESY. None of the approximately 105 students at Rock Terrace, which serves students with multiple disabilities (generally including mental retardation), received ESY, and no student at McKenney Hill Learning Center, which also serves students with multiple disabilities, received ESY.

In the public schools offering day programs to Intensity V children labeled seriously emotionally disturbed ("SED"), none of the 225 or more students at Mark Twain's main campus, none of the approximately 90 students at RICA, and none of the 18 students at Taylor Learning Center received ESY in 1992. By contrast, 59 students labeled SED who were

151

placed in nonpublic programs by MCPS received ESY that summer. In assessing these numbers, the Court is once again reminded of the Fifth Circuit's pointed observation: "Statistics are not, of course, the whole answer, but nothing is as emphatic as zero." *Hinds County Sch. Bd.,* 417 F.2d at 858. And, in this limited example, six zeros are more emphatic than one.

Overall, only approximately 140 out of approximately 11,100 disabled students in Montgomery County (slightly more than 1%) received ESY in 1992. (Pl.'s Ex. 1, chart 9.) Broken down, that year's figures show that only about 60 of 10,600 students in public schools received ESY (0.1%) while about 80 of 450 students in nonpublic schools (15 %) received such services. (Pl.'s Ex. 1, chart 10.) Of the approximately 8700 students receiving Intensity I, II, III, or IV in Montgomery County, none at all received ESY. (Pl.'S Ex, 1, chart 12.) In sum, these statistics reflect a pattern and practice of a school board that has avoided its obligation to provide ESY to disabled students when appropriate.

## C. Individualization Requirements

Plaintiffs claim that ESY decisions are not individualized because students who receive ESY are placed in fixed-length programs and that ESY placements do not take into account the LRE requirement.

The Fourth Circuit has stated that under the IDEA, placement is to follow the development of an individualized program, and not vice versa. *See Spielberg,* 853 F.2d at 259. Under both Federal and State law, ESY is to be provided under a properly developed IEP, taking into account LRE. *See, e.g.,* COMAR ? 13A.05.01.09(G)(3).

The evidence presented at trial established that there was little, if any, consideration of the appropriate duration of individual ESY programs at annual review meetings. *(See* Sirotkin testimony, Tr, dated Sept. 24, 1993, at 117.) Moreover, the evidence revealed that in certain cases

students were receiving uniform, fixed-length ESY programs based solely on the length of existing summer school/enrichment programs. *(See* Pl.'s Ex. 1, chart 21.) While these programs may have been appropriate for the students placed in them, no individual evaluation was made to ensure that this was the case.

In the future, MCPS must make individualized determinations of the number of weeks, days per week, and hours per day that each student receiving ESY should be provided. This is required under MCPS's own 1992 and 1993 ESY guidelines. Of course, the Court does not interpret the IDEA to require these decisions to be made in a vacuum, without any consideration of programs already in existence and the rational administration of county resources. Rather, putting the existence of fixed-length programs in their proper place in the IDEA hierarchy, MCPS first must determine the child's individualized summer needs and *then* determine whether an existing program can satisfy those needs. In any event, Defendants must make allowances and adjustments in those instances when a child's individualized needs cannot be met by an existing summer program.

### D. Least Restrictive Environment ("LRE") Requirements

The Court finds that the LRE requirements are not being considered for students who have been found to qualify for ESY. Many students---for example, those in the autism program---who were educated with nondisabled students during the regular school year received their 1992 ESY in a segregated environment. Moreover, MCPS educators have testified that LRE was not even a topic of discussion at annual review meetings. At one point, the Acting Director of Special Education testified that she did not "see [LRE] as germane to the issue of extended school year." This attitude cannot continue. However, the express language of the Maryland regulations requires due consideration to LRE concerns.

153

While MCPS must recognize LRE as a component of ESY in the future, the Court does not read the IDEA to mandate indifference to legitimate practical considerations or interference with other school programming to create artificial LRE settings during the summer months. Considering, however, the extensive number of programs offered by MCPS during the summer (as listed in its *"Elementary and Secondary Summer School Programs"* brochures) there appear to be ample opportunities to mainstream ESY recipients when appropriate.

## VI. Attorney's Fees

Courts, in their discretion, may award reasonable attorney's fees to parties who have prevailed in actions under the IDEA. 20 U.S.C. ? 1415(e)(4)(B) (Supp. 1994). It is beyond question that Plaintiffs have prevailed in the present dispute. *See Combs v. School Bd. of Rockingham County,* 15 F.3d 357, 360-61 (4th Cir. 1994). As a consequence, and also because Plaintiffs' efforts will result in a substantial benefit to all disabled children in Montgomery County, the Court will exercise its discretion in favor of awarding such fees.

## VII. Remedies

The duty of this Court is to ensure that the Montgomery County School System meets its legal obligations. It shall do so while bearing in mind that---as long as acting consistent with its legal obligations---the school system should be permitted to perform its education function in accordance with its best professional judgment. [21]

There shall, promptly, be supplemental proceedings so that the Court can be assisted by the parties in drafting order(s) to provide relief consistent with this decision.

154

## VIII. Conclusion

For the foregoing reasons the Court concludes that:

1. Defendants have violated the Individuals with Disabilities Education Act by:

a. Failing to provide adequate notice regarding ESY to parents of disabled students.

b. Utilizing procedures that delay decisions regarding the providing of ESY to disabled students.

c. Making decisions on ESY too late in the school year.

d. Failing to address ESY at annual review meetings, and failing to document the required discussions of ESY.

e. Failing to apply a proper standard for the determination of whether students should receive ESY as part of their IEPs.

f. Failing to comply with requirements for an individualized program, including LRE considerations when ESY is offered.

2. Defendants must forthwith come into compliance with IDEA.

3. An appropriate Order must be issued to insure that Defendants cease and desist from their violation of the IEPs.

4. Plaintiffs are entitled to recover their expenses, including legal fees, with regard to the Class Action aspects of this case.

5. Counsel for the parties shall as expeditiously as possible, and in no event later than September 15, 1994, submit an agreed Order or separate versions of an Order that will provide remedies consistent with this decision.

155

[1] The defendants in this suit---Dr. Hiawatha Fountain ("Fountain") and Dr. Paul Vance---are employees of MCPS, who are being sued in their official capacities. For convenience of reference, the defendants are referred to collectively as "MCPS."

[2] Formerly named "The Education of the Handicapped Act."

[3] Essentially identical requirements are imposed by the Rehabilitation Act, 29 U.S.C. ? 794 (Supp. 1994). Therefore, the Rehabilitation Act is not separately discussed herein.

[4] 34 C.P.R. ?? 300.1-300.754.

[5] The IDEA, however, does not require that IEPs be designed to maximize each child's potential. *Rowley,* 458 U.S. at 198.

[6] *See Honig v. Doe,* 484 U.S. 305, 311 (1988).

[7] The IDEA requires that schools take steps to ensure "[t]hat to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled." 34 C.F.R. ? 300.550(b)(1). *See also* 20 U.S.C. ? 1412(5)(B) (Supp. 1994); COMAR ? 13A.05.01.10(B).

[8] "Reasonable efforts" is a defined term under the Maryland regulations, including the following obligations:

(i) giving timely notice to parents of meetings; (ii) scheduling meetings at a mutually agreed upon time and place; (iii) fully explaining to the parents their rights in the special education decision-making process; (iv) providing to parents written information on placement procedures and due process rights; and (v) arranging for interpreters for the parent who

156

is deaf or whose native language is other than English.

COMAR ? 13A.05.01.02(B)(7)(a).

[9] The other required determinations are whether the student has achieved his or her IEP goals, whether to modify the IEP, and whether LRE can be better achieved.

[10] The regulations also set forth a standard for determining when ESY must be provided, *see* COMAR ? 13A.05.01.09(G)(2), which will be discussed below.

[11] The individual claims of the named Plaintiffs have been severed for separate trial.

[12] The process is "unique" in that Montgomery County parents face such dual hurdles in no other area of special education.

[13] While IEPs may be updated as necessary, this Court does not understand MCPS to offer a second SARD meeting after the CARD ESY decision.

[14] The IDEA requires no rigid voting system in the IEP decision-making process. Consequently, MCPS is free to adopt---as it has---a policy of consensus-building at IEP meetings in which voting is discouraged. However, voting does occur in some cases. Plaintiffs argue that when IEP committees do vote on critical issues, parents and teachers should be included. MCPS denies that there is such a requirement under the IDEA.

Under federal and state regulations, parents and teachers are statutorily named members of IEP committees. *See* 34 C.P.R. ? 300.344; COMAR ? 13A.05.01.09(B). The provisions make no mention of any difference in status between them and the administration representative also required to

157

attend such meetings. To the contrary, the regulations note that parents are to be treated as "equal participants" in the process. 34 C.F.R. ? 300 app. C, ? 26. The Court is not going to require that parents and/or teachers be given a vote in the decisional process. However, it will require that the position of non-voting parents and teachers be considered by those voting and placed in the record of the proceedings.

[15] The Court is not holding that the IDEA prevents MCPS from addressing its very real administrative concerns. Rather, those concerns must be addressed in light of the educational services MCPS is obligated by the IDEA to provide.

[16] Defendants' counsel have chosen to include in their briefs *ad hominem* attacks on Plaintiffs and their counsel peppered with acerbic quotes from such authors as Voltaire and H.L. Mencken. Presumably, counsel sought and failed to find more pertinent---albeit more prosaically written---quotations from legal authorities to support their arguments.

[17] Apparently, it may take extra time to trigger the due process timeliness in Montgomery County because MCPS does not start time running until it receives a request for a hearing on an official MCPS form. The Court finds no support in any of the relevant statutes or regulations for tolling the due process timeliness during an exchange of forms.

[18] Amid Defendants' counsel's attacks on Plaintiffs' "preconceived policy goals," "willful misunderstanding of [MCPS] procedures," "ignorant" experts, and "bizarre" conclusions is enough substance to lead the Court to conclude that they disagree with the Plaintiffs.

[19] Both federal and state regulations provide for different treatment of students in nonpublic placements. *See* 34 C.F.R. ? 300.400-.452; COMAR ? 13A.05.01.12. Students placed in nonpublic schools, however, are guaranteed the same broad procedural protections as students placed

158

in public schools, 34 C.F.R. ? 300.401(b); COMAR ? 13A.05.01.12(C).

[20] In Maryland, a continuum of educational placements are provided for disabled students based on a system of six "intensity" classifications. Intensity I would be for the least severely disabled students while Intensity VI would be for students in need of residential treatment. *See* COMAR ? 13A.05.01.10(E).

[21] The Court is mindful of the Supreme Court's warning in *Rowley* that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." 458 U.S. at 207.

### Order

For the reasons stated in the Memorandum Decision issued on August 25, 1994:

1. This case is certified as a class action on behalf of all students receiving special education services from MCPS. A notification of this Court's action shall be provided to all class members as set forth herein.

2. The Court finds that the Montgomery County Public Schools ("MCPS") have violated the Individuals with Disabilities Education Act ("IDEA") with respect to providing eligible students with Extended School Year services ("ESY") by:

a. Failing to provide adequate notice regarding ESY to parents of disabled students;

b. Utilizing procedures that delay decisions regarding the providing of ESY to disabled students;

c. Making decisions on ESY too late in the school year;

159

d. Failing to address ESY at annual review meetings and failing to document the required discussions of ESY;

e. Failing to apply a proper standard for the determination of whether students should receive ESY as part of their Individualized Education Plans ("IEP"); and

f. Failing to comply with requirements for an individualized program, including Least Restrictive Environment ("LRE") considerations, when ESY is offered.

3. Defendants shall cease and desist from violating the IDEA as has been found herein.

4. Defendants shall educate and inform the parents of disabled students as to the existence of ESY, the eligibility standards, the types of services provided, the absence of cost for such services, the procedures by which students are considered for ESY, and the procedures by which parents can appeal denials of ESY. In furtherance of this objective, MCPS shall:

a. By the end of the first semester of the 1994-95 school year, provide to parents of all disabled students and to those pertinent organizations identified to MCPS by Plaintiffs, an ESY information brochure and notice to all class members developed in consultation with the Plaintiffs. The said documents shall be sent to parents either by mail or by giving copies to their children at school and shall be mailed to the aforesaid organizations.

b. At least 10 working days [1] prior to each student's annual review meeting, provide parents with the aforesaid ESY brochure and (for 1995 only) class notification as well as written notice developed in consultation with the Plaintiffs and concerning ESY eligibility standards and procedures and the requirement that ESY eligibility be considered at each annual review meeting.

160

c. Diligently, in consultation with the Plaintiffs, develop, implement and document a long-term parental education and notification plan.

5. MCPS shall make all ESY decisions sufficiently early so that students can appeal a denial and, if successful, receive the ESY to which they are entitled.

a. For the 1994-95 school year, MCPS shall comply with Exhibit A hereto attached.

b. Defendants shall, in consultation with Plaintiffs, develop an ESY Decision Timeline plan for subsequent years.

c. By October 31, 1995, the parties shall submit an agreed ESY Decision Timeline Plan or, absent agreement, separate proposed plans.

6. At each annual review meeting, MCPS shall properly consider a student's eligibility for ESY. As part of that consideration, the school committee shall:

a. Comply with 34 C.F.R. ? 300.344 and Appendix C with regard to committee membership;

b. Discuss with parents the ESY eligibility standards, services and procedures and request parents to sign a form acknowledging their receipt of this information;

c. Consider and document the parents' position with respect to ESY;

d. Document that it considered ESY eligibility according to the appropriate standards and either approved or rejected ESY for every child;

e. Have the final power to provide ESY without external review through a two-step process, although MCPS can send central administrators to attend the annual review meetings and generally monitor the committee's compliance with system guidelines;

161

f. Also have the power to, if it finds it necessary for a particular child, refer the child to a central committee which includes all necessary members of an IEP Committee.

g. Design an individualized program of ESY services for each eligible student and, thereafter, find an existing or specially created program which can provide the required program in the least restrictive environment;

h. Before the end of the meeting, both orally and in writing, inform the parents as to their procedural rights to appeal the committee's decision not to provide ESY; and

i. Provide a written summary of the discussion of ESY at the annual review meeting to parents within 10 working days after the meeting.

7. Defendants shall utilize the eligibility standards for ESY services set forth in Exhibit B to this Order.

8. All IEP committees shall make individualized decisions an to the number of weeks, days per week, hours per day and types of services that each student receiving ESY requires as an integral part of the student's IEP as developed at the annual review meeting.

a. In making individualized ESY decisions, the committee shall first determine the student's unique needs and then develop an ESY program, either through an existing program or through a specially developed program.

b. Availability of existing programs shall not govern the determination of the individual student's ESY needs.

9. MCPS shall place students receiving ESY services in the least restrictive environment, considering summer programs offered by MCPS for nondisabled students.

162

a. LRE shall be offered to the fullest extent practical, educationally reasonable and legally required.

b. MCPS shall require its committees to document that LRE was factored into the design of the ESY service program provided to eligible students.

c. MCPS is not required to identify the specific site of the program in the IEP until such time as it is feasible to do so. Site selection is an administrative decision subject, however, to challenge by parents in an administrative hearing.

10. As soon as practicable, MCPS shall provide training for all staff who participate in ESY eligibility and placement decisions and shall, in consultation with the Plaintiffs, develop an ongoing training system.

11. The student record of each disabled student shall include documentation indicating that ESY was considered at the annual review meeting, that the parents were informed, what the parents' position on ESY was, and that individualized services were developed and provided (if the committee approved ESY).

12. MCPS shall monitor the compliance of its schools with IDEA and shall, within one year and in consultation with the Plaintiffs, develop a system to monitor compliance on a system wide basis.

13. MCPS shall file with the Court by March 31 and October 31 of each year a report indicating efforts and progress in bringing the school system into compliance with this Order and any subsequent orders.

a. The report shall be signed by the Superintendent, attesting that it is true to the best of the Superintendent's knowledge and belief.

b. The Plaintiffs may file a response within is days of the Defendants' filing of each such report.

163

14. The Court shall retain jurisdiction to modify, enforce and terminate this Order.

15. By January 31, 1997 the parties shall provide the Court with their respective positions as to whether this Order shall be terminated in light of MCPS' record of compliance with this Order and the IDEA.

[1] For purposes of this Order the term "working days" refers to school days during the academic year and to those days on which 12-month employees of MCPS regularly work during the summer recess.

## Exhibit A

## Timeline of 1994-1995 ESY Decisions [1]

All annual review meetings, including decisions regarding ESY eligibility, for students receiving Intensity 4 or 5 services shall be scheduled by MCPS to be held no later than April 15, 1995 except when the needs of the child as determined by the ARD committee require a later decision. All annual review meetings, including decisions regarding ESY eligibility, for students receiving intensity 1, 2, or 3 services shall be scheduled to be held no later than May 20, 1995 except when the needs of the child as determined by the ARD committee require a later decision.

If the annual review meeting is scheduled before April 15, requests for ESY due process hearings shall be scheduled to ensure a decision is made within 45 days of the request for the hearing.

If the annual review meeting is scheduled between April 15 and May 20, ESY due process hearings requested *before* May 20 shall be scheduled in a timely manner to ensure a hearing decision is made by June 15 or within 45 days of the request for a hearing, whichever is earlier.

164

If the annual review meeting is scheduled between April 15 and May 20, ESY due process hearings requested *after* May 20 shall be scheduled in a timely manner to ensure a hearing decision is made within 20 days of the request.

If the annual review meeting is scheduled after May 20, ESY due process hearings shall be scheduled in a timely manner to ensure a hearing decision is made within 20 days of the request.

[1] This timeline chronology represents agreement among the parties for an ESY annual review implementation plan for the 1994-1995 school year.

## Exhibit B

## Extended School Year Eligibility Standard

### November 1994

A school system must provide Extended School Year (ESY)[1] services when such services are necessary to permit a student who has a special education Individualized Educational Program (IEP) to receive some benefit from his/her educational program during the regular school year. While there is no requirement that ESY be made a part of every disabled student's IEP even if there would be some educational benefit, there is an obligation for the ARD committee to determine each student's eligibility for ESY at the annual review meeting.

The ARD Committee applies the following criteria in making ESY eligibility decisions. ESY services must be provided if the student meets any one, or a combination, of these criteria.

A. Regression/recoupment---The ARD Committee determines whether,

without ESY services, there is a likelihood of substantial regression of *critical life skills*[2] caused by the school break and a failure to recover those lost skills in a reasonable time following the school break.

B. Degree of progress---The ARD Committee reviews the student's progress towards IEP objectives on critical life skills and determines whether, without ESY services, the student's degree of progress toward those objectives will prevent the student from receiving some benefit from his/her educational program during the regular school year.

C. Emerging skills/breakthrough opportunities---The ARD Committee reviews all IEP objectives targeting critical life skills to determine whether any of these skills are at a breakthrough point. When critical life skills are at this point, the ARD Committee determines whether the interruption of instruction on those objectives caused by the school break is likely to prevent the student from receiving some benefit from his/her educational program during the regular school year without ESY services.

D. Interfering behavior(s)---The ARD Committee determines whether any interfering behavior(s), such as stereotypic, ritualistic, aggressive or self-injurious behavior(s) targeted by IEP objectives have prevented the student from receiving some benefit from his/her educational program during the previous school year without ESY services or whether the interruption of programming which addresses the interfering behavior(s) is likely to prevent the student from receiving some benefit from his/her educational program during the next school year without ESY services.

E. Nature and/or severity of the disability---The ARD Committee determines whether, without ESY services, the nature and/or severity of the student's disability is likely to prevent the student from receiving some benefit from his/her educational program during the regular school year.

F. Special circumstances---The ARD Committee determines whether, without ESY services, there are any special circumstances that will

166

prevent the student from receiving some benefit from his/her educational program during the regular school year.

[1] This standard shall not be construed to impose any duty, obligation, or criteria which exceeds that established by federal and/or Maryland law.

[2] A *critical life skill* is any skill determined by the ARD Committee to be critical to the student's overall educational progress.

**Statutes Cited**
Fed.R.Civ.P. 52(a)
29 USC 794 [Find other cases with 29 USC 794]
20 USC 1400(c) [Find other cases with 20 USC 1400(c)]
20 USC 1412(5) [Find other cases with 20 USC 1412(5)]
20 USC 1401(a)(20) [Find other cases with 20 USC 1401(a)(20)]
20 USC 1412(5)(B) [Find other cases with 20 USC 1412(5)(B)]
20 USC 1415 [Find other cases with 20 USC 1415]
20 USC 1415(b) [Find other cases with 20 USC 1415(b)]
20 USC 1415(b)(1)(D) [Find other cases with 20 USC 1415(b)(1)(D)]
20 USC 1415(b)(1) [Find other cases with 20 USC 1415(b)(1)]
20 USC 1415(e)(4)(B) [Find other cases with 20 USC 1415(e)(4)(B)]

**Regulations Cited**
34 CFR 300.400-300.452 [Find other cases with 34 CFR 300.400-300.452]
34 CFR 300.401(b) [Find other cases with 34 CFR 300.401(b)]
34 CFR 300.343(d) [Find other cases with 34 CFR 300.343(d)]
34 CFR 300.552 [Find other cases with 34 CFR 300.552]
34 CFR 300.550(b)(1) [Find other cases with 34 CFR 300.550(b)(1)]
34 CFR 300.343(c) [Find other cases with 34 CFR 300.343(c)]
34 CFR 300.505(a) [Find other cases with 34 CFR 300.505(a)]
34 CFR 303.505(b) [Find other cases with 34 CFR 303.505(b)]

34 CFR 300.345 [Find other cases with 34 CFR 300.345]
34 CFR 300.505 [Find other cases with 34 CFR 300.505]
34 CFR 300.382 [Find other cases with 34 CFR 300.382]
34 CFR 300.344 [Find other cases with 34 CFR 300.344]
34 CFR 300.343 [Find other cases with 34 CFR 300.343]
34 CFR 300.506 [Find other cases with 34 CFR 300.506]
34 CFR 300.512 [Find other cases with 34 CFR 300.512]
34 CFR 300.501 [Find other cases with 34 CFR 300.501]

471 U.S. 359 [Find other cases with 471 U.S. 359]
57 F. Supp. 2d 776 [Find other cases with 57 F. Supp. 2d 776]
34 IDELR 264 [Find other cases with 34 IDELR 264]

ALL-STATE LEGAL
*AL-12*

<u>**19 IDELR 105**</u>
<u>19 LRP 1925</u>

**Category**
Special Education, Judicial Decisions

*Kareem Harris, et al., Plaintiffs v. District of Columbia, at al.,*
*Defendants*

—

**U.S. District Court, District of Columbia**
<u>91-1660 (RCL)</u>

August 6, 1992

**Related Index Numbers**
<u>100.001 Compensatory Education, Administrative Awards</u>
<u>160.045 Due Process Hearings, Scope of Hearing Officer's Authority</u>
<u>100.005 Compensatory Education, In General</u>

**Case Summary**

It would be inefficient to bar hearing officers from awarding relief under the IDEA which would otherwise be granted by courts on appeal. Accordingly, the court in the present case declared that hearing officers are equally authorized with courts to make awards of compensatory education to students with disabilities who have been denied FAPE.

The parent of a 17-year-old student with mental and emotional disabilities sought an order for an additional year of education for his son beyond the age of 22 and a declaration that hearing officers are empowered to award

170

compensatory education. In an earlier administrative proceeding, a hearing officer found that the district denied FAPE to the student by failing to place him in an appropriate educational setting.

*HELD:* for the parent.

The court first held that compensatory education is an available remedy under the IDEA and that the *Burlington* standard for determining whether to reimburse the costs of an unilateral placement, and not a higher standard of "gross violations" or "exceptional circumstances," is applicable in determining whether to award compensatory education. Furthermore, the court concluded that it would be inefficient to bar hearing officers from awarding relief under the IDEA which would otherwise be granted by a court on appeal. Accordingly, the court ordered the school district to provide the student with one year of compensatory education beyond the age of 22 and declared that hearing officers are equally authorized with courts to make such awards.

**Judge / Administrative Officer**

Lamberth, District Judge.

**Full Text**

Memorandum Opinion
I. Introduction
II. Facts
III. Plaintiff Is Entitled to Summary Judgment Regarding His Request for Compensatory Education Because There Is No Genuine Issue as to Any of the Facts in the Dispute Where the Facts as They Stand Entitle Plaintiff to a Judgment as a Matter of Law
IV. Because Hearing Officers Are Able to Grant Relief That Is Determined to be Appropriate by Statutes, Rules, Regulations, Case Law, and Policy Promulgated by the Agency Charged With Monitoring and

171

Enforcing the Legislation, and Because this Court and the Office of
Special Education Programs Have Determined that Compensatory Relief
Is Appropriate Under the IDEA, Plaintiffs' Motion for a Declaration that
Hearing Officers Can Award Compensatory Education as a Remedy Is
Granted
Order

## Memorandum Opinion

### I. Introduction

This matter comes before the court on the motion for summary judgment
of plaintiff Kaream Harris and his plaintiff father against defendants, the
District of Columbia and Franklin Smith (Superintendent of D.C. Public
Schools). Plaintiff Kaream Harris is a 17 year old boy who is mentally
and emotionally disabled. As such, he is eligible for special education
services between the ages of three and twenty-one under the Individuals
with Disabilities Education Act (IDEA). Plaintiff Kaream Harris was
denied 9 1/2 months of special education due to a failure on the part of the
District of Columbia Public Schools to place him in a suitable educational
setting. He therefore requests that the court remedy the situation by 1)
granting his motion for summary judgment which would allow him to
receive one additional year of school after he reaches age 22 as
compensation for the year he was denied, and by 2) declaring that
hearing officers have the authority to award compensatory education at
the administrative hearing level. The court has jurisdiction under 28
U.S.C. ? 1331.

### II. Facts

The Individuals with Disabilities Education Act (IDEA) gives all disabled

172

students who qualify the right to "free appropriate public education" from age three until the end of the semester in which the student turns twenty-two. 20 U.S.C.A. ? 1400 et seq.; 5 D.C.M.R. ? 3001 (1987). Plaintiff Kaream Harris was originally identified as eligible for special education by the District of Columbia Public Schools (DCPS) in 1980. He received special education without interruption from that original determination until March 14, 1989 when he was withdrawn from school and admitted into the Psychiatric Institute of Washington, D.C. (PIW) for treatment. He remained at PIW until April 28, 1989, when he was discharged with a recommendation that he be enrolled in a residential program for children with similar learning and emotional disabilities. Despite this recommendation, DCPS was unable to place him in any type of learning situation until January 24, 1990 when Kaream entered Lake Grove at Durham School, a residential school in Durham, Connecticut. Kaream remained there until December of 1990. Prior to his discharge from the Durham School, DCPS had been notified that another learning situation would be needed for Kaream after he was discharged. However, DCPS did not find a new placement for Kaream and it was not until after an administrative hearing on February 7, 1991 that DCPS was able to place him at the Frost School, beginning on February 20, 1990. All told, Kaream Harris was deprived of special education for a total of 9 1/2 months. (Hearing Determination at 5).

Plaintiffs have already sought an administrative remedy as is prescribed by IDEA, where the hearing officer who analyzed the situation said that he was without valid statutory authority to award plaintiffs the compensatory education that they requested. (Hearing Determination at 3, 5). Therefore, plaintiff Kaream Harris and his parents come before this court claiming that the relief they request, an academic year of compensatory education to make up for the 9 1/2 month denial of education, is justified and summary judgment should be granted.

### III. Plaintiff Is Entitled to Summary Judgment Regarding His

### Request for Compensatory Education Because There Is No Genuine Issue as to Any of the Facts in the Dispute Where the Facts as They Stand Entitle Plaintiff to a Judgment as a Matter of Law

Summary judgment will be granted only when there is no genuine issue as to any material fact in the dispute where the facts prove that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c); *Celotex v. Catrett,* 477 U.S. 317 (1986). Plaintiff claims that the facts as established in the administrative hearing create no genuine issue as to plaintiff's right to compensatory education under the Individuals with Disabilities Education Act and this court should therefore grant summary judgment in his favor.

IDEA was designed to ensure that every child between ages 3 and 21 in need of special education receive a free and appropriate public education 20 U.S.C.A. ? 1400 (Supp.1991); 34 C.F.R. ? 300.14 (1991). If no public education is available, then it is the responsibility of the state to enroll the qualifying child in an appropriate private school at no cost to the student. 20 U.S.C.A. ? 1413(a)(4)(b); 34 C.F.R. ?? 300.400-.402. When a school system has failed to fulfill its obligations under IDEA, the aggrieved party must first seek an administrative hearing to remedy the situation and then appeal any unsatisfactory outcome to the federal district court in which the cause of action arose. 20 U.S.C.A. ? 1415(e)(2).

The administrative hearing established that 1) Kaream Harris has been eligible for special education services from DCPS under IDEA since 1980, 2) he has been denied a free and appropriate special education for periods totaling 91/2 months, 3) it is unknown whether Kaream Harris will actually need the one year of compensatory education that he has requested, and 4) there is no precedent in this jurisdiction that allows a hearing officer to make an award of compensatory education in the form of extended entitlement. Hearing Officer's Determination at 5. The hearing officer felt that under the terms of the act, even though other

174

circuits have decided that compensatory education is appropriate, he lacked the authority to make such a determination in the absence of precedent in the D.C. Circuit.

The next step procedurally under IDEA is for this court to review the records of the administrative hearing along with additional evidence at the request of a party and shall grant relief that it determines to be "appropriate." 20 U.S.C.A. ? 1415(e)(2). "Appropriate" has been broadly interpreted. 20 U.S.C.A. ? 1415(e); *Burlington Sch. Comm. v. Massachusetts Dep't of Educ.,* 471 U.S. 359, 369 (1985); *Smith v. Robinson,* 468 U.S. 992, 1019 (1984); *Mckenzie v. Smith,* 771 U.S. 1527, 1535 (D.C.Cir.1985). In *Burlington,* the Supreme Court declared that it would be appropriate relief to reimburse the parents of a disabled student for the cost required to keep that child in an appropriate educational setting when the state, in violation of the act, had failed to place him. *Burlington Sch. Comm. v. Massachusetts Dep't of Educ.,* 471 U.S. 359 (1985). The court found that this type of retroactive relief was appropriate as it would merely require the state to "belatedly pay expenses that it should have paid all along." Id. at 370-71. This principle has been applied in the D.C. Circuit in *Knight by Knight v. District of Columbia,* 877 F.2d 1025 (D.C.Cir.1989), and in *Andersen v. District of Columbia,* 877 F.2d 1018 (D.C. Cir. 1989). It protects those parents who can advance the cost of special education when their school system has failed to carry out its duty. It fails to protect those parents who are not in a strong enough financial position to keep their child in a private school when the state fails to place him in a timely manner.

Some federal appellate courts have extended the meaning of "appropriate relief" to include compensatory education in order to ensure that families who cannot afford to unilaterally place their child in a private educational setting when the state fails to do so will have a viable remedy when their children are deprived of an education in violation of IDEA. *Hall v. Knott Co. Bd. of Educ.,* 941 F.2d 402 (6th Cir. 1991); *Lester H. v. Gilhool,* 916 F.2d 865 (3rd Cir. 1990); *Burr by Burr v. Ambach,* 863 F.2d 853

175

(2nd Cir. 1988); *Jefferson Co. Bd. of Educ. v. Breen*,  853 F.2d 853
(11th Cir. 1988); *Meiner v. Missouri,* 800 F.2d 749 (8th Cir. 1986). In
*Meiner,* the 8th Circuit stated "we can't agree with defendants that they
should escape liability for these services simply because Clyde Meiner
was unable to provide them in the first instance; we believe that such a
result would be consistent neither with *Burlington* nor with congressional
intent . . . we are confident that Congress did not intend the child's
entitlement to turn upon her parent's ability to 'front' its costs." *Meiner v.
Missouri,* 800 F.2d 749, 753 (8th Cir. 1986). The Third Circuit in  *Lester*
said, "Congress . . . did not intend to offer a remedy only to those parents
able to afford alternative private education."*Lester H. v. Gilhool,* 916
F.2d 865, 873 (3d Cir. 1990), *cert. denied sub nom. Chester Upland Sch.
Dist. v Lester H.,* 111 S.Ct. 1317 (1991).

In 1983 in *Bennett v. District of Columbia Bd. of Educ.,*  Judge Penn of
this court confirmed that compensatory education was an appropriate
form of relief. *Bennett v. District of Columbia Bd. of Educ.,*  No.
82-0224 (D.D.C. April 22, 1983). In  *Bennett,* the court stated that
compensatory education was "virtually indistinguishable from" tuition
reimbursement and is therefore permissible under IDEA. Id.

The court is persuaded that the holdings from the various circuit courts
and Judge Penn are well reasoned and appropriate constructions of the
statute. Because Plaintiff Kaream Harris was deprived of 91/2 months of
special education where it was the duty of DCPS to place him in an
appropriate setting during those months, this circuit finds that plaintiff is
entitled to appropriate relief under the Act as a matter of law. Plaintiff's
request for the remedy of an additional academic year of schooling after
he passes the statutory limit is an appropriate remedy based on the
determinations made by five circuits around the country and Judge Penn.

Defendants argue that if compensatory education is an appropriate
remedy, plaintiff is not entitled to it as compensatory education has only
been awarded in circuits where a "gross violation" of the IDEA is shown

176

or only in cases of "exceptional circumstances." However, this standard is not the applicable standard to use in analyzing a deprivation of education. The standard that the Supreme Court set forth in *Burlington* is applicable to the present case. That case merely required parents whose children have been deprived of special education in violation of IDEA to prove that their children were entitled to coverage under the Act and that they were denied coverage under the Act. See *Kattan v. District of Columbia*, 691 F.Supp. 1539 (D.D.C. 1988). There was no demand that the plaintiffs demonstrate a "gross violation" of IDEA in order to receive retroactive reimbursement. The same standard should be used when awarding compensatory education. As plaintiff has been denied 9 1/2 months of education in violation of IDEA, he is eligible for relief.

Defendants also argue that plaintiffs are not entitled to a judgment as a matter of law because the case is not ripe for adjudication since the plaintiffs are seeking a remedy that Kaream Harris may or may not need at some point in the future. The court determines whether a case is ripe or not depending upon whether the plaintiff has a "concrete injury" as a foundation for his current claim. *DKT Memorial Fund Ltd. v. Agency for Int'l Development*, 887 F.2d 275, 296 (D.C. Cir. 1989). This court is satisfied that Kaream Harris currently possesses a concrete injury, namely that he has been deprived of 9 1/2 months of education without remedy. There is no reason to delay a decision in this matter.

Because the defendants are unable to present any genuine issue as to why plaintiff is not entitled to relief under the Individuals with Disabilities Act and because the court is convinced that compensatory education, as a matter of law, is an appropriate remedy under the Act, plaintiffs' request for summary judgment is granted.

**IV. Because Hearing Officers Are Able to Grant Relief That Is Determined to be Appropriate by Statutes, Rules, Regulations, Case Law, and Policy Promulgated by the Agency Charged With**

**Monitoring and Enforcing the Legislation, and Because this Court and the Office of Special Education Programs Have Determined that Compensatory Relief Is Appropriate Under the IDEA, Plaintiffs' Motion for a Declaration that Hearing Officers Can Award Compensatory Education as a Remedy Is Granted**

The United States Supreme Court has said that when a hearing officer is interpreting an ambiguous statute and there is no controlling case law, the court may "defer to the construction adopted by the agency charged with monitoring and enforcing the statute." *Honig v. Doe,* 484 U.S. 305, 325 n. 8 (1988). In *Honig,* the court used a policy letter issued by the Office of Special Education Programs in the U.S. Department of Education as authority to construe an ambiguous statute. The ambiguity came from a section of the statute that does not allow a school to change the placement of a student while a complaint is proceeding against him or her. The hearing officer was able to use a policy letter that stated that suspending a student for as many as 10 days during the complaint procedure would not constitute a 'change in placement' if the student posed an immediate threat to the safety of others. In doing that, the Supreme Court gave the administrative agency the authority to interpret an ambiguous statute based on the policy of the organization charged with monitoring and enforcing the statute, namely the Department of Education via the Office of Special Education Programs. Id.

In the present case, the Office of Special Education Programs has issued a policy letter on the subject of compensatory education and the authority of hearing officers. The policy letter states:

Part B [of the IDEA] and its legislative history evince the importance attached by the Congress to the procedural safeguards as a method of ensuring that FAPE (free appropriate public education) is made available to children with disabilities. Therefore, OSEP's position is that Part B intends an impartial hearing officer to exercise his/her authority in a manner which ensures that the right to a due process hearing is a

178

meaningful mechanism for resolving disputes between parents and responsible public agencies concerning issues relating to the provision of FAPE to a child. Although Part B does not address the specific remedies an impartial hearing officer may order upon a finding that a child has been denied FAPE, OSEP's position is that, based upon the facts and circumstances of each individual case, an impartial hearing officer has the authority to grant any relief he/she deems necessary, inclusive of compensatory education, to ensure that a child receives the FAPE to which he is entitled. (Emphasis omitted).

OSEP Policy Letter, 17 Educ. Hand. L. Rep. 522, 523 (1991). *Honig* established the idea that a policy letter could be given great deference in construing an ambiguous statute, where 'appropriate relief' creates just such an ambiguity. OSEP's policy letter clearly states that it is the agency's opinion that hearing officers should be able to award compensatory education. IDEA was designed to set up an enforceable substantive right to free appropriate education to all disabled students using an administrative proceeding as the initial means of resolving the dispute. Congress did not intend hearing officers to be the primary reviewers of the IDEA cases yet foreclose them from applying certain remedies that the court has determined to be appropriate. It would be inefficient to tie the hands of the hearing officer, disabling him or her from awarding the relief that this court has determined to be appropriate and consequently creating a greater number of appeals that will end in reversal. Therefore, the court declares that hearing officers possess the authority to award compensatory education.

A separate order shall issue this date.

## Order

This matter comes before the court on plaintiffs' motion for summary judgment, defendants' opposition thereto, and defendants' motion to

179

dismiss, and plaintiffs' opposition thereto. Plaintiffs allege that the defendants violated the right of plaintiff Kaream Harris to a free and appropriate education under the Individuals with Disabilities Act by depriving him of 91/2 months of special education. Plaintiffs request the remedy of one academic year of compensatory education to be used after Kaream Harris surpasses the statutory age of coverage under the Act as well as a court declaration that hearing officers have the authority to award compensatory education at the administrative hearing level.

Upon consideration of the cross-motions and the entire record herein, the court finds that there is no genuine issue of material fact and that plaintiffs are entitled to judgment as a matter of law. The court finds that administrative hearing officers within the District of Columbia have the authority pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. ? 1400 et seq., to award compensatory education as a remedy for the denial of special education, and that in light of that conclusion and the undisputed facts, defendants erred in denying Kaream Harris's eligibility for compensatory education. Therefore, it is hereby ORDERED:

1. That plaintiffs' motion for summary judgment and request for declaratory relief is GRANTED, and defendants' motion to dismiss is DENIED;

2. That the defendants the District of Columbia and the Superintendent of District of Columbia Public Schools extend Kaream Harris's eligibility for special education for one school year beyond the semester in which he reaches his twenty-second birthday;

3. The court declares that administrative hearing officers in the District of Columbia have the authority pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. ? 1400 et seq., to award compensatory education as a remedy for the denial of special education; and

4. That plaintiffs may recover their reasonable attorney's fees and related costs in this action. A status conference shall be scheduled in accordance

180

with Local Rule 214.

A separate memorandum opinion shall issue this date.

SO ORDERED.

EXHIBIT
AL-13
ALL-STATE LEGAL®

Paul L. Vance
Superintendent



Allie C. Gay
Assistant
Superintendent

---

# ESY ELIGIBILITY CRITERIA

The IEP Team uses one or more of the following criteria when determining the need for ESY Services:

1.  **Regression/Recoupment.**    Without ESY Services, there is a likelihood of substantial regression of critical skills caused by the school break and is accompanied by the failure to recover those skills in a timely manner.

2.  **Emerging Skills/Breakthrough Opportunities.**  When critical skills are at a breakthrough point, the interruption of instruction on those objectives is likely to prevent the student from receiving benefit from his/her educational program during the regular school year with the provision of ESY Services.

3.  **Interfering Behaviors.**    Without ESY Services, any interfering behavior, targeted by IEP objectives, is likely to prevent progress.  The interruption of programming that addresses the interfering behaviors is likely to substantially compromise the student's school program.

## ELIGIBILITY DETERMINATION

1.  Does the nature or severity of the disability prevent the student from receiving measurable benefits from the educational program during the regular school year?

2.  Will the student demonstrate substantial regression in critical skills with ESY, thus preventing him/her from receiving measurable benefit from the educational program during the regular school year?

3.  Has the student demonstrated emerging skills/breakthrough in critical skills, which will be lost without ESY Services, thus preventing him/her from receiving some benefit from the educational program during the regular school year?

4.  Are there interfering behaviors, such as stereotypic, ritualistic, aggressive, or self-injurious, which will prevent him/her from receiving measurable benefit from an educational program during the regular school year?

5.  Are there circumstances (i.e., vocational needs, interaction with non-disabled peers, ability of child's parent to provide structure in the home), which prevent the student from receiving measurable benefit from an educational program during the regular school year?

6.  Does the student need ESY to maintain current level of information, skills, and behaviors in areas necessary for self-sufficiency?

**NOTE:  Yes to 4 or more of the aforementioned inquiries indicate a presumption of eligibility.**

Karen Griffin
Director of Special Projects  11-9-01

EXHIBIT

AL-14

ALL-STATE LEGAL®

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 10, 2005          Decided March 25, 2005

No. 04-7051

GWENDOLYN REID, AS MOTHER AND NEXT FRIEND OF
MATHEW REID, A MINOR,
APPELLANT

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01611)

---

*Keith A. Noreika* argued the cause for appellant. With him on the briefs were *Carolyn F. Corwin, Jennifer E. Schwartz*, and *Robert I. Berlow*.

*Mary T. Connelly*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

Before:    SENTELLE, HENDERSON, and TATEL, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*:  When a school district deprives a disabled child of free appropriate public education in violation of the Individuals with Disabilities Education Act, a court fashioning "appropriate" relief, as the statute allows, may order compensatory education, i.e., replacement of educational services the child should have received in the first place.  This commonsense proposition—conceded by the school district here and supported by the Supreme Court's decision compelling reimbursement for such services in *School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985)—led a hearing officer to award appellant, a sixteen-year-old with severe learning disabilities, 810 hours of compensatory education, one hour for each day in the four-and-a-half years during which the school system denied the student appropriate instruction.  Pointing out that neither reasoning nor evidence supported this hour-per-day calculation and insisting that hour-per-hour relief was instead the child's due, the child and his mother argue that the hearing officer abused his authority.  They also challenge the officer's decision to allow the child's "individualized education program team" to reduce or discontinue compensatory services "on the decision of the IEP team that Minor no longer needs or is not benefitting from this compensatory education."  Because we agree that the hearing officer's mechanical calculation merits no deference and that the IEP team delegation violates the statute, we reverse the district court's grant of summary judgment to the school district.  We reject, however, appellants' equally mechanical hour-per-hour calculation and instead adopt a qualitative standard:  compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.

184

3

## I.

Under the Individuals with Disabilities Education Act (known as "IDEA"), states and territories, including the District of Columbia, that receive federal educational assistance must establish "policies and procedures to ensure," among other things, that "free appropriate public education," or "FAPE," is available to disabled children. *See* 20 U.S.C. § 1412(a)(1)(A). Premised on Congress's expectation that "[w]ith proper education services, many [disabled individuals] would be able to become productive citizens, contributing to society instead of being forced to remain burdens," S. Rep. No. 94-168, at 9 (1975) (discussing predecessor to IDEA), this requirement furthers "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities," 20 U.S.C. § 1400(c)(1). School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction. Instead, school systems must ensure that "[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated." *Id.* § 1412(a)(3)(A). Once such children are identified, a "team" including the child's parents and select teachers, as well as a representative of the local educational agency with knowledge about the school's resources and curriculum, develops an "individualized education program," or "IEP," for the child. *See id.* §§ 1412(a)(4), 1414(d). Pursuant to the Supreme Court's decision in *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176 (1982), the IEP must, at a minimum, "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *See id.* at 203. In addition, "if the child is being educated in the regular classrooms of the public education system, [the IEP] should be reasonably

185

4

calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. "If no suitable public school is available, the [school system] must pay the costs of sending the child to an appropriate private school." *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991).

In this case, as two successive administrative hearings established and as the District of Columbia, appellee herein, now concedes, the District of Columbia Public Schools ("DCPS") failed to meet its IDEA obligations with respect to appellant Mathew Reid. A sixteen-year-old District of Columbia resident, Mathew suffers from documented learning disabilities, including dyslexia and attention deficit hyperactivity disorder, that affect his short-term auditory memory, formation of grammatical sentences, and articulation of word sounds. Though Mathew's mother had noticed by the fall of her son's second-grade year that he had difficulty reading, when she contacted a school district counselor, the counselor refused to provide the necessary form for requesting a disability evaluation. The following spring, during a meeting with Mathew's teacher and school principal, the teacher recommended that Mathew be retained in second grade due to behavioral and academic problems. According to Ms. Reid, however, the principal told her that "she didn't believe that Matthew really needed to be kept back."

Mathew spent the next year in California and then returned to D.C. By that time, test scores placed him in the bottom one percent of his age group for reading comprehension and the bottom five percent for reading overall. Nonetheless, without performing any disability evaluation, the school district placed Mathew in a regular fourth-grade class. Only after a full school year of unsatisfactory grades did DCPS recognize Mathew's disability and develop an IEP.

Under this IEP, Mathew was retained in fourth grade and attended ten hours per week of special education instruction plus

5

twice-weekly half-hour language therapy sessions and one half hour per week of counseling. In accordance with IDEA's preference for avoiding separate instruction "[t]o the maximum extent possible," *see* 20 U.S.C. § 1412(a)(5), Mathew spent the remainder of the school day mainstreamed in regular classes, but received accommodations such as preferential seating and extended time for assignments. Two years later, DCPS revised Mathew's IEP to provide seventeen-and-a-half hours of special education services per week. Despite these services, testing in November of Mathew's sixth-grade year revealed him reading at a second-grade level, even though six months earlier he had been reading at a third-grade level. Mathew's overall intellectual ability placed him in the ninth percentile for his age.

Despite further testing confirming these results, Mathew's IEP team made no change in his program until April of that school year. At that point, presumably because Mathew's math skills had risen from low fourth-grade level to low sixth-grade level (though at the time Mathew was entering seventh grade and was old enough to be entering eighth), the team eliminated 250 minutes per week of math tutoring while adding 200 minutes per week of reading instruction and fifteen extra minutes per week of counseling.

Objecting to this new IEP, Mathew's mother exercised her statutory right to demand an "impartial due process hearing," *see* 20 U.S.C. §§ 1415(b)(6), (e)(1), (f)(1). She argued that "the IEP is inappropriate because Mathew requires a full-time special education program and the IEP calls for a part time special education program." The hearing officer agreed. Based on "the student's serious and extensive needs and the glaring inappropriateness of the IEP in terms of placing Mathew in a part-time program when he requires a full-time program," the officer ordered the school district to place Mathew in "a full-time special education program with a low student teacher ratio and intensive work in reading with the other related services,"

6

designating one such program, the Accotink Academy, as Mathew's placement "at least on an interim basis." "This is a student who is capable of doing better," the hearing officer wrote, "and as he approaches adolescence, the likelihood of his remaining interested in staying in school will decrease if his reading level stays at a second grade level."

To make up for deficiencies in Mathew's prior education, Ms. Reid also sought extra instruction beyond his Accotink Academy IEP—in other words, "compensatory education." In separate proceedings related to that claim, a second hearing officer heard expert testimony indicating, among other things, that in struggling to read, Mathew had "learned compensatory strategies that are counterproductive," that "there was a gap in between what [Mathew] was capable of, and actually what he was performing," and that because of academic and interpersonal difficulties, Mathew had grown "significantly depressed." Three experts—a psychologist, a speech language pathologist/audiologist, and an educational consultant—all testified that the school district should have known Mathew was disabled in second grade or earlier. Based on this evidence, and building on the earlier hearing, the hearing officer concluded that DCPS had denied Mathew FAPE for roughly four-and-a-half years, from midway through second grade until the Accotink placement at the end of sixth grade (skipping Mathew's year in California and counting both fourth-grade years).

As a remedy, the officer ordered 810 hours of compensatory education, a figure he derived by awarding "1 hour for each day of special education services not provided." Indicating neither why he chose this formula nor what specific services should be provided, the officer empowered Mathew's IEP team to "direct[]" implementation of the award. "The services are to be reduced or discontinued," he added, "on the decision of the IEP team that Minor no longer needs or is not benefitting from this

188

7

compensatory education. The team's decision that Mathew no longer needs or is not benefitting from this award of compensatory education services will terminate this award. The team decision and reasoning in this regard are to be fully explained in the IEP meeting notes."

Under IDEA, parties aggrieved by an administrative decision may sue in either state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). The court then "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *See id.* § 1415(i)(2)(B). Seeking such review in the U.S. District Court for the District of Columbia, Mathew and his mother challenged both the number of hours awarded as compensatory instruction and the allowance for reduction or termination by the IEP team. On cross-motions for summary judgment, the district court rejected the Reids' two claims (as well as a third argument not renewed here) and affirmed the administrative award. *See Reid v. District of Columbia*, 310 F. Supp. 2d 137 (D.D.C. 2004). The Reids now appeal.

## II.

We begin with our standard of review. Though conceding that judicial review under IDEA is more rigorous than in typical agency cases, the school district argues that both our review of the district court and the district court's review of the hearing officer should be deferential. We disagree on both counts.

To start with the standard applicable in the district court, it is true that under our precedent "a party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *See Kerkam v. McKenzie*, 862 F.2d 884,

8

887 (D.C. Cir. 1989) ("*Kerkam I*"). But we have also made clear that given the district court's authority to "hear additional evidence at the request of a party" and "bas[e] its decision on the preponderance of the evidence," *see* 20 U.S.C. §§ 1415(i)(2)(B)(ii), (iii), IDEA "plainly suggest[s] less deference than is conventional" in administrative proceedings. *See Kerkam I*, 862 F.2d at 887. Moreover, a hearing decision "without reasoned and specific findings deserves little deference." *See Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) ("*Kerkam II*") (internal quotation marks omitted).

In this case, although the hearing officer made express findings regarding DCPS's four-and-a-half-year denial of FAPE, he set forth the 810-hour award in a one-sentence ipse dixit. "At rate of 1 hour for each day of special education services not provided," he wrote, "DCPS is to provide 810 hours (4.5 multiplied by 180 school days) of compensatory education services to Mathew as his IEP team directs." The officer's order contains neither reasoning to support this hour-per-day formula nor factual findings showing that the 810-hour result satisfied Mathew's needs. Accordingly, the district court, obligated by IDEA to ensure that relief set forth in the administrative award was "appropriate," could not simply rely on the hearing officer's exercise of discretion. Instead, the court had to examine the record itself. Nor, regarding the other issue in this case, could the court defer to the officer's decision to delegate authority to the IEP team, for the officer's implicit ruling on that issue—that IDEA permits such delegations—raises an issue of statutory construction, a pure question of law that courts review de novo. Thus, on neither issue in this appeal could the district court presume the validity of the hearing officer's action.

We reach a similar conclusion regarding the standard governing our review of the district court's decision. As noted above, trial judges in IDEA cases may "hear additional

190

9

evidence" and fashion "appropriate relief." *See* 20 U.S.C. §§ 1415(i)(2)(B)(ii), (iii).    These powers of fact-finding and remedy-crafting, the Supreme Court has explained, entail "broad discretion" and implicate "equitable considerations." *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993) (internal quotation marks omitted).  Thus, had the district court actually exercised those powers, our review would be deferential—clear error as to any factual findings and abuse of discretion as to the remedy. *See Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 466-67 (7th Cir. 2000) (fact-finding); *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994) (remedial discretion).  In this case, however, the district court granted summary judgment based simply on the administrative record.  Applying the familiar Rule 56 standard, the court took no additional evidence, but viewed the record in the light most favorable to plaintiffs and concluded that the administrative award was appropriate. *See Reid*, 310 F. Supp. 2d at 144-45, 153 (applying standard of review based on Fed. R. Civ. P. 56).  On appeal, therefore, we find ourselves in exactly the same position as the district court.  Accordingly, we review its decision de novo as in an ordinary summary judgment case, *see, e.g., Maydak v. United States*, 363 F.3d 512, 515 (D.C. Cir. 2004), and apply the same non-deferential standard the district court should have applied to the hearing decision.

With these principles in mind, we turn to the disputed issues:  the compensatory education amount and the IEP team delegation.

### Compensatory Award

Under the theory of "compensatory education," courts and hearing officers may award "educational services . . . to be provided prospectively to compensate for a past deficient program." *See G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003).  Embraced in some form by

10

several circuits, *see, e.g., id.* at 308-09; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 249 (3d Cir. 1999); *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ.,* 79 F.3d 654, 656 (7th Cir. 1996); *Parents of Student W.,* 31 F.3d at 1496; *Pihl v. Mass. Dep't of Educ.,* 9 F.3d 184, 188-89 (1st Cir. 1993); *Miener v. Missouri,* 800 F.2d 749, 753 (8th Cir. 1986); *see also Diatta v. District of Columbia,* 319 F. Supp. 2d 57, 65 (D.D.C. 2004), this theory builds on the Supreme Court's holding in *Burlington* that "appropriate" IDEA relief may include reimbursement for parents who place children in private school rather than accept a deficient public school IEP, *see* 471 U.S. at 369. If IDEA permits reimbursement for educational services, courts have reasoned, then it must also allow awards of the services themselves. *See, e.g., Bd. of Educ. of Oak Park & River Forest High Sch.,* 79 F.3d at 655-56; *Pihl,* 9 F.3d at 188-89; *Miener,* 800 F.2d at 753. Based on such logic, courts have upheld awards requiring, among other things, special programs to make up for prior deficiencies, *see, e.g., Diatta,* 319 F. Supp. 2d at 65; *Westendorp v. Indep. Sch. Dist. No. 273,* 35 F. Supp. 2d 1134, 1135-36, 1137 (D. Minn. 1998); *cf. G. ex rel. RG,* 343 F.3d at 299, 309 (remanding claim of eleven-year-old), and instruction beyond age twenty-one (ordinarily the limit of IDEA coverage, *see* 20 U.S.C. § 1412(a)(1)(A)), *see, e.g., Ridgewood Bd. of Educ.,* 172 F.3d at 249; *Pihl,* 9 F.3d at 189-90.

In our view, this extension of *Burlington* to cover services as well as payments makes eminent sense. Given the availability of reimbursement for compensatory instruction, were it impossible to obtain an award of the instruction itself, children's access to appropriate education could depend on their parents' capacity to front its costs—a result manifestly incompatible with IDEA's purpose of "ensur[ing] that *all* children with disabilities have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A) (emphasis added). Even worse, students who remained in public

192

11

school would lack any effective redress for FAPE denials, even those extending over many years, as in Mathew's case. To be sure, such students could seek prospective correction of a deficient IEP, as the Reids did in the first administrative proceeding described above. But because the *Rowley* standard requires only that schools provide "some educational benefit," *see Rowley*, 458 U.S. at 200—a standard that looks to the child's present abilities—an IEP conforming to that standard carries no guarantee of undoing damage done by prior violations. As this case demonstrates, moreover, that damage may be quite severe: according to expert testimony, Mathew not only failed to keep pace with his peers under the school district's IEP, but actually learned "counterproductive" compensatory techniques that he must now unlearn before he may advance. Consistent with Congress's stated aim of "ensur[ing] that the rights of children with disabilities and parents of such children are protected," *see* 20 U.S.C. § 1400(d)(1)(B), we therefore join our sister circuits and hold that compensatory education awards fit comfortably within the "broad discretion" of courts fashioning and enforcing IDEA remedies, *see Carter*, 510 U.S. at 15-16.

That said, we part company with the Reids regarding how such awards are calculated. They urge us to adopt a presumption that each hour without FAPE entitles the student to one hour of compensatory instruction, a standard apparently embraced by several courts. *See, e.g., M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391-92, 396-97 (3d Cir. 1996) (holding that when "a school district . . . knows or should know" that a disabled child's educational program is deficient yet fails to correct the problem, the child "is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem"); *Westendorp*, 35 F. Supp. 2d at 1137 (holding that "where [plaintiff] was denied his IDEA rights for six academic years, the court will presume that he is entitled to six academic years of compensatory relief"). In our view, this

12

cookie-cutter approach runs counter to both the "broad discretion" afforded by IDEA's remedial provision and the substantive FAPE standard that provision is meant to enforce.

As to the remedial provision, the Supreme Court has emphasized that IDEA relief depends on "equitable considerations." *See Carter*, 510 U.S. at 15-16; *Burlington*, 471 U.S. at 374. Accordingly, "compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting 'appropriate relief.'" *Parents of Student W.*, 31 F.3d at 1497. More specifically, as the Fourth Circuit has explained, "[c]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. ex rel. RG*, 343 F.3d at 309. Overlooking this equitable focus, the Reids' hour-for-hour formula in effect treats compensatory education as a form of damages—a charge on school districts equal to expenditures they should have made previously. Yet "[t]he essence of equity jurisdiction" is "to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). In keeping with that principle of case-specific flexibility, we agree with the Ninth Circuit that "[t]here is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W.*, 31 F.3d at 1497.

Reinforcing this conclusion, the substantive FAPE standard—the rule of law the Reids seek to enforce—also carries a qualitative rather than quantitative focus. As IDEA itself states, the statute's aim is to guarantee disabled students "specialized education and related services *designed to meet their unique needs*." *See* 20 U.S.C. § 1400(d)(1)(A) (emphasis

13

added).  Hence, as the Supreme Court explained in *Rowley*, "the
basic floor of opportunity provided by the Act consists of access
to specialized instruction and related services which are
*individually designed* to provide educational benefit to the
handicapped child." *See* 458 U.S. at 201 (internal quotation
marks omitted) (emphasis added).  We think it would be highly
incongruous if this qualitative focus on individual needs gave
way to mechanical hour-counting when past rather than current
violations of the FAPE standard were at issue.  Accordingly, just
as IDEA's focus on disabled students' individual needs, so too must
awards compensating past violations rely on individualized
assessments.

Unlike the Reids' one-for-one standard, this flexible
approach will produce different results in different cases
depending on the child's needs.  Some students may require
only short, intensive compensatory programs targeted at specific
problems or deficiencies.  Others may need extended programs,
perhaps even exceeding hour-for-hour replacement of time spent
without FAPE.  In addition, courts have recognized that in
setting the award, equity may sometimes require consideration
of the parties' conduct, such as when the school system
reasonably "require[s] some time to respond to a complex
problem," *M.C.*, 81 F.3d at 397, or when parents' refusal to
accept special education delays the child's receipt of appropriate
services, *Parents of Student W.*, 31 F.3d at 1497.  In every case,
however, the inquiry must be fact-specific and, to accomplish
IDEA's purposes, the ultimate award must be reasonably
calculated to provide the educational benefits that likely would
have accrued from special education services the school district
should have supplied in the first place.

Given this standard, neither party in this case is entitled to
summary judgment.  As to the Reids, because we reject the one-
for-one formula they advocate, the amount of compensatory
education appropriate in Mathew's case cannot be determined

195

14

as a matter of law. Rather, designing Mathew's remedy will require a fact-specific exercise of discretion by either the district court or a hearing officer. As to the school district, although 810 hours certainly seems like a significant award, without grounds for deference to the hearing officer we may conclude at summary judgment that this remedy was correct as a matter of law only if our review of the record reveals that any greater remedy would amount to an abuse of discretion. We cannot reach that conclusion because, drawing all inferences in Mathew's favor, as we must at summary judgment, *see, e.g., Maydak*, 363 F.3d at 515, we have no basis for concluding that 810 hours—barely more than half of a single academic year—would suffice to make up for Mathew's four-and-a-half years without FAPE, especially considering that during that period he developed "counterproductive" reading habits.

The district court appears to have granted summary judgment to the school district simply because it assumed that compensatory awards need only provide "some benefit" going forward, as in an ordinary non-compensatory IEP under *Rowley*. Applying this standard and assuming that it could defer to the hearing officer, the district court faulted Mathew for "fail[ing] to offer proof regarding why the hearing officer's award is 'inappropriate' to achieve what is required by the Act, *i.e.*, a basic floor of opportunity and 'access to specialized instruction and related services which are individually designed to provide educational benefit to [Mathew].'" *See Reid*, 310 F. Supp. 2d at 150 (quoting *Rowley*, 458 U.S. at 201) (alteration in original). In particular, based on the additional assumption that the Accotink Academy IEP already compensated Mathew to some degree, the court faulted the Reids for "fail[ing] to provide the Court with a copy of Mathew's current IEP," a lapse the court believed left it "unable to assess whether the services [Mathew] is already receiving are inadequate to compensate for the prior denial of FAPE, which might justify a larger compensatory education award." *Id.* at 152.

196

15

As we have explained, however, whereas ordinary IEPs need only provide "some benefit," compensatory awards must do more—they must *compensate.* Accordingly, the district court should not have assumed that the Accotink Academy placement, based as it was only on *Rowley,* provided compensation. If anything, at summary judgment the court should have assumed the opposite, requiring DCPS to offer proof that the placement compensated for prior FAPE denials in addition to providing some benefit going forward. Nor should the district court have assumed the adequacy of the 810-hour award, for that award, as we have also explained, deserved "little deference," *Kerkam II,* 931 F.2d at 87 (internal quotation marks omitted). To be sure, as the "party challenging the administrative determination," the Reids "must at least take on the burden of persuading the court that the hearing officer was wrong," *Kerkam I,* 862 F.2d at 887, but given the minimal deference owed to the hearing award in this case, they could satisfy that burden simply by pointing to the award's evident arbitrariness. Thus, with the district court's incorrect assumptions stripped away, the Reids' failure to present evidence beyond the administrative record provides no justification for awarding summary judgment to the school district.

Offering yet another theory for affirming the hearing award, the school district argues that because the Reids based their challenge to the compensatory education award on their favored one-for-one standard, reversing the district court's grant of summary judgment would require us to accept that mechanical approach. We disagree. Although the Reids focus on the one-for-one theory here, as they did in the district court, the relevant claim in their complaint states not that Mathew was entitled to hour-for-hour relief, but rather that the hearing officer erred by "limit[ing] relief to one hour for each day that defendants denied a free public education to Mathew Reid." *See* Compl. at 6. Moreover, based on that theory, Mathew sought not just an injunction directing defendants to provide an amount of

197

16

compensatory education consistent with the hour-for-hour formula, but also a declaration that the administrative award "did not adequately compensate Mathew Reid for defendants' denial of a free appropriate education to Mathew Reid." *See id.* at 7. Far from waiving their claim to the latter relief, the Reids assert here, again as they did in the district court, that "[t]he absence of any explanation or support in the record before the hearing officer itself would be enough to require reversal of the district court's decision." Appellant's Br. at 19; *see also Reid*, 310 F. Supp. 2d at 146 n.7 (discussing Reids' argument that "the hearing officer 'fail[ed] to acknowledge the appropriateness standard, fail[ed] to explain why one hour of compensatory education for each day of FAPE denied is "appropriate," and fail[ed] to explain why a lump sum award of five years . . . is not appropriate'" (quoting plaintiffs' memorandum) (alterations and ellipsis in original)). Because this claim to relief based solely on the hearing award's inadequacy is entirely consistent with our analysis here, we see no reason why our disagreement with the Reids' favored one-for-one formula should compel us to endorse the hearing officer's equally flawed hour-per-day approach.

Accordingly, we will affirm the district court's denial of the Reids' motion but reverse its grant of summary judgment to the school district. On remand, the district court may solicit additional evidence from the parties and fashion an appropriate compensatory education award based on the principles outlined in this opinion. *See* 20 U.S.C. § 1415(i)(2)(B). Alternatively, in light of the absence of pertinent findings in the administrative record and given that both parties previously filed cross-motions for summary judgment rather than exercising their right to "request" consideration of additional evidence, the district court may determine that the "appropriate" relief is a remand to the hearing officer for further proceedings. *See, e.g., JH ex rel. JD v. Henrico County Sch. Bd.*, 395 F.3d 185, 198 (4th Cir. 2005) (remanding IDEA suit to district court with instructions to remand to hearing officer); *Shapiro v. Paradise Valley Unified*

198

17

*Sch. Dist. No. 69*, 152 F.3d 1159, 1160 (9th Cir. 1998) (ordering district court to stay proceedings and remand to hearing officer). Whichever path the court chooses, the parties must have some opportunity to present evidence regarding Mathew's specific educational deficits resulting from his loss of FAPE and the specific compensatory measures needed to best correct those deficits.

### The IEP Team

The Reids' second challenge raises a straightforward question of law: may IDEA hearing officers authorize IEP teams to "reduce or discontinue" compensatory education awards? Disagreeing with the district court, we answer no.

As the Reids point out, IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child." *See* 20 U.S.C. § 1415(f)(3). The award at issue runs afoul of this prohibition, for Mathew's IEP team, like any other, must include "a representative of the local educational agency," *see id.* § 1414(d)(1)(B)(iv)—presumably an employee of that agency—and when modifying an award set by the hearing officer the IEP team would in effect exercise the officer's powers. It makes no difference that the IEP team also includes non-employees such as Mathew's mother. Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions.

Nor does it make any difference that IDEA affords "procedural safeguards" to protect parents and students from arbitrary action by IEP teams. *See Reid*, 310 F. Supp. 2d at 153. To be sure, if Mathew's team reduced his award, his mother could again seek a due process hearing and even judicial review. Yet as IDEA makes plain, hearing awards "shall be final" unless modified through administrative appeal or judicial action.

18

*See* 20 U.S.C. § 1415(i)(1)(A).    Consistent with that requirement, once a parent challenges an IEP and obtains final relief, as Ms. Reid has done, preservation of that relief requires no further action on the parent's part.    To the contrary, before any reduction in an adjudicated award of compensatory instruction may take effect, the school district—the party whose failures, after all, necessitated awarding relief in the first place—must initiate new proceedings before a hearing officer. *Cf. Helms v. McDaniel*, 657 F.2d 800, 805 (5th Cir. 1981) ("To appoint an officer to conduct the hearing but then to treat his report only as a recommendation violates the Act's requirement that the decision of the hearing officer be final unless appealed.").    By the same token, of course, any increase sought by Ms. Reid over the school district's objection must be justified to a hearing officer.    The point is that absent a new hearing, the existing award is binding on both parties.

In sum, while the IEP team certainly must monitor Mathew's progress and coordinate compensatory relief with his current IEP, a delegation that permits the team to reduce or terminate his awarded amount of compensatory education exceeds the statute's bounds.    We will therefore reverse the district court's ruling on this issue.

## III.

Neglected by the school system charged with affording him free appropriate education, Mathew Reid is entitled to compensatory instruction.    He is not entitled, however, to an amount of such instruction predetermined by a cookie-cutter formula, but rather to an informed and reasonable exercise of discretion regarding what services he needs to elevate him to the position he would have occupied absent the school district's failures.    Accordingly, the district court's award of summary judgment to the school district is reversed and the matter remanded for further proceedings consistent with this opinion.

19

Any modified award may not delegate authority to the IEP team to reduce or discontinue the prescribed compensatory instruction.

*So ordered.*

*Henderson, Circuit Judge, concurring in the judgment*:  I agree that this case should be remanded because the district court relied on an inadequate administrative record to support the administrative law judge's (ALJ's) award of 810 hours of compensatory education to Mathew Reid.  Nevertheless, I write separately to emphasize my view that, despite the district court's equitable authority under the Individuals with Disabilities Act (IDEA), *see Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985), to "hear additional evidence at the request of a party" and "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(B)(ii) & (iii), the record in an IDEA case is supposed to be made not in the district court but primarily at the administrative level, where the parties and the school authorities, sometimes with input from other professionals, can tailor an individualized education plan (IEP) to the student's needs.  *Id.* at § 1415(f)(1)–(2) & (h).  Denying a party's request to hear additional evidence is a valid exercise of the district court's discretion that should be upheld except where, as here, the administrative record is deficient.  Had the ALJ made a sufficient record, I would not have hesitated to affirm the district court's grant of summary judgment without additional proceedings.

202

*Henderson, Circuit Judge, concurring in the judgment*: I agree that this case should be remanded because the district court relied on an inadequate administrative record to support the administrative law judge's (ALJ's) award of 810 hours of compensatory education to Mathew Reid. Nevertheless, I write separately to emphasize my view that, despite the district court's equitable authority under the Individuals with Disabilities Act (IDEA), *see Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985), to "hear additional evidence at the request of a party" and "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(B)(ii) & (iii), the record in an IDEA case is supposed to be made not in the district court but primarily at the administrative level, where the parties and the school authorities, sometimes with input from other professionals, can tailor an individualized education plan (IEP) to the student's needs. *Id.* at § 1415(f)(1)-(2) & (h). Denying a party's request to hear additional evidence is a valid exercise of the district court's discretion that should be upheld except where, as here, the administrative record is deficient. Had the ALJ made a sufficient record, I would not have hesitated to affirm the district court's grant of summary judgment without additional proceedings.

203

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE

1150 5th Street, S.E. .
1st Floor
Washington, D.C. 20003
PHONE: (202) 442-5432
FAX: (202) 698-3825



### HEARING NOTICE

| MEMORANDUM VIA: [√] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:      Parent (or Representative): **J. Tillery**          Fax No.:     **(202) 742-2098**


LEA Legal Counsel:      **OGC**


RE:      ~~L____, A_____~~          and (LEA)  DOB:     ~~____~~95
         Student's Name

FROM:    SHARON NEWSOME
         Special Education Student Hearing Office Coordinator

DATE SENT:     **5-30-07**

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 4-9-07.
Please be advised that the hearing has been scheduled for:

         DATE:     **6-11-07**

         TIME:     **9:00 AM**

         AT:       1150 5th Street., S. E. , Washington, D.C. 20003
                   1st Floor

         ASSIGNED HEARING OFFICER: _____

[ ] **THIS IS A FINAL NOTICE OF HEARING**: If you wish to request a continuance of this hearing, you must submit your request to
the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances
are made *exclusively* by the Hearing Officer, and cannot be made by **SHO** administrative staff. Unless you receive notice that the
Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[ ] **THIS IS A PROVISIONAL NOTICE OF HEARING**: The SHO was unable to accommodate any of your proposed dates. If you
are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times
during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the
SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a
final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of
evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special
Education Student Hearing Office.

204

# District of Columbia Public Schools
### *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
1150 5th Street, S.E. .
1st Floor
Washington, D.C. 20003
PHONE: (202) 442-5432
FAX: (202) 698-3825



HEARING NOTICE

| MEMORANDUM VIA: [ √ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative): **J. Tillery**       Fax No.:    **(202) 742-2098**


        LEA Legal Counsel:     **OGC**


RE:         I■■, A■■■■■        and (LEA)  DOB:      ■■/95
            Student's Name

FROM:     ___SHARON NEWSOME_____
            Special Education Student Hearing Office Coordinator

DATE SENT:     **5-30-07**

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 4-9-07. .
Please be advised that the hearing has been scheduled for:

        DATE:     **6-11-07**

        TIME:     **9:00 AM**

        AT:     1150 5th Street., S. E. , Washington, D.C. 20003
                1st Floor

        ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to
the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances
are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the
Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[ ] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you
are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times
during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the
SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a
final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of
evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special
Education Student Hearing Office.

205

```
TRANSMISSION VERIFICATION REPORT
```

```
                                    TIME : 05/30/2007 14:18
                                    NAME : STUDENT HEARING
                                    FAX  : 2026983825
                                    TEL  : 2026983819
                                    SER.# : BROE6J471574
```

```
DATE,TIME              05/30  14:18
FAX NO./NAME           97422098
DURATION               00:00:17
PAGE(S)                01
RESULT                 OK
MODE                   STANDARD
                       ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
1150 5th Street, S.E. .
1st Floor
Washington, D.C. 20003
PHONE: (202) 442-5432
FAX: (202) 698-3825



HEARING NOTICE

| MEMORANDUM VIA: [√] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |

TO:     Parent (or Representative): **J. Tillery**      Fax No.:   **(202) 742-2098**


        LEA Legal Counsel:     **OGC**


RE:     ~~L——, A————~~          and (LEA) DOB:      ~~——795~~
        Student's Name

FROM:   __SHARON NEWSOME__
        Special Education Student Hearing Office Coordinator

DATE SENT:     **5-30-07**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 4-9-07.
Please be advised that the hearing has been scheduled for:

        DATE:     **6-11-07**                                                      206
        ——  ——   9:00 AM

## STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
## STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
## SPECIAL EDUCATION PROGRAMS

Theresa Lee, on behalf of                              )
A.L. (a minor), DOB: ███████, 1995                     )
    Petitioner                     )
                                                        )
v.                                                      )
                                                        )
District of Columbia Public Schools                     )
                                                        )
    Respondent                     )
_____                     )

### MOTION FOR DEFAULT JUDGMENT FOR FAILURE TO RESPOND

**COMES NOW,** Theresa Lee, by and through her attorneys, the Law Offices of James E. Brown & Associates, PLLC (hereinafter "counsel"), request that a Motion for Default Judgment be granted against the District of Columbia Public Schools (hereinafter "DCPS"), for their failure to comply with the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C.1415(c)(2)(B) and respond at least 10 days after receiving the complaint.

On April 9, 2007, the parent by and through her attorneys, filed an administrative due process complaint alleging that DCPS denied access to a Free and Appropriate Education when it failed to 1) conduct an annual review of the student's IEP, 2) provide the student with agreed upon compensatory services, and 3) provide the student with Extended School Year Services (ESY) for the summer of 2005.

The petitioner requests that a default judgment be entered for the petitioner pursuant to Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. 1415(c)(2)(B) because DCPS failed to respond with 10 days of receiving the complaint.

**WHEREFORE,** the complainant, by and through counsel, hereby requests the following relief:

1. A finding that DCPS failed to respond within 10 days of receiving the complaint as required under 20 U.S.C. 1415(c)(2)(B); and

2. A default finding that DCPS denied A.L. a Free and Appropriate Public Education in regards to all allegations contained in the parent's administrative complaint of April 9, 2007, and an order that DCPS must complete and fulfill all relief requested in the Complaint.

207

_____

Jani Tillery, Esq.
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2000 (Telephone)
202-742-2097/2098 (Fax)
Counsel for the Parent

## CERTIFICATE OF SERVICE

    I, Jani Tillery, Esq., hereby certify that a copy of the *Petitioner's Motion for Default Judgment* was served to the District of Columbia Public Schools' Office of Student Hearings, via facsimile, at 202-442-5556, and the Office of General Counsel, for the District of Columbia Public Schools via facsimile, at 202-442-5097/5098.

_____

Jani Tillery, Esq.
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2005
Counsel for the Parent

2

208

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | Attorneys at Law | |
|---|---|---|
| James E. Brown | | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | Roxanne D. Neloms |
| Miguel A. Hull | Washington, DC 20005 | Omar Karram |
| Christopher L. West | Telephone: (202) 742-2000 | Christie Fontaine-Covington |
| John A. Straus | Facsimile: (202) 742-2098 | Jani Tillery |
| | e-mail: Admin@Jeblaw.biz | |

‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐‐

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:   David Smith, Student Hearing Office

FROM: Clarence Hayes, Paralegal to Jani Tillery, Esq.

DATE:  April 24, 2007

FAX NO: 202-442-5556

SUBJECT: A▨▨▨ L▨▨, DOB: ▨▨-95

NUMBER OF PAGES INCLUDING COVER SHEET:   3

COMMENTS:   Motion for Judgement

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

STATE EDUCATION AGENCY
DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| I⬛, A.                    Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| PUBLIC | ) | |
| Attending Nativity Catholic Academy | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.    A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint within 15 calendar days of receiving notice of the parents' complaint. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.    The complaint notice was filed on **April 9, 2007**

3.    The deadline for the resolution meeting is   **April 24. 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

**RESPONSE TO THE COMPLAINT**

A.    _**Prior Written Notice Not Issued by the Local Educational Agency**_.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include:

1.    An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;

2.    A description of other options that the IEP Team considered and the reasons why those options were rejected;

3.    A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

4.    A description of the factors that is relevant to the agency's proposal or refusal.

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **April 19, 2007**.

C.    **_Deficiency Notice_**.  A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **April 24, 2006**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.  A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.  The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.  The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Attorney:Jani Tillery, Esq.**
**Parent: Theresa Lee**

Telephone Number: **(202) 742-2000**
Fax Number: **(202) 742-2097**

Pages: **3**
Date: **April 9, 2007**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **A̶̶̶̶ L̶̶̶**
School: **Attending Nativity Catholic Academy**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

**Thank You**
**Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West
John A. Straus
-----------------------------------

Juan J. Fernandez!+
Tilman L. Gerald
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington
Jani Tillery
--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

**TO:**   Sharon Newsome, Hearing Coordinator
Student Hearing Office

**FROM:** Clarence Hayes, Paralegal to Jani Tillery, Esq.

**DATE:** April 9, 2007

**FAX NO:** 202-442-5556

**SUBJECT:** Antonio Lee, DOB: ███-95

**NUMBER OF PAGES INCLUDING COVER SHEET:**   9

**COMMENTS:** Administrative Due Process Complaint Notice

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

213

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# ADMINISTRATIVE DUE PROCESS
# COMPLAINT NOTICE

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.  INFORMATION ABOUT THE STUDENT:

Name of the Student:  _A████ L██_ Date of Birth: _█████ 1995_

Address: _722 Girard Street, N.W., Washington, DC 20001_

Present School of Attendance: __Nativity Catholic Academy___

214

Parent/Guardian of the Student: __Ms. Theresa Lee____

**B.      Legal Representative/Attorney (if applicable):**

Name: ____Jani S. Tillery, Esq.____

Address: ____1220 L Street, NW, Suite 700, Washington, DC 20005____

Phone: (w) _202-742-2000_ (Fax) _202-742-2097_ (e-mail) _____

Will attorney / legal representative attend the resolution session?     **X** Yes        ☐ No

**C.      Complaint Made Against (check all that apply):**

**X** DCPS
☐ Charter school (name of the charter school if different from page one)_____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**D.      Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution meeting to avoid having this meeting.)

**X** I wish to waive the Resolution Session Meeting

**E.      Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

**I am requesting an administrative due process hearing _only_ at this time.**

**F.      Facts and Reasons for the Complaint:**

**I.   Background Information**

1.  The student's name is A▬▬▬ L▬▬.

2.  The student's date of birth is ▬▬▬, 1995.

3.  The student's address is 722 Girard Street, N.W., Washington, D.C. 20001

2

215

4. The student's home school is Bruce-Monroe Elementary School in the District of Columbia.

5. The student currently attends Nativity Catholic Academy in the District of Columbia.

6. On May 26, 2005, the IEP team convened and drafted an initial IEP. The student was identified as a student with specific learning disabilities. The IEP provides for him to receive 5 hours of specialized instruction per week. *See* IEP meeting notes, dated May 26, 2005.

7. The May 26, 2005, IEP provided for ten (10) hours of ESY services per week for the summer of 2005. *See* IEP Addendum for ESY Services, dated May 26, 2005.

8. On May 26, 2005, a compensatory education plan was developed. The compensatory education services were to begin on May 27, 2005. *See* Compensatory Education Plan, dated May 26, 2005.

9. DCPS failed to implement the compensatory education plan and extended school year services as agreed by the team in the May 26, 2005 IEP meeting.

10. On April 6, 2007, the parent, through counsel, requested a comprehensive reevaluation of the student, including a psycho-educational, speech and language, audiological, and social history evaluation.

11. The student is in danger of failing the 5th grade.

## II. Issues presented.

**1. DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.**

Pursuant to 34 C.F.R. § 300.324 (b), DCPS

> must ensure that...the IEP team reviews the child's IEP periodically, but not less, than annually, to determine whether the annual goals for the child are being achieved; and revises the IEP, as appropriate, to address any lack of expected progress toward the annual goals...and in the general education curriculum, if appropriate; the results of any reevaluation conducted...information about the child provided to, or by, the parents...the child's anticipated needs; or other matters.

On May 26, 2005, DCPS convened an IEP team to draft an initial IEP. There is nothing in the record that indicates that DCPS convened an IEP team meeting to review and revise the IEP since the expiration of the student's IEP on May 26, 2006. Nor is there anything in the record that indicates that that student is receiving any specialized services. Therefore, in this case it is clear that DCPS has failed to comply with the requirements of IDEIA.

3

216

**2. DCPS failed to provide the student with the agreed upon compensatory services.**

*Harris v. District of Columbia* states that students with disabilities are entitled to compensatory services where they have been "deprived of special education in violation of the IDEA." Pursuant to *Reid v. District of Columbia*, "the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *See also, School Committee of the Town of Burlington Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985) (In *Burlington*, the United States Supreme Court concluded that retroactive reimbursement is available to parents. This led to courts allowing compensatory services to parents as an equitable remedy.) *Reid v. District of Columbia*, No. 02cv01611 (2005) (In Reid, the Circuit Court for the District of Columbia Circuit determined that "courts and hearing officers may award 'educational services...to be provided prospectively to compensate for a past deficient program.'" *See Id.* at 9 (quoting *G. ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 308 (4th Cir. 2003). Pursuant to D.C. Mun. Regs. tit. 5, § 3010.2 (2003), DCPS "shall implement an IEP as soon as possible after the meeting where the IEP is developed..."

On May 26, 2005, DCPS agreed to provide the student with 17 hours and 15 minutes of compensatory education in the areas of reading and written expression starting May 27, 2005. However, DCPS did not implement the compensatory education plan and as a result the student did not receive reimbursement for missed education services.

**3. DCPS failed to provide the student with Extended School Year Services ("ESY") for the summer of 2005.**

District of Columbia Public Schools ("DCPS") failed to provide for Extended School Year services ("ESY") in the student's 2005 program, which the student requires to prevent regression and enable him to make appropriate progress. Under the IDEIA, schools are required to provide ESY services as necessary to provide a child with FAPE (*See* 34 C.F.R Section 300.106(a). ESY services are considered to be necessary when there is evidence of regression without such services and the student lacks the ability for recoupment in a reasonable period of time. See Independent School District No. 709, Duluth v. Bonney, 44 IDELR 191 (Minn Ct. App. 2005). ESY services are also considered to be necessary when emerging skills are at a breakthrough point. IDEA further states that "Extended school year services must be provided only if a child's IEP Team determines, on an individual basis...that the services are necessary for the provision of FAPE to the child." (*See* 34 C.F.R. Section 300.106(a)(2).

At the May 26, 2005 IEP meeting, the IEP team determined that the student was to receive ESY services to address the student's emerging skills in reading, written

4

expression, and to prevent regression in his educational progress. Nevertheless, the student did not receive ESY services in the summer of 2005.

### III.    Relief Sought.

1. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to conduct an annual review of the student's IEP.

2. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his agreed upon compensatory services.

3. The hearing officer shall find that DCPS denied the student a free and appropriate public education by failing to provide the student with his Extended School Year ("ESY") services for the summer of 2005 and the summer of 2006.

4. DCPS shall within five (5) business days convene an interim IEP meeting and develop an interim IEP for the student.

5. DCPS shall fund a comprehensive reevaluation including a psycho-educational, speech and language, audiological, social history reevaluation, and any other evaluations deemed necessary by the evaluators.

6. DCPS shall within ten (10) business days of receipt of the last evaluation, convene an IEP meeting to review the evaluations, revise the IEP consistent with the evaluations and determine an appropriate placement for the student where the IEP may be implemented.

7. DCPS shall fund student with seventeen (17) hours and fifteen (15) minutes of compensatory education services in the form of specialized instruction not to exceed sixty (60) dollars an hour.

8. DCPS shall fund one hundred and twenty (120) hours of Extended School Year Services ("ESY") for ESY services missed during the summer of 2005 and summer of 2006.

9. DCPS shall fund the student with Extended School Year Services ("ESY") during the 2007 summer.

10. DCPS agrees to pay counsel for the complainant reasonable attorney's fees and related costs incurred in the matter.

11. All meetings shall be scheduled through counsel for the complainant in writing, via facsimile, at 202-742-2098.

12. DCPS send all notices to counsel for the parent with copies of such to the parent and in the parent's native language.

13. DCPS within ten (10) calendar days of the filing of this complaint, pursuant to 34 C.F.R. § 300.508(e), shall provide the complainant's representative, through Jani S. Tillery, Esq., via facsimile, at 202-742-2098, the following: i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action.

14. In the event DCPS fails to answer/respond to the issues alleged in the complainant's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the complainant will be deemed true and accurate and act as a waiver, on the part of DCPS, for their desire to have a Resolution Session Meeting, and the complainant's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA.

15. DCPS, within fifteen (15) calendar days of receiving the complainant's complaint, pursuant to 34 C.F.R. § 300.508(d), shall respond to the complainant's request alleging any insufficiency of notice.

16. DCPS' failure to comply with 34 C.F.R. § 300.508(d), and allege any insufficiency of the complainant's administrative due process complaint, will constitute waiver on the part of DCPS to make such argument at any later date and time.

17. DCPS, pursuant to 34 C.F.R. § 300.510(a), within fifteen (15) calendar days of receiving the complainant's administrative due process complaint, shall contact the complainant's representative, in writing, via facsimile, at 202-742-2098, to schedule and convene a Resolution Session Meeting.

18. DCPS, pursuant to 34 C.F.R. § 300.510(a), shall convene the Resolution Session Meeting, with the complainant, the complainant's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. The relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student, and 6) any service providers for the student.

19. DCPS' failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified according to the 34 C.F.R. § 300.510(a) shall constitute joint waiver between DCPS and the complainant to have such meeting and the forty-five

6

(45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the complainant's counsel.

20. D.C. MUN. REGS. tit. 5 § 3030.1 provides that the public agency shall ensure that not later than 45 days after the receipt of a request for a hearing, a final decision is reached in the hearing and a copy of the decision is mailed to each of the parties. Should the hearing for this student take place 45 days after the date of this hearing request, DCPS shall be found to have violated the 45-day time line.  DCPS shall provide the parent with a due process hearing within 15 calendar days of a request on any issue arising out of the noncompliance with DCPS' obligations hereunder, or any disagreement that the parent may have with the assessments, programming or placement.  Such issue will be raised at the hearing with or without an amended hearing request.

21. Pursuant to D.C. MUN. REGS. tit. 5 § 3000 et. seq., DCPS shall ensure that BP's rights and his complainant's rights are protected, and consistent with the Hearing Officer's preamble to all due process hearing that, "the hearing officer will rule on the evidence as presented at the hearing and will ACT in the BEST INTEREST of the child," and make a ruling consistent with the obligation of DCPS and the hearing officer's responsibility.

22. The hearing officer shall find that the complainant is the prevailing party in this action.

**G.    Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)_____
- Special Communication (please describe the type)_____
- Special Accommodations for Disability (please be specific)_____
- Other_____

**H.    Signature:**

_____    4/9/07_____
Legal Representative //Advocate (if applicable)         Date

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**

**Fax number: 202/442-5556**

221

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF

A███████ L███


HEARING DATE:  JUNE 11, 2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.   (301) 277-5711

### APPEARANCES

PAGE

HEARING OFFICER:  Frederick Woods . . . . . . . . . . . . . . 3, 81

ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:  Tiffany Puckett. . 4, 66

ATTORNEY FOR PARENT:  Jeannine Tillery . . . . . . . . . . . 4, 66

PARENT:  Teresa Lee . . . . . . . . . . . . . . . . . . . 3, 4, 52, 88

WITNESSES:  Diane Cruise Pinkley . . . . . . . . . . . . . . 60

—————

223

1                            PROCEEDINGS

2

3    [Hearing called to order t 9:33 a.m.]

4         HEARING OFFICER:  Good morning everyone, it's Monday,

5    June the 11th, 2007.  My name is Fred Woods the hearing

6    officer convening the due process hearing for A███████ L██.

7    And Ms. Lee I have A████████ birth date as █████████████,

8    1995.  Is that Correct?

9         MS. LEE:  That's correct.

10        HEARING OFFICER:  This hearing is convened in

11   accordance with the Individuals with Disabilities Education

12   Improvement Act and the Federal and the District of

13   Columbia laws and regulations that implement the act.  My

14   role as the Hearing Officer will be to receive testimony

15   and review the documents that the party will submit in

16   support of their case.  And based on that information and

17   the law I will reach a decision in regards to the issue

18   presented for resolution.

19        That decision will be provided to the party's through

20   their respective attorney's with - - in writing with in 10

21   days of this hearing date.

22        This hearing Ms. Lee is considered a closed hearing

23   meaning we will not invite anyone else into this room

24   unless they are a witness or party to this case.  The

3

224

1    hearing is however is being audio recorded so I'd ask that

2    if each of you would make sure that you're in front of a

3    microphone when you're speaking so that we can make sure

4    that we pick up your voice.

5        Before further explaining how the hearing will be

6    actually conducted in terms of how we will take the

7    testimony.  I'll first allow everyone present to introduce

8    their selves.  And then I would like to speak with the

9    lawyers to see if they have narrowed the issues in this

10   case.

11       Ms. Tillery?

12       MS. TILLERY:  Jeannine Tillery, Attorney for the

13   parent.

14       MS. LEE:  Teresa Lee, The mom of A████████ L███.

15       MS. PINKLEY: Diane Cruise Pinkley, Educational

16   advocate for A███████.

17       MS. PUCKETT:  Tiffany Puckett, Attorney for DCPS.

18       HEARING OFFICER:  Okay I want to welcome you all here.

19   Ms. Lee good morning to you it is always important to see

20   the mother's here and this hearing is about your son here.

21       Let me start by asking Ms. Tillery is Ms. Lee aware of

22   her due process rights?

23       MS. TILLERY:  Yes.  We talked about them.

1        HEARING OFFICER:  Okay and I'll admit if there are no

2    objections the documents that the party's have provided in

3    advance of the hearing.  That they want to rely on at the

4    hearing and for short hand Ms. Lee I'm going to refer to

5    those as disclosure letters.

6        I have received from Ms. Tillery on behalf of Ms. Lee

7    a disclosure letter dated June 4, 2007 that lists four

8    witnesses and attached 15 exhibits.

9        Ms. Puckett, are you in receipt?

10       MS. PUCKETT:  I am in receipt.  I have no objection.

11       HEARING OFFICER:  Then it's admitted as part of our

12   record.  And I'll receive from Ms. Puckett a disclosure

13   letter dated June 6, 2007.  It was six witnesses and

14   attached no exhibits.

15       Ms. Tillery, are you in receipt of that disclosure?

16       MS. TILLERY:  Yes, I have an objection to the motion

17   to compel, being improperly filed by counsel within the

18   five day disclosure, instead the 14 days as per the

19   standard operating procedures.

20       MS. PUCKETT:  I think it's irrelevant at this point.

21   The parent is here.

22       HEARING OFFICER:  Is that in here?  Oh at the bottom?

23       MS. TILLERY:  Ah-uh.

24       HEARING OFFICER:  Okay.

226

1    MS. PUCKETT:  Parent is a moving party Mr. Woods.  The

2    parent brought the complaint.  It's very proper for the

3    parent to be at the hearing to address the issues in the

4    complaint.  I believe that the school district has a right

5    to confront the individual who is making allegations

6    against them.

7        This is not a situation where we're dealing with the

8    fact witness, or an expert witness or something like that.

9    We're dealing the party who brought the complaint.  And

10   like I said, I think it's irrelevant at this point because

11   the parent is here this morning.

12       HEARING OFFICER:  Okay.

13       MS. TILLERY:  That's fine; I just want to make it

14   clear that my objection is based on the fact that it was

15   the motion to compel was not properly done.  Not the fact

16   that the parents hear the fact that it was not properly

17   done.

18       HEARING OFFICER: Okay.  I don't a motion, it's in the

19   - -

20       MS. PUCKETT:  There's a - -

21       MS. TILLERY:  She, she, she just - - That was not

22   disclosed to us.  The motion to dis - -

23       MS. PUCKETT:  What's not disclosed to you?

24       MS. TILLERY:  You have motion to compel - -

6

227

1    MS. PUCKETT:  He's looking at the scheduling

2  memorandum.

3    HEARING OFFICER:  You mean, in this document?

4    MS. TILLERY:  Yes.

5    HEARING OFFICER:  There was an attached motion?

6    MS. TILLERY:  No there was not.

7    HEARING OFFICER:  Okay.

8    MS. TILLERY:  It just says motion to compel at the

9  top.  And parent is here.

10    HEARING OFFICER:  Okay, I see but yeah I guess that

11  it's movement in light of the fact that what you were - -

12  Is that what you're saying?

13    MS. TILLERY:  Yeah I just wanted to just make it for

14  the record.

15    HEARING OFFICER:  Yeah you just wanted that noted.

16  Okay, any objections to the disclosure itself?

17    MS. TILLERY:  No.

18    HEARING OFFICER:  Okay, then without objection, it's

19  submitted.  Where are we with respect to issues presented

20  forward?

21    MS. TILLERY:  Well, I would start with - - I guess I

22  want to make a motion for directive finding at this time,

23  based on the fact that DCPS did not disclose any documents

24  pertaining to with her five-day disclosure.  Further, she

7

228

1   did not file a response to the complaint and to clarify

2   IDEIA and the Student Operating Manual.  The parent has a

3   right to prohibit the introduction of surprised evidence,

4   pursuant to the standard operating procedures.

5       DCPS also failed to hold a resolution meeting pursuant

6   to IDEIA and the standard operating procedure manual.

7       Lastly, documents basically speaks for themselves that

8   there has been a denial of fate.  DCPS counsel has

9   presented no evidence to prove anything to the contrary.

10      HEARING OFFICER:  Okay.  What are the issues now?

11      MS. TILLERY:  The issues are - -

12      HEARING OFFICER:  Yeah.

13      MS. TILLERY:  Umm, DC - -

14      HEARING OFFICER:  All of them still remain?

15      MS. PUCKETT:  Uh-umm.

16      HEARING OFFICER:  Okay.

17      MS. PUCKETT:  There still the same issues, and if I

18  could responds to - -

19      HEARING OFFICER:  Well let me get - -

20      MS. PUCKETT:  You want to get the issues first?

21      HEARING OFFICER:  Yeah if you can be clear on that.

22      MS. TILLERY:  The issues are DCPS failed to conduct an

23  annual IEP, review an IEP.  DCPS also failed to provide

24  student - -

1       HEARING OFFICER:  When was that due?

2       MS. TILLERY:  The IEP expired; the last one was

3   January '06.

4       MS. PUCKETT:  And just for the record, they did not

5   put that date in the complaint, the date that they put in

6   the complaint is at the last - - the IEP expired May 26th

7   of '06.  So I just wanted to let you know that we did to

8   stick to the four walls of the complaint.  The complaint

9   says that May 26, '06 the IEP was expired; since the

10  student's expiration of the student's IEP, May 26th of '06.

11      And this complaint cannot be amended here today on the

12  table.  The complaint is factually wrong if she's

13  indicating that the IEP expired in January, because if you

14  look at their documents, they do have an IEP that would

15  have expired in January of '07.  But the documents that

16  they're referring to in this complaint are not in existence

17  because there is no May 26th, '06 IEP, - - there's no May -

18  -

19      There is a May 26th, '05 IEP, but there was an IEP done

20  after that.  So there was a January 26th, '06 IEP which is

21  not even mentioned in here.  So how can you bring up the

22  fact that the January 26th IEP is outdated when it was not

23  in this complaint?  I would ask that the hearing officer

24  keep the parties within the four walls of this complaint

1    and that amendments not be allowed in this complaint - - be

2    allowed today.

3         And if the party doesn't want to amend their

4    complaint, then the hearing officer can give them the

5    discretion to do that.

6         And there is an issue, as far there have not being a

7    resolution meeting.  Our Office of Special Ed makes initial

8    phone calls to try to schedule these meetings, Mr. Woods,

9    because there are a whole bunch of resolution meetings to

10   be scheduled; and they have not been able to schedule this

11   meeting and there hasn't been a resolution meeting.

12        Now, I can't tell you specifically right here today

13   how the parties were not able to come to a meeting of the

14   minds in regards to this resolution meeting, but there has

15   not been a resolution meeting here today.

16        And I will object to the complaint being amended at

17   the table.  Because, as you see, in the complaint, as you

18   see in the documents submitted by the parent's counsel,

19   there is a January '06 IEP.  The IEP that they're claiming

20   is outdated is a May 26th IEP.  It specifically says that

21   May 26th, '05 DCPS completely convened an IEP meeting to

22   draft initial IEP.  There is nothing that indicates that

23   DCPS convened a meeting to review and revise the IEP since

24   the expiration of the student's IEP on May 26th of '06.

10

231

1       The next allegation is a Comp Ed issue and then there

2    is an ESY issue.  But as far as the IEP issue, it was never

3    amended and I would object to it being amended today at the

4    table.  Because there is an IEP in the record that the

5    parents counsel submitted that is date from the date that

6    they put in this complaint.

7       MS. TILLERY:  May I respond?

8       HEARING OFFICER:  Yes ma'am.

9       MS. TILLERY:  Nevertheless, the IEP is still expired.

10   There hasn't been an IEP done for A███████ this year, number

11   one.  Number two, as far as the resolution goes, DCPS is

12   supposed to contact us.  I don't see any documents that

13   show that an attempt has been made.  If that was so, it

14   should have been included in the five-day disclosure as I

15   stated earlier.  There's no documents to include it in the

16   five-day disclosure.

17      If that was the case, any documents that bring up to

18   date stating the attempts have been made for a resolution

19   meeting should be not allowed based on the best evidence

20   rule.  Further, the IEP, the issue was that DCPS denied the

21   student of pre-appropriate public education, based on the

22   fact that there's no annual IEP.

23      If an IEP was not done, if there is no IEP for the

24   school year, there's no IEP for the school year.  This

11

1  child does not have a IEP at this time.  So, DCPS is in

2  violation of that.

3      MS. PUCKETT:  Mr. Woods, Congress intent with IDEIA

4  2004, was to make sure these complaints are filed with

5  specificity.  That you have to look at the complaint with

6  the facts that go along with it.  If Congress intended for

7  DC, for parents to be allowed to file complaints with just

8  issues, then they would not have changed the law.  It

9  specifically says with the facts and issues related to the

10 complaint.

11      You have - - it says that the IEP is out of date, but

12 right under it says, two lines under it, it says the IEP of

13 May 26th of '05 has there never been a meeting to amend the

14 IEP of May 26th '05 to come and revise that IEP.  The parent

15 cannot amend this complaint at the table here today.

16      MS. TILLERY:  The bottom line is pursuant to 34 C.F.R.

17 300.324; the IEP team reviews the IEP periodically, but not

18 less than annually.  There hasn't been an annual review of

19 the IEP at this time.

20      MS. PUCKETT:  Once the parent found out through her

21 documents request that there was a January 26th, '05, '06

22 IEP, there could have been a motion of contacting me to

23 asking me if I would agree to amend the complaint to make

24 it correct on his fate.  Or she could have motioned the

233

1    hearing officer to allow her to amend the facts in the

2    complaint.  But the reality is, the complaint says and

3    stands as it is, and it says May 26th, '05 IEP has never

4    been updated.

5        There is two addition issues that we can still go on

6    today but I'm going to object to them amending the first

7    issue.  I'm strongly going to object to it being amended at

8    the table.

9        HEARING OFFICER:  Is that right?  I mean, it says 5-

10   26-05, was that - -

11       MS. TILLERY:  Well that's when the last - - My, what I

12   said in the complaint was that that's the expiration

13   because the last one was done in '05.  The 1-26, was done

14   to review evaluations which is (where is that file) 8, 05.

15       The purpose of this meeting was to review the

16   evaluations completed and to determine eligibility of

17   Special Ed services.  Again, if one was done 1-26-06, then

18   it would have expired 1-26-07.

19       HEARING OFFICER:  She was saying you raised claim on

20   the 5-26-05; not on the 1-26-06.  Would that claim, if

21   there is a 1-26-06, that claim wouldn't be true, right?

22       MS. TILLERY:  If there is a 1-26, then the claim that

23   the annual IEP has been done?

13

234

1    HEARING OFFICER:  No, that you had - - the facts

2  though are that you challenged the 5-26-05.

3    MS. TILLERY:  Oh, the 5-26.

4    HEEARING OFFICER:  Yeah.  So if there is a 1-26-06,

5  that claim wouldn't be true, right?

6    MS. TILLERY:  Yes, if there is a 1-26.

7    HEARING OFFICER:  What do you want to doe with that

8  claim then, do you - -

9    MS. TILLERY:  Umm - -

10    HEARING OFFICER:  And I guess you might want to think

11  about it.  I don't how it impacts your other claims.

12    MS. TILLERY:  It doesn't impact the other two issues.

13    HEARING OFFICER:  It does not?  Because is there an

14  ESY on the 5-26-05?

15    MS. TILLERY:  There was an ESY - -

16    HEARING OFFICER:  On the 5-26-05?

17    MS. TILLERY:  Yes, but that was never implemented.

18    HEARING OFFICER:  Okay.

19    MS. TILLERY:  And a Comp Ed plan was just not.

20    HEARING OFFICER:  You had a plan already developed?

21    MS. TILLERY:  For Comp Ed, yes.

22    HEARIN OFFICER:  Okay.  And what's the concern with

23  the ESY now?

24    MS. TILLERY:  Concern with the ESY?

1        HEARING OFFICER:  Yes.  He didn't get it?

2        MS. TILLERY:  No he did not get it.

3        HEARING OFFICER: Okay.  For the school year, summer

4   '05?

5        MS. TILLERY:  Yes, for the summer '05.  DCPS agreed to

6   provided it, but it was not provided.

7        HEARING OFFICER:  And what's the Comp Ed, what was

8   that for?

9        MS. TILLERY:  The Comp Ed plan was awarded from

10  previous HOD, 17 hours and 15 minutes of Comp Ed.  That is

11  found in Exhibit 4, and that's this service, for reading

12  and written expression.

13       HEARING OFFICER:  So what are you asking, you're

14  asking the hearing officer to order Comp Ed, because - -

15       MS. TILLERY:  I'm asking that DCPS fund the student

16  with 17 hours and 15 minutes of compensatory education and

17  DCPS.  And DCPS to fund 120 hours of extended school use

18  services for the miss-services during the summer of 2005

19  and 2006.

20       HEARING OFFICER:  Okay.  Ms. Puckett, are those to - -

21  and what are going to do this.

22       MS. PUCKETT:  And in - - If you look at the meeting

23  notes from that 5-26-05, and it's parent's Document no. 2,

24  the meeting notes indicates that the student will receive

1    Comp Ed 17 hours and 15 minutes beginning on 5-27-05 in a

2    Resource Special Ed center two hours daily.  The last day

3    was to be June 9th.

4        The student was to receive Comp Ed from Bruce Monroe,

5    the student's home school, and those services were offered.

6    I don't believe there has ever been a request for an

7    independent instead of in lieu of the services at the

8    student's home school.  At the time that the student, this

9    complaint was filed then, this child was at - - I'm sorry -

10   - At the time the Comp Ed plan was made, the student was

11   still enrolled with the DC Public School.  And the Comp Ed

12   services were to be provided by the student's home school.

13       The student, after that, transferred to a private

14   school which is not funded by DCPS at this point.  And

15   there has not been a request to, for the student to receive

16   these services independently.  Like I said, they've already

17   been ordered by a prior HOD.  This is a - - it comes out of

18   an HOD which was from miss-services from, if you look at

19   the Comp Ed plan AL-4, the miss-services was from February

20   19th to May 26th '07.  So they've already been ordered.

21   There is currently a Comp Ed plan.  The Comp Ed plan was

22   written to be implemented at the student's school.  As I

23   said, the student was attending a DC Public School at the

24   time the Comp Ed was written.  The student then, the next

16

237

1    school year, went to a private school, and there has never

2    been a request to the Care center to provide the student

3    with independent services, because when the student is in

4    private school we will fund ours for Comp Ed plan, because

5    it's very difficult to have teachers go into the private

6    school.

7        I also want to note, Mr. Woods, that even though the

8    student has Special Ed services, the student is not in a

9    Special Ed program.  He hasn't been in a Special Ed program

10   this past two school years.  So this is a IEP that DCPS is

11   developing.  But the student is not receiving any type of

12   Special education at the private school where the student

13   is at.

14       Secondly, the ESY services IEP was written for Bruce

15   Monroe, also.  So I'm not sure why the parent didn't

16   present the student to Bruce Monroe for ESY services.

17       I'm sure you've had many of these hearings when there

18   is an ESY plan; the student receives ESY at the

19   neighborhood school over the summer.  There is an ESY plan

20   for this child in place.  And once again, I'd like to point

21   out that student, the following school year for the 2005,

22   2006 school year, never received any type of Special Ed

23   services.  The student hasn't been receiving any type of

24   Special Ed services.

238

1       HAERING OFFICER:  What was the ESY for?

2       MS. PUCKETT:  That's DCPS's IEP.  We developed a IEP

3    for the student at the end of 2004, 2005 school year.   The

4    subsequent school year, that the only thing we had this

5    summer, the student started at a private school 2005, 2006.

6    Never again received any type of Special Ed services.   The

7    student is not currently receiving Special Ed services.

8    And the student is not currently in any type of Special Ed

9    program.

10       The private school is a General Ed program.  We need

11   to update the student's IEP but there is no Special Ed

12   program at this point.  It's just some, there's Care - -

13   you know how center Care for students who are non-

14   attending; they meet and they update the student's IEP.

15   But that doesn't mean that the IEP is being implemented.

16   The student's IEP is written for the neighborhood school.

17   The parent is choosing to keep the student in a private

18   school, which is not Special Ed at all.

19       MS. TILLERY:  May I respond?

20       HEARING OFFICER:  Yes, ma'am.

21       MS. TILLERY:  Ms. Puckett made reference that there

22   was a Comp Ed plan.  The Comp Ed plan was implemented but

23   there's - - I don't see anything that she's presented us

24   that said that there is a Comp Ed implemented.   The mom can

1    testify to the fact that the Comp Ed plan that he didn't

2    receive those Comp Ed services.

3        As far as the ESY services, the ESY services weren't

4    provided because Bruce Monroe was under renovation and

5    that' stated in notes from the 1-26-2006 IEP.  So the ESY

6    services weren't implemented.  This is emergency skills; it

7    was determined that he needed them, for emergency skills

8    and reading and written expression, and the schools wasn't

9    even available for him to have it.

10       Further, DCPS is responsible for monitoring the

11   student even when they're in a private school.  That's what

12   the Care center is for.  If that wasn't the case this

13   wouldn't have been developed by the Care center.

14       HEARING OFFICER:  Okay.  Let me make sure that I'm

15   clear on that.  The first then what are you doing with it?

16       MS. TILLERY:  The first issue?

17       HEARING OFFICER:  Right.

18       MS. TILLERY:  For the IEP?

19       HEARING OFFICER:  Right.

20       MS. TILLERY:  My feeling is that the IEP is still

21   expired.

22       HEARING OFFICER:  Okay, but based on your hearing

23   request.

1    MS. TILLERY:  Oh, based on that.  Unless I have to - -

2    I feel like that it's still expired the 5th, January, if we

3    have to say January '06 and - -

4    [Pause.]

5    MS. TILLERY:  Can we reserve that issue and come back

6    to it.

7    HEARING OFFICER:  When you say reserve it - -

8    MS. TILLERY:  I mean reserve it - -

9    HEARING OFFICER:  To another discussion right now?

10   MS. TILLERY:  Yeah.

11   HEARING OFFICER:  Okay.  But yeah we can reserve it to

12   another hearing.  With re - -

13   MS. PUCKETT:  I'm sorry, reserve it until - -

14   HEARING OFFICER:  I guess she doesn't want to answer

15   the question right now.

16   MS. PUCKETT:  Because I mean, the other option is to

17   withdraw it without prejudice, or to be dismissed without

18   prejudice, or to ask the hearing - - there's three options;

19   withdrawal without prejudice, dismissal without prejudice,

20   or request that the hearing officer allow her to amend the

21   complaint.  Which is gonna - - if there are any amendment,

22   it's gonna require a resolution meeting anyway.

23   HEARING OFFICER:  I think the way you're saying in

24   this case, if that first issue was not before the hearing

241

1   officer, you still could go forward on the other two.  Do

2   you feel like you could go forward or do you feel that that

3   would be impacted?

4        MS. TILLERY:  I could still go forward on the other

5   two issues without - -

6        HEARING OFFICER:  Now, the Comp Ed and the - - well,

7   the ESY was part of the '05 IEP.

8        MS. TILLERY:  Yes.

9        HEARING OFFICER:  If that issue is not before me, will

10   that affect it?

11        MS. TILLERY:  I'm not asking you to pull the 2005 IEP.

12   This issue as far the IEP being expired, I don't see how

13   that would affect that, using the IEP, the 5-26 IEP as far

14   as still using that as evidence.

15        HEARING OFFICER:  Well how are you gonna come up with

16   ESY wasn't it gonna be based on the IEP?

17        MS. TILLERY:  Yeah, that would then be based on the

18   IEP so I would still need to - -

19        HEARING OFFICER:  Right, that's what I said; the ESY

20   would be impacted by the IEP.

21        MS. TILLERY:  Yeah.

22        HEARING OFFICER:  And at this point, you really could

23   get ESY, you'd have to establish deficits that you need to

24   re-mediate under the retest.

1       MS. TILLERY:  For ESY based - -

2       HEAREING OFFICER:  ESY is always summer.  We can't go

3   back to the summer 2005.  So you have to deal with another

4   remedy.  I can't order ESY for the summer 2005; it's 2007.

5   It's the only thing I could do; you see what I'm saying.

6   It's too late; the summer of 2005 is over.

7       So now we'd have to establish under *Reed* what happened

8   to him as a result of that loss of services.  And what was

9   his deficit and based on that deficit what does he need

10  now?

11      MS. TILLERY:  I'm asking for the 120 hours for the

12  past for the summer of 2005 and 2006.  And you're saying

13  that that can't be awarded at this time?

14      HEARING OFFICER:  Not in a cooki - - the court has

15  told us we can't award a cookie cutter relief.  We have to

16  substantively determine what the needs of the child are and

17  then base our relief on that.  And what your doing is

18  saying, here is what he would have gotten he didn't get it

19  cookie cut giving this for that.

20      We can't order 2005 or 2006 ESY because those two

21  summers have passed, or we would have to move it forward.

22      You're saying he missed two years?

23      MS. TILLERY:  Yes.

24      MS. PUCKETT:  I'm sorry, where is the two years ESY?

1          MS. TILLERY:  There are two summers.

2          MS. PUCKETT:  Because the complaint was only dealing

3     with in 2005.  That's the only thing that you have ESY

4     eligibility for, and actually you have the 2006 IEP in the

5     record which said that the student was not eligibility, the

6     ESY is not checked off, so we're doing one year and we're

7     doing of a IEP which only has five hours of specialized

8     instruction on it.  And ESY services is only for eight

9     weeks in the summer time.

10         MS. TILLERY:  So I'm not - -

11         MS. PUCKETT:  So I'm not sure where we're getting 120.

12    Well that's not my argument to make anyway, that's the

13    parent's under *Reed*, because it could be more, it could be

14    less than what the IEP has.  It really just depends on some

15    type of substantive evidence as to how the student was

16    harmed by missing services.

17         MS. TILLERY:  Well, as far as the ESY, if the child

18    didn't get ESY, what is the parent's recourse if the child

19    didn't get ESY because the school is under construction.

20    What is the parent's recourse for ESY service that the

21    child desperately needs.  It states right in the ESY plan

22    that what the services are needed for.

23         I'm trying to figure out what is our recourse if the

24    hearing officer cannot award services, this is not an issue

1   of ESY and it's not an issue of Comp Ed.  We're talking

2   about extended school year services based on the IEP.

3        MS. PUCKETT:  I think, - - I don't think the hearing

4   officer - - my understanding of this case is that the

5   hearing officer is not saying he can't award services.  I

6   believe the hearing officer is indicating that the parent

7   has the burden to show under *Reed*, to prove under *Reed*,

8   what Comp Ed is warranted due to the denial of fate and the

9   loss of services and that has to be done through some type

10  of substantive evidence that needs to be presented.

11       And that it, - - you can't, no one like I can't, - -

12  like I was making representations, but it was inappropriate

13  for me at the table to say well lets count the hours up and

14  how did you come up with 20 hours.  Because *Reed* has made

15  it clear that that's not the way it should be done, that

16  there needs to be more substantive evidence to show what

17  harm, and based on that harm, what is specifically needed

18  to put that student back in the place where that student

19  would be had that student receive the ESY services.

20       HEARING OFFICER:  Yeah, the law has changed here in

21  the District.  We can't do - - they call it cookie cutter -

22  - what you're saying he miss this, so give him this.  The

23  court told us we can't do that.  That the burden would be

24  on the - - you would have to - -

24                                          245

1        First of all, we can't get 2005 ESY the summer is

2    over.  It would be different if it's the beginning of the

3    summer, we could say, Okay, he's to get ESY, he hadn't

4    started, Bruce is under construction, using your argument.

5    Where can he go?

6        But we're in the summer of 2007.  So it would have to

7    be made up.  That's what you're asking for, so now that

8    you're asking to make it up, then, the way that we make it

9    up is, as Ms. Puckett was describing.

10        MS. TILLERY:  The fact that ESY services and she's

11    talking about that it's of substantive nature, but the fact

12    that ESY services, I won't even say the comp ed; that is,

13    they're not provided a, would be, the procedural violation

14    that would rise the level of a denial of fate.  Based on

15    the fact that the child has been deprived of educational

16    benefit.

17        HEARING OFFICER:  You have to prove that.  I can't

18    assume that.  What you're saying is - -

19        MS. TILLERY:  Well I had - - I mean - - I would like

20    my parent to testify.

21        HEARING OFFICER:  I don't know how I - - maybe you're

22    not familiar - - are you familiar with the *Reed* case?

23        MS. TILLERY:  I am familiar with the *Reed* case.

1      HEARING OFFICER:  Yeah, that's a pretty high burden to

2   meet.  Particularly, if the child is not in a Special

3   education program now, is that true?

4      MS. TILLERY:  He is at Nativity now, yes.

5      HEARING OFFICER:  And that's not a Special Ed program?

6      MS. TILLERY:  Yes.  No, no it's not, but the Care

7   center is supposed to be implementing these services for

8   him.

9      MS. PUCKETT:  I'm sorry the Care center is not

10   implementing services.  The student is at Care center

11   because the student is a non-attending student.  If the

12   student - - if DCPS would implement these services, the

13   student would have been at Bruce Monroe.

14      If you look at the IEP in '05 and '06, it says the

15   placement location is at Bruce Monroe, five hours of

16   service.  The IEP only requires five hours of service.  The

17   student is currently at a privately placed in a non-Special

18   Ed school.  And that's why the student is going over to

19   Care center.  Care center only deals with early childhood

20   students and non-attending students; students who have been

21   parentally placed and students who are early childhood.

22      If the student was placed at the private school by

23   DCPS, then the Office of Special Ed placement monitor would

24   be dealing with this case, but there is no placement

247

1  monitor, because the student is enrolled, parentally

2  enrolled in a non-attending school.

3      If the student was not parentally enrolled, and it was

4  something that DCPS was funding, and we were the funding

5  agent and responsible for the implementation of the

6  services at the private school, then the student would have

7  placement specialist in the Office of Special Ed.  But this

8  student is at Care center because it's non-attending and

9  it's parentally enrolled.

10     And if you look at the '06 IEP, Natalia Houston, who

11 is the director of the Care center, participated in that

12 meeting, and that's why the Care center is over this case

13 because it is a parentally enrolled case.

14     HEARING OFFICER:  Okay.

15     MS. PUCKETT:  And a non-Special Ed school.

16     HEARING OFFICER:  I had the wrong birth date, too, the

17 child's - - let me make sure this is right, Ms. Lee; 1995,

18 not '05; '95.  Because I said, '05.

19     MS. PUCKETT:  No, you said '95.

20     HEARING OFFICER:  I said '95?

21     MS. PUCKETT:  Uh-mm.

22     HEARING OFFICER:  Okay.  Because I was wondering how

23 did he get, if he was born in '05, how did he get to the

24 Care center, I'm sorry, to Bruce Monroe that quick.

27                                                    248

1    MS. TILLERY:  That quick, he would have been three - -

2    HEARING OFFICER:  He wasn't three.

3    So this is a non-attending student whose services that

4    you're saying is made available for him at Bruce Monroe - -

5    MS. PUCKETT:  This is parentally placed, non-

6    attending.

7    HEARING OFFICER:  And he's not - -

8    MS. PUCKETT:  And we're not funding it.

9    HEARING OFFICER:  I see.

10    MS. PUCKETT:  It's parentally place, non-attending,

11    non-DCPS funded.

12    HEARING OFFICER:  Is that true?

13    MS. TILLERY:  Yes, he's at Nativity, placed there by

14    the parent.  But, nevertheless, the SEA is responsible.

15    HEARING OFFICER:  So you're challenging their

16    placement?

17    MS. TILLER:  Challenging her placing him there?

18    HEARING OFFICER:  No, the school's placement at Bruce

19    Monroe.

20    MS. TILLERY:  I'm not understanding your question.

21    HEARING OFFICER:  If fate has been made available, and

22    you're saying you're not getting it, why aren't you getting

23    it?

1      MS. TILLERY:  How has fate been made available to the

2  parent?  The parent has that Bruce Monroe has - -

3      HEARING OFFICER:  If fate has been available - -

4  what's Bruce Monroe?  Is that what fate was to be provided?

5      MS. TILLERY:  The home school was supposed to be

6  implementing the program.

7      HEARING OFFICER:  Okay, so why isn't he at the home

8  school, then?

9      MS. TILLERY:  They were supposed to be giving him the

10  services, at - -

11      HEARING OFFICER:  There's something that say that?

12      MS. TILLERY:  I don't have anything that says that.

13      HEARING OFFICER:  Well why did you think that?

14      MS. TILLERY:  From my parent.

15      HEARING OFFICER:  Oh I see.  If they - - I'm not sure

16  about that.  I mean if the school made fate available, why

17  would they transport it?

18      MS. PUCKETT:  And I'm sorry.

19      MS. TILLERY:  And I'm trying to figure out - -

20      MS. PUCKETT:  If you look at the meeting notes from

21  the 1-26-06 IEP; they actually did address the Comp Ed.  I

22  know you were talking that, it said the parent will enroll

23  A██████ in summer school to complete the Comp Ed services

24  completed on 5-26-05.  So they did address that in the '06

1    IEP meeting.  And if you look at the '06 IEP, the IEP was

2    written for Bruce Monroe.  It indicates that the student

3    was to receive five hours of specialized instruction.

4        The Care center updates these IEPs all the time for

5    the home school.  It says that the student attending school

6    is Nativity.  The home school is old for is, for, and

7    indicates that go to the, if you go to, - - the student is

8    supposed to have minimal's, specialized services, and

9    inclusion setting.  And that's General Ed.

10       There's nothing here that says - - and actually, if we

11   were supposed to be giving the student services at his non-

12   attending school, then you will have a services plan.  The

13   Care center completes a services plan that will go along

14   with this that is different from the IEP that the non-

15   attending student can go into the local school and receive

16   like related services; like speech and language, or

17   occupational therapy.

18       Because DCPS is only required to provide a certain

19   amount of services when students are parentally placed by

20   their parents.  So if this student had any of type of

21   related services on the IEP, then DCPS could provide those

22   related services at the home school through a service plan.

23   But this IEP was written for the student to attend Bruce

1    Monroe.  It wasn't written for the student for Nativity or

2    for DCPS to complete any type of services plan.

3         And if you look at the meeting notes, they had a

4    discussion about Comp Ed.  It says their son did not attend

5    summer school because it was under reconstruction; the

6    parents were not inform that he could get the services that

7    summer; and that, if he keeps going there, it says the

8    student was transferred to Nativity, where he is currently

9    not receiving specialized instruction, and that,

10   specialized services, specialized ed services.

11        And then, you know, you go through, there is report on

12   his educational performance and things of that nature.

13   Then it says, General Ed setting is accepted.  Combination

14   classroom rejected, outer General Ed rejected.

15        Location of services will be Bruce Monroe Elementary

16   School.  The parent will enroll A_____ in summer school to

17   complete the Comp Ed plan that was dated 5-26-05.

18        MS. TILLER:  May I respond?

19        The Comp Ed, summer school - - Comp Ed is

20   individualized.  So if they were gonna put him in summer

21   for Comp Ed, how is that addressing the compensatory

22   education plan?  If he's supposed to just be enrolled in

23   summer school.  That's not giving him compensatory

31

252

1    education services.   That's supposed to be individualized

2    services.

3         Further, it says in this, as you stated, it says that

4    ESY services were not provided because of summer school.

5    This is 1-26-06.  The ESY was supposed to be provided in

6    '05.  So obviously, it wasn't provided; it wasn't provided

7    here.  And they don't say where it's going to be provided.

8    And the summer school is not Comp Ed, and it is not ESY.

9    ESY is IEP based.

10        MS. PUCKETT:  Mr. Woods, you have had many cases here.

11   And I'm sure you are aware that DCPS does Comp Ed at summer

12   school.  We have many students' Comp Ed plans have been

13   implemented at summer school.  Summer school is not only

14   for students who are required to go the summer school.  A

15   lot of students right now are in summer, because they have

16   Comp Ed plans that need to be implemented.

17        And the services are provided to compensate that

18   student at summer school.  It's not just summer school

19   because you need to go there in order not to be retained or

20   you need to work on some type of subject area.  We have

21   implemented thousands of Comp Ed plans during summer

22   school.

23        MS. TILLERY:  Thousands - -

32

253

1        MS. PUCKETT:  Actually, DCPS has a right to implement

2   Comp Ed plans during summer school.

3        And furthermore, Mr. Woods, even though we're all

4   going through this, the reality is the parent still has to

5   establish that this child was harmed.  The student is, once

6   again, is not in a Special education program, he hasn't

7   been for two years.  Yes we are required to continue to

8   update the student's IEP and provide a placement for the

9   child, which is not being accepted at this time.  It's not

10  even on the table, there is no allegation that the

11  placement that we offered in the last two IEPs is

12  inappropriate.  You don't have any that.

13       So it's still, at this point, before I even move to

14  any type of Comp Ed discussion, there has to be an

15  establishment of a denial of fate how this child has been

16  harmed.  Especially, if there is no - - there is no

17  specialized instruction being requested right now.

18       We're doing this IEP, but it's a pointless IEP,

19  because if the student is not going to go to Bruce Monroe,

20  then there's not going to be any services provided for the

21  child.

22       MS. TILLERY:  Where is the proof that the Comp Ed plan

23  has been implemented?  Where is that proof?  You keep

1    saying that thousands of people have, you've done thousands

2    - -

3         MS. PUCKETT:  It's not my - - there has to be

4    established first, - -

5

6         MS. TILLERY:  So where is it?

7         MS. PUCKETT:  - - that the Comp Ed plan was not

8    implemented Mr. Woods.  And it's clearly in the notes that

9    this parent was going to enroll - -

10        MS. TILLERY:  The mom can testify that the Comp Ed

11   plan wasn't in the - -

12        MS. PUCKETT:  It's clearly in the notes, that the

13   parent's not that was submitted by parent's counsel, that

14   parent was supposed to enroll the student in summer school

15   for Comp Ed.  So they have to present their case.  They

16   have to present their case.

17        MS. TILLERY:  The parent can tes - -

18        HEARING OFFICER:  Well do you wanna, I mean, I, Do you

19   understand what's going on here, I mean because the burden

20   is pretty significant with respect to this issue.

21        Number one, if the 5-26-05 IEP is not before the

22   hearing officer because that claim is one that have to be

23   dealt with before you proceed here, then that would be your

24   claim for ESY as well.  But even for your claim of ESY and

34

255

1  for your Comp Ed, you'd have to the hearing officer the

2  entitlement to it.  I cannot.  The court has said that we

3  have to make substantive claim, we have to find the need

4  for those services.  We can't just order those services.

5      MS. TILLERY:  I understand what you're saying about

6  having to find a need for the services, but my point is

7  that, the plan has already been developed.  Obviously, the

8  need has already been established.  The Comp Ed plan

9  exists.  They've ordered it from a previous HOD.  Further,

10 the ESY plan exists.

11     This is already - - this is not us coming - - that's

12 why I'm saying there is more procedures because this is not

13 us coming to the table saying, He didn't get ESY; or he

14 didn't get comp ed; and, he should have got it; and we

15 don't have anything.

16     We're saying here is the plan that wasn't implemented;

17 here is the ESY that wasn't implement.  This has already

18 been established.

19     HEARING OFFICER:  In other - - have you attempted to

20 get any of than done, before coming here?

21     MS. TILLERY:  Attempted to get any of the services

22 done?

23     HEARING OFFICER:  Yes.

256

1        MS. TILLERY:  We have not attempted to get the

2   services done but from what I understand, its DCPS should

3   be contacting the parent in order to get these services

4   done.

5        MS. PUCKETT:  Just one additional comment, Mr. Woods,

6   the parent is indicating that there is a Comp Ed plan,

7   which essentially stands on its face.  The hearing officer

8   cannot make a denial of fate ruling off a prior denial of

9   fate; and that's what this Comp Ed plan came from.  The

10  failure to implement a Comp Ed plan is a procedural

11  violation which there needs to be some type of evidence to

12  show how it's raised to level of substantive violation to

13  find a denial of fate.  That's the first thing hat needs to

14  be done.

15       Secondly, what need's to be done is then there needs

16  to be an establishment after there is an establishment that

17  the student is harmed from the failure to development this,

18  to implement this Comp Ed plan.  What services are needed

19  to - - is there additional Comp Ed needed.  I mean, there

20  has to be a finding of a denial of fate first.  We can't

21  just say, here's a Comp Ed plan which came out of a prior

22  denial of fate and therefore, the student needs additional

23  Comp Ed.  There has to be some type of burden, the parent

24  has to present something to show this.

36

257

1       MS. TILLERY:  And the fact that it's a procedural

2   violation, in order for a procedural violation to rise to a

3   level of fate there's only three ways that can do that;

4   that's cause deprivation of education benefit;

5   significantly impede the parent's opportunity to

6   participate a decision making process; and impede the

7   child's right to fate.  I haven't even had a opportunity to

8   put my parent on the stand to testify to, if she has, if

9   there's been a cause of a deprivation of educational

10  benefits or if it significantly impeded the parent's

11  opportunity to participate in a decision making process.

12      And those are the only three ways a procedural

13  violation can raise the level of fate and I am stating that

14  we believe we have that.

15      MS. PUCKETT:  From my understanding we're going on

16  issues two and three.

17      HEARING OFFICER:  Okay.  I'll let you put on your

18  case.  It's a very - - if that's your evidence it's much

19  more than that.  I think you should make sure you

20  understand what the burden is in this case, because if you

21  lose on these issues, - - I'm not sure what - - what is it

22  that you want?  What did you want?

23      MS. TILLERY:  What do we want, well umm - -

37

258

1      HEARING OFFICER:  If the child is not receiving

2   Special Ed services now and haven't been for the last two

3   years, what Special Ed services do you want?

4      MS. TILLERY:  We're asking that they fund them, that

5   they fund the ESY and Comp Ed independently.  So, we're

6   asking for - -

7      HEARING OFFICER:  Is the child receiving Special Ed

8   services?

9      MS. TILLERY:  Is the child receiving Special Ed

10  services now?

11     HEARING OFFICER:  Yes.

12     MS. TILLERY:  No.  The child - -

13     HEARING OFFICER:  Has the child received Special Ed

14  services since that IEP was developed?

15     MS. TILLERY:  Since 1-26-06?

16     HEARING OFFICER:  Yeah.

17     MS. TILLERY:  No, the child has not received Special

18  Ed services.

19     HEARING OFFICER:  So have you rejected the services?

20     MS. TILLERY:  The parent hasn't - - no one has

21  contacted the parent to have his services implemented.

22  That's - -

1      HEARING OFFICER:  They did.  The IEP says where his

2  services was gonna be implemented.  Why isn't the student

3  at Boeing and at Bruce Monroe?

4      [Pause.]

5      HEARING OFFICER:  Why isn't the student at Bruce

6  Monroe?

7      MS. TILLERY:  Why isn't he?

8      HEARING OFFICER:  Yeah.

9      MS. TILLERY:  Bruce Monroe?

10      HEARING OFFICER:  Isn't that where the services are

11  going to be provided?

12      MS. TILLERY:  Well, according to - -

13      [Pause.]

14      MS. TILLERY:  Okay, umm.

15      HEARING OFFICER:  You want a minute to talk to your

16  client or?

17      MS. TILLERY:  Yeah.

18      HEARING OFFICER:  Okay, why don't I give you - - how

19  much time you want about?

20      MS. TILLERY:  About five minutes.

21      HEARING OFFICER:  About five minutes, that's the

22  target set.

23      MS. TILLERY:  Okay.

24      HEARING OFFICER:  Okay.

1        I'll come back in.

2        MS. TILLERY:  Okay.

3        HEARING OFFICER:  Okay.

4

5        [Break was taken 10:18 a.m. to 10:45 a.m.]

6

7        HEARING OFFICER:  Okay, back on the hearing record

8    here.  It's about time for attorneys to consult with their

9    client.  Where are we now with this case?  I know we're - -

10   yeah.  There are lots of things what was in the air when I

11   left, was - -

12       MS. TILLERY:  But we're still - -

13       My issue is still with the ESY services and I know

14   that we stated before that according to *Reed* the hour for

15   hour couldn't be done and that the division that the three

16   prongs need to be satisfied.  But based on the fact that

17   this - - we're talking ESY not as Comp Ed but as ESY.  Then

18   *Reed* does not apply to issues we're talking about

19   compensatory education.

20       ESY is supposed to be provided if it determined that

21   the services are necessary as a provision of fate to the

22   child's IEP, pursuant to IDEIA.  In this case it has been

23   determined that ESY services are supposed to be done.

40

261

1     Secondly, the IEP from 1-26-06; DCPS counsel says that

2     the IEP was supposed to be made but if that was the case

3     .then why does it say that the managing schools, Care

4     center, and Bruce Monroe, and the goals are developed·

5     should be evaluated monthly based on test and documented

6     observations.  So obviously, there's was, the IEP was to be

7     implemented at the school by Care center and Bruce Monroe.

8     If that was the case then, this schools would not have been

9     implemented when his IEP was done.  And it's clear that the

10    attending school at the time was Nativity.

11    And manager care center in Bruce Monroe and these

12    schools were developed with evaluation procedures in place,

13    and the evaluation schedule in place.  And annual goals and

14    short term objectives.

15    So if that was the case, then why would these be

16    developed if this was not supposed to be implemented at the

17    school by the Care center?

18    HEARING OFFICER:  I think we might as well take the

19    case because I have explained what you have to do.  You

20    disagree.  Unfortunately, I make the decisions, so.  The

21    law is very clear.  I'm not here to enforce his Comp Ed

22    plan; that you can't site me any authority where I have

23    authority to enforce a Comp Ed plan.

41

262

1      You have to establish for me, this hearing officer,

2   this student needs the Comp Ed.  There is no authority in

3   the IDEIA for me to enforce a Comp Ed plan; cited.

4      MS. TILLERY:  So you're saying that because the Comp

5   Ed plan that exists, you cannot enforce a Comp Ed plan

6   that's in existence?

7      HEARING OFFICER:  No.  I'd have to determine the

8   student is in need of the Comp Ed.  Plus the Comp Ed plan,

9   if I'm not mistaken is two years old and - -

10     MS. TILLERY:  Yes, but we still fall within the

11  timeline. The timeline has not expired.

12     HEARING OFFICER:  So that's more the reason I need

13  evidence of the need.  Particularly in light of the fact

14  that you said that the child is not in a Special Ed program

15  now.

16     MS. TILLERY:  So you're asking for the need of the

17  Comp Ed plan that was already, that was the reason for

18  that.

19     HEARING OFFICER:  I'm asking, Ma'am, when you come

20  here with a case, you have to be able to establish the

21  evidence for the case.  Unless you can site me authority

22  that; I'm here, here is your authority under the IDEIA to

23  enforce an existing Comp Ed plan, it's two years old.  Then

1    you would have to be prepared to put on your case that the

2    student is entitled to the services.

3        I think more so because the plan is two years old,

4    there has been, obviously, a change.

5        MS. TILLERY:  Even if there has been a change of the

6    services, he's still entitled to his services.

7        HEARING OFFICER:  Okay.  Well, you're evidence will

8    establish that; if you have evidence beyond the plan.

9        MS. TILLERY:  Can I have my parent testify?

10       HEARING OFFICER:  Yes.

11       Okay what we will do at this point - - let's make sure

12   that we're clear on our issue.  What are we gonna do with

13   the first one?  You can't reserve on it now if we are going

14   to start the case.

15       MS. TILLERY:  The IEP issues?

16       HEARING OFFICER:  Yes.

17       MS. TILLERY:  Well if that's the case then we would

18   like to - - if we could - - if we with drawl this issue

19       then that will leave us with the Comp Ed.  And if we

20   amend this issue, if we are allowed to amend this issue at

21   the table, then, we would be able to go through with the

22   ESY and the Comp Ed.

23       HEARING OFFICER:  I can't amend at the table.  The

24   court's made that - - the law it says I cannot amend it.

1          MS. TILLERY:  Well we would have liked to then

2    withdraw this issue without prejudice, Mr. Hearing Officer.

3          HEARING OFFICER:  How could you withdraw without

4    prejudice, you could never bring it back, there is another

5    IEP.  You would never bring back the 5-26-05; that claim is

6    no longer valid.

7          MS. TILLERY:  Oh, because of the 1-26-06 IEP?

8          HEARING OFFICER:  Right.

9          MS. TILLERY:  So you're saying the 5-26-05 - -

10         HEARING OFFICER:  You would never - -

11         MS. TILLERY:  Oh - -

12         HEARING OFFICER:  So that's - -

13         MS. TILLERY:  I understand what you're saying.

14         HEARING OFFICER:  Yeah, there would never be a need to

15    bring that claim back.  Now, the only problem with that,

16    link that to your ESY.  There's no ESY after that year?

17         [Pause.]

18         HEARING OFFICER:  Right at - -

19         MS. TILLERY:  That's what the year that ESY was

20    awarded.

21         HEARING OFFICER:  Yeah, you had said it was for '05

22    and '06 but then the 06 IEP didn't have ESY.

23         MS. TILLERY:  There is a '06 IEP that still states

24    that the ESY was not given.  So, - -

44

265

1          HEARING OFFICER:  There's no ESY in the '06 IEP

2     though, correct?

3          MS. TILLERY:  Correct.  They are referring to 5-26,

4     '03-'05 IEP.

5          [Pause.]

6          MS. TILLERY:  Well, then I would have to, I guess I -

7     -

8          HEARING OFFICER:  Let me give you one more thing to

9     factor in before you consider.  You've re-filed this, you

10    know you'd be on your statute of limitation there, because

11    5-26-07 was two years.

12         MS. TILLERY:  Uh-mm.

13         HEARING OFFICER:  Now it's June.

14         MS. TILLERY:  So at this point, then.

15         HEARING OFFICER:  Yeah, you'd be on your, so you

16    couldn't re-file it anyway.  You'd be on your statute of

17    limitations.

18         MS. TILLERY:  [Whispering to her client.]

19         HEARING OFFICER:  There's a two year statute of

20    limitation.

21         MS. TILLERY:  [Whispering to her client again.]

22         HEARING OFFICER:  You don't wanna think about this

23    because this puts you in a tough bind that you're placed in

266

1    because the claim would be, you couldn't bring it back,

2    it's already past May 26, '07.

3        MS. TILLERY:  Uh-mm.  So then our only option is to -

4    -

5        HEARING OFFICER:  Your only option is you have to deal

6    with is advice her, I mean, when you get into situations

7    like this you have to talk.

8        [Laughter.]

9        MS. TILLERY:  Our only option would be to request then

10    to amend - -

11        HEARING OFFICER: Well you have to get consent, see.

12        MS. PUCKETT:  To amend to what exactly what are we

13    talking about to amending to?

14        MS. TILLERY:  Um, the for the issue of the annual IEP,

15    review of the students IEP to we would have to, we would

16    like to then amend the issue of and then the facts to

17    reflect the it was expired 1-26-06.

18        MS. PUCKETT:  And were talking about issue one correct

19    Mr. Woods?

20        MS. TILLERY:  Um.

21        HEARING OFFICER:  Well were flowing from it is because

22    the problem is that - -

23        MS. TILLERY: Flowing from that is the ESY.

46

267

1      HEARING OFFICER:  Right because you don't have an ESY

2  in the '06.  That's the dilemma it places you in.

3      MS. TILLERY:  The ESY - -

4      HEARING OFFICER:  Is in the '05.  That's what I'm

5  saying that put in a little dilemma because you don't have

6  ESY in '06.

7      MS. TILLERY:  For the '06 - -

8      MS. PUCKETT:  But there's nothing I can do in regards

9  to that - -

10     HEARING OFFICER:  Yeah there's no - -

11     MS. PUCKETT:  There's - - I mean the issue I can agree

12  to amend that would be relevant with this case is the

13  information in regards to the DCPS failure to not have an

14  annual IEP and amending the days to be 1-26-06 instead of

15  the 5-26-05 and even if, even - -

16     MS. TILLERY:  That's what I just - - go ahead.

17     MS. PUCKETT:  And even when it's amended, it starts

18  essentially, you don't file a new complaint but it starts

19  over again so it's really no different.  So I have no

20  problem with the amendment of the language for that, for

21  that issue that 1-26-06 IEP because it's going to

22  essentially start over again anyway and the school wants to

23  do a resolution meeting which is going to be required

24  anyway.

1      MS. TILLERY:  So if an amendment is done, I didn't

2  think that a resolution meeting would be required to be - -

3      HEARING OFFICER:  You have to start over.

4      MS. PUCKETT:  It starts over.

5      MS. TILLERY:  From the beginning?

6      HEARING OFFICER:  Yes.

7      MS. TILLERY:  And how is that going to - - that's

8  still going to put us beyond the statue of limitations if

9  we - -

10     MS. PUCKETT:  Time line starts over.

11     HEARING OFFICER:  You're going to be, you're already

12  to lose the 5-26-05. That's why I'm saying technically you

13  lost that because if you change it you don't have it before

14  your hearing officer and if you wanted to re-file it's to

15  late.

16     MS. TILLERY:  What issue are we at Comp Ed?

17     HEARING OFFICER:  You want to talk about this?  You

18  want to just look at your case again?  And - -

19     MS. TILLERY:  No I'm familiar with - - I know that

20  that's the issue that we have left is a compensatory

21  education in 17 hours.

22     [Pause.]

23     HEARING OFFICER:  But we're not gonna bifurcate this;

24  either it's gonna to be amended and it's all one hearing or

269

1  we could withdraw it or it'd be dismissed, the other

2  claims.  But we can't two hearings.

3      MS. TILLERY:  No, I understand.  If we were to go

4  forward with the one issue and the other issues are not

5  going to be brought.

6      HEARING OFFICER: So what - -

7      MS. TILLERY:  That the ESY and the Comp Ed, I mean,

8  the ESY and the 5-26.

9      HEARING OFFICER:  So I can dismiss those?

10     MS. TILLERY: [Whispering.]

11     HEARING OFFICER:  I'm sorry.

12     MS. TILLERY:  The parent would like to proceed on the

13 issue of co-efficient situation.

14     HEARING OFFICER:  We gotta deal with the first ones

15 first though.

16     MS. TILLERY:  Oh the other-, the 5-, issue one and

17 issue three.  You just said that you were going to - -

18     HEARING OFFICER:  Dismiss them?  They'd be dismiss

19 with prejudice, they could not be brought back.  That means

20 they can never come back to the hearing officer.

21     MS. TILLERY:  But regardless they could never go back

22 because if we re-file they're still going to be, they're

23 going to be, after 5.607.

24     HEARING OFFICER:  That's correct.

270

1          MS. TILLERY:  So these issues are, are issues that we

2     could not bring regardless.

3          HEARING OFFICER:  Okay, so the IEP, - - so there's no

4     need to amend their complaint, then?

5          MS. TILLERY:  No, the parent would just like to

6     proceed on the one issue of the compensatory education so

7     we - -

8          HEARING OFFICER:  Okay, so we need to take the

9     evidence on the issue of the - - whether the student is

10    entitled to any compensatory education.

11         [Pause.]

12         HEARING OFFICER:  How would you like to proceed on

13    that issue?

14         MS. TILLERY:  Could I have my parent testify?

15         HEARING OFFICER:  Yeah, whoever you want.

16         MS. TILLER:  Okay.

17         HEARING OFFICER:  Okay.  We'll take the testimony in

18    this case on the sole issue remaining.  The hearing officer

19    will dismiss with prejudice the issue in the hearing

20    request that deals with a 5-26-05 IEP.  Because when that

21    issue was filed there was in fact a January 26, '06 IEP.

22    So that issue was incorrectly stated when filed.  And if

23    counsel has asked for leave to amend, even if she had to

1    leave to amend, it would be beyond the two years statute of

2    limitation that the IDEIA provides.

3         The claim for extended school year services for the

4    summer of 2007 falls within the, two thousand, 5-26-05 IEP.

5    So if you were to join the - - if the IEP was not going to

6    be an issue in the case then anything related to it would

7    seem to the hearing officer, at least it's my understanding

8    would not be in this case.

9         So the only issue remaining is, whether the student,

10   for the reasons that will be established, he's entitled to

11   any compensatory education.  The hearing officer is not

12   sure what the basis for that is, but the testimony will

13   provide the reasons for it and the need, pursuant to the

14   requirements of *Reed*.

15        And the parent, therefore, can call their witnesses

16   first.  Your attorney will call witnesses to testify who

17   will support her case.  Each witness would be sworn to give

18   their testimony by being asked questions by Ms. Tillery,

19   sot that would be followed by questions from Ms. Puckett.

20        Once the parent finishes her case, DCPS would put on

21   its case asking questions of its witnesses first, so that

22   would be followed from Ms. Tillery.  And at the conclusion

23   of that testimony, the parties can give, if they'd like

1    some of their remarks and that will conclude the

2    evidentiary phase of the hearing.

3        So Ms. Tillery, the case is yours, you would like to

4    proceed with calling your witnesses.

5        MS. TILLERY:  Could you tell us your name for the

6    record?

7        HEARING OFFICER:  Who is your first witness?

8        MS. TILLERY:  I'm sorry, my first witness is Ms.

9    Teresa Lee, here.

10       HEARING OFFICER:  Oh, Ms., pardon me, Teresa Lee,

11   okay, Ms. Lee before giving your testimony, do you swore

12   affirm you're about to give will be the truth?

13       MS. LEE:  Yes.

14

15                 **TESTIMONY OF TERESA LEE**

16

17       HEARING OFFICER:  Okay.  You may proceed, Ms. Tillery.

18       MS. TILLERY:  Could you tell us your name for the

19   record.

20       MS. LEE:  Teresa Lee.

21       MS. TILLERY:  What is your relationship to A████████

22   L███?

23       MS. LEE:  I'm his Mom.

273

1        MS. TILLERY:  What if any disability does A███████

2    have?

3        MS. LEE:  He has a learning disability.

4        MS. TILLERY:  Can you identify this exhibit, can you

5    identify Exhibit 4 for me?

6        MS. LEE:  Yes.

7        MS. TILLERY:  What is this exhibit?

8        MS. LEE:  Comp Ed plan.

9        MS. TILLERY:  Do you remember this compensatory

10   education plan being developed?

11       MS. LEE:  Yap, yes I do.

12       MS. TILLERY:  Why was he given compensatory education?

13       MS. LEE:  Because he has a learning disability.

14       MS. TILLERY:  Can you be more specific?

15       MS. LEE:  He has issues in reading, and writing, and

16   expression.

17.      MS. TILLERY:  What services, if any, was your son

18   given from this plan?

19       MS. LEE:  You mean what did he receive?

20       MS. TILLERY:  Yes.

21       MS. LEE:  Lies, nothing, promises.

22       MS. TILLERY:  Who, if anyone, did you speak with about

23   getting is compensatory education services implemented?

1          MS. LEE:  I spoke with DCPS, I've talked to the Care

2     Center, I've talked to the principals of the school,

3     teachers.

4          MS. TILLERY:  What did they tell you?

5          MS. LEE:  That he's gonna be alright.

6          MS. TILLERY:  Who told you - - who did you

7     specifically speak with?

8          MS. LEE:  In '06, or '05?

9          MS. TILLERY:  After the Comp Ed plan was developed.

10         MS. LEE:  In '06?

11         MS. TILLERY:  '05, and '06.

12         MS. LEE:  In '05, we had a team meeting at Bruce

13    Monroe.  Mr. Turner finally granted us the 17 hours and 15

14    minutes.  None of it was implemented.

15         MS. TILLERY:  Okay.  How is your child's academic

16    progress currently?

17         MS. LEE:  Poor.

18         MS. TILLERY:  How has his behavior affected his - -

19    how has his poor academics affected his behavior?

20         MS. LEE:  Whenever he is faced with a challenge, he

21    acts out.

22         MS. TILLERY:  What education benefits has A▆▆▆▆▆ been

23    deprived of?

24         MS. LEE:  The education.

275

1        MS. TILLERY:  Can you be more specific?

2        MS. LEE:  He's been deprived of one-on-one tutoring,

3   he's been deprived of one-on-one sessions in Reading.  He's

4   not that bad in Math but he just haven't been entitled to

5   that one-on-one Reading.

6        MS. TILLERY:  Okay, no further questions.

7        HEARING OFFICER:  Ms. Puckett?

8        MS. PUCKETT:  Ms. Lee, do you recall participating in

9   a IEP meeting on January 26, '06?

10       MS. LEE:  Yes.

11       MS. PUCKETT:  And do you recall there being some

12  discussion about Comp Ed at that meeting in regards to him

13  not getting a Comp Ed from DCPS?

14       MS. LEE:  Repeat that again.

15       MS. PUCKETT:  Do you recall there being a discussion

16  of Comp Ed at that meeting?

17       MS. LEE:  Yes.

18       MS. PUCKETT:  And do you recall that DCPS in their

19  being an indication that you will enroll your student in

20  summer school to implement that Comp Ed plan?

21       MS. LEE:  Not in '06, but in '05.

22       MS. PUCKETT:  I would like parent's counsel to refer

23  to the plans to the meeting notes from the 1-26-06 meeting.

24  That's parent's Document no. 5.  And I'm referring to the

276

1    last page of the meeting notes at the bottom it indicates,

2    under location of services, Bruce Monroe Elementary School;

3    it says, that with an asterisk, ``the parent will enroll

4    A██████ in summer school to complete Comp Ed plan completed

5    on 5-26-05.''

6         MS. LEE:  I remember, yeah, I'm thinking about,

7    Nativity.

8         MS. PUCKETT:  And did you enroll the student in summer

9    school for the summer of 2006 at Bruce Monroe?

10        MS. LEE:  Yes, ma'am.

11        MS. PUCKETT:  You enrolled the student in summer

12   school?

13        MS. LEE:  Uh-mm.

14        MS. PUCKETT:  Did he go to summer school?

15        MS. LEE:  No, they went under construction.

16        MS. PUCKETT:  Did they go under construction on '05,

17   or '06?

18        MS. LEE:  '05.  '06 CP was out on Bruce Monroe.

19        MS. PUCKETT:  Okay, but do you recall there being a

20   discussion that he can receive the Comp Ed plan at Bruce

21   Monroe, for the summer '06

22        MS. LEE:  No, I don't recall.

23        MS. PUCKETT:  And, is the student currently in a

24   Special Ed program at Nativity center?

277

1        MS. LEE:  Supposedly.

2        MS. PUCKETT:  What do you mean, supposedly?

3        MS. LEE:  Well actually the only way he ended up at

4    Nativity is because Nativity received his educational

5    issues on paper.

6        MS. PUCKETT:  Uh-mm.

7        MS. LEE:  His IEP, all of that was brought to them,

8    before, I enrolled him in Nativity.

9        MS. PUCKETT:  Okay.  And now are they implementing the

10   Comp, the IEP for him?

11       MS. LEE:  In the 5th grade, they did.

12       MS. PUCKETT:  Uh-uh.

13       MS. LEE:  I mean in the 45th grade, they did.  But the

14   5th grade, they didn't.

15       MS. PUCKETT:  Fourth grade, he was at Bruce Monroe,

16   correct?

17       MS. LEE:  No, 4th grade, - - He's now entering into the

18   6th grade.

19       MS. PUCKETT:  Okay so 4th grade at Nativity, they

20   implemented his IEP from DCPS?

21       MS. LEE:  Pretty much.

22       MS. PUCKETT:  And did they implement the IEP for this

23   school year?

24       MS. LEE:  No ma'am.

1     MS. PUCKETT:  Okay.  And do you know why they are not

2  implementing that IEP?

3     MS. LEE:  Well, after talking with the principal, she

4  went out under maternity leave.

5     MS. PUCKETT:  Uh-mm.

6     MS. LEE:  She was under the impression that the team

7  was gonna still communicate with me, we want to still have

8  our monthly meetings, and that we were gonna still have a

9  progress report on him.  However, when she was gone, none

10  of this was done.  Nothing.

11     MS. PUCKETT:  And you do understand that, Nativity is

12  not a DCPS school?

13     MS. LEE:  Yes ma'am.

14     MS. PUCKETT:  I don't have any additional questions.

15     HEARING OFFICER:  Anything further?

16     MS. TILLERY:  At the 1-26-06 meeting, was the Comp Ed

17  plan brought out?

18     MS. LEE:  Yes.

19     MS. TILLERY:  At this meeting where it says the parent

20  must enroll students to complete compensatory education

21  plan?

22     MS. LEE:  With at '06?

23     MS. TILLERY:  Yes, the 1-26-06 in January.

24     MS. LEE:  At Nativity?

1          MS. TILLERY:  Yeah.

2          MS. LEE:  The summer school part.  I can't recall us

3     talking about summer school because Bruce Monroe - - I mean

4     because Nativity doesn't have summer school.

5          MS. TILLERY:  Where you under the impression that the

6     Comp Ed plan that you went, did in '05 was gonna be done?

7          MS. LEE:  Yes.

8          MS. TILLERY:  In the summer of '06?

9          MS. LEE:  Actually, I'm thinking that they would want

10    to follow the plan that was presented to them.

11         MS. TILLERY:  Do you remember if that plan was brought

12    out at, on the table at the 1-26-06 meeting?

13         MS. LEE:  No, very vaguely.

14         MS. TILLERY:  At that meeting do you remember them

15    discussing how many hours of Comp Ed he was supposed to

16    get?

17         MS. LEE:  Yes.

18         MS. TILLERY:  Did they say who will be implementing

19    that Comp Ed plan in summer school?

20         MS. LEE:  Well I had to - - when I enrolled him into

21    summer school in '06, they said he would get an hour of

22    enrichment.  An hour of enrichment.

23         MS. TILLERY:  Can you explain to us what enrichment

24    is?

1        MS. LEE:  An enrichment is to bring out their skills,

2    other than just having fun all day long.  That's their

3    learning time for an hour, and that's what he did receive

4    from Nativity and when he went it's called, it was camp.

5    That was camp, it wasn't summer school, it was camp.  And

6    they had an enrichment program.

7        MS. TILLERY:  Can you tell us, was that a group

8    program or individualized program?

9        MS. LEE:  Until we found out, it was a group.

10    There was no individuals there.

11        MS. TILLERY:  Okay, I have no further questions for

12    her.

13        HEARING OFFICER:  Okay, anything further?  Any other

14    witness?

15        MS. TILLERY:  I'm not going to call Ms. Pinkley at

16    this time.

17        [Pause.]

18        MS. TILLERY:  Can I retract that?  Can I call Ms.

19    Pinkley?

20        MS. PUCKETT:  She hasn't rested, so that's fine.

21        HEARING OFFICER:  Yeah, you maybe - -

22        Ms. Pinkley, do you swear upon the testimony you're

23    about to give will be the truth?

24        MS. PINKLEY:  Yes.

281

1      HEARING OFFICER:  Okay.

2

3                **TESTIMONY OF DIANE CRUISE PINKLEY**

4

5      MS. TILLERY:  Please state your name for the record.

6      MS. PINKLEY:  Diane Cruise Pinkley.

7      MS. TILLERY:  Where are you currently employed?

8      MS. PINKLEY:  James E. Brown and Associates.

9      MS. TILLERY:  What is your position?

10     MS. PINKLEY:  Educational Advocate.

11     MS. TILLERY:  What is your educational background?

12     MS. PINKLEY:  I have 15-plus years in the field of

13  education.  I have a Masters Degree in Education, and I

14  have 18-plus hours towards a Special Education with

15  children working with behavioral and emotional

16  disabilities.

17     MS. TILLERY:  What are your duties?

18     MS. PINKLEY:  My duties are to attend IEP meetings of

19  the parent; correspond as a liaison with the school and

20  parent; review client's files; schedule resolution

21  meetings.

22     MS. TILLERY:  Did you review the file for A██████ L██?

23     MS. PINKLEY:  Yes I did.

1          MS. TILLERY:  Can you look at Exhibit 4 for me,

2    please.

3          MS. PINKLEY:  Yes.

4          MS. TILLERY:  Can you identify this for me?

5          MS. PINKLEY:  That is the Compensatory Education plan.

6          MS. TILLERY:  Is this one of the documents you

7    reviewed?

8          MS. PINKLEY:  Yes I do.

9          MS. TILLERY:  What if any info did you gather from

10   this document?

11         MS. PINKLEY:  Information that I've gathered from this

12   document was that A▬▬ was awarded 17 hours and 15

13   minutes of Comp Ed time for reading and written expressions

14   services that he missed in May of '05.

15         MS. TILLERY:  What if any opportunity did you have to

16   observe A▬▬?

17         MS. PINKLEY:  Yes, I had an opportunity to observe

18   A▬▬ at Nativity School.

19         MS. TILLERY:  Could you please describe what you

20   observed?

21         MS. PINKLEY:  I observed a Map lesson, in

22   participating in a map lesson.  He appeared to be involved.

23   He participated.  I had an opportunity at a short break to

24   speak with his teacher, Ms. Williams.  She indicated to me

1    that he had difficulty with reading and writing.  I asked

2    what was his overall average level, and she said that he

3    falls somewhere between a low average or below average as

4    far as her entire class was concerned.

5         She advised me through our discussion to speak with

6    Ms. Whampley the Title One resource teacher at Nativity,

7    and I had an opportunity to speak to her as well.

8         MS. TILLERY:  What she tell you?

9         MS. PINKLEY:  Mrs. Whampley shared with me that

10   A███████ comes to her a couple of times a week for maybe 45

11   minutes.  She also stated that he reads at somewhere at a

12   First to a Second grade reading level.  She stated that he

13   had difficulty with the coding words.  And she also stated

14   that he needed intense one-on-one time with the special

15   education teacher.

16        MS. TILLERY:  Okay, thank you.  No further question.

17        HEARING OFFICER:  Ms. Puckett?

18        MS. PUCKETT:  Yes, Ms. Pinkley, you indicated that you

19   spoke with Ms. Whampley.  She's not a Special Ed teacher,

20   correct?

21        MS. PINKLEY:  No she isn't.

22        MS. PUCKETT:  And did you find out if the student is

23   currently seeing a Special Ed teacher at Nativity?

24        MS. PINKLEY:  Yes I did.

284

1          MS. PUCKETT:  Is he receiving any type of Special Ed

2     services at Nativity?

3          MS. PINKLEY:  No he's not.

4          MS. PUCKETT:  And how long have you known the student?

5          MS. PINKLEY:  I know of him through way of reading his

6     file and conducting an observation for approximately an

7     hour.

8          MS. PUCKETT:  And when was that observation?

9          MS. PINKLEY:  That observation was done on May 14th.

10         MS. PUCKETT:  And prior to that, did you know the

11    student?

12         MS. TILLERY:  Objection.  Relevance.

13         What is relevance to that regarding compensatory

14    education?

15         MS. PUCKETT:  She's the student's advocate.  I'm

16    trying to figure out when she got involved with the case.

17    We have an observation that wasn't out.

18         HEARING OFFICER:  Any objects?  I mean - -

19         MS. PUCKETT:  I don't understand how it's irrelevant.

20         HEARING OFFICER:  Any objections I mean your offering

21    us as a person who has knowledge of the need for the

22    services.

23         MS. TILLERY:  That's fine, but the issue is the need

24    for the compensatory education plan.

1          MS. PUCKETT:  The Comp Ed plan goes back to 2005.  I'm

2     asking, I think it's very relevant the time period, she's

3     been working with the student.

4          HEARING OFFICER:  Wouldn't that be relevant with

5     respect to his needs?

6          MS. TILLERY:  She's reviewed the documents though.  So

7     - -

8          HEARING OFFICER:  Okay so she, we'll allow that

9     question because it certainly would appear that because the

10    person whose trying to establish his needs, we'd like to

11    know your first hand knowledge for those needs.

12         MS. PINKLEY:  My personal knowledge is - -

13         HEARING OFFICER:  No, if you could just answer her

14    question.

15         MS. PUCKETT:  Did you know the student prior to May

16    14th, '07?

17         MS. PINKLEY:  Yes I did.

18         MS. PUCKETT:  And what time frame did you first become

19    familiar with the student?

20         MS. PINKLEY:  In, beginning of May.

21         MS. PUCKETT:  Beginning of May?  I have no additional

22    questions.

23         MR. HEARING OFFICER:  May of what year?

24         MS. PUCKETT:  May what?

286

1       MS. PINKLEY:  May '07.

2       MS. PUCKETT:  I have no additional questions.

3       HEARING OFFICER:  Ms. - -

4       MS. TILLERY:  The only thing I'm waiting here is do my

5   closing.

6       HEARING OFFICER:  Are you done?

7       MS. TILLERY:  I don't have additional questions.

8       HEARING OFFICER:  Okay.

9       Ms. Puckett?

10       MS. PUCKETT:  Are you resting?

11       MS. TILLERY:  I - - once I do my closing.  So my - -

12       HEARING OFFICER:  So your - -

13       MS. TILLERY: - - my cases.

14       HEARING OFFICER:  You're resting your case at this

15   point?

16       MS. TILLERY:  Umm - -

17       HEARING OFFICER:  You do the closing after DCPS's

18   case.

19       MS. TILLERY:  I just want to add that in a claim of

20   the compensatory education - -

21       MS. PUCKETT:  I'm sorry, I don't know if she's doing

22   closing but I'm trying find out if there's gonna be

23   additional witnesses called, if not, then the case needs to

24   be rested.

287

1      MS. TILLERY:  There's no additional witnesses that I'm

2    going to be calling at this time.

3      HEARING OFFICER:  Okay, you rest?

4      MS. TILLERY:  Then I rest my case from him, I reserve

5    my closing.

6      HEARING OFFICER:  Okay.

7      MS. PUCKETT:  And DCPS is asking for a motion for

8    directive finding.  For two reasons: number one, there has

9    not been any evidence to establish any type of a denial of

10   fate in this case.  You do have a Comp Ed plan that came

11   out of an HOD prior to May 26th of '05 for a denial of fate.

12   There has not been an establishment of how a failure to

13   implement the Comp Ed plan has caused an additional denial

14   of fate.

15      The hearing officer cannot make a finding on a denial

16   of fate from a previous denial of fate.  There has to be an

17   establishment of how this procedural violation has harmed

18   the student.  There hasn't been any evidence to show that.

19      And actually, we all know that the student is

20   currently not receiving any Special Ed services. The

21   student is parentally placed, and a private school which

22   DCPS is not the LEA for.  We're not responsible for the

23   school and we're functioning right now as the SEA for this

24   child.

288

1    The parent indicated that Nativity was providing

2   services, providing some Special Ed services in 2005.  But

3   they're currently not providing Special Ed services this

4   year based on the IEP that DCPS did.

5    DCPS has nothing to do with that.  We can't force

6   Nativity to provide the student with Special Ed services.

7   We offer Special Ed services at Bruce Monroe.  The two IEPs

8   that you have in the record are for services at Bruce

9   Monroe.  There has not been an establishment of a denial of

10   fate.  Parents, counsel, witness, Ms. Pinkley, has gotten

11   involved with this case after the complaint was filed.

12   Then I believe she said that at the believe that the

13   beginning of May, she got involved with this case; she did

14   a classroom observation and reviewed some records.

15    There has not been any testimony as to what the loss

16   has been to this child as far as giving out the hearing

17   officer something to make a remedy on.  As we know, the

18   *Reed* case some type of substantial evidence as to what is

19   required.  You don't have any testimony in regards to the

20   amount of hours that are required, the loss that actually

21   took place due to a '05, 17 hours of specialized

22   instruction; you don't have anything as to what type of

23   specific programs the student would need.  And what level

1    the student should be at, should have been at after

2    receiving 17 hours of specialized instruction.

3         I don't believe that parent has met their burden in

4    his case, and DCPS is asking for a directive finding

5    dismissing this client.

6         HEARING OFFICER:  You may sit down.

7         Yes Ms. Tillery.

8         MS. TILLERY:  I don't understand how DCPS counsel can

9    ask for a motion for directive finding when they didn't

10   even put on a case.  They didn't present any evidence; they

11   didn't have a disclosure; didn't do a response.  And we had

12   no - - we're - - the parent is prejudiced as far as being

13   surprised evidence, or being unaware of what DCPS is going

14   to bring at this time.

15        Further, the issue of the compensatory education plan.

16   The fact that the plan exists, the prongs of *Reed* has

17   already been established if the plan is here.  We're not

18   asking for you to develop a Comp Ed plan.  We're asking for

19   one to be implemented.

20        And also this is the form for parent if the plan is

21   not being implemented.  DCPS has offered no evidence to

22   prove that this Comp Ed plan has been implemented.  The

23   child's old services has already been established from a

24   previous HOD.  We're not asking you to look at the

290

1    deficiencies and match all the prongs because that we're

2    saying that was already been established here.  If that was

3    not established, this compensatory education plan would not

4    be in existence, if the prongs of *Reed* had not already been

5    met.  We're asking that you implement, that this plan be

6    implemented through DCPS independently funding the 17 hours

7    and 15 minute.

8        We're not asking that at this time that you do the

9    qualitative hour by hour.  It's already said what is

10    necessary here.  Seventeen hours and 15 minutes.  It's not

11    a matter of us saying, He missed services, he didn't - - he

12    missed service, and so for those services that we're

13    talking about he missed today, we're saying a Comp Ed plan

14    is already here, DCPS to not implement this service.

15        So, the denial of fate has already been established.

16    If this plan is here, then, *Reed* has already been met at

17    this point.  This is not a point of going back and going

18    thru *Reed* again because then that would be going back to

19    the old HOD.

20        This Comp Ed plan exists because of a denial of fate

21    was found for missed services in the past, and therefore

22    *Reed* has already been met, the prongs of *Reed* has already

23    been met at this time.

24        MS. PUCKETT:  Mr. Woods, DCPS is not required to call

1    A witness; not required to put on a document.  I'm not

2    required to do anything in regards to disclosure.  The

3    parent has the burden of proof.  And I'm not making any

4    defense arguments or anything that they would have to be

5    put on notice for.

6        What I'm asking for is a motion for directive finding,

7    which is something, motion that the non-moving party could

8    make if the parent has not presented evidence to move the

9    case forward to the non-moving party.  They have not

10   presented evidence.  Parent's counsel just said, that there

11   has already been a denial of fate made, and there's already

12   a Comp Ed plan from a previous denial of fate.  Exactly,

13   there had already been a denial of fate.

14       This hearing officer in front of us has authority to

15   make findings in regards to denials of fate.  Not an old

16   denial of fate.  What we have in front of us is a

17   procedural violation where they need to establish how

18   failure to implement something created a new denial of fate

19   to this hearing officer.  There has not been any evidence

20   here presented today that can give you what you need to

21   make a ruling of a new denial of fate.

22       Especially, in light of the fact that, the student is

23   not currently receiving any specialized services.  DCPS is

24   not funding the private school; is not one of our schools.

1    The parent testified that the student was receiving Special

2    Ed from Nativity in '05, but has not been receiving it this

3    year.  In light of all of that, there has not been any - -

4    and especially with the notes in which the parent

5    participated in saying that we would implement the Comp Ed

6    plan.

7         The parent enrolls the student in summer school at

8    Bruce Monroe in summer of 2006.  There has not been

9    anything to establish a denial of fate in this case.  There

10   is nothing for you to make a new denial of fate finding and

11   I don't believe that you can go back to a 2005 HOD and say

12   because there was a, a there was a, in which the HOD at

13   this point is past two years old, so there can't be a alleg

14   - - there's no allegation as to failure to implement a HOD,

15   because that HOD was way before this case was even filed

16   then.

17        You can't just go back and say, okay Mr. So and so

18   made a denial of fate ruling and so I'm gonna automatically

19   say there's a denial of fate.  There has to be a new denial

20   of fate.  Hearing officers can't make a new ruling of a

21   denial of fate based on a previous denial of fate.

22        MS. TILLERY:  Do you suggest counsel has not provided

23   any evidence, yet, to prove - -

24        MS. PUCKETT:  I'm not required to.

72

293

1     MS. TILLERY:  You are not required to provide any

2    evidence of the compensatory education plan once it is

3    implemented?

4     MS. PUCKETT:  I'm not required to, Mr. Woods.  I'm

5    asking for a motion for directive finding.

6     MS. TILLERY:  What is parent's recourse if she says,

7    Well, there's one done.  She hasn't presented no evidence

8    to the contrary.  Parent testified that Comp Ed plan has

9    not been implemented.  The Comp Ed plan is here and it has

10   not been implemented.

11     MS. PUCKETT:  It's a procedural violation that

12   requires substantive evidence to move it to a substantive

13   violation.

14     MS. TILLERY:  A procedural violation only requires, it

15   only has to cause of deprivation of educational benefit.

16     MS. PUCKETT:  Where is it at?

17     MS. TILLERY:  Where is that found?

18     MS. PUCKETT:  Where is the cause of deprivation in

19   educational benefit.  It has not been presented.  Where is

20   any of the three prongs that the law requires that there is

21   a procedural violation.  They had not presented that.

22   Where is any evidence to go to one of those three prongs.

23   It has not been presented here today.

294

1      MS. TILLERY:  The parent and my advocate - - parent

2    stated that his progress is poor, and that he is below

3    level.  Stating what the advocate stated that she spoke

4    with his first hand with his teacher that the progress was,

5    that he is on a below level and first, I believe she said

6    First grade level.  And the fact is if he didn't need the

7    services then this plan wouldn't exist.  If that was the

8    case then this plan would not be here.  If he didn't need -

9    -

10      MS. PUCKETT:  And there is no evidence that these

11    calls are from DCPS, especially when you have a parent

12    testifying that the private school provided some Special Ed

13    services in 4th grade, but didn't provided any in 5th grade.

14    The advocate just met the student.  And the advocate even

15    said that the teacher said he needs a Special Ed teacher,

16    but the student is not getting what the student needs at

17    Nativity.

18      We offered this student a placement where the student

19    can have a Special Ed teacher.  It says five hours a week

20    with a Special Ed teacher to meet certain goals.  It's not

21    our fault that Nativity is not implementing this IEP, Mr.

22    Woods.  We can't require Nativity to implement this

23    student's IEP.

1          MS. TILLERY:   The issue of the IEP we are talking

2    about Comp Ed, she's talking about implementing the IEP.

3    The Comp Ed has not been given.   That's - -

4          MS. PUCKETT:   There hasn't been a relationship

5    established that - -

6          MS. TILLERY:   Not to mention - - not to mention - -

7          MS. PUCKETT:   - - the student struggling because he

8    didn't get seven hours of Comp - - 17 hours of services

9    Comp Ed services, versus how much of it is DCPS not

10   providing 17 hours of Comp Ed services, versus Nativity not

11   providing a student with an appropriate education, which is

12   not our fault because we didn't place him there, and this

13   is a parentally placed child.

14         MS. TILLERY:   Nevertheless, the Care center is

15   responsible for the monitoring.   If that was the case they

16   would not have developed a IEP for him.   But the goals - -

17         MS. PUCKETT:   Care center is not responsible for

18   monitoring their student - - care center is respon - -

19         MS. TILLERY:   Yes, the SEA is responsible for

20   monitoring.

21         MS. PUCKETT:   Let me just say this Mr. Woods, we need

22   to go back and get the law.   Because the SEA is responsible

23   for providing the student with education opportunity and a

1    IEP.  What's what Care center did.  They provided the

2    student with a IEP, and a placement at Bruce Monroe.

3         We are not responsible for monitoring private schools

4    when we are not the LEA.  You have over 2,000 students in

5    DCPS right now that are placed at private schools by DCPS

6    and we are funding them, and they have placement monitors.

7    Those placement monitors, then considered the LEA for those

8    children because we're placing them there, and funding them

9    there.

10        So we are in a LEA capacity, so we're responsible if

11    that private school does not provide that student with

12    services.  Yes we are.  This is not the same situation.

13    This is why the student is at the Care center.  We're not

14    funding Nativity.  So we can't tell Nativity what they have

15    to do.  We're responsible for placing children at

16    appropriate placements that they can have their needs met.

17        So we're not funding Nativity.  We are not responsible

18    for Nativity not providing the student with Special Ed

19    services.  Had we been funding Nativity, then yes, the

20    person in the office of Special ED will be responsible for

21    making sure that Nativity provides him with five hours of

22    specialized instruction.  And if they didn't, they were

23    supposed to pull him out of there.  This is not the

24    situation.

76

297

1      MS. TILLERY:  The issue is not about the five hours of

2  Special Ed instruction.  As we stated, we are talking about

3  the compensatory education plan.  And DCPS counsel has

4  stated that the parent was supposed to enroll the child in

5  summer school.  Summer school is not Comp Ed.  Comp Ed is

6  services, for missed services in the past, number one.

7  Number two, it's supposed to be individualized.

8      Parent stated that, the child only had one hour of

9  enrichment, and that was with the group.  That's not

10  compensatory education.  If that was the case that it said

11  that it was supposed to be implemented from summer school

12  even if you were to say that.  That was not what the child

13  got.  The child did not get Comp Ed, the child got, one

14  hour of enrichment for summer school, which is not

15  individualized, and not grouped.  And not followed, in the

16  compensatory education plan was not followed, if it was in

17  a group.

18      MS. PUCKETT:  What's Comp Ed, Mr. Woods?  I mean, we

19  all - - Comp Ed is services, or miss-services.  It doesn't

20  say what type of service.

21      MS. TILLERY:  Comp Ed is not one size fits all.

22      MS. PUCKETT:  I'm not sure if parent's counsel under -

23  -

24      MS. TILLERY:  Comp Ed is not one size fits all.

1    MS. PUCKETT:  I'm not sure if parent's counsel

2  understands the relationships as to private students,

3  students who attend private school that are parentally

4  placed that we're not funding, versus students who are

5  placed by DCPS or they come to a hearing and get a

6  placement, and we're funding it, therefore we are the LEA

7  for that child.  We are not the LEA for this student for

8  IDEIA purposes.

9       We are responsible for coming every year which Care

10  center does, and create in a plan.  If the private school

11  chooses to implement it, then that's fine.  If the private

12  school chooses not to implement it DCPS, not being the LEA,

13  cannot do anything about that.  But we did offer this

14  student a placement at Bruce Monroe.

15       There has been no establishment and no calls or link

16  to DCPS not providing 17 hours, and this student not being

17  able to function right now, especially when there's other

18  intervening factors, especially considering that this

19  student has been found eligible as a Learning Disabled

20  student.  But we have on the record that he is currently

21  not receiving any specialized instruction to address any of

22  his IEP goals.

23       And that's not upon DCPS because we issue a IEP for

24  him to receive these services at Bruce Monroe.  We don't

78

299

1   have any control over Nativity not providing the student

2   with specialized services.  So, if this was a case where we

3   had all these Comp Ed that we needed to provide, and there

4   was no other intervening factors that could relate to the

5   student being not making academic progress right now, then

6   it's different.

7       But you don't even have the child in a Special Ed

8   program right now.  The student is not even - - the IEP is

9   not being implemented by the private school, and there has

10  been testimony of that.  So how do you draw the conclusion

11  that he's on the First or Second grade level right now, and

12  that's because of DCPS's failure to implement 17 hours from

13  '05, five from two years ago?  You can't.

14  HEARING OFFICER:  Let me make sure that the parent is

15  aware of where we are in this case.  Because this motion is

16  asking me, before DCPS put on its case to decide that the

17  parent has lost their case, without DCPS putting on a case.

18      A motion for directed decision comes after the party

19  who has the responsibility of producing evidence to prove

20  their claim.  And the person who goes after that can say,

21  well they haven't presented you with the evidence to prove

22  their claim.  So that party says, we don't need to go

23  forward with our case, because you have no case that we

1    need to defend against.   So that's the first thing, that's

2    the status of a case.

3        If the hearing officer was to regret their motion the

4    case would be over.   So I wanted you to understand that

5    that's what a motion for directed decision is.   That

6    happens in basically every case.   And even if it takes you

7    to go before a court, once the party finished their case,

8    whoever goes first, the plaintiff typically, the other side

9    will ask for a directive finding.   Someone I was trying to

10   - -

11       MS. PUCKETT:  I have - -

12       HEARING OFFICER:  Okay.

13       MS. PUCKETT:  Can we go off the record for one second,

14   I think there's my 11 o'clock - - Ms. Covington is not

15   longer with their office so, Mr. West will just go on the

16   record to say that they're asking for a continuance for all

17   of her cases.

18       HEARING OFFICER:  Okay, why don't we - -

19       MS. PUCKETT:  Let me see if this is what she - - let

20   me just find out.

21       HEARING OFFICER:  I forgot that there - - oh, we do

22   have a 11:00?

23       MS. TILLERY:  No, I don't.

24       HEARING OFFICER:  Okay.

1       MS. TILLERY:  But I have a 1:00.

2       HEARING OFFICER:  Pardon me.

3       MS. TILLERY:  I have a 1:00.

4       HEARING OFFICER:  Oh I - -

5       MS. PUCKETT:  She says - - okay Quinn is gonna go in

6  and do it.

7       HEARING OFFICER:  Okay.

8       MS. PUCKETT:  Okay.

9       HEARING OFFICER:  So that was the first thing I just

10  wanted you to aware of.  No, we're wrapping it up, - -

11      MS. TILLERY:  I know.

12      HEARING OFFICER: - - but we wanted you to be aware of

13  that.  The other thing before I make this decision, I just

14  wanted to be clear, Comp Ed is not a right, it's a remedy,

15  it's a remedy that the hearing officer can give.  And

16  that's the way the court has set it up.  You don't get it

17  as a matter of right, it's of that - - once that the

18  hearing officer has made the determination, that a student

19  has been deprived of a free and appropriate public

20  education, one of the remedies, in other words, what you

21  can do, Hearing Officer, to re-mediate that situation is

22  offer compensatory education.

23      So the context that it has to be presented today.  How

24  do I remedy a situation.  So, what the concern is, well I

1    don't know what the situation is, that what was presented

2    was, here is a Comp Ed pointed in this record.   Somebody

3    else made the determination as to why it was needed.

4    That's enough for you, Hearing Officer, to say that it's

5    needed.

6        That's basically the posture of your case.   Do I have

7    evidence to make an independent judgment as to A) that the

8    student has been denied of free and appropriate public

9    education, and then B) the retest, has it been met, and

10   that would be, Well what services did the student miss?   I

11   have no idea.   When did he miss those services?   I have no

12   idea, whatsoever.

13       I don't know what the services are; when he missed it.

14   And then based on that, where would the student be had he

15   received those services?   And then, based on what he is

16   receiving, which really puts a big hole in this case

17   because, apparently receiving Nothing.   How do you remedy

18   that situation when the child has been down-taken.   I'd

19   suspect on his special education.

20       But that's how you fashion a Comp Ed relief.   That's

21   how the hearing officer would fashion a Comp Ed relief.

22   I'm not sure what to do because I tend to think that

23   counsel didn't completely understand.   I tried to explain

24   the burden, but I don't think it was completely understood.

1    And I always feel a little concern when I place

2    mothers, parents, in situations like this, where they

3    didn't understand and they expect someone else to

4    understand, and, here we are now that I'm explaining it,

5    this is what needs to be done, and, I think we can all sit

6    here and say, well we could listen to this tape a hundred

7    times and many of those things that I need are not on this

8    record.

9        I'm just wondering is there some other way that,

10   before deciding this motion that this case could be

11   resolved.  At this point the issue is simply in you don't

12   have to talk I already talked to DCPS because he needs

13   Special Ed services.  Number one, how do you anticipate

14   giving him those services and he is not in special

15   education program.  So that's number one, how do you want

16   that done.  Because obviously, Nativity is not gonna do it,

17   right?

18       MS. TILLERY:  Uh-mm.

19       HEARING OFFICER:  They're not gonna do it.  They're

20   not even providing him with special education.  So,

21   realistically, how do you want it done.  And then,

22   secondly, where do you want it done.  If they're not gonna

23   do it, why would you like to see that done.

83

1    I mean that, you know, when you get in situations like

2    this if it's the way you have good relationship with your

3    opposing county, you just talk to them and try to see in

4    what you can work out.

5    I'm not sure if you completely understood what the

6    obligation was and maybe I'm wrong, maybe there is some law

7    that says I don't have to make this finding, that I could

8    do it your way.  Unless some cited to that legal authority,

9    you know, it's not looking good here.

10    But on the other hand, should the mother suffer?  I

11    don't know if there's some middle ground somewhere that I

12    could reserve on this motion for just a few minutes for the

13    parties to talk.

14    MS. PUCKETT:  Talk about what?

15    HEARING OFFICER:  Can the mother get something.

16    MS. TILLERY:  I mean - -

17    HEARING OFFICER:  I mean - -

18    MS. PUCKETT:  We're talking about a Comp Ed plan from

19    2005 Mr. Woods.  What are we supposed to do about a Comp Ed

20    plan for 2005?  The parent brought the claim.  The parent

21    did not meet their burden.  And there's, I mean, the other

22    issues which could have possibly resolve some other stuff -

23    -

24    MS. TILLERY:  Or can't resolve.

84

305

1       MS. PUCKETT: - - that are, have not been, are not in

2   the record today.

3       HEARING OFFICER:  You were the one that wanted to just

4   sit here and just - - I mean this - -

5       MS. TILLERY:  Well counsel, I'm not asking for that.

6       HEARING OFFICER:  See I don't think she - -

7       MS. TILLERY:  I'm not asking for back comp.  I'm not

8   asking for that and I don't - -

9       HEARING OFFICER:  She may not understand what's going

10  on.

11      MS. PUCKETT:  I understand.  Mr. Woods, DCPS should

12  not to sit and resolve stuff because the parent's attorney

13  does not understand something.  Do you unders - -

14      MS. TILLERY:  I know he's asking you to think and act

15  on your heart, and not on your rules and regulations.

16      MS. PUCKETT:  I only know DCPS is not interested in

17  settling anything at this point Mr. Woods.  Especially not

18  on Comp Ed issue.  DCPS is not resolving this matter.

19      MS. TILLERY:  We are looking to have you ask about

20  where and what we want done, and what we want done is, the

21  17 hours funded independently.  That's our asking, to fund.

22  And the parent will have - - the parent will have these

23  services implemented.  We can talk to compensatory

1  educational services places such as Stepping Stones, and

2  have these 17 hours implemented as funded by DCPS.

3      MS. PUCKETT:  Mr. Woods, you would not be given them

4  anything that they don't already have.  There's nothing

5  here showing that they've requested, this, you know, when

6  we said the student can get in a summer school, you don't

7  have anything saying, we don't want the summer school.  Can

8  we have independent hours, we're talking about 17 hours of

9  services.

10     DCPS is not, is not gonna be, not gonna, and first of

11  all, we're dealing prevailing party status right now

12  anyway.  If we're taking the denial of fate off the record,

13  if we're taking the denial of fate out of here right now,

14  and we're taking prevailing party, where they give

15  attorney's fees, then yes, I'll be willing to sit here and

16  discuss this with the mother.

17     MS. TILLERY:  I wouldn't want you to.

18     MS. PUCKETT:  But I'll be willing to try to resolve

19  something off the record Mr. Woods, if the parent's counsel

20  was not seeking attorney's fees.  And not exceeding a

21  prevailing party status.

22     But the reality is they've already presented their

23  case.  And DCPS has asked for a motion for a directive

24  finding.  It's not our fault that if the parent's counsel

307

1    did not understand the claims or the arguments they were

2    being made.  I'm sorry, it's not our fault.  And I hope the

3    mother understand that it's not my fault that the parent's

4    attorney does not understand the claims.

5         MS. TILLERY:  That's not the case, the parent's

6    attorney is very well aware of the claims and I, you know,

7    am offended by the fact that you're sitting here on stating

8    that I don't know what I'm doing.  I don't unders - -

9         MS. PUCKETT:  I'm sorry, I didn't say it, the hearing

10   officer said it.  I'm just saying what the hearing officer

11   said.

12        MS. TILLERY:  No, I'm addressing you, and I'm stating

13   that, I do know what's - -

14        MS. PUCKETT:  Well don't address me, the hearing

15   officer - -

16        MS. TILLERY:  I do know what's - - I do know what - -

17        MS. PUCKETT:  - - indicated that he does not believe

18   that the parent's attorney - -

19        MS. TILLERY:  I do understand - -

20        MS. PUCKETT:  - - understood her claims.  I did not

21   make that statement.

22        MS. TILLERY:  Well, I do understand the claim.

23        MS PUCKETT:  I'm referring to what the hearing officer

24   said.

1       MS. TILLERY:  I do understand very well with what's

2   going on with my case.  Thank you.

3       And I've stated - -

4       HEARING OFFICER:  Did you understand what she's

5   offering you?

6       MS. TILLERY:  DCPS took - - we're asking for the 17

7   hours funding.  She has offered - - where did she offered?

8   She said she's not willing to do anything.

9       HEARING OFFICER:  She said she - -

10      MS. TILLERY:  She's willing to - -

11      MS. PUCKETT:  I'm not willing to do anything in this

12  venue Mr. Woods.  But I can - -

13      MS. TILLERY:  She's not willing to do anything, she's

14  not willing to - -

15      HEARING OFFICER:  But she said why, she said you have

16  to take off the table - -

17      MS. TILLERY:  The attorney's fees?

18      HEARING OFFICER:  Right, and prevailing party status.

19      MS. TILLERY:  We're not willing to not have attorney's

20  fees.  I mean, we worked just like Ms. - -

21      MS. LEE:  Well Ms., I don't understand that part.

22      MS. TILLERY: - - Like Ms. Puckett works - -

23      MS. LEE:  What do you mean, no attorney fees.

24      HEARING OFFICER:  What's - -

1      MS. TILLERY: [Whispering to her client.]

2      MS. LEE:  And they would do what in return of that?

3  They would still up-grant me compensation, not

4  compensation, I just want him to have Special Ed setting.

5  That' all I want.  I don't want any of their back pay.  I

6  don't want any of that.  I want from this day forward, I

7  want him to be able to go into a DC Pubic School and be

8  granted Special Ed.  That's all I want.

9      MS. PUCKETT:  And see, that's the problem it's not

10  what the complaint is about.

11      MS. LEE:  I want him to be in setting where he could

12  get at least one hour of Special Ed.  I don't want any of

13  this back stuff.  I just want him to be able to learn with

14  a Special Ed teacher.  That's all I, I don't want anything

15  else.  That's all I want.  And that means that you all

16  don't get paid, I don't care.  It ain't about the money,

17  but it's about my son, learning how to read.  This isn't

18  the Sixth grade, or the First grade level.  And I am tired

19  of this, I've been reaching out Care centers and everybody

20  and no one wants to help me.  I'm fed up.

21      MS. TILLERY:  Could I have a moment with my client,

22  please?

1          HEARING OFFICER:  Yes.  Because it does seem that

2    we're really getting at to what her concerns are and that's

3    what the hearing officer was really trying to get at.

4          MS. PUCKETT:  Mr. Woods, I would just ask that

5    parent's counsel explains to the mother that when we are in

6    a private school setting, it's completely different 'cause

7    I'm not sure - -

8          MS. LEE:  He's going to - - I took him out of there

9    because - -

10         MS. PUCKETT:  Let me just say this, because I think

11   the mother is con - - it doesn't understand the

12   relationship between Nativity and DCPS.  I think the mother

13   might be confused as to these services that DCPS is

14   supposed to provide to the student and she probably doesn't

15   fully understand that.

16         When the student is parentally placed in private

17   school, the DCPS does not have to provide specialized

18   instruction.

19         MS. LEE:  I understand that, but if you can recall my

20   statement, the only reason that I placed him into Nativity

21   because I went to them with this in hand before I signed on

22   the dotted line.

311

1      MS. PUCKETT:  And see, that's the problem, Nativity is

2  their own L.E., they're their own school.  And DCPS can't

3  do anything about that.

4      MS. LEE:  I wouldn't have put him in there, if I was

5  under the impression that he wasn't going to receive

6  Special Ed.  They even changed their criteria of his Fourth

7  grade class to meet his need.  So I'm under the impression

8  that they're meeting his need.  They're gonna do what this

9  thing says, to the best of their ability.  This is what the

10  principal and the team of Nativity told me.  So, yes, I've

11  been misled all the way around the board.

12      MS. PUCKETT:  And the parent can't bring their

13  complaint against Nativity.

14      HEARING OFFICER:  But I understand.  That's what I

15  think what we were getting at.  Is there's other issues on

16  the lying, and now we see that there were, I mean, she,

17  this is were their real concern is, I mean, she really - -

18  it may be just being - -

19      MS. PUCKETT:  But there are issues with the private

20  school.

21      HEARING OFFICER:  No, no, are there any explanation.

22  What could she do - -

23      MS. PUCKETT:  Yeah I understand.

312

1          HEARING OFFICER:  All she needs really is an

2    explanation.

3          MS. PUCKETT:  The parent can withdraw her student from

4    a private school.

5          MS. LEE:  I've done that.  I'm doing that now.

6          HEARING OFFICER:  Let me get off the record for that

7    please but so they could - -

8          MS. PUCKETT:  Uh-uh.

9          HEARING OFFICER:  But that's all, I think she really -

10   -

11         MS. PUCKETT:  I understand that but I'm just saying

12   regards to we're down to one issue right now.  DCPS,

13   there's nothing to resolve in regards to that one issue.

14   There are other issues with this child that once this case

15   is concluded, yes ma'am, Ms. Tillery can try to figure out

16   how this whole process can be furthered along as fast as it

17   can be done.

18         But we only have one issue on the table right now

19   that's going forward.  The other issues are not on the

20   table, so we can discuss anything further that's about to

21   come in the future after this one issue has been resolved

22   here in front of the hearing officer.

23         HEARING OFFICER:  Do you still want a minute with your

24   - -

313

1    MS. TILLERY:  Yes.

2    HEARING OFFICER:  Okay.

3    And would you mind, you know, talking? You know

4    talking. I mean, I understand your position.

5    MS. PUCKETT:  Talking to who?

6    HEARING OFFICER:  If the mother wants her questions

7    answered.

8    MS. PUCKETT:  I mean, if the mother wants questions

9    answered about what's going on and understanding in how the

10   DCPS process work, if her counsel doesn't have a problem

11   with me having a discussion with the parent, - -

12   HEARING OFFICER:  With her present, of course, yeah.

13   MS. PUCKETT:  With all three of us, afterwards, so I

14   can explain the system to you because you fully don't

15   understand how the Care center and the private school

16   relationship is, but I have no problem with doing that.

17   And I can help un-search what she can do next to deal with

18   the problem that she's having with Nativity.  And we can

19   discuss that afterwards, I have no problem with that, Mr.

20   Woods.  And I can put the person in contact who she needs

21   to be in contact with.

22   HEARING OFFICER:  Can we you a chance then, if you

23   want that opportunity you could - -

24   MS. TILLERY:  Okay, I need to talk to her first.

1    HEARING OFFICER:  By yourself?

2    MS. TILLERY:  Yeah.

3    HEARING OFFICER:  Yeah, okay.

4

5    [Off the record 11:47 a.m. to 12:11 p.m.]

6

7    HEARING OFFICER:  Okay, back on the hearing record

8    here and now we'll reset so that the parties can talk and

9    any new thoughts here Ms. Tillery?

10   MS. TILLERY:  Everything remains the same as far as

11   our request.

12   HEARING OFFICER:  Okay.

13   MS. TILLERY:  She wants the 17 hours independently of

14   comp Ed that was missed.

15   HEARING OFFICER:  Okay anything differently for DCPS?

16   MS. PUCKETT:  Yes.

17   HEARING OFFICER:  Motion for direct decision is

18   granted.  Hearing officer tried everything he humanly

19   possibly could to get this matter dealt with, without

20   having to make that decision.  The burden was on the parent

21   to establish that since their claim is based on an existing

22   request for Comp Ed that there is now a violation under the

23   IDEA for failure to implement that plan that resulted in a

24   denial of fate.  There's no evidence presented to this

315

1   hearing officer as required under the Reed standard.  I

2   think more troubling is that the hearing officer pretty

3   much said that before he had to make this decision and

4   hopes that we could do something else for this parent.  I'm

5   at a loss for why we're not doing anything for this parent.

6   I really am at a complete loss why we would risk this case

7   for and not deal with the mother and the mother's made it

8   clear what her underlining issue's are.  I would just ask

9   for someone to at least try to help the mother today I

10  can't order it, you know because I have to take the case as

11  presented to me.  And I'm just at a loss for why we didn't

12  address this mother's concerns, she pretty much said this

13  wasn't her concern.  Is there anything - - could you at

14  least talk to the mother?

15      MS. PUCKETT:  Talk to what?

16      HEARING OFFICER:  Talk to the mother.  I mean the case

17  is over now.

18      MS. PUCKETT:  I mean I could talk to parent's counsel.

19  I don't know how appropriate it is  - -

20      HEARING OFFICER:  I mean - -

21      MS. PUCKETT:  for me to talk to mom directly but I can

22  talk to parent's counsel in regards to information that I

23  have regarding the case as far as what, what, what possibly

24  I mean I don't if any of it is appropriate at this point

95

316

1    but I do understand as a parent myself the mother's

2    concerns about not having services at the private school.

3    I do understand that.

4        HEARING OFFICER:  Again you don't have to take it but

5    at least we could try to get the mother's needs addressed

6    with the appropriate people in the room and that was one of

7    the reasons that I was holding the motion open so that I

8    could be done.  Unfortunately I don't have a case before me

9    so I can't hold it open but apparently are willing to talk

10   to the mother?

11       MS. PUCKETT:  Through her Counsel yeah I mean - -

12       HEARING OFFICER:  I mean with the mother present in

13   the room.

14       Ms. PUCKETT: I mean I'm not because unfortunately my

15   office has a policy that were not supposed to talk to

16   parents like that - -

17       HEARING OFFICER:  Oh I see.

18       MS. PUCKETT:  So I can talk to Ms. Tillery as to what

19   information I have as far as what can probably facilitate

20   the parent's closer to the concern's that she has as far

21   as, I mean like I said DCPS is not the overseer of the

22   private school.  So I don't know how much we will be able

23   to do for the child if the child is not enrolled in a DCPS

24   public school that's the essential problem.  I'm not sure

1  what we, we can't do anything for the private school, we

2  can't do anything.  This is not a related services issue

3  which is we can provide related services at the public

4  school while the student is parentally placed enroll.  Like

5  if we if he had speech and language services or he had OT

6  services or some type of adaptive P.E.  Those related

7  services could be provided like after school or on the

8  weekend or things of that nature. We can provide those but

9  when we are dealing with specialized instruction that's

10  completely different.

11      HEARING OFFICER:  Okay so what your saying is I

12  understand because the student is receiving specialized

13  instruction that is not a supplement that DCPS can provide

14  at that private school.

15      MS. PUCKETT:  No like sometimes parent's request that

16  even though they want to keep their students in a private

17  school.  They might say well we still since you're the SEA

18  we still want you to give us the related services and that

19  would have to be done through a service agreement with the

20  care center where care center would create something

21  separate from the IEP which would which is a service

22  agreement and it will say that the student will receive

23  these related services at Monroe and it will list a

24  schedule of when the student might be going to after school

1   or there might be a bus picking the student up from

2   Nativity and taking the student over to Monroe to get the

3   occupational therapy, speech and language services or

4   adaptive P.E.

5        But when you're dealing with inclusion setting and

6   specialized instructions it completely different but

7   parents do request related services sometimes and they

8   still want them even though they're going to keep the

9   student in that educational setting they still want the

10  related services.  But were not the - - we can't, we can't

11  oversee, we can't force nativity to implement the IEP's

12  that we develop because we're not, we're not - - we have no

13  authority at all over the private school.  We're not

14  funding it and we didn't place the student there and the

15  student wasn't parentally placed through a HOD, so we have

16  no authority whatsoever over Nativity.

17       We have authority over our school in making them do

18  stuff.  But we have no authority whatsoever over Nativity

19  at all.  They're their own private school, not DCPS funded,

20  I mean they receive funds from the Federal government so

21  they are under their own certain obligations, as far as

22  services to students, but unfortunately, I don't believe

23  parents can bring complaints, due process complaints

24  against private schools.

1        HEARING OFFICER:  Okay.  If you wanna use this

2   opportunity that you'd get more information about what the

3   mother's next step may be, this might be a good

4   opportunity.

5        MS. TILLERY:  Well, we can talk to, I mean at this

6   point, at this point, the record, I mean you have already

7   made a decision, so I would rather talk to my client and

8   with my educational advocate at our own time.  I mean, Ms.

9   Puckett has said what she has decided what to say when I've

10  already explained this to the mother at this time.

11       So as far us adding anything else, we feel that we're

12  gonna discuss this, I will discuss this with the client,

13  and I've discussed this with the advocate.  I don't think

14  Ms. Puckett can add anything else to the case, or to Ms.

15  Lee at this time, and your ruling has already been made.

16  So, we would just like to - - just for the - - I have this

17  to be adjourned and, I mean, I can talk to my client and my

18  educational advocate and we can tell her what she needs and

19  where she can go.

20       HEARING OFFICER:  Okay.

21       MS. PUCKETT: Well if she wants to call me one day I'm

22  - -

23       MS. TILLERY:  They have my office number.

1       HEAARING OFFICER: Okay.  Then case is submitted and

2   order be issued in ten days of this hearing.

3       MS. PUCKETT:   Thank you.

4

5       [Hearing ended at 12:19 p.m.]

321